# No. 20- 3816 (L)

## No. 20-4020 (CON)
## No. 20-4099 (XAP)

## United States Court of Appeals for the Second Circuit

————

ABKCO MUSIC, INC., COLGEMS-EMI MUSIC INC., EMI ALGEE MUSIC CORP., EMI APRIL MUSIC INC., EMI BLACKWOOD MUSIC INC., EMI CONSORTIUM MUSIC PUBLISHING, INC., DBA EMI FULL KEEL MUSIC, EMI CONSORTIUM SONGS, INC., DBA EMI LONGITUDE MUSIC, EMI FEIST CATALOG INC., EMI ROBBINS CATALOG INC., EMI UNART CATALOG, INC., JOBETE MUSIC CO., INC., SCREENGEMS-EMI MUSIC INC., STONE AGATE MUSIC, STONE DIAMOND MUSIC CORP., IMAGEM MUSIC LLC, PEER INTERNATIONAL CORP., PSO LTD., PEERMUSIC LTD., PEERMUSIC III, LTD., SONGS OF PEER, LTD., SPIRIT CATALOG HOLDINGS S.A.R.L., SPIRIT TWO MUSIC, INC., WARNER-TAMERLANE PUBLISHING CORP., WB MUSIC CORP,
PLAINTIFFS-APPELLEES-CROSS-APPELLANTS

*v.*

WILLIAM SAGAN, NORTON LLC, BILL GRAHAM ARCHIVES, LLC, DBA WOLFGANG'S VAULT, DEFENDANTS-APPELLANTS-CROSS-APPELLEES.

————

*APPEAL FROM THE UNITED STATES DISTRICT COURT*
*FOR THE SOUTHERN DISTRICT OF NEW YORK, NO. 1:15-CV-04025*

————

**BRIEF FOR**
**DEFENDANTS-APPELLANTS-CROSS-APPELLEES**
**WILLIAM SAGAN ET AL.**
**Public Version**

————

MICHAEL S. ELKIN
*Winston & Strawn LLP*
*200 Park Avenue*
*New York, NY 10166*
*(212) 294-6729*
MElkin@winston.com

ERIN R. RANAHAN
*Winston & Strawn LLP*
*333 South Grand Avenue*
*Los Angeles, CA 90071*
*(213) 615-1835*
Eranahan@winston.com

*Counsel for Appellants-Cross-Appellees William Sagan et al.*

# CORPORATE DISCLOSURE STATEMENT

Appellants Norton LLC, Bill Graham Archives, LLC, and William Sagan ("Defendants"), by and through their attorneys, Winston & Strawn LLP, hereby disclose the following pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure:

1. Norton LLC is the parent company of Bill Graham Archives, LLC; and

2. No publicly held corporation owns 10% or more of the stock of Norton LLC or Bill Graham Archives, LLC.

Dated: New York, New York

MARCH 8, 2021

s/Michael S. Elkin<br>
Michael S. Elkin

# TABLE OF CONTENTS

CORPORATE-DISCLOSURE STATEMENT ........................................................1

INTRODUCTION ..............................................................................................1

JURISDICTIONAL STATEMENT ..........................................................................5

STATEMENT OF ISSUES ....................................................................................6

STATEMENT OF THE CASE.................................................................................7

    A.    The Parties........................................................................................7

    B.    WV's Business ..................................................................................8

    C.    WV's Joint Exploitation Agreements with UMG Recordings, Inc., Warner Music, Inc., and Sony Music Entertainment/EMI..........10

    D.    Plaintiffs File Suit Against Defendants .............................................11

    E.    Mechanical Licensing Under the Copyright Act................................12

    F.    Defendants Are Denied the Right to Take Critical Discovery Regarding Consent .................................................................17

    G.    Defendants Move for Summary Judgment on Their Licenses............18

    H.    The District Court's Summary-Judgment Order ................................25

    I.    The District Court Denies Reconsideration .......................................28

    J.    Damages Trial and Post-judgment Pleadings....................................30

SUMMARY OF ARGUMENT................................................................................32

STANDARD OF REVIEW ...................................................................................35

ARGUMENT ....................................................................................................35

    I.    The District Court Improperly Imposed Personal Liability Against Mr. Sagan ....................................................................35

        A.    The District Court Improperly Conflated Direct Infringement and Vicarious Liability ........................................35

i

B.  There Is No Evidence to Support Holding Mr. Sagan Personally Liable for Any Direct Infringement ....................................39

C.  In Holding Mr. Sagan Personally Liable, the District Court Deviated from Well-Settled Corporate Law..........................41

II.  The District Court's Orders Hinge on a Fundamental Misreading and Misapplication of § 115(a)(1) .............................................45

A.  The Substantive Requirements of § 115(a)(1) Are Triggered Only When One Has Duplicated "Sound Recordings Fixed by Another" ..................................................................................46

B.  The District Court Misplaced the Burden of Proof on Defendants and Overlooked Evidence That Creates at Least a Triable Issue of Fact About Whether the Recordings Were "Fixed Lawfully"..................................................................49

C.  The District Originally Found a Written-Consent Requirement That Does Not Exist, Then Reversed Itself by Conceding Consent Need Not Be in Writing, but Still Declined to Reverse Its Order ..................................................................................56

D.  The District Court Misconstrued the Meaning of "Phonorecords" ......................................................................59

III. The District Court Committed Manifest Error in Disposing of Defendants' Affirmative Defenses Before Trial ........................64

A.  Defendants' Implied-License Defense ..................................64

B.  Defendants' Estoppel Defense..............................................68

IV.  To the Extent the District Court's Summary-Judgment Order Is Reversed, the Court's Fees Order Must Likewise Fall ............71

ii

CONCLUSION ....................................................................................72

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT,
    Typeface Requirements, and Type-Style Requirements...............................73

CERTIFICATE OF SERVICE .................................................................74

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A/S Domino Mobler v. Braverman*,
  669 F. Supp. 592 (S.D.N.Y. 1987) ....................................................44

*Alpha Capital Anstalt v. Oxysure Sys., Inc.*,
  216 F. Supp. 3d 403 (S.D.N.Y. 2016) ..............................................37

*Asher Worldwide Enters. LLC v. Housewaresonly.com Inc.*,
  No. 12 C 568, 2013 WL 4516415 (N.D. Ill. Aug. 26, 2013) ............42

*Capitol Records LLC v. Redigi Inc.*,
  2014 WL 4354675 (S.D.N.Y. Sept. 2, 2014) .......................36, 38, 41

*Chamberlain Grp. v. Skylink Tech.*,
  381 F.3d 1178 (Fed. Cir. 2004) ........................................................49

*Cherry River Music Co. v. Simitar Entm't, Inc.*,
  38 F. Supp. 2d 310 (S.D.N.Y. 1999). [SJ Order at 4] .....................14

*Dangler v. Imperial Mach., Co.*,
  11 F.2d 945 (7th Cir. 1926) ..............................................................42

*EMI Ent. World, Inc. v. Karen Recs., Inc*.,
  603 F. Supp. 2d 759, 766 (S.D.N.Y. 2009) ......................................14

*Encyclopedia Brown Prods. v. Home Box Office, Inc.*,
  No. 91 CIV. 4092 (PKL), 1998 WL 734355 (S.D.N.Y. Oct. 15,
  1998) ............................................................................................69, 70

*Fame Pub. Co. v. Alabama Custom Tape, Inc.*,
  507 F.2d 667 (5th Cir. 1975). [SJ Order at 3] .............................13, 14

*Gershwin Pub. Corp. v. Columbia Artists Mgmt., Inc.*,
  443 F. 2d 1159 (2d Cir. 1971) .......................................................36, 37

*Hoover Grp., Inc. v. Custom Metalcraft, Inc.*,
  84 F.3d 1408 (Fed. Cir. 1996) ..........................................................42

*Island Software & Computer Serv., Inc. v. Microsoft Corp.*,
   413 F.3d 257 (2d Cir. 2005) ..............................................................39

*Keane Dealer Servs., Inc. v. Harts*,
   968 F. Supp. 944 (S.D.N.Y. 1997) ......................................64, 65, 68

*Merchant v. Lymon*,
   828 F. Supp. 1048 (S.D.N.Y. 1993) ..................................................69

*Mickle v. Morin*,
   297 F.3d 114 (2d Cir. 2002) .............................................................53

*Midland Funding, LLC v. Johnson*,
   137 S. Ct. 1407 (2017) .....................................................................50

*Palmer/Kane LLC v. Gareth Stevens Publ'g*,
   No. 1:15-CV-7404-GHW, 2017 WL 3973957 (S.D.N.Y. Sept. 7,
   2017) ................................................................................................64

*Pavlica v. Behr*,
   397 F. Supp. 2d 519 (S.D.N.Y. 2005) ..............................................64

*Psihoyos v. Pearson Educ., Inc.*,
   855 F. Supp. 2d at 129 ................................................................64, 65

*Rams v. Def Jam Recordings, Inc.*,
   *202 F. Supp. 3d 376* (S.D.N.Y. 2016) ..............................................38

*Rodgers and Hammerstein et al. v. UMG*,
   2001 WL 1135811 (S.D.N.Y. 2001).....................................16, 66, 67

*Sadhu Singh Hamdad Tr. v. Ajit Newspaper Advert., Mktg. &
   Commc'ns, Inc.*,
   503 F. Supp. 2d 577 (E.D.N.Y. 2007) ..............................................49

*Salter v. Upjohn Co.*,
   593 F.2d 649 (5th Cir. 1979) ...........................................................51

*UMG Recordings, Inc. v. Veoh Networks Inc.*,
   2009 WL 334022 (C.D. Cal. Feb. 2, 2009), *aff'd*, 718 F.3d 1006
   (9th Cir. 2013)..................................................................................43

*Viacom Int'l, Inc. v. YouTube, Inc.*,
  676 F.3d 19 (2d Cir. 2012) ...............................................................35

*Wechsler v. Macke Int'l Trade, Inc.*,
  486 F.3d 1286 (Fed. Cir. 2007) ........................................................43

*White-Smith Music Pub. Co. v. Apollo Co.*,
  209 U.S. 1, 28 S. Ct. 319, 52 L. Ed. 655 (1908)................................13

*William Wrigley Jr. Co. v. Waters*,
  890 F.2d 594 (2d Cir. 1989) .............................................................44

*Worth v. Trans World Films*,
  11 F.R.D. 197 (S.D.N.Y. 1951) .........................................................51

*Zappa v. Rykodisc, Inc.*,
  819 F. Supp. 2d 307 (S.D.N.Y. 2011) ........................................39, 57

**Statutes**

17 U.S.C. § 101 ................................................................................59, 62

17 U.S.C. § 102(a) ...................................................................................61

17 U.S.C. § 106 .......................................................................................39

17 U.S.C. § 115 ...................................................................................*passim*

17 U.S.C § 115(b) ...................................................................................15

17 U.S.C. § 204 .......................................................................................56

17 U.S.C. § 1101 .....................................................................................56

28 U.S.C. § 1291 .......................................................................................5

28 U.S.C. § 1331 and 1338(a)....................................................................5

U.S. Copyright Act, 17 U.S.C. § 101, *et seq.* ............................................5

U.S. Copyright Act of 1909 .............................................................*passim*

U.S. Copyright Act § 505 .........................................................................31

## Other Authorities

Fed. R. App. P. 32(a)(5) ................................................................77

Fed. R. App. P. 32(a)(6) ................................................................77

Fed. R. App. P. 32(f) ....................................................................77

Fed. R. Civ. Proc. 12 ...................................................................36

H.R. Rep. 94-1476 .....................................................47, 53, 54, 62

H.R. Rep. No. 94-1476, 9 (1976) ...........................................54, 62

H.R. Rep. No. 94-1476, 53 (1976) ...............................................63

H.R. Rep. No. 94-1476, 108 (1976) .............................................47

Local Rule 32.1(a)(4)(A) ..............................................................77

## INTRODUCTION

In rulings that misconstrue and misapply copyright and corporate law, the District Court erred by relying on the wrong standard to impose personal liability for direct copyright infringement against individual defendant William Sagan; disregarding years of licenses and licensing payments to Plaintiffs by accepting novel but erroneous legal theories; and failing to allow triable issues of fact surrounding those licenses to reach the jury. Through this appeal, Appellants Norton LLC ("Norton"), Bill Graham Archives LLC d/b/a Wolfgang's Vault's ("WV"), and William Sagan (collectively, "Defendants") seek to reverse these portions of the District Court's summary judgment order and reconsideration of the same (the "Orders") as set forth in greater detail below.

This lawsuit was brought by some of the largest music publishers in the world against Defendants—WV, a small business; its president and CEO, Mr. William Sagan; and Norton, WV's parent company. WV has been in busines for twenty years and has devoted substantial resources to restoring, curating, and making available to the public certain historic live music recordings that WV lawfully acquired, including original live performances of the Rolling Stones, the Who,

Carlos Santana, and many other legendary artists. WV owns copyrights to each of these recordings and is the recognized owner of the sound recordings in registrations with the United States Copyright Office and in agreements with Plaintiffs' record label affiliates. Plaintiffs here include multi-billionaire music publishing conglomerates that do not claim to own or have any rights to WV's physical recordings or copyrights to the sound recordings but instead claim rights to compositions in some of those musical works.[1]

After many years of Plaintiffs receiving WV's licensing payments under well-established compulsory and other licensing schemes to compensate music publishers, the District Court's Orders denied the legal or equitable existence of those licenses, and effectively foreclosed the public from accessing historic live music. In doing so, the District Court accepted Plaintiffs' novel but defective legal arguments regarding technicalities surrounding the creation and licensing of the recordings.

---

[1] Compositions are a song's underlying lyrics and melody, which can then be recorded in various versions and by various artists as separate sound recordings. Compositions are a separate copyright from the copyright to each sound recording, even though the composition of the work is embodied within each sound recording.

Though Plaintiffs raised these issues in many cases thirty to fifty years after the recordings were made, and without any evidence that the recordings were not authorized at the time of the recordings, the District Court remarkably put the burden on Defendants to present affirmative proof of non-hearsay "consent" from the time the recordings were made, while at the same time denying Defendants' right to take depositions of artists (those that were still alive) present at the time of the recordings.

The District Court disregarded factual disputes for the jury about whether the recordings were authorized, including acquisition, recording, and other agreements that explicitly represented that the recordings were authorized, and other evidence that supported Defendants' position that the recordings were made with consent—an inference that a reasonable juror could draw by reviewing this evidence and watching the historic audiovisual recordings at the heart of this case.

The District Court committed reversible error in at least three ways: (i) holding the individual defendant, Mr. Sagan, personally liable for direct copyright infringement without any evidence to support that claim, and applying the wrong legal standard applicable only to secondary copyright infringement that was not alleged against Mr.

3

Sagan in this case; (ii) misconstruing § 115(a)(1) by holding that WV had to satisfy a subsection regarding duplicating *sound recordings fixed by another*—which are not at issue here—and deciding issues of law where there were questions of triable facts concerning whether the sound recordings were lawfully "fixed" or consented to; and (iii) disregarding that WV obtained licenses, and Plaintiffs accepted payments thereunder for nearly a decade, which at the very least presented triable issues of fact on Defendants' equitable defenses of implied license and estoppel that should have gone to the jury to resolve.

For these and all the foregoing reasons, the District Court's Orders should be reversed and remanded. To the extent the Orders are reversed, the District Court's Order awarding Plaintiffs' attorneys' fees and costs must also fall.

## JURISDICTIONAL STATEMENT

Plaintiffs brought this suit for copyright infringement under the United States Copyright Act, 17 U.S.C. § 101, *et seq.* The District Court had subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 1338(a).

Defendants timely appealed the District Court's summary judgment Order, and the District Court's Order denying reconsideration, on November 6, 2020. Defendants appealed the District Court's fees and costs Order on December 1, 2020. Plaintiffs filed a cross-appeal on December 7, 2020. Jurisdiction in this Court is based on 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

This appeal raises the following three issues, which present important and novel issues of copyright law:

1. Did the District Court err in holding Mr. Sagan individually liable for direct infringement without any evidence to support that claim against him, and by relying on the inapplicable standard for vicarious liability, a claim that is not at issue in this case?

2. Did the District Court err by holding as a matter of law that WV was ineligible for a compulsory mechanical license under § 115 by applying an inapplicable subsection involving sound recordings fixed by another (which Plaintiffs do not claim here) and disregarding genuine issues of triable fact surrounding those licenses and recordings?

3. Did the District Court err in granting summary judgment where there are genuine issues of material fact regarding Defendants' equitable defenses of implied license and estoppel related to the licenses WV obtained and paid Plaintiffs?

## STATEMENT OF THE CASE

### A.   The Parties

WV is a small business owned by Norton, its parent company. Mr. William Sagan is the president and CEO of WV, and sole shareholder of Norton. Doc. 262 at 6. In July 2002, Norton purchased the archives of the late concert promoter Bill Graham. Sappx6. This archive contained numerous audiovisual recordings of concerts by many of the twentieth century's most famous musical artists. Starting in 2006, WV made these and other historic recordings available to the public through websites like "Wolfgangs.com." SAppx12. Appx285.

Plaintiffs are twenty-four music publishers that can be classified into six groups.[2] Collectively, these publishing conglomerates are worth billions of dollars. They control most of the music publishing world and

---

[2] Plaintiffs include the following companies: (1) ABKCO Music, Inc., (2) Colgems-EMI Music Inc., EMI Algee Music Corp., EMI April Music Inc., EMI Blackwood Music Inc., EMI Consortium Music Publishing, Inc. d/b/a EMI Full Keel Music, EMI Consortium Songs, Inc. d/b/a EMI Longitude Music, EMI Feist Catalog Inc., EMI Robbins Catalog Inc., EMI Unart Catalog Inc., Jobete Music Co., Inc., Screen-Gems-EMI Music Inc., Stone Agate Music, Stone Diamond Music Corp.; (3) Imagem Music LLC; (4) Peer International Corp., PSO Ltd., Peermusic Ltd., Peermusic III, Ltd., Songs of Peer, Ltd.; (5) Spirit Catalog Holdings S.A.R.L., Spirit Two Music, Inc.; and (6) Warner-Tamerlane Publishing Corp. and WB Music Corp.

millions of musical works, 197 of which are at issue here. Appx1355; Appx1406-7; Dkt. 389 (p. 4).

Plaintiffs were not involved in the original creation of the musical works—they instead cash in after the fact, and typically obtain such rights through large scale acquisitions of music publishing catalogs—like Concord Music's recent $500 million purchase of a 200,000 song catalog, Appx1208; and Spirit Music's recent catalog purchase for $350 million. Appx1406; Appx1225; Appx1230.

Plaintiffs claim no rights in the sound recordings, and do not dispute that WV lawfully acquired the recordings.

B. **WV's Business**

WV owns the master recordings to its unique and valuable collection of live music, and has registered copyrights to those master recordings with the United States Copyright Office. Appx282-283. WV built its collection of audio and audiovisual recordings of live music performances between 2002 and 2015 by investing tens of millions of dollars in acquiring historic concert and other live music recordings, and the associated copyrights to those master recordings, from several notable and well-respected sources, including the archived assets of Clear

8

Channel Communications that were formerly owned by Bill Graham's concert promotion business, as well as recordings and associated intellectual property rights from the King Biscuit Flower Hour, the Capitol Theatre, Newport Folk, Newport Jazz, Great American Music Hall, the Trammps, the Record Plant, Dawson Sound, the Bill Graham Fillmore/Winterland recordings, the Ash Grove recordings, the Daytrotter Sessions, the Metropolitan recordings, Amazingrace, the Silver Eagle archive, the Starfleet recordings, and others. Appx426. In building this collection, WV has devoted substantial resources toward preserving and protecting these recordings. Appx284.

WV allows music fans everywhere to celebrate these historic live concerts by offering access to the WV's timeless collection. Appx284. Toward that end, WV offers the live music recordings at issue via on-demand streams, digital downloads, and record sales through WV's websites. Appx284-285.[3]

---

[3] Since its inception in 2002, WV has not turned a profit, and operates at a loss. Appx796; Appx1656; Appx1759-1760.

C. **WV's Joint Exploitation Agreements with UMG Recordings, Inc., Warner Music, Inc., and Sony Music Entertainment/EMI**

In 2006, certain of Plaintiffs' affiliated record labels and a group of rock musicians sued WV for copyright infringement over certain sound recordings by many of the same artists whose works are at issue in this case, including the Grateful Dead and Carlos Santana. The case settled in 2008, after which the parties entered agreements acknowledging WV's copyright ownership interest in the sound recordings. Appx1831-1832. Specifically, WV entered Joint Exploitation Agreements with certain major record labels, including UMG Recordings Inc. ("UMG") and affiliates of Plaintiffs in this action, Warner Music, Inc., and Sony Music Entertainment (who has since acquired EMI's publishing catalog).

These agreements acknowledged WV's copyright ownership in the master recordings covered by the agreements, and both expressly and implicitly acknowledged the right of WV to exploit the compositions in the recordings at issue, including through download, streaming, and other means, through mechanical licenses. Appx294-1-296-13; Appx427.[4]

---

[4] "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10

The Warner and Sony agreements provide Defendants—on behalf of the labels' artists—authorization to exploit the recordings in which the artists are captured. *Id.*; SAppx15-16. The agreement with UMG[5] implicates the copyrights to the same songs performed by the band the Who that are at issue in this case through the claims of Plaintiffs Spirit Catalog Holdings S.A.R.L. and Spirit Two Music, Inc. *Id.*

WV relied on these agreements in conducting its business and in securing and paying licensing fees. Appx278-9 ("Subsequent to this document, Sony, Warner and Universal acknowledged the copyright ownership—our copyright ownership of these Bill Graham recordings. So that has already been adjudicated and contractually agreed to.").

### D. Plaintiffs File Suit Against Defendants

After Plaintiffs collected WV's licensing payments for nearly a decade, in 2015, Plaintiffs sued WV; its parent company, Norton; and

---

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
█████████████████████████████████ (citing Appx295-7).

[5] UMG subsequently acquired EMI's recorded music assets in 2012. *Universal Music Completes Acquisition of EMI Music*, MUSIC BUSINESS WORLDWIDE, Sep. 28, 2012, https://www.musicbusinessworldwide.com/universal-music-completes-acquisition-of-emi-music/.

Norton's manager, Mr. Sagan, alleging copyright infringement. Appx109. Specifically, Plaintiffs alleged that Defendants infringed their copyrights in 197 compositions by reproducing these works in digital format and making them available for downloading and streaming on WV's websites without Plaintiffs' consent. *Id.* Plaintiffs alleged that Defendants had done so without obtaining "a proper license required for such downloads and reproductions (known as a 'mechanical') license." Appx112.

### E.   **Mechanical Licensing Under the Copyright Act**

The mechanical license is a product of the 1909 Copyright Act and grants the right to make and distribute "mechanical" reproductions of musical works—often in the form of CDs, digital download, or interactive audio streams. The concept of a mechanical license dates back to a copyright controversy that arose in the early 1900s, when player pianos, (or "ghost pianos") could "read" and perform various songs through piano rolls for listeners without any human pianist performing. Without having to pay a performer, the only conceivable payment would have been to the songwriter/composer or the publisher who acquired those rights. But the Supreme Court found that piano rolls did not fit the definition of sheet music, and thus there was no requirement to pay royalties to songwriters

or publishers. *White-Smith Music Pub. Co. v. Apollo Co.*, 209 U.S. 1, 18, (1908). This outraged songwriters, who turned to Congress for redress. As a result, the Copyright Act of 1909 was born, which included the creation of mechanical licenses. As a means to compensate songwriters or music publishers, Congress created "mechanical rights" to make sure that songwriters or publishers were compensated for the use of their compositions.

But as is always the tension with Copyright law, Congress also wanted to "encourage future creative endeavor and to combat monopolization in the music industry." *Fame Pub. Co. v. Alabama Custom Tape, Inc.*, 507 F.2d 667, 670 (5th Cir. 1975); SAppx3. The right Congress created is unlike anything else in the Copyright Act—its licensing scheme bypasses the "exclusive right" copyright holders *usually* enjoy when deciding whether to license their work for others' use. *Id.* That is, publishers could no longer unilaterally bar others from exploiting their compositions. Artists who complied with the statute were guaranteed a "mechanical" license to record (and distribute) these musical works. Of course, performers would still have to pay for this use of another's composition—but Congress created a standard royalty rate,

13

again, to prevent monopolization. *Id.* at 669. Such an arrangement, Congress hoped, would help musical creativity flourish. And it did.

There are several ways of securing a mechanical license. While a licensee may go directly to the copyright owner and negotiate a license at arm's length, it is far more common for parties to secure a compulsory mechanical license—meaning the music publisher cannot prevent it from happening. Crucially, parties seeking a compulsory license need not negotiate directly with the music publishers—and need not fear a publishers' rejection. Once the copyright owner of a composition begins to publicly distribute phonorecords of that work, it becomes eligible for compulsory licensing under § 115 of the Copyright Act. 17 U.S.C § 115.[6] The copyright owner is then required to grant a mechanical license to anyone who substantially complies with the statutory requirements. *Cherry River Music Co. v. Simitar Entm't, Inc.*, 38 F. Supp. 2d 310, 312 (S.D.N.Y. 1999); SAppx4.[7]

---

[6] Section 115 of the Copyright Act was amended in 2018, but without substantial change to the provisions at issue here. For the sake of consistency, this brief relies on the pre-2018 version of § 115, which was relied on in the District Court's Orders and governed during the relevant time period.

[7] See *EMI Ent. World, Inc. v. Karen Recs., Inc.*, 603 F. Supp. 2d 759, 766 (S.D.N.Y. 2009) (party's communications "substantially complied" with requirements of 17 U.S.C. § 115, and party "therefore acquired mechanical licenses"). To the extent

In order to secure a compulsory license, a licensee serves a Notice of Intention to Obtain a Compulsory License ("NOI") on the copyright owner, or the owner's agent. 17 U.S.C § 115(b). From there, one must make royalty payments (along with statements of account) to the copyright owner. Under this process, licensees are guaranteed a mechanical license. Having secured a mechanical license, one can, for example, record and distribute a "cover" version of another's composition.

Under some limited circumstances specified in certain subsections, additional limitations and/or requirements are set forth in § 115(a)(1):

> A person may not obtain a compulsory license for use of the work in the making of phonorecords *duplicating a sound recording fixed by another*, unless: (i) such sound recording was fixed lawfully; and (ii) the making of the phonorecords was authorized by the owner of copyright in the sound recording or, if the sound recording was fixed before February 15, 1972, by any person who fixed the sound recording pursuant to an express license from the owner of the copyright in the musical work or pursuant to a valid compulsory license for use of such work in a sound recording.

(emphasis added.) Section 115(a)(1) applies when licensees are making phonorecords "duplicating a *sound recording*" that is "*fixed by another*." (emphasis added).

---

there are any technicalities raised regarding the NOIs obtained, the question of "substantial compliance" with the statute would create another issue of disputed fact inappropriate for determination on summary judgment.

15

There are several companies that broker mechanical licenses between copyright owners and licensees. HFA is the long standing default for these licenses, and functions as a non-exclusive licensing arm of the music publishing industry. Apx288. HFA brokers mechanical licenses and collects and distributes royalties on behalf of rights holders.[8] In addition, service providers like Rightsflow, Inc. and MediaNet help connect parties to the proper rights holders, and coordinate royalty payments for a party's mechanical licenses. Appx291. These service providers will also send NOIs on behalf of a licensee to secure mechanical licenses. *Id.* It is accepted practice that licensees or third parties such as Rightsflow would send an NOI for a newly published recording to the appropriate publisher or administrator of the composition (embodied within an audio or audiovisual recording) within thirty days of the licensee's exploitation of the recording. *Id.*

---

[8] Many music publishers employ HFA as their agent "to receive notice of the intention to obtain a compulsory license, and to collect and distribute royalties. Acting on behalf of their clients, HFA waives the statutory notice requirements, negotiates royalty rates at or below the statutory level, and substitutes a quarterly accounting and payment schedule for the monthly schedule prescribed by Section 115." *Rodgers and Hammerstein et al. v. UMG*, 2001 WL 1135811, *2 (S.D.N.Y. 2001).

16

F.   **Defendants Are Denied the Right to Take Critical Discovery Regarding Consent**

Despite the factual question of the consent of the musical artists who also composed their works ultimately becoming central to the District Court's Orders—a question that clearly presented factual disputes inappropriate for resolution on summary judgment—the District Court denied Defendants' earlier attempts to depose performers about the recording of their performances. Appx238.

Instead, the District Court permitted Defendants to serve a limited number of written interrogatories to only a few of the musical artists at issue, which of course did not permit Defendants to ask any follow up questions, test credibility, refresh recollection, or obtain any of the litigation benefits adversaries gain from taking live depositions.

Instead, these few artists served interrogatory responses that claimed not to recall anything of importance given how long ago the recordings were created, and could not recall whether bandmates might have consented to the recordings. Appx480-535. For example, third party witness Keith Richards stated, "I have no recollection of ever objecting to, consenting to, or taking any other position regarding any recordings being made by promoters or recording engineers …" Appx490. Similarly,

third party witness Michael Stipe could not recall making any objections to recordings being made of him or R.E.M. on the nights in question: "The passage of time and adrenaline of performing have affected my memory or recollection of discussions that took place at concerts or live performances during that period." Appx505. Third party witness David Byrne prefaced many of his responses with "[t]o the best of my recollection." Appx531.

The District Court denied Defendants discovery in part on the ground that *only* the "consent" of artists *that owned the composition at the time they consented* would be potentially relevant. Appx237-39. But the Orders make no such distinction, holding all artist consent relevant to the consent issue. This not only means that Plaintiffs' position when litigating to avoid artist discovery was contradictory, but it shows that the Orders misconstrue and conflate the rights and rights between the artists and their labels, and composers and their publishers. *Id.*

G. **Defendants Move for Summary Judgment on Their Licenses**

Defendants' primary defense to Plaintiffs' claims was that WV had obtained all required licenses and, thus, there was no infringement. Dkt. 164. Defendants moved for summary judgment on their mechanical

licenses, and also asserted the equitable defenses of estoppel and implied license, given the licenses that had been entered and WV's long-standing payments to Plaintiffs. Following discovery, the parties cross-motioned for summary judgment.

WV paid full amounts to Plaintiffs under the licenses it secured, which was undisputed. *See* Dkt. 201 (p. 44). Plaintiffs explicitly agreed not to contest that the payments were fully received pursuant to the compulsory or HFA payment formulas for purposes of summary judgment. Appx438-439. At trial, the witnesses again did not dispute that they were paid any specific amounts owed under the licenses. Appx278-279; Appx285-289; Appx297-381; Appx1001-1002 (ABKCO); Appx1062 (PEER); Appx1215-1216 (Rodgers and Hammerstein); Appx1362-1363 (Warner).

### 1.    WV Paid Plaintiffs Under Mechanical Licenses

WV has acquired and paid Plaintiffs pursuant to mechanical licenses for use of the compositions at issue in this case, which granted WV rights to reproduce and distribute copyrighted musical compositions featured in the master recordings WV lawfully owns on CDs, permanent

digital downloads, and, more recently, through interactive streaming. Appx426-428.

### 2. WV's HFA licenses

WV had a negotiated mechanical licensing account with the HFA beginning in 2007, when it first obtained mechanical licenses for thousands of compositions directly from HFA. Appx289; Appx380. WV acquired these licenses for use of the compositions in the audio and audiovisual recordings available for download on WV's Websites directly from HFA from 2007 until 2010 and made all required royalty payments owed to HFA. Appx288-289; Appx379-420.

### 3. WV Hired Industry Expert Rightsflow Inc. to Manage the Licensing of the Musical Compositions at Issue

Once mechanical licenses became required for purposes of on-demand streaming, necessitating significantly more resources, WV hired Rightsflow Inc. ("Rightsflow") in August 2010 to manage its licensing needs. Appx289-290. WV hired Rightsflow because of its reputation in the industry for matching musical compositions to the proper rights holders and issuing timely royalty payments. *Id.* Each month, WV submitted a list of newly published recordings on WV's Websites to

Rightsflow, along with a revenue statement providing the number of streams, download sales, and vinyl sales for all the recordings available on WV's Websites from the past month. Appx290-291. Rightsflow would then match the newly published recordings with the proper rights holders of the compositions in order to obtain licenses on WV's behalf. *Id.*

Rightsflow acquired these licenses by either (1) obtaining licenses directly from the publisher; (2) obtaining licenses from HFA through WV's HFA account; or (3) issuing NOIs pursuant to the statutory requirements. Appx290. Rightsflow sent NOIs on WV's behalf to the publishers or administrators of the rights for the compositions that allowed WV to obtain "compulsory" mechanical licenses,

Rightsflow would also determine the amount WV was required to pay to the various music publishers and administrators from whom WV licensed the compositions and would timely distribute those payments on WV's behalf. Appx289-291. Each month, Rightsflow sent WV a monthly invoice that included its monthly service fee plus a sum for any amount that WV owed the apparent rights holders based on WV's revenue statements. Appx291. Rightsflow managed WV's acquisition of and any payments owed for all the compositions on WV's Websites. Appx289.

WV never received, nor was it made aware of, any objections or complaints with its licensing of the compositions at issue from any of the publishers and administrators to whom Rightsflow submitted payments on WV's behalf. Appx291; Appx427. Indeed, Plaintiffs readily accepted all payments sent by Rightsflow on WV's behalf. *Id.* Plaintiffs have not produced *any* evidence that they have ever rejected any payments made by RightsFlow on WV's behalf, and their witnesses could not recall any instances where they rejected any payments from Rightsflow on behalf of WV for any reason. *Id.*

### 4. WV Later Hired Another Industry Expert, MediaNet, to Manage the Licensing of the Musical Compositions at Issue

In May 2013, after Google acquired Rightsflow, WV selected a new service provider for its licensing of the compositions on WV's Websites, MediaNet, Inc. ("MediaNet"). Appx291-293. WV hired MediaNet for the same reason it had previously used RightsFlow—because of its reputation in the industry for matching musical recordings to the proper rights holders of the compositions and issuing timely royalty payments. *Id.*

MediaNet continued to provide this service to WV until earlier this year, when the Musical Works Modernization Act ("MMA")[9] became effective and changed the way compulsory licenses are obtained. Appx292-293. Each month, WV would submit a list of newly published recordings by WV to MediaNet, along with a revenue statement providing the number of streams, download sales, and vinyl sales for all the recordings available on WV's Websites in the past month. Appx292. MediaNet then matched the newly published recordings with the proper rights holder of the compositions to obtain licenses on WV's behalf. *Id.* MediaNet acquired these licenses by either (1) obtaining licenses directly from the publisher; (2) obtaining licenses from HFA through WV's HFA account; or (3) issuing an NOI pursuant to the statutory requirements. *Id.*

MediaNet also determined the amount WV was required to pay to the various music publishers and agencies from whom WV licensed the compositions and timely distributed those payments on WV's behalf.

---

[9] Pursuant to the MMA, WV obtained the compulsory license under Section 115 by promptly filing the required notice of license with the newly formed mechanical license collective in accordance the procedures sent forth in Section 115(d)(2), and intends continue to remit required payments on compositions in accordance with the procedures established by the mechanical license collective.

Appx292-293. Each month, MediaNet sent WV a monthly invoice that included its monthly service fee plus a sum for any amount that WV owed the apparent rights holders based on WV's revenue statements. *Id.*

None of the payments made by WV for the uses of the compositions at issue in this case had ever been returned to WV. Plaintiffs did not produce any evidence in this case that they ever rejected any payment from MediaNet on WV's behalf, and their witnesses could not recall any instances where they rejected any payments from MediaNet on behalf of WV. Appx427-428.

In short, WV was up to date in connection with the licenses with all royalties owed to all the publishers who are parties to this litigation. Appx428.

### 5. WV Also Paid Licenses to Songwriters and Publishers Through Performance Rights Organizations

WV has also obtained the requisite licenses for public performance, which grant the right to perform the work in, or transmit the work to, the public, by paying the required amounts to performing rights organizations ("PROs"), who in turn pay songwriters and publishers. Appx288; Appx316-378. WV has contracts with and makes payments to

the three leading PROs: the American Society of Composers, Authors and Publishers ("ASCAP"); Broadcast Music, Inc. ("BMI"); and the Society of European Stage Authors and Composers ("SESAC"). *Id.* Prior to 2010, WV remitted royalties for all on-demand streaming under the licenses it had, and still has, with the three major PROs (ASCAP, BMI, and SESAC) in accordance with law and industry practice. *Id.*

## H. **The District Court's Summary Judgment Order**

The District Court (Hon. Edgardo Ramos) disregarded WV's years of payments and licenses it obtained over the prior decade in denying Defendants' motion for summary judgment regarding their licenses. Instead, even though there were at the very least factual questions regarding Defendants' mechanical licenses and equitable defenses regarding WV's licenses, the District Court granted Plaintiffs' motion for summary judgment, finding that Defendants infringed all 197 of Plaintiffs' compositions. Despite no evidence of bad faith being submitted—and instead plenty of evidence to support an inference that Defendants had acted in good faith relying on WV's licenses—the District Court found that Defendants willfully infringed 167 works in suit, but

declined to decide whether the other thirty were potentially non willful or innocent. SAppx54.

The District Court determined the question of what "fixed lawfully" meant within subsection 115(a)(1)—a novel issue that had never been decided by any court. Dkt. 201 (p. 29); Appx240-275; Appx430.

In doing so, the District Court rejected Defendants' extensive evidence that the original recordings were "fixed lawfully," which included agreements and representations by predecessors with firsthand knowledge of artist consent. And as described above, Defendants were denied the right to take basic discovery from artists at issue, with the exception of a few who responded to interrogatories stating their memories had faded and that any additional evidence would understandably be stale many decades later. The recordings of the alleged infringements at issue, however, appear to be obvious professional recordings as opposed to surreptitiously recorded "bootlegs," which is why the record labels entered major agreements with WV that their recordings were authorized, and acknowledged WV's copyright interests. *See* Appx294-296. Indeed, the audiovisual recordings themselves—the works that form the basis of Plaintiffs' claims for

infringement—support an inference that the artists were well aware they were being recorded, as they feature large video equipment and artists who also composed the works they were performing interacting with the camera. Appx1673-1675 (video recordings cited to in Complaint: Appx132, Appx155, Appx201).

The District Court held WV's HFA licenses "invalid as a matter of law," even though there was no question HFA was Plaintiffs' agent for purposes of these licenses. SAppx36. But the District Court went on to find that such agency was somehow meaningless because Plaintiffs never had direct contact with WV. SAppx42. Of course, this ignores that the purpose of designating agents eliminates the need for any direct contact with the principal.

Separately, the District Court also ignored the distinction between works originally fixed or recorded onto phonorecords with audiovisual images included (i.e., the live audiovisual concert recordings here) and phonorecords later paired with visual elements (for instance, if added to a movie), holding that at least with respect to WV's 133 audiovisual recordings at issue, those archives should be ineligible for § 115(a)(1) licenses because they are not "phonorecords." SAppx26.

27

The District Court also rejected Defendants' implied license and estoppel defenses as a matter of law. Regarding the defense of implied license, even though there was evidence of Plaintiffs' agent dealing directly with WV, the District Court found that "Defendants cannot show that there was a meeting of the minds" between WV and Plaintiffs. *Id.* at 42. Regarding estoppel, the District Court held that WV's years of payments to Plaintiffs did *not* equate to Plaintiffs' knowledge of WV's "allegedly infringing conduct." SAppx45-46.

The District Court also held that Mr. Sagan, as WV's "ultimate decisionmaker," was personally liable for direct infringement.

## I.  **The District Court Denies Reconsideration**

In an effort to prevent manifest injustice, Defendants moved for reconsideration of several aspects of the District Court's summary judgment Order, including certain issues raised in this appeal. Defendants argued that even if the District Court was not inclined to grant Defendants' motion for summary judgment recognizing its licenses as a matter of law, there were at the very least triable issues of fact for the jury on these issues. Nevertheless, the District Court denied reconsideration on all accounts, declining to credit a plethora of disputed

evidence and credibility questions, citing largely to erroneous evidentiary barriers that allowed the District Court to avoid the disputed evidence. SAppx70.

On reconsideration, the District Court did appear to alter one of its summary judgment rulings. In its initial Order, the District Court appeared to require that performer consent be written. *See* SAppx31 ("[T]he agreements do not … attach any written consents from those performers … ."); SAppx33 (David Hewitt "acknowledged that he did not have written consents from performers because it was not industry custom"). On reconsideration, the District Court disclaimed this requirement, conceding that "consent" *need not* be in writing. SAppx62. Nevertheless, the District Court then held that Defendants had "adduced no admissible evidence that the performers consented, whether in writing or orally." *Id*. Ironically, the District Court holding that Defendants were required to present direct evidence of consent by performers contradicted earlier rulings by the District Court that Defendants would not be permitted to depose consenting artists that could have provided just the evidence that the District Court stated was

absent—or at least contributed to the inference that such recordings were authorized.

J.    **Damages Trial and Post-judgment Pleadings**

Though the District Court decided liability against Defendants prior to trial, jury questions remained on an appropriate amount of statutory damages and whether thirty works were "willfully" infringed. After a nine-day jury trial on damages, Plaintiffs were awarded $189,500 in statutory damages—far less than the nearly $30 million Plaintiffs had asked the jury to award. Appx790; Appx859.

For those thirty works for which "willfulness" had not yet been decided by the District Court, the jury found the infringement was non willful. Appx790. For those, the jury awarded the minimum in the non willful statutory range of $750 per work. For those remaining 167 works—which the District Court had previously found to be willful infringement, meaning the jury could select a per work damages amount between $750 and $150,000—the jury awarded $1,000 per work. Plaintiffs moved for a new damages trial, which the District Court denied. Dkt. 379; Appx802.

Plaintiffs also moved for attorneys' fees and costs under § 505 of the Copyright Act. Dkt. 376. The District Court granted Plaintiffs' award but reduced their fees from over $6 million to $2.4 million. Appx802.

Defendants filed a notice of appeal from the District Court's summary judgment Order and the District Court's Order denying reconsideration. Appx800. Defendants also noticed their appeal from the District Court's Order granting Plaintiffs' fees and costs. Appx827. Plaintiffs cross-appealed several rulings, including the District Court's summary judgment Order denying an injunction, and the District Court's Order denying a new damages trial. Appx829.

## SUMMARY OF ARGUMENT

The District Court's summary judgment Order is flawed on several grounds and should be reversed.

First, the District Court found individual Defendant Bill Sagan personally liable for direct copyright infringement without a shred of evidence that Mr. Sagan engaged in unauthorized copying or distribution. In doing so, the District Court applied the wrong legal standard in analyzing liability against Mr. Sagan—applying factors relevant to secondary infringement of vicarious liability as opposed to direct infringement, even though direct infringement is the only claim brought against Mr. Sagan in this case. This ruling threatens to undermine long standing principles of corporate governance by imputing a claim of direct infringement against an individual that did not commit direct infringement, and by imposing personal liability against an individual officer for actions done solely on behalf of the company.

Second, the District Court erred and ignored factual disputes in misconstruing the requirements of the compulsory licensing scheme under 17 U.S.C. § 115. The subsection (a)(1) that the District Court relied on is not applicable to this case, which applies only to "duplicating sound

32

recordings" "fixed by another." WV is exploiting sound recordings "fixed" by their own predecessors, not "by another." To not allow WV the benefit of the rights that its predecessors had under the law by treating its interests separately would upend basic concepts of corporate transfers and assignments.

And even if subsection 115(a)(1)'s requirements made sense to apply here (they do not), there are still novel questions of who should carry the burden here to establish that historic recordings were consented to or "fixed lawfully"—especially given concerns with stale and unavailable evidence when the live music recordings at issue are thirty to fifty years old. And regardless of who carries the burden, there are questions about the novel issue of what "fixed lawfully" means. If it means (as the District Court concluded) that it requires consent by performers at time of the original recording, there was ample evidence to create triable issues of fact regarding whether "consent" was obtained.

Further, the District Court misconstrued the term "phonorecords" to erroneously mean that WV could not obtain compulsory licenses for its audiovisual recordings offered online.

33

Third, even if § 115 licenses were precluded based on technical (but flawed) grounds, the District Court erred in rejecting as a matter of law Defendants' equitable defenses of estoppel and implied license. In doing so, the District Court disregarded triable issues of fact and evidence that a reasonable jury could have concluded were valid to foreclose liability against Defendants for copyright infringement altogether.

Fourth, to the extent this Court reverses the summary judgment Order, the fees order must fall.

## STANDARD OF REVIEW

This Court reviews summary judgment rulings *de novo*, "drawing all factual inferences in favor of the non-moving party." *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 30 (2d Cir. 2012).

## ARGUMENT

## I.   The District Court Improperly Imposed Personal Liability Against Mr. Sagan

The District Court cited no evidence of Mr. Sagan committing direct infringement, because there is no such evidence. But the District Court found Mr. Sagan liable for direct infringement anyway by misapplying the standard for vicarious liability—a secondary claim for copyright infringement that Plaintiffs did not plead—to hold Mr. Sagan personally liable for direct infringement. This is not only reversible error; it threatens to undermine basic tenets of corporate law in holding Mr. Sagan personally liable for WV's alleged conduct.

### A.   The District Court Improperly Conflated Direct Infringement and Vicarious Liability

Instead of applying the proper standard for direct infringement, the Order quotes dicta from an unpublished case for the proposition that "a corporate officer, who has the ability to supervise infringing activity and has a financial interest in that activity, or who personally participates in

that activity is *personally* liable for infringement." Order 50 (quoting *Capitol Records LLC v. Redigi Inc.*, 2014 WL 4354675, at *2 (S.D.N.Y. Sept. 2, 2014)). That dictum merely paraphrases the standard for vicarious liability, under which "one may be vicariously liable if he has the *right and ability to supervise* the infringing activity and also has a direct financial interest in such activities." *Gershwin Pub. Corp. v. Columbia Artists Mgmt., Inc.*, 443 F. 2d 1159, 1162 (2d Cir. 1971) (emphasis added).

*Redigi* did not analyze the circumstances under which a company's officer could be liable for direct infringement; rather, it merely held that plaintiff's generalized allegations (that the corporate defendant "engaged in various infringing activities and that these activities were undertaken at the behest of or with the approval of the [i]ndividual [d]efendants, who were [its] co-owners") met the Rule 12 plausibility standard. 2014 WL 4354675 at *3 (S.D.N.Y. Sept. 2, 2014). *Redigi* cannot help plaintiffs that, as here, have failed to adduce sufficient evidence to support such claims on summary judgment.

*Arista Records, LLC v. Lime Grp., LLC*—cited in *Redigi*—likewise involved claims of secondary rather than direct infringement. 784 F.

Supp. 2d 398, 434 (S.D.N.Y. 2011) (denying defendants' motion for summary judgment on vicarious liability of company and its sole director).

Here, all of the purported evidence that the Order cites is relevant only to vicarious liability, as it concerns only Mr. Sagan's purported "[right and] ability to supervise infringing activity" and "[direct] financial interest in that activity." *See Gershwin*, 443 F. 2d at 1162.

Regardless of whether the District Court thought the secondary claim of vicarious liability was appropriate against Mr. Sagan, it was not pled by Plaintiffs. The entire discovery in the case was geared towards one claim of direct infringement, and it is improper to switch the claim during summary judgment, after evidence and all discovery was conducted to defend against direct infringement. It violates due process against Mr. Sagan to hold him liable on a claim and theory never pled against him throughout the case. *Alpha Capital Anstalt v. Oxysure Sys., Inc.*, 216 F. Supp. 3d 403, 411 (S.D.N.Y. 2016) ("A court cannot grant summary judgment regarding a [ ] claim if the plaintiffs have failed to plead the claim in the Complaint.").

37

And even if it were proper to substitute in a new claim at summary judgment, the evidence the District Court relied on in imposing liability under the vicarious liability test is insufficient for that claim too. To prove vicarious infringement, a plaintiff must also show "a causal relationship between the infringing activity and any financial benefit [the] defendant reaps." *Rams v. Def Jam Recordings, Inc., 202 F. Supp. 3d 376, 385* (S.D.N.Y. 2016). There is no evidence (and at the very least a factual dispute) about whether Mr. Sagan has any direct financial interest in the allegedly infringing activity.

Other cases upon which the District Court relied are readily distinguishable. In each of them, the undisputed facts showed that the individual defendants went well beyond their ordinary roles as company officers or executives—and in none of them were the officers held personally liable for direct infringement based merely on their title, job responsibilities, membership, or ownership status. As noted, *Redigi* merely assessed the adequacy of the plaintiff's complaint. 2014 WL 4354675 at *2-3 (S.D.N.Y. Sept. 2, 2014). In *Lime Group*, the court held the company's chairman and sole director liable for the secondary claim of inducing infringement, based on extensive evidence that he had

knowingly and intentionally taken affirmative steps to encourage infringement. 784 F. Supp. 2d at 438-39. And in *Arista Records LLC v. USENET.com, Inc.*, a company's CEO was liable because he "was personally and intimately involved in many of the activities that form the basis of Defendants' copyright liability"—including taking steps intended "to foster infringement"—and was "the driving force behind, and personally involved in," numerous acts of evidentiary spoliation. 633 F. Supp. 2d 124, 131-4 (S.D.N.Y. 2009). There is no such evidence here, and the District Court's holding is reversible on this basis alone.

### B. There Is No Evidence to Support Holding Mr. Sagan Personally Liable for Any Direct Infringement

To establish a claim of direct copyright infringement, the plaintiff must prove "that … the defendant infringed the plaintiff's copyright by violating one of the exclusive rights that 17 U.S.C. § 106 bestows upon the copyright owner." *Island Software & Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 260 (2d Cir. 2005). Direct liability requires "volitional conduct" that "causes" the copying or distribution. *Zappa v. Rykodisc, Inc.*, 819 F. Supp. 2d 307, 316 (S.D.N.Y. 2011) (noting lack of evidence to establish direct liability).

There is no evidence in the record—and the summary judgment
Order cites none—that Mr. Sagan personally copied, distributed, or
publicly performed any of the works at issue. Whether he founded,
owned, or was a member of a limited liability company, acquired copies
of existing recordings, or documented "licensing issues," none of these
directly infringes any of the § 106 exclusive rights. Dkt. 201 (pp. 5, 51).

Nor does merely exercising "final decision-making authority" in the
management of a company's day-to-day activities—the ordinary
responsibility of any CEO. *Id.* The District Court also relied on Mr.
Sagan's management of the companies' original agreements and "plans"
to digitize tape recordings—but none of these activities constitute direct
copyright infringement. SAppx52. While Plaintiffs' Complaint alleges
that Mr. Sagan "*participated in* … the acts'" identified in the Complaint,"
Appx118 (emphasis added), there is zero evidence that his purported
participation included any act of direct infringement. Mr. Sagan was not
the person at the company involved with the licensing, and more than
allegations are required at the summary judgment stage.

Two cases relied on by the District Court illustrate the high bar to
individual liability in this context. In *UMG Recordings, Inc. v. Escape*

40

*Media Group*, the court found the individual defendants liable for direct infringement based on undisputed evidence that they had themselves "uploaded works-in-suit … without authorization." 2014 WL 5089743 at *25 (S.D.N.Y. Sep. 29, 2014).

And in *Arista Records LLC v. Usenet.com, Inc.*, the court held an individual defendant liable based on a "multitude" of "evidence that show[ed] [his] intent to foster infringement," including the defendant's directing "promotional items specifically to attract the primary market of direct infringer customers to engage in direct infringement through its website." 633 F. Supp. 2d 124, 159 (S.D.N.Y. 2009).

But here, Plaintiffs' account of Mr. Sagan's purported "involvement" contains not a single fact showing that he personally copied or distributed any of the works at issue or cultivated a market of known infringers.

### C.    **In Holding Mr. Sagan Personally Liable, the District Court Deviated from Well-Settled Corporate Law**

The District Court improperly disregarded corporate formalities, relying on nothing more than the fact that Mr. Sagan is a company member and officer in holding him liable for direct infringement. It is black-letter law that holding an officer, shareholder, or member liable for

the acts of a company requires something more than merely finding that the *company* is liable; either the corporation or the officer, or both, must have an improper purpose. "Thus, for personal liability for corporate [copyright] infringement to extend to corporate officers, a special showing must be made that they acted willfully and knowingly and personally participated in the infringing activities or used the corporation to carry out their own deliberate infringement." *Asher Worldwide Enters. LLC v. Housewaresonly.com Inc.*, No. 12 C 568, 2013 WL 4516415, at *3 (N.D. Ill. Aug. 26, 2013) (copyright case).[10]

Just as in the closely analogous patent law context, "acts of a corporate officer that are within the scope of the officer's responsibility are not always sufficient grounds for penetrating the corporate protection and imposing personal liability, … [t]he policy considerations that underlie the corporate structure yield to personal liability for corporate acts only in limited circumstances." *Hoover Grp., Inc. v. Custom Metalcraft, Inc.*, 84 F.3d 1408, 1411 (Fed. Cir. 1996) (reversing a finding

---

[10] *Dangler v. Imperial Mach., Co.*, 11 F.2d 945, 947 (7th Cir. 1926) (holding that "in the absence of some special showing, the managing officers of a corporation are not liable for the [patent] infringements of such corporation, though committed under their general direction").

42

that "president, chief executive officer, and principal shareholder" was personally liable because "the district court's logic" would extend to the problematic approach that "a person that incorporates him or herself to conduct business can never escape personal liability" for the company's infringement. *Wechsler v. Macke Int'l Trade, Inc.*, 486 F.3d 1286, 1292 (Fed. Cir. 2007) ("a corporate officer could negligently believe that a patent was invalid and/or not infringed" and "[t]his might support a finding of willful infringement by the corporation, but not a finding of personal liability for the officer"); *UMG Recordings, Inc. v. Veoh Networks Inc.*, 2009 WL 334022, *3 (C.D. Cal. Feb. 2, 2009) ("membership on a Board of Directors necessarily … entails making … 'decisions.' To allow for derivative copyright liability merely because of such membership could invite expansion of potential shareholder liability for corporate conduct, without meaningful limitation"), *aff'd*, 718 F.3d 1006 (9th Cir. 2013).

And even if his role could be sufficient, there would be questions of fact regarding whether his actual level involvement rose to the level of any secondary liability, especially when he was not closely involved with

any of the licensing decisions, which were made by his attorneys and executed by other employees of his company. Appx1635.

Mr. Sagan is protected by the corporate shield doctrine, and there is no basis in the record to apply alter ego liability. *See William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 600 (2d Cir. 1989); *A/S Domino Mobler v. Braverman*, 669 F. Supp. 592, 594 (S.D.N.Y. 1987). Given Plaintiffs' lack of evidence and failure to plead any relevant legal claim against Mr. Sagan, the District Court had no basis to hold Mr. Sagan liable in his personal capacity—and certainly not as a matter of law.

## II.   The District Court's Orders Hinge on a Fundamental Misreading and Misapplication of § 115(a)(1)

Throughout its Orders, the District Court misapplied § 115(a)(1) in key respects.

First, the District Court incorrectly applied the substantive requirements of § 115(a)(1), which are triggered *only* when one has duplicated "sound recordings fixed by another." But here, Plaintiffs assert rights only to musical compositions, not recordings, and WV is exploiting sound recordings "fixed" by its own lawful predecessors in interest, not "by another." In other words, the District Court's Order ignores the clear privity between WV and its predecessors.

Second, even if the requirements of § 115(a)(1) applied, there are questions of evidentiary burden, and at the very least triable issues of fact, regarding whether WV's recordings were consented to and thus "lawfully fixed."

But Defendants had evidence to present that would allow the jury to infer that the weight of the evidence supports that there was consent to create the recordings—including representations in various agreements from the persons who created the recordings—and have firsthand knowledge of consents by artists and the recordings

45

themselves, testimony from witnesses such as David Hewitt, as well as the acquisition agreements, record label joint exploitation agreements and the recordings themselves. Moreover, Defendants sought to obtain live artist testimony from artists present when the recordings were created, but the District Court shielded the performers—even those songwriters who originally owned or still co-owned the compositions— from being subjected to depositions in the lawsuit, denying Defendants' right to take performer depositions or call them to trial. Appx245; Dkt. 311.

Third, the District Court misconstrued the term "phonorecords" to mean that WV could not obtain compulsory licenses for its audiovisual recordings offered online.

## A. The Substantive Requirements of § 115(a)(1) Are Triggered Only When One Has Duplicated "Sound Recordings Fixed by Another"

While the District Court correctly noted that a "licensee cannot simply repackage and sell copies of another's *sound recording*," SAppx5 (emphasis added), Plaintiffs do not allege that WV copied *another's sound recordings*. Rather, they claim that WV used Plaintiffs' *compositions* in *WV's sound recordings*. Thus, the limitations and/or "additional

substantive requirements" of § of 115(a)(1) that call for analyzing whether the "duplicate" "sound recording" "fixed by another" is "fixed lawfully" does not even apply here, as WV was not "duplicating" any sound recording "fixed by another." Plaintiffs do not own the sound recordings; they contend to own the musical *compositions* that are contained in WV's sound recordings that were fixed by WV's predecessor.

H.R. Rep. 94-1476 provides a discussion about the intent behind "fixed lawfully" being:

> to make clear that a person is not entitled to a compulsory license of copyrighted musical works for the purpose of making *an unauthorized* **duplication** *of a* **musical sound recording originally developed and produced by another**.

H.R. Rep. No. 94-1476, 108 (1976) (emphasis added).

Because the only sound recordings at issue are indisputably owned by WV, the additional substantive requirements that concern whether a "sound recording" that was "duplicated" "by another" was lawfully fixed are simply inapplicable. *See* Appx580 (addressing this issue). WV is exploiting sound recordings "fixed" by its own *lawful predecessors*, not "by another." The District Court ignored the fundamental privity between WV and the concert promoters, venue operators, and sound engineers who initially fixed these recordings and from whom WV ultimately

47

acquired its rights. WV is not seeking to "repackage and sell a copy of another's sound recording." SAppx5. The District Court's holding turns basic contract law on its head and would undermine the efficacy of transferring intellectual property.

Defendants raised this point below, but the District Court's summary judgment Order fails to mention it. Appx580. Similarly, the District Court's reconsideration Order glosses over this point: "Defendants have pointed to no authority—let alone controlling authority—holding that when a person acquires a recording from another person, the latter person is not 'another' for purposes of § 115(a)(1)." SAppx60.

It is beyond question that WV is the legal successor in interest to the archives that it acquired. The District Court Orders essentially ruled that when a party obtains recordings or rights from predecessors, it should not be able to take advantage of the legal benefits associated with those transfers when construing applicability of statutes that seek to carve out separate interests of "others." This undermines the whole purpose of transferring property, and it would create dangerous acquisition uncertainty if there were statutory rights that would have

48

been enjoyed by the original seller or owner, but not any of the subsequent transferees.

### B. The District Court Misplaced the Burden of Proof on Defendants and Overlooked Evidence That Creates at Least a Triable Issue of Fact About Whether the Recordings Were "Fixed Lawfully"

The District Court erred in placing the burden on Defendants to demonstrate "that any of their recordings were lawfully fixed." SAppx34. Plaintiffs, not Defendants, are seeking to invalidate the legality of works under a certain statute and therefore have the burden of presenting evidence that Defendants' recordings are unauthorized. *Sadhu Singh Hamdad Tr. v. Ajit Newspaper Advert., Mktg. & Commc'ns, Inc.*, 503 F. Supp. 2d 577, 583 (E.D.N.Y. 2007) (plaintiff must prove "unauthorized copying of that … work"); *Chamberlain Grp. v. Skylink Tech.*, 381 F.3d 1178, 1204 (Fed. Cir. 2004) (affirming summary judgment for defendant where plaintiff failed to prove lack of authorization). Plaintiffs did not meet that burden. Further, whether a particular recording was "authorized" is clearly a question of fact that should go to the jury.

The question of burden is further complicated by the state of the evidence at issue. Most of the recordings at issue were made thirty to fifty years ago. This lapse in time raises questions of stale or lost evidence—

obvious issues of proof that are typically addressed by the statute of limitations.[11] The same policy rationale behind statutes of limitations exists when dealing with circumstances surrounding recordings created several decades ago. Statutes of limitations "reflect strong public-policy determinations that 'it is unjust to fail to put [an] adversary on notice to defend within a specified period of time' … . And they 'promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared.'" *Midland Funding, LLC v. Johnson*, 137 S. Ct. 1407, 1418 (2017) (Sotomayor, J., dissenting).

Indeed, while the District Court inexplicably protected the artists from sitting for depositions in this case, a few of the artists were required to respond to interrogatories. Appx238-239. Of course, allowing evidence by interrogatories denied Defendants the opportunity to assess credibility, ask follow up questions, and seek direct answers not filtered through the lens or coaching of counsel. And the gist of these answers

---

[11] Indeed, the District Court made this same observation at an early discovery hearing: "It seems to me highly unlikely that the individuals you identify in footnote 1 of your November 18 letter are gonna have a recollection of who said what to whom at the time of the performance." Appx237-9 - 10.

50

was that the artists could not recall the circumstances and were not aware if bandmembers consented. Appx480-535.[12] Thus, even the artists that are still alive and could testify about the original creation of the recordings were shielded from doing so, thus precluding Defendants from being able to offer direct evidence of consent. That should not be sufficient to deem recordings that had been created decades ago unlawful, and certainly should not be sufficient to prevent the jury from hearing these disputes.

Indeed, the audiovisual recordings themselves—the allegedly infringing works at the center of the case—demonstrate that these were professional recordings and that the artists plainly knew they were being recorded. Appx1829 ("at that high a quality it can't be a bootleg"). Several had giant video equipment right in the performers' plain sight—indicating they had obviously consented to the original recording.

---

[12] *See Salter v. Upjohn Co.*, 593 F.2d 649, 651 (5th Cir. 1979) ("It is very unusual for a trial court to prohibit the taking of a deposition altogether, and absent extraordinary circumstances, such order would likely be in error."); *see also Worth v. Trans World Films*, 11 F.R.D. 197, 198 (S.D.N.Y. 1951) ("With respect to the alternative request that the deposition be taken only on written interrogatories, the advantages of oral examination over the rigidity of written interrogatories are readily acknowledged. Cross-examination of a witness who may be evasive, recalcitrant or non-responsive to questions is an essential in ferreting out facts, particularly of an adverse party or witness.").

Appx1823:1-4 ("I mean, this was a venue that had the cameras right in front of the performers, and all of the performers spoke about the recordings as they were being recorded."). This is consistent with the representations made in each acquisition agreement by those who produced the recordings. Appx1605 (Festival Network, LLC acquisition); Appx1597 (Filmsonix acquisition); Appx1824 (Plainfield acquisition); Appx1825-1826 (Hewitt acquisition). As Mr. Sagan testified, this is also consistent with the discussions he had as part of his diligence in deciding to purchase the recordings. Appx1597:15-21 (Chris Stone acquisition); Appx1599:10-13 (Ash Grove acquisition); Appx1572. And as confirmed by Plaintiffs' witnesses at trial, none of the Plaintiffs' witnesses had a clue about the circumstances of the original recordings—but were relying on pure speculation in claiming they were unauthorized or bootlegs. Peer Music's witness testified, "I do not know the circumstances those records were made under." Appx1075:3-5. Similarly, Warner Chappell's witness testified that he did not know the circumstances surrounding the creation of the videos at issue. Appx1372:4-7; *see also* Appx1411:8-16 (Spirit Music witness's lack of knowledge about the Tanglewood concert recordings at issue).

It is well settled that "the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Mickle v. Morin*, 297 F.3d 114, 120 (2d Cir. 2002). But citing largely to erroneous evidentiary issues, and despite that the question of whether consent was obtained is clearly one of fact, the District Court declined to even permit the jury to consider Defendants' evidence that could lead a reasonable juror to infer that the recordings were "fixed lawfully" by concert producers and sound engineers.

And there was evidence that many of the recordings had been licensed by the artists to WV and its predecessors. Appx537-6 – 7; Appx655. Indeed, while the District Court suggested in a footnote that such exploitation was limited to what Bill Graham's companies did, that was not the case with the Tanglewood Concert—which implicates twenty works at issue—where there was language noting that WV's predecessor exploited this work. Documents and testimony by Michael Krassner also reflect the companies' rights in the Tanglewood concert audiovisual recordings. Appx655-18 – 39; Appx460-461.

Moreover, H.R. Rep. 94-1476 makes clear that the producer of a sound recording will usually be considered an author of the recording:

The copyrightable elements in a sound recording will usually, though not always, involve "authorship" both on the part of the performers whose performance is captured and on the part of the record producer responsible for setting up the recording session, capturing and electronically processing the sounds, and compiling and editing them to make the final sound recording.

H.R. Rep. No. 94-1476, 9 (1976).

As observed in H.R. Rep. No. 94-1476, it is usually the case that the ownership in a sound recording will be shared. In the case of Defendants' recordings, material contributions were, in fact, made by the sound engineers when these recordings were fixed, which rendered WV's predecessors "performers" on those recordings. There is ample evidence that those producers—including David Hewitt, for King Biscuit, and Bill Graham—were integral to the ultimate sound captured in those recordings. Appx654-2 - 13.

Bill Graham produced the concerts, spoke to the crowd in many of the recordings,[13] and directed sound engineers from his concert promotion team to operate the delicate sound boards. Appx451 (p.45:2-10). The bulk of the works at issue were from King Biscuit, about which the legendary sound engineer David Hewitt provided extensive

---

[13] *See, e.g.*, Bill Graham introduces the band in "The Who at Tanglewood," *available at* https://www.youtube.com/watch?v=61foW5x2cmo (last accessed Apr. 7, 2018).

testimony concerning the recordings, how he created and fixed the recordings for radio broadcast, and how artists entered the recording trucks to have the recordings made. Appx653-10 – 17; Appx657-660. This is plainly enough to present a triable issue on lawful fixation.

The District Court improperly discounted evidence of the material contributions provided by the concert producers and sound engineers who fixed the recordings and who therefore *shared* a joint copyright interest in the initial recordings and should have the same rights to attest to or demonstrate that the recordings were consented to and thus fixed lawfully.

The District Court found in footnote 26 that these concerts somehow did not rise to the level of the contributions that a record producer would make to a sound recording. SAppx34. But that was an inappropriate finding to make as a matter of law. The District Court improperly drew all inferences in Plaintiffs' favor—including accepting three artists' written responses as uncontroverted evidence of non-consent for all recordings, even those that had nothing to do with these artists.

C. **The District Originally Found a Written Consent Requirement That Does Not Exist, Then Reversed Itself by Conceding Consent Need Not Be in Writing, but Still Declined to Reverse Its Order**

In considering the issue of lawful fixation, the District Court originally imposed a requirement that any consent by the performer be "written." SAppx9-11, 15, 31, 33. But that requirement has no basis in the text of the statute, which refers simply to those who act "without *the consent* of the performer or performers involved." 17 U.S.C. § 1101 (emphasis added). Plaintiffs did not even argue—let alone cite any authority holding—that consent for purposes of fixation must be written. *See* Dkt. 201, 230.[14] Nor did the District Court cite any such authority, as none exists. Furthermore, other sections of the Copyright Act include writing requirements; transfer of a copyright, for example, requires a written instrument. 17 U.S.C. § 204. Had Congress intended to include a requirement that consent be written, the statute would include such language.

---

[14] As early as fall 2015, Plaintiffs recognized Defendants' position that artist consents could be either implied, oral, or written. *See* Appx227:5-11 ("… and it is an indication to us that some of the agreements that Mr. Elkin referred to with performers are either oral or implied.").

On reconsideration, the District Court walked back what previously appeared to be a written consent requirement, holding that the evidence need only be admissible. SAppx62. This reframing shifted the analysis to the District Court now dismissing the disputed evidence itself, holding that Defendants had offered "no *admissible* evidence that the performers consented, whether in writing *or* orally." *Id.* (emphasis added).

There is evidence in the record to show that it was industry custom for consent to be oral. Appx536-7. Further, the District Court excluded post facto agreements that WV had reached with agents of the artists to jointly exploit the works. In assessing implied licenses—which is perhaps the closest analog to the issue of non-express artist consent—courts in this district have found knowledge and cooperation to be sufficient reasons to find a material question of fact not suitable for resolution on dispositive motion. *E.g.*, *Zappa v. Rykodisc, Inc.*, 819 F. Supp. 2d 307, 319 (S.D.N.Y. 2011). Given that no such "written" requirement exists, at the very least, a material question of fact exists as to the nature of the initial fixation of the recordings at issue.

The District Court also failed to accept Defendants' Joint Exploitation Agreements as creating at least a disputed issue on artist

57

consent, finding that these agreements did not "provide any written consent from the artists themselves or purport to say anything about whether the artists consented to the initial *fixation* of these recordings." SAppx31. The District Court thus held that Defendants cannot "rely on documents purporting to grant exploitation rights as proof that artists consented to the initial fixation of their performance decades prior." *Id.*[15] As is customary in the music industry, the labels were contracting here on the artists' behalf. The District Court failed to credit these agreements as evidence of artist consent *vis a vis* "lawful fixation."

Moreover, even though not required, WV does have written agreements with several artists who performed on the sound recordings at issue, acknowledging that the recordings were lawful and owed by WV. Appx662-2 – Appx665-6 (exploitation agreements with various artists). This includes WV's agreement with Van Morrison, Santana, and the

---

[15] The District Court's summary judgment Order also denied Plaintiffs injunctive relief, noting that Defendants' "licensing hurdles are not insurmountable" that is, Defendants may yet acquire the requisite artist consents. SAppx54. But in the same Order, the District Court rejected the labels' blanket acknowledgments from 2008 and 2009 that the recordings were authorized, essentially holding that for the recordings to be "fixed lawfully," the performers must have consented at the time the recording was fixed. This underestimates the manner in which record labels control their artists' recordings.

Grateful Dead. *Id.* There is a fundamental factual issue with respect to the recordings by those artists.

D. **The District Court Misconstrued the Meaning of "Phonorecords"**

The "phonorecords" definition advanced by Plaintiffs and adopted by the District Court is incorrect. Section 115 grants a license to make and distribute phonorecords of musical works. The Copyright Act defines "phonorecords" as:

> material objects in which sounds, other than those accompanying a motion picture or other audiovisual work, are fixed … , and from which the sounds can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. The term "phonorecords" includes the material object in which the sounds are first fixed.

17 U.S.C. § 101. The District Court held that WV's audiovisual recordings are not "phonorecords" and are therefore ineligible for § 115 licensing. SAppx28. That is, despite the statute's explicit reference to material objects of fixation, the District Court found, without citing any authority, that "phonorecords include *only* sounds." SAppx27 (emphasis added). The District Court's interpretation ignores the statute's plain language and the distinction between "sounds" and "material objects." This reading focuses entirely on the statute's first sentence and renders

59

the second sentence redundant. After all, "material objects in which sounds … are fixed" plainly includes the material objects in which sounds are first fixed.

To be clear: *all* of WV's recordings at issue are unambiguously "phonorecords" under the plain language of the Copyright Act's definition. Where, as here, sounds are "first fixed" *as part of* and inseparably from an audiovisual work, the resulting "material object" is a phonorecord by definition. The statute's second sentence, by expressly *including* "the material object in which the sounds are first fixed"—i.e., a tape that also records video images—establishes that WV's "first fix[ation]" recordings are phonorecords. And Plaintiffs concede that all of WV's recordings at issue, including those with visual components, were "first fixed" in that form. *See, e.g.*, Dkt. 201 (pp. 3-4).

The District Court's reference to fixation via "studio equipment" highlights its erroneous logic. In its summary judgment Order, the District Court noted:

> As Plaintiffs explain, the more natural interpretation is that Congress intended to ensure that the Copyright Act protected as phonorecords material *objects such as studio equipment* on which "sounds are first fixed," just as it protected commercially available objects such as records and CDs.

60

SAppx27 (emphasis added). This interpretation wrongly assumes that sounds may be "fixed" on "studio equipment." Studio equipment—such as microphones, mixing boards, and audio interfaces—do not store phonorecords the way CDs and records do.[16] In their motion opposing reconsideration, Plaintiffs revisited this "studio equipment" example and conceded that the statutory definition of *phonorecord "plainly includes the recording medium used in the studio."* Dkt. 265 (p. 20 n.20) (emphasis added). In the case of WV's live concert recordings, of course, the only such "recording medium" is the videotape on which the sounds were first fixed.

The District Court also erred in finding that the recordings at issue were "sounds … accompanying … [an] audiovisual work" and thus excluded under the phonorecords definition's first prong. SAppx27. That is simply incorrect: the "sounds" at issue were those created by on-stage performers in the course of live performances—and therefore not "sounds

---

[16] The Copyright Act concerns works that are fixed "*in*" a material object—not "by" a material object—and the equipment that *performs* or *enables* the fixation is plainly not part of the work itself. *See* 17 U.S.C. § 102(a) (copyright applies only to works "fixed in [a] tangible medium").

… accompanying a motion picture or other audiovisual work."[17] Because the sounds of such live performances do not "accompany[]" anything, they do not fall into the "audiovisual works" exception, and there is no conflict between the first and second prongs of the phonorecords definition.

H.R. Rep. 94-1476 also makes clear that the term "audiovisual work" does not include recordings like those that are at issue here. That report included an illustrative example of what would constitute an "audiovisual work": "the bill equates audiovisual materials such as *filmstrips, slide sets, and sets of transparencies* with 'motion pictures.'" H.R. Rep. No. 94-1476, 9 (1976) (emphasis added).

Similarly, H.R. Rep. 94-1476 makes clear that the audiovisual exception is meant to exclude from compulsory licensing a sound recording that is produced separate from the video portion of a work and then is subsequently added, such as a soundtrack to a motion picture:

> The first sentence of section 115(a) (1) would change the basis for compulsory licensing to authorized public distribution of phonorecords (including disks and audio tapes ***but not the sound tracks or other sound records accompanying a motion picture or other audiovisual work***).

---

[17] Plaintiffs argued below that the first part of the statutory definition "expressly excludes material objects in which audiovisual works are fixed," but the statute says *no such thing*. It classifies *sounds*, not material objects. Dkt. 230 (p. 9n.21); 17 U.S.C. § 101.

H.R. Rep. No. 94-1476, 53 (1976) (emphasis added).

Finally, the District Court's interpretation is wrong from a policy standpoint: while the definitional exclusion, in conjunction with § 115, properly protects filmmakers by excluding motion pictures from compulsory licensing regimes, there is no rational policy basis for a reading whose sole effect is to permit Plaintiffs to make an end run around Congress's carefully calibrated compulsory licensing framework and let them collect windfall profits by exercising veto power over the dissemination of culturally important works that happened to have been first fixed on videotape. The decision below effectively bars countless recordings from § 115(a)(1) licensing.

In sum, the District Court erred in misconstruing the definition of "phonorecord" to exclude WV's recordings. The District Court further erred in ruling that WV's recordings are ineligible for § 115 licensing on this basis.

## III. The District Court Committed Manifest Error in Disposing of Defendants' Affirmative Defenses Before Trial

The District Court manifestly erred in disposing of Defendants' affirmative defenses as a matter of law. The defenses of estoppel and implied licenses often raise fact questions that belong to a jury. *Psihoyos v. Pearson Educ., Inc.*, 855 F. Supp. 2d 103, 129 (S.D.N.Y. 2012) (denying summary judgment on implied license defense where "Defendants may or may not be able to persuade a jury that the course of conduct here created an implied license" and there was "insufficient evidence in the record for the District Court to resolve this question as a matter of law"); *Pavlica v. Behr*, 397 F. Supp. 2d 519, 527 (S.D.N.Y. 2005) (defenses of implied license and estoppel were questions of fact for the jury).[18]

This case is no different.

### A. Defendants' Implied License Defense

A copyright holder's knowledge of, and acquiescence in, the use of copyrighted material by the (allegedly) infringing party may well constitute an implied license. *See Keane Dealer Servs., Inc. v. Harts*, 968

---

[18] *See also Palmer/Kane LLC v. Gareth Stevens Publ'g*, No. 1:15-CV-7404-GHW, 2017 WL 3973957, at *17 (S.D.N.Y. Sept. 7, 2017) ("a jury could find for either party on … whether the Images were used pursuant to and within the scope of a valid license, whether that license was express or implied. Accordingly, the question cannot be resolved … as a matter of law.").

F. Supp. 944, 947 (S.D.N.Y. 1997). The question of an implied license "comes down to whether there was a 'meeting of the minds' between the parties to permit the particular usage at issue." *Psihoyos v. Pearson Educ., Inc.*, 855 F. Supp. 2d at 124.[19]

At summary judgment, Defendants argued that even if the District Court found defects with respect to the § 115 licenses, Plaintiffs had granted WV an implied license to exploit the recordings at issue. Plaintiffs' years of accepting WV's payments without objection constituted an implied license to exploit these works.

The District Court not only denied summary judgment on WV's implied license defense but refused to allow the jury to resolve factual issues surrounding that defense, even though WV, through HFA, made payments for years to Plaintiffs for the uses at issue. The District Court found significant that there was no evidence that Plaintiffs had direct contact with WV or, "aside from cease-and-desist letters," there was no evidence that Plaintiffs understood the "nature of the use that they were licensing." SAppx43, 45-46.

---

[19] This "meeting of the minds" may be inferred from "consent given in the form of mere permission or lack of objection." *Keane*, 968 F. Supp. 944 at 947 (quoting *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir. 1996)).

But, of course, you cannot simply set aside cease-and-desist letters—their existence supports the existence of at least a triable fact, as clearly Plaintiffs did know about WV and had communicated with WV, creating at least a factual dispute about Plaintiffs' knowledge regarding WV's uses and licensing activity. And regardless, the District Court acknowledged that HFA was acting as Plaintiffs' agent, meaning it stood in their shoes. As explained in *Rodgers and Hammerstein v. UMG*,

> Most music publishers, including Plaintiffs, employ the Harry Fox Agency, Inc. ("HFA") as their agent to receive notice of the intention to obtain a compulsory license, and to collect and distribute royalties. Acting on behalf of their clients, HFA waives the statutory notice requirements, negotiates royalty rates at or below the statutory level, and substitutes a quarterly accounting and payment schedule for the monthly schedule prescribed by Section 115.

2001 WL 1135811 at *2 (S.D.N.Y. 2001).

The District Court conceded that "HFA acts as the publishers' agent to receive notices of the intention to obtain a compulsory license, and to collect and distribute royalties." SAppx36. But at the same time, the District Court ruled that—as a matter of law—there was no "meeting of the minds" between Defendants and licensors. SAppx42,46. Setting aside the extent to which the licenses were "compulsory" (and thus no "meeting of the minds" need be found in such context), given that HFA operates

66

separately as an agent overseeing a negotiated license, an undisputed agency relationship at the very least creates a fact question about whether the licenses should be upheld as implied.

Here, the District Court ignored triable issues of material fact about whether there was a meeting of the minds to create implied licenses. In holding that Plaintiffs and WV had no contact with one another, the District Court dismissed a crucial question of agency regarding HFA, who was acting as Plaintiffs' agent in its administration of mechanical rights and royalties. *See Rodgers and Hammerstein v. UMG*, 2001 WL 1135811, \*2 (S.D.N.Y. 2001). As such, HFA has the power to waive statutory notice requirements and can secure mechanical licenses for uses that are otherwise ineligible for a compulsory license. *Id.* Defendants presented evidence that HFA did so for works exploited by WV in 2006 and for all works at issue exploited by 2010. *See* Appx382. (noting dates of first exploitation as "release date").[20] A reasonable jury could rely on this evidence to determine that there had been a meeting of the minds between WV and Plaintiffs, via Plaintiffs' authorized agent for these

---

[20] *And see* Appx421: July 3, 2013 Email from Nicole Malumba, HFA Digital Licensing Agent ("You have advised us, in our capacity as Agent for the Publisher(s)…").

exact licenses. It was premature to dispose of this defense as a matter of law.

On reconsideration, the District Court went even further: "Because Defendants failed to comply with §115, including the requirement of lawful fixation, there was no meeting of the minds with Plaintiffs or HFA." SAppx63. The District Court effectively ruled that—because the District Court (erroneously) concluded that WV had not complied with a statutory licensing scheme—WV was *de facto* barred from pleading these defenses in equity. This undermines the whole point of implied license— which is often premised in (allegedly) unauthorized or infringing conduct. *See Keane Dealer Servs., Inc. v. Harts*, 968 F. Supp. 944, 947 (S.D.N.Y. 1997) (finding implied license to use copyrighted software where the plaintiffs were aware of the defendants' allegedly infringing use of the software and still remained silent).

### B. **Defendants' Estoppel Defense**

The District Court also prematurely disposed of WV's estoppel defense. In order to prevail on an estoppel defense, "the defendant must have been misled into reasonably and justifiably believing that the plaintiff would not pursue his claims against the defendant." *Merchant*

*v. Lymon*, 828 F. Supp. 1048, 1064 (S.D.N.Y. 1993)(overruled on other grounds)(*citing Glus v. Brooklyn Eastern Dist. Terminal*, 359 U.S. 231, 234 (1959). This consent, "whether *express* or implied from long acquiescence with knowledge of the infringement, will prevent relief in equity." *Encyclopedia Brown Prods. v. Home Box Office, Inc.*, No. 91 CIV. 4092 (PKL), 1998 WL 734355, at *14 (S.D.N.Y. Oct. 15, 1998).

Defendants' equitable estoppel defense was based upon WV relying on years of regular royalty payments to Plaintiffs, WV's Joint Exploitation Agreements with Plaintiffs' affiliates in operating and building its business, and in acquiring and licensing additional recordings. Dkt. 164 (p. 23).

The District Court rejected this defense as a matter of law. It held first that Defendants "cannot show that Plaintiffs 'knew' that their conduct was infringing." SAppx46. And second, "Defendants' estoppel claim fails because they were not ignorant of the facts at issue"; i.e., "that the sales agreements did not convey the intellectual property rights that Defendants now claim entitlement to exploit." *Id.*

In so ruling, the District Court again overlooked triable issues of material fact. For example, Defendants cited Plaintiffs' years of accepted

payments from WV as evidence of Plaintiffs' awareness of (and acquiescence to) Defendants' conduct. Dkt. 164 (p. 22). At the very least, a reasonable jury could rely on such evidence to find that Plaintiffs had the requisite "knowledge" for estoppel to apply. Similarly, Defendants should have been able to introduce evidence that they had a good faith belief that the acquisition agreements did, in fact, convey intellectual property rights in the recordings at issue, and should have been allowed to provide evidence of this belief.

Because a reasonable jury could conclude, based upon the available evidence, that WV had at least implied, if not actual, licenses with HFA and/or others, there is a triable issue of fact as to the nature and validity of the HFA licenses and whether Plaintiffs should be estopped from denying their existence based on a pattern of conduct between WV and Plaintiffs' agent, HFA.

In short, WV paid Plaintiffs for years without objection. Even if Defendant's statutory licenses were somehow defective (they were not), there were triable issues that Plaintiffs should be estopped from denying the effect of the licenses.

## IV.   To the Extent the District Court's Summary Judgment Order Is Reversed, the Court's Fees Order Must Likewise Fall

The District Court's fees order is directly contingent on its summary judgment Order. Thus, a reversal of the District Court's summary judgment Order would necessitate a reversal of the District Court's fees order as well.

## CONCLUSION

The District Court's Orders should be reversed here to the extent that they hold Mr. Sagan liable without evidence and, by using the wrong standard, misapply the inapplicable subsection of § 115(a)(1), and disregard Defendants' affirmative defenses where there were at the very least factual questions. For the foregoing reasons, the District Court's Orders should be reversed, and to the extent they are, the fees order must be reversed as well.

MARCH 8, 2021

s/Michael S. Elkin
Michael S. Elkin

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS,
## AND TYPE-STYLE REQUIREMENTS

I hereby certify that

1.    This document complies with the type-volume limit of Local Rule 32.1(a)(4)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 13,386 words.

2.    This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

MARCH 8, 2021

                                    s/Michael S. Elkin
                                     Michael S. Elkin

# No. 20- 3816 (L)

## No. 20-4020 (CON)
## No. 20-4099 (XAP)

# United States Court of Appeals for the Second Circuit

———————

ABKCO Music, Inc., Colgems-EMI Music Inc., EMI Algee Music Corp., EMI April Music Inc., EMI Blackwood Music Inc., EMI Consortium Music Publishing, Inc., DBA EMI Full Keel Music, EMI Consortium Songs, Inc., DBA EMI Longitude Music, EMI Feist Catalog Inc., EMI Robbins Catalog Inc., EMI Unart Catalog, Inc., Jobete Music Co., Inc., ScreenGems-Emi Music Inc., Stone Agate Music, Stone Diamond Music Corp., Imagem Music LLC, Peer International Corp., PSO Ltd., Peermusic Ltd., Peermusic III, Ltd., Songs of Peer, Ltd., Spirit Catalog Holdings S.A.R.L., Spirit Two Music, Inc., Warner-Tamerlane Publishing Corp., WB Music Corp,
Plaintiffs-Appellees-Cross-Appellants

*v.*

William Sagan, Norton LLC, Bill Graham Archives, LLC, DBA Wolfgang's Vault, Defendants-Appellants-Cross-Appellees.

———————

*APPEAL FROM THE UNITED STATES DISTRICT COURT*
*FOR THE SOUTHERN DISTRICT OF NEW YORK, NO. 1:15-CV-04025*

———————

**SPECIAL APPENDIX**
**Volume I (SAppx1-79)**
**Public Version**

———————

Michael S. Elkin
*Winston & Strawn LLP*
*200 Park Avenue*
*New York, NY 10166*
*(212) 294-6729*
MElkin@winston.com

Erin R. Ranahan
*Winston & Strawn LLP*
*333 South Grand Avenue*
*Los Angeles, CA 90071*
*(213) 615-1835*
Eranahan@winston.com

*Counsel for Appellants-Cross-Appellees William Sagan et al.*

# TABLE OF CONTENTS

**Page**

**VOLUME I**

Opinion and Order Granting in Part and Denying in Part Summary
Judgment dated April 9, 2018 (ECF 262.01)...................................................SAppx1

Opinion and Order Denying Reconsideration dated March 26, 2019
(ECF 272.01)....................................................................................................SAppx55

U.S.C. Title 17, §115 (pre-2018 revision) ......................................................SAppx71

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ABKCO MUSIC, INC., COLGEMS-EMI MUSIC,
INC., EMI ALGEE MUSIC CORP., EMI APRIL
MUSIC INC., EMI BLACKWOOD MUSIC, INC.,
EMI CONSORTIUM MUSIC PUBLISHING, INC.
d/b/a EMI FULL KEEL MUSIC, EMI
CONSORTIUM SONGS, INC. d/b/a EMI
LONGITUDE MUSIC, EMI FEIST CATALOG
INC., EMI ROBBINS CATALOG INC., EMI
UNART CATALOG, INC., JOBETE MUSIC CO.,
INC., SCREEN-GEMS-EMI MUSIC INC.,
STONE AGATE MUSIC, STONE DIAMOND
MUSIC CORP., RODGERS & HAMMERSTEIN
HOLDINGS LLC, PEER INTERNATIONAL
CORPORATION, PSO LIMITED, PEERMUSIC
LTD., PEERMUSIC III, LTD., SONGS OF PEER,
LTD., SPIRIT CATALOG HOLDINGS S.A.R.L.,
TOWSER TUNES, INC., TOWSER NEWCO
LTD., SPIRIT TWO MUSIC, INC., WARNER-
TAMERLANE PUBLISHING CORP., and WB
MUSIC CORP.,

       Plaintiffs-Counterclaim-Defendants,[1]

          against

WILLIAM SAGAN, NORTON LLC, BILL
GRAHAM ARCHIVES, LLC d/b/a
WOLFGANG'S VAULT, BILL GRAHAM
ARCHIVES, LLC d/b/a CONCERT VAULT,
BILL GRAHAM ARCHIVES, LLC d/b/a MUSIC
VAULT, and BILL GRAHAM ARCHIVES, LLC
d/b/a DAYTROTTER,

       Defendants-Counterclaim-Plaintiffs.

**OPINION AND ORDER**

15 Civ. 4025 (ER)

---

[1] During the course of this litigation, Rodgers & Hammerstein Holdings LLC acquired the musical works
that had been controlled by Imagem Music LLC. Plaintiffs therefore request that Rodgers &
Hammerstein Holdings LLC be substituted for Imagem Music LLC. The Court grants this request. *See*
Fed. R. Civ. P. 25(c) ("if an interest is transferred" the court, on motion, may order "the transferee to be
substituted in the action"). Similarly, on March 26, 2018, the Court granted Plaintiffs' request to join two
subsidiaries of Plaintiff Spirit Catalog Holdings S.a.r.l: Towser Tunes, Inc. and Towser Newco Ltd. *See*
Fed. R. Civ. P. 17(a)(3). The Clerk of Court is respectfully requested to update the caption as reflected
above.

Ramos, D.J.:

This federal copyright infringement suit concerns a collection of live audio and audiovisual recordings of iconic songs that were recorded while being performed live in concert and thereafter acquired by Defendants William E. Sagan, Bill Graham Archives, LLC, [2] and Norton, LLC ("Defendants"), from the late Bill Graham and operators of other concert venues. The collection primarily consists of recordings made from the 1960s to the 2000s, and reads like a veritable who's who of rock, soul, and alternative music, containing the performances of The Rolling Stones, The Who, the Grateful Dead, Willie Nelson, Ray Charles, Aretha Franklin, and Carlos Santana, to name a few. The list of songwriters who penned the works embodied in those performances is no less impressive and diverse, including legends such as Hoagy Carmichael, Carol King, Mick Jagger, Keith Richards, Pete Townshend, and Green Day, among others.

In the years following Defendants' acquisitions, they have reproduced those recordings principally in digital format and made them available for mass consumption through digital download and streaming services offered for a fee through Defendants' websites. [3] Plaintiffs are a collection of six groups of music publishers [4] who claim to own, or hold exclusive licenses in,

---

[2] Bill Graham Archives, LLC, does business under the names Wolfgang's Vault, Concert Vault, Music Vault, and Daytrotter.

[3] Defendants operate Wolfgangs.com, WolfgangsVault.com, ConcertVault.com, Daytrotter.com, MusicVault.com and the Music Vault channel on YouTube. Defs.' Responses and Objections to Plaintiffs' Statement of Undisputed Facts, ("Defs.' Counter 56.1") ¶ 40.

[4] Plaintiffs are comprised of the following groups of music publishing companies: (1) ABKCO Music, Inc., (2) Colgems-EMI Music Inc., EMI Algee Music Corp., EMI April Music Inc., EMI Blackwood Music Inc., EMI Consortium Music Publishing, Inc. d/b/a EMI Full Keel Music, EMI Consortium Songs, Inc. d/b/a EMI Longitude Music, EMI Feist Catalog Inc., EMI Robbins Catalog Inc., EMI Unart Catalog Inc., Jobete Music Co., Inc., Screen-Gems- EMI Music Inc., Stone Agate Music, Stone Diamond Music Corp.; (3) Rodgers & Hammerstein Holdings; (4) Peer International Corporation, PSO Limited, Peermusic Ltd., Peermusic III, Ltd., Songs Of Peer, Ltd.; (5) Spirit Catalog Holdings S.A.R.L., Spirit Two Music, Inc.; and (6) Warner-Tamerlane Publishing Corp. and WB Music Corp.

the copyrights to approximately 200 musical compositions (the "Musical Works") reflected in Defendants' recordings. Plaintiffs claim that Defendants' exploitation of those recordings infringes their copyrights in the Musical Works. The principal question before the Court is whether Defendants obtained valid licenses such that their exploitation of these recordings is lawful under the Copyright Act, 17 U.S.C. § 101 *et seq*.

Before the Court are the parties' cross motions for summary judgment pursuant to Federal Rule of Civil Procedure 56 on Plaintiffs' claim of copyright infringement and their request to permanently enjoin Defendants from using the recordings at issue. Docs. 161, 191. For the reasons set forth below, the parties' motions for summary judgment are GRANTED in part and DENIED in part.

## I.   BACKGROUND

### A.   Statutory Scheme for Mechanical Licenses under the Copyright Act

To better contextualize the dispute between the parties, it is helpful to outline the statutory scheme covering the licensing of musical works under the Copyright Act. As a general matter, the owner of a copyright in a nondramatic musical work (i.e., a song's words and musical composition) "has the exclusive rights" to reproduce that musical work in copies or phonorecords and to distribute those copies or phonorecords to the public.[5] 17 U.S.C. § 106(1), (3). That exclusive right, however, is not without limitation. To encourage creativity and prevent monopolization in the music industry, Congress created the compulsory mechanical license,[6] a narrow exception to that exclusive right, which "must be construed narrowly, lest the

---

[5] Under the Copyright Act, separate copyrights attach to a musical work and a sound recording. *See* 17 U.S.C. § 102 (a)(2), (7).

[6] The term "mechanical license" derives from the historical practice of using "such media as a phonograph record or piano roll," to mechanically reproduce the sounds embodied in a musical work.

exception destroy, rather than prove, the rule." *Fame Publishing Co. v. Alabama Custom Tape,*

*Inc.*, 507 F.2d 667, 670 (5th Cir. 1975) ("[W]e should neither expand the scope of the

compulsory license provision beyond what Congress intended . . . nor interpret it in such a way

as to frustrate that purpose.") (citing H.R. rep. NO. 2222, 60th Cong., 2d Sess. 6 (1909)); *see*

*also Fox Television Stations, Inc v. Aereokiller, LLC*, 851 F.3d 1002, 1011 (9th Cir. 2017).  As a

result, although the copyright holder in the musical composition has the exclusive right to

determine "the manner in which his composition will initially be offered to the public," once that

musical work has been distributed to the public, the copyright holder "must then license others

who wish to present their own competing renditions." *Fame Publishing Co.*, 507 F.2d at 670.

Under Section 115 of the Act, compulsory licensees are entitled to make and distribute

"phonorecords" of a musical work, so long as they comply with requirements of that section.

*See* 17 U.S.C. § 115; *Cherry River Music Co. v. Simitar Entm't, Inc.*, 38 F. Supp. 2d 310, 312

(S.D.N.Y. 1999).  Certain of those requirements are purely procedural, such as the timely filing

of a Notice of Intention to Obtain Compulsory License ("NOI").  In this respect, Section

115(b)(1) requires that "[a]ny person who wishes to obtain a compulsory license under this

section shall, before or within thirty days after making, and before distributing any phonorecords

of the work, serve notice of intention to do so on the copyright owner."  17 U.S.C. § 115(b)(1).

At that point, the copyright owner cannot deny the license—hence the term "compulsory"—

however, "[f]ailure to serve or file the notice required by clause (1) forecloses the possibility of a

---

*Cherry River Music Co. v. Simitar Entm't, Inc.*, 38 F. Supp. 2d 310, 312 (S.D.N.Y. 1999) (citations and
quotation marks omitted).

compulsory license and, in the absence of a negotiated license, renders the making and

distribution of phonorecords actionable as acts of infringement . . . ." *Id.* § 115(b)(2).[7]

    Typically, a compulsory licensee must "exercise his rights under the compulsory license

only by assembling his own musicians, singers, recording engineers and equipment . . . for the

purpose of recording anew the musical work that is the subject of the compulsory license." 2 M.

Nimmer & D. Nimmer, Nimmer on Copyright ("Nimmer") § 8.04 [A]; *see also* The Law of

Copyright, Howard B. Abrams, ("Abrams") § 5:25; *Recording Indus. Ass'n of Am., Inc. v.*

*Librarian of Congress*, 608 F.3d 861, 863 (D.C. Cir. 2010).  In other words, the licensee cannot

simply repackage and sell copies of another's sound recording.  To do that, a licensee would

have to comply with the additional substantive requirements of Section 115(a)(1).  *See* 17 U.S.C.

§ 115(a)(1) (identifying the requirements for works "fixed by another").  Those requirements

include that the recording be (1) "lawfully fixed,"[8] and (2) that the licensee have the

authorization of the copyright holder in the sound recording, or "if the sound recording was fixed

before February 15, 1972," that the sound recording was fixed "pursuant to an express license

from the owner of the copyright in the musical work or pursuant to a valid compulsory license

for use of such a work in a sound recording." *Id.*  As discussed in more detail below, these

---

[7] In contrast to a compulsory license, a negotiated license is simply a license that is consensually entered into based on terms privately negotiated and set by the parties.  *See Blagman v. Apple, Inc.*, No. 12 Civ. 5453 (ALC) (JCF), 2014 WL 1285496, at *5 (S.D.N.Y. Mar. 31, 2014).

[8] Pursuant to the Copyright Act, a work is "fixed" when it is embodied in a "tangible medium of expression . . . by or under the authority of the author, [and] is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated."  17 U.S.C. § 101.  In layman's terms, the recordings here were fixed when they were first captured on film reel, VHS, cassette tape, CD, DVD, vinyl record, or similar device.  For a work to be "lawfully fixed" its fixation cannot "constitute[] copyright infringement under federal law, or common law copyright infringement, unfair competition," or any other violation of state law.  2 Nimmer § 8.04[E][2] n.88.

5

procedural and substantive requirements are strictly enforced and form the basis of the dispute
between the parties in the instant suit.

### B.   Defendants Acquire Bill Graham Archives

Defendant William Sagan is the founder, president, CEO, and sole owner of Defendant
Norton LLC.  Defendants' Responses and Objections to Plaintiffs' Statement of Material Facts,
("Defs.' Counter 56.1"), Doc. 218 ¶ 10.  Between 2002 and 2015, Defendants built their
collection of audio and audiovisual recordings of live concert performances by acquiring entities
possessing such recording archives, as well as acquiring collections of such recordings from
various concert venues.  Plaintiffs' Responses to Defendants' Statement of Material Facts ("Pls.'
Counter 56.1"), Doc. 202, ¶ 1.  These acquisitions began in July 2002, when Defendant Norton
LLC acquired Bill Graham Archives LLC ("BGA"), which owned the archives of the late
concert promoter Bill Graham.  Defs.' Counter 56.1 ¶ 11.  That acquisition netted Defendants
276 recordings covering approximately 90 of the Musical Works.  *See* Dickstein Decl. Ex. 11
(Columns E & F).  In documenting the sale, BGA was careful to advise Norton LLC that it was
making no representations regarding BGA's rights to record or exploit the Musical Works.  The
purchase agreement that conveyed the BGA collection provided that the seller was acquiring



Defs.'
Counter 56.1 ¶ 17 (citing Dickstein Decl., Ex. 3 at ¶ 3.10(a)(C), ¶ 3.11(a)).  A side letter to that
purchase agreement further provided that ████████████████████████████████
████████████████████████████████ *Id.* ¶ 18 (citing Dickstein Decl.,

6

Ex. 7 at *2).[9]  In purchasing those recordings, Defendants never saw any performance contracts

executed by the artists authorizing the recording of those performances, nor were they made

aware that such agreements existed.  *Id.* ¶ 19.

Contemporaneous external sources confirmed the exceedingly limited nature of the

intellectual property rights Norton was acquiring along with the BGA collection.  An appraisal

report prepared by Richard Prelinger, a prominent archivist and intellectual property consultant,

and included in Defendants' closing binder stated that: ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████ *Id.* ¶

21; Dickstein Decl., Ex. 5, BGA Appraisal Report, at 26200.  Indeed, in his deposition

testimony, Sagan later confirmed that he was unaware if any of the copyright owners of the

Musical Works captured in those recordings ever even consented to the recording of those

concert performances.  Defs.' Counter 56.1 ¶ 27; Dickstein Decl. Ex. 2 at 132:18–25, 133:10–15.

A marketing document for the BGA archive that was provided to Sagan at the time of the

acquisition disclosed that ████████████████████████████████

████████████████████████████████████████████████████

---

[9] In this regard, it is important to note that although he created a world-famous archive of concert footage, Bill Graham did not appear himself exploit the recordings commercially, except on a very limited basis. The video recordings were "used in approximately 10 non-revenue generating instances as part of concert programs and to provide ambient imagery for special events or private parties."  Dickstein Decl., Ex. 5, BGA Appraisal Report, at 26177.  Certain material was also licensed to VH-1 and MTV for documentary and biographic series such as "Behind the Music," "Where Are They Now," and "VH-1 Confidential." *Id.*

7

███████████████████████████████████████████

███████████████████████████████████████████

███████████████  *Id.*

Michael Krassner, an attorney who represented the seller in connection with the sale of

BGA to Defendants, explained to Sagan at the time of the sale that ██████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████  *Id.*

Finally, Nicholas Clainos, an employee of Bill Graham's companies since the 1970s and

president of those companies following Graham's death, testified that the ██████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

████████  *Id.*[10]

### C.   **Defendants Expand their Collection of Live Concert Recordings**

Following Defendants' acquisition of BGA in 2002, they acquired at least a dozen other

collections of concert tapes, which "expanded dramatically" the number of recordings in their

collection.  Defs.' Counter 56.1 ¶ 26.  All told, Defendants went on to acquire recordings from

collections owned by King Biscuit Flower Hour, Festival Network, Thomas Bradshaw, John

---

[10] Defendants challenge these statement on the basis of hearsay not within any exception and lack of personal knowledge, to the extent those statements are used to determine the Graham companies' practices prior to Clainos's hire.  Defs.' Counter 56.1 ¶ 23.

Brower, Plainfield Music, David Hewitt, Steve Weitzman, Dawson Sound Productions,

Amazingrace, Filmsonix, Fuel 2000 Records, Daytrotter, and the Ash Grove theatre.  Pls.'

Counter 56.1 ¶ 1.

The Plainfield Music collection includes some 213 recordings covering approximately 86

Musical Works.  Dickstein Decl. Ex. 11 (Columns E & F).  However, the agreement by which

Plainfield Music acquired those recordings provided that the concert promoter, ████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████  Defs.' Counter 56.1 ¶ 35.  And

despite Sagan inquiring about performance agreements for this collection, the seller of those

works did not possess any consents for Sagan to review, *id.*, and no such consents were produced

in discovery.

Likewise, David Hewitt, from whom Defendants purchased a collection of live concert

recordings that he created using recording equipment in a truck parked outside the concert

venues, acknowledged that he did not have written consents from performers because it was not

industry custom to acquire such consents when those performances were recorded.  Though, he

also noted that such consents would have gone through a legal or business department, and not

through him as the engineer.  Defs.' Counter 56.1 ¶ 33.  That collection conveyed 303 recordings

to Defendants, covering 86 of the Musical Works.  Dickstein Decl. Ex. 11 (Columns E & F).

Similarly, the agreement by which Festival Network acquired a collection of concert recordings

later sold to Defendants in 2009 noted that Festival Network's predecessor ████████████

███████████████████████████████████████████████████████████████

████████████  Defs.' Counter 56.1 ¶ 34.  Again, although Sagan requested copies of the

9

performance agreements for the Festival Network collection, he did not receive any consents, *id.*, and no consents were ever produced in discovery.

The sales agreement with Thomas Bradshaw, however, did purport to be made with the consent of performers.[11]  The agreement stated ███████████████████████ ███████████████████████████████████████████████████████ ███████████  Dickstein Decl., Ex. 15, ████████████████████████████ ████████████████████████████████████████████, ¶ 4(e). That agreement, however, did not attach any of the performer consents that were ostensibly entered into decades prior.  Moreover, that agreement further ████████████████ █████████████████████████████████████████████████████████ ███████████████████████  Dickstein Decl., Ex. 15, ¶ 4(e).  There is no evidence in the record that Defendants ever acquired those consents.

More broadly, although Defendants unilaterally prepared performer revenue share agreements, which would "authorize [them] to fully utilize and exploit the [recordings] in exchange for sharing with the Artist a portion of the revenue from such activity," Sagan testified that he could not recall which artists have signed that form, *id.* ¶ 29, and no executed performer revenue share agreements were produced in discovery.  To the contrary, three performing artists whom Defendants sought to depose—Keith Richards, David Byrne, and Michael Stipe—could not recall ever consenting to the recording of their performances.  Defs.' Counter 56.1 ¶ 30.

Notably, even as of 2010, when Defendants applied to register copyrights in remixes of concert recordings they had acquired, the United States Copyright Office repeatedly asked Defendants to ██████████████████████████████████████████████████████

---

[11] Bradshaw operated the Great American Music Hall, and conveyed 27 recordings (covering seven of the Musical Works) to Defendants.  *See* Dickstein Decl., Ex. 11 (Columns E & F).

10

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████  In response, and not

withstanding Defendants' inability to produce a single written performer consent, █████████

██████████████████████████████████████  Lundberg

Decl., Doc. 163, Ex. D.

### D.   **Defendants Begin Exploiting their Recordings**

As early as 2002, the Defendants █████████████████████

██████████████████████████████████████████████████

███████████████████████  Defs.' Counter 56.1 ¶ 53; Dickstein Decl. Ex. 2 Sagan

Dep. at 132:9–17.  In October 2003, as Sagan sought to reproduce and exploit his archive in CD

and DVD format, he informed an employee that ████████████████████

██████████████████████████████████████████████

█████████████████████████  Dickstein Decl., Ex. 30 at 2.  During his

deposition, ████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████

████████████████

In 2003, Defendants established their first website, Wolfgang's Vault, now named

11

Case 20-3816, Document 106, 03/10/2021, 3053577, Page96 of 164

Case 1:15-cv-04025-ER-HBP   Document 262   Filed 04/09/18   Page 12 of 54

Wolfgang's, to provide to the public the live concert recordings obtained through Defendants'
acquisition of BGA (the only collection that had been acquired up to that point).  Lundberg Decl.
¶ 10; Dickstein Decl, Ex. 11 (Column G, showing acquisition date).  But it was not until 2006
that Defendants made audio recordings in that collection, and others, available for download and
on-demand streaming.  *Id.*  Defendants also launched the Concert Vault website in 2006, which
offers both audio and audiovisual recordings for on-demand streaming.  Lundberg Decl. ¶ 11.  In
the years that followed, Defendants continued to expand their internet-based platforms.  In 2007,
Defendant Norton LLC acquired a majority stake in Daytrotter Media, LLC, thereby acquiring
Daytrotter's website, which also offered audio recordings to the public.  *Id.* ¶ 12.  Daytrotter
Media, LLC, which now touts itself as the source for discovering new music,[12] rewrote its
website in 2010 and now only allows visitors to download or stream audio recordings from
recording sessions hosted specifically for the website.  *Id.*  As such, Plaintiffs' recordings are no
longer offered on that website.  In 2014, Defendants' Music Vault Youtube channel was
launched and offers audiovisual recordings for on-demand streaming, including certain of the
Musical Works at issue here.  *Id.* ¶¶ 13–14.

> E.   **Mechanical Licensing**

As Defendants tell it, they have, "at all relevant times," properly obtained mechanical
licenses to ensure compliance with the Copyright Act.  Defendants' Cross-Motion for Summay
Judgment ("Defs.' MSJ"), Doc. 161, at 13.  They have done so either by working directly with
the Harry Fox Agency ("HFA"), a third-party licensing agent that grants mechanical licenses on
behalf of music publishers, or by using licensing vendors that obtain licenses on behalf of record
manufacturers and distributors.  *Id.* at 13–14; Lundberg Decl. ¶ 41.  However, Defendants first

---

[12] *See* www.daytrotter.com.

12

applied for a mechanical licensing account with the Harry Fox Agency on March 1, 2007, over a

year *after* they began to provide downloading and on-demand streaming of audio and

audiovisual recordings of the then-acquired Musical Works through the Wolfgang's and Concert

Vault websites.  Lundberg Decl. ¶ 42; *id.* Ex. 28, Application for HFA Mechanical Licensing

Account, at 1.  Defendants worked directly with HFA until 2010, when they switched to

RightsFlow Inc. ("RightsFlow") to secure their necessary licenses.  *Id.* at 43–44.

Defendants contend that RightsFlow obtained on their behalf the right to exploit the

Musical Works in one of three ways:  by either "(1) obtaining licenses directly from the

publisher; (2) obtaining licenses from HFA through Defendants' HFA mechanical licensing

account; or (3) issuing a . . . NOI . . . pursuant to the statutory requirements."  *Id.* ¶ 50 (c).

Finally, in May 2013, after RightsFlow was acquired by Google, Inc., Defendants switched to

MediaNet, Inc. ("MediaNet") to manage their licensing needs and make the necessary payments

to the publishers and administrators of the Musical Works.  *Id.* ¶ 51.  Notwithstanding "noted

administrative issues occurring with HFA" that arose when Defendants changed licensing

services providers from RightsFlow to MediaNet in 2013, Defs.' MSJ at 9; Lundberg Decl. ¶ 52,

Defendants claim that they have fulfilled their royalty-payment obligations for all the recordings

at issue and that Plaintiffs have never returned or rejected their payments, Defs.' MSJ at 9  10,

14; Pls.' Counter 56.1 ¶¶ 6–7.  Defendants also contend that they have held licenses with

performing rights organizations ("PROs"), which grant them the right to publicly perform, or, as

in this case, provide on-demand streams for viewing of the Musical Works in question.

Lundberg Decl. ¶¶ 36  39.  The PROs, in turn, pay songwriters and publishers for the public use

of their works.  *Id.* ¶ 40.  Defendants maintain that they have remitted royalties for all on-demand

streaming pursuant to their licenses with the PROs and in accordance with the law and industry

practice.  *Id.*  Those licenses, however, do not authorize Defendants to reproduce or distribute any of the Musical Works.  Lundberg Decl., Ex. 25, ██████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
█████████████████████████████████████████████████
██████████ [13]

In Plaintiffs' rendition, licensing gaps abound.  They assert that HFA licenses cover only a limited number of the recordings at issue; specifically they argue that 180 of the approximately 200 Musical Works have at least one recording that is not covered by Defendants' HFA licenses. Defs.' Counter 56.1 ¶ 63.  Plaintiffs further explain that once Defendants began sending NOIs in 2013, they served their notices months or even years after they began exploiting a given recording, and that Lundberg, Defendants' Chief Technology Officer, acknowledged that Defendants failed to abide by Section 115 when he testified that it was "common industry practice" to send NOIs *after* publishing a recording to the Defendants' websites.  *Id.* ¶ 61; Dickstein Decl., Ex. 1, Lundberg Dep. 245:13–265:23.  Further, Plaintiffs state that the NOIs "fraudulently misrepresented" the date on which Defendants began distributing the recordings at issue.  *Id.* ¶ 62. As they explain, the NOIs stated that the date of distribution of the relevant recording was the same as the date that the NOI was filed.  In actuality, and as Lundberg

---

[13] A license for public performance of a musical work, which includes on-demand streaming, is distinct from a mechanical license, which grants the licensee the right to reproduce and sell recordings of the musical work.  *Compare* 17 U.S.C. §§ 115 *with id.* § 106(4); *see Country Rd. Music, Inc. v. MP3.com, Inc.*, 279 F. Supp. 2d 325, 327 (S.D.N.Y. 2003) ("'Performance' and 'reproduction' are clearly and unambiguously separate rights under the Copyright Act of 1976 . . . .")  (citing 17 U.S.C. § 106 (1), (4)).

14

concedes, the dates listed on the NOIs were not the dates on which Defendants' own records show the recordings were first downloaded or streamed. *Id.* Although Plaintiffs admit that they have not returned any payments made to them on the Defendants' behalf, they strongly "deny that Defendants have paid all sums owed," as, they contend, "Defendants have no valid licenses that would authorize [their] exploitation" of the Musical Works at issue. Pls.' Counter 56.1 ¶ 7.

### 1. **Defendants Enter Joint Exploitation Agreements**

In 2009—three years after they began exploiting their then-current collection of live recordings—Defendants entered into Joint Exploitation Agreements with three major record labels: Warner Music, Inc., Sony Music Entertainment, and UMG Recording Inc. (collectively, the "Joint Exploitation Agreements").[14] Generally, the agreements purport to authorize Defendants to exploit through sale and distribution certain sound recordings of concerts featuring the record labels' artists, so long as Defendants obtained mechanical licenses for those recordings. *See* Lundberg Decl. ¶¶4 6, Ex. 2, Warner Music Inc. Joint Exploitation Agreement, dated August 4, 2009, §§ 1.1, 3.3; Ex. 3, Sony Music Entertainment Joint Exploitation Agreement, dated August 4, 2009, §§ 1.1, 3.2; Ex. 4, UMG Recording, Inc., Joint Exploitation Agreement, dated August 4, 2009 §§ 1, 2.2.

None of these agreements, however, provide any written consent from the artists

---

[14] Warner Music, Inc. is the record-music arm of the larger Warner Music enterprise. It is a distinct entity from Plaintiffs Warner-Tamerlane Publishing Corp, and WB Music Corp, which are publishing companies. *See* Pls.' MSJ at 38. Sony Music Entertainment is likewise the recorded –music arm of Sony, and an affiliate of Plaintiff Sony/ATV Music Publishing, LLC, which, in 2012, began administering the music catalog owned by the EMI Plaintiffs. *Id.* Defendants initially contended that Sony Music Entertainment acquired the publishing catalog of the EMI Plaintiffs noted above. Pls.' Counter 56.1 ¶ 4. However, in their Counter 56.1, they do not dispute that it is Sony/ATV Music Publishing, LLC that administers the EMI Plaintiffs' music catalog. *See* Defs.' Counter 56.1 ¶ 86; Declaration of Audrey Ashby, dated September 12, 2017, Doc. 199 ("Ashby Decl.") ¶ 3 ("Sony Music Entertainment was not a member of the group that acquired EMI," and EMI's music publishing catalog is administered by Sony/ATV – not Sony Music Entertainment.").

themselves, nor do they purport to state that the artists consented to the recording of their

performances.  Moreover, none of the Plaintiffs in this case are signatories to any of the Joint

Exploitation Agreements, and those agreements expressly exclude any rights to the musical

compositions.  Pls.' Counter 56.1 ¶ 3.

Instead, the Warner and Sony ██████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████  Lundberg Decl., Ex. 2, § 1.1.  In somewhat different language,  ████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████  Lundberg Decl., Ex. 3, § 1.1. [15]

███████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████  Defendants have produced no

---

[15] Both agreements, however, expressly exclude audiovisual recordings of the Musical Works.  *See*
Lundberg Decl., Ex. 2, § 3.6(f) (providing that the agreement "shall not apply to audio-visual
recordings")' *id.* Ex. 3, § 10.3 (same); Pls.' Counter 56.1 ¶ 3.

16

**SAppx16**

Section 1 Notices.

### 2.  **Defendants Receive Cease-and-Desist Demands**

In August of 2013 and 2014, Plaintiff ABKCO Music, Inc., demanded that Defendants

cease and desist exploiting an audiovisual recording of a 1981 Rolling Stones concert because

"ABKCO has never issued synchronization licenses for the video" and without such a grant

"ABKCO's copyrights in those Compositions have been infringed and continue to be knowingly

and willfully infringed." *Id.* ¶ 64.  From 2013 to 2016, Defendants also received several similar

demands from songwriters and publishers of songs embodied in Defendants' audiovisual

recordings, alerting Defendants that they potentially lacked the necessary licenses to exploit

those audiovisual recordings. *Id.* ¶¶ 65–71.[16]

### F.  **Procedural History**

On May 27, 2015, Plaintiffs filed this action claiming Defendants infringed their

copyrights in approximately 200 Musical Works by reproducing those works in digital format

and making them available for downloading and streaming from Defendants' websites without

Plaintiffs' consent.  Doc. 1, 43.  Plaintiffs also claimed infringement based on Defendants'

manufacture of physical records containing certain of Plaintiffs' Musical Works.  *See* Doc. 1,

Defs.' Counter 56.1 ¶ 50.[17]  All told, Plaintiffs assert that Defendants have exploited in audio or

---

[16] Defendants assert that third-party records relied on by Plaintiffs are inadmissible hearsay that may not be relied on for the truth of the matter asserted, and are not authenticated. Defs.' Reply at 37 (citing Fed. R. Evid. 801).  Plaintiffs correctly point out, however, that Defendants have authenticated these records by acknowledging their receipt and that those records are not being offered for the truth of the matter asserted, but are offered to show that the Defendants were on notice as to their allegedly infringing activity.  Pls.' Reply at 14 n.35.  As a result, the Court finds these records admissible in that limited regard.  *See George v. Celotex Corp.*, 914 F.2d 26, 30 (2d Cir. 1990) ("out of court statement offered not for the truth of the matter asserted, but merely to show that the defendant was on notice of a danger, is not hearsay").

[17] Those physical records include a vinyl albums that include the song "Moondance" by Van Morrision, and a John Denver performance of James Taylor's 'Fire and Rain." Pls.' Counter 56.1 ¶ 50.

audiovisual format more than 1,175 recordings of Plaintiffs' approximately 200 Musical Works.
*Id.* ¶ 47.  Of those approximately 200 works, Defendants have exploited audiovisual recordings
of at least 146 of them.  *Id.*  ¶ 79.

Defendants answered, asserting counterclaims seeking a declaration that their use of the
recordings does not infringe Plaintiffs' rights and that they do not need synchronization licenses
to exploit the audiovisual works at issue.  Doc. 12.[18]  Defendants also claimed in their answer
that "all of the recordings which make up Defendants' collection were created (and have been
exploited) with permission and proper legal consent from the various artists who controlled the
copyrights in the musical compositions they performed."  Doc. 12 at 21, 28 ¶¶ 4, 50.  Defendants
similarly represented in their Rule 26(a)(1) Initial Disclosures that they had "[l]icense
agreements, including but not limited to agreements between and among BGA (and/or its
predecessors and/or affiliates) and [PROs], [HFA], and/or any of the Plaintiffs . . . and/or the
artists whose musical compositions and/or recordings [Plaintiffs] now allege to control."  Defs.'
Counter 56.1 ¶ 72.  Notwithstanding ABKCO's cease and desist letters of August 2013 and 2014
and the commencement of this action, Defendants have added to their websites at least 36
recordings of Plaintiffs' Musical Works during the pendency of this action.  *Id.* ¶ 77; Doc. 59 at
4.  Following discovery, in May and September 2017, the parties filed cross-motions for
summary judgment on Plaintiffs' infringement claim and request for permanent injunction.
Docs. 161, 191.

On December 14, 2017, the Court held oral argument to address Defendants' motion to
strike eleven documents produced in Plaintiffs' reply submission that were intended to fill chain-

---

[18] Defendants also brought third party claims against the National Music Publishers' Association and its
president.  Doc. 12.  Those claims were dismissed in May 2016.  Doc. 44.

of-title gaps raised by Defendants.[19]  Because Defendants had raised those arguments for the first time in their opposition papers and the documents were relevant, the Court concluded that the documents were properly submitted in reply and denied Defendants' request.  Doc. 240 at 8, 11. The Court also granted Plaintiffs leave to submit additional, recently obtained documents that Plaintiffs claimed would complete their chain of title for the Musical Works, and permitted Defendants to submit a sur-reply addressing those chain-of-title issues.  Doc. 240 at 8, 11; Doc. 234; *id.* Ex. A, Supplemental Declaration of Audrey Ashby, Exs. 202–210.

In their sur-reply, Defendants challenged the chain of title for 45 of the Musical Works created by Pete Townshend (the "Townshend Works") and administered by Plaintiff Spirit Catalog Holdings, S.a.r.l ("Spirit").  Defendants' Sur-Reply ("Defs.' Sur-Reply"), Doc. 242 at 4. Defendants contended for the first time that Plaintiff Spirit did not own or possess an exclusive license in the Townshend Works, and that its status as "exclusive administrator" was insufficient to confer standing.  *Id.* at 5.

On February 6, 2018, Plaintiffs moved to strike the portions of Defendants' sur-reply that alleged a break in the chain of title for the Townshend Works.  Doc. 244 at 1.  They contended that the chain-of-title documentation challenged by Defendants fell outside the scope of the Court's prior order, and had been produced to Defendants not later than March 2017.  *Id.* at 2. Alternatively, Plaintiffs advanced several theories purporting to establish Spirit's standing to sue. First, Plaintiffs claimed that because Townshend assigned Spirit his 50% share of writer's royalties, Spirit was a beneficial owner with standing to sue.  *Id.*  Second, Plaintiffs claimed that Spirits "exclusive administration rights" entitled them to bring suit on behalf of the owner or exclusive licensee.  *Id.* at 3.  Third, Plaintiffs claimed that Spirit could bring suit on behalf of its

---

[19] Defendants concede Plaintiffs' copyright ownership for purposes of their summary judgment motion. *See* Defs.' MSJ at n.2.

wholly owned subsidiaries, Towser Tunes, Inc. and its subsidiary Towser Newco Ltd., which the

parties agreed held the exclusive license in the Townshend Works.  *Id.*; Doc. 242 at 6

("Towser—not its new parent Spirit—continued to hold any and all copyrights.").  Finally, and

in the alternative, Plaintiffs requested leave to join its subsidiaries pursuant to Federal Rule of

Civil Procedure 17(a)(3).  Doc. 244 at 3.

On March 26, 2018, the Court heard oral argument on these issues, among others.  In an

effort to reach the merits, the Court denied Plaintiffs' motion to strike and concluded that Spirit

lacked standing to sue under any of the theories advanced by Plaintiffs because neither exclusive

administration rights nor beneficial ownership in a writer's royalty share conferred to Spirit an

"exclusive right" as contemplated by the Copyright Act.  *See* 17 U.S.C. § 501(b) (providing that

"the legal or beneficial owner of an exclusive right" may bring suit); *id.* § 106 (setting out the

"exclusive rights" referenced in Section 501(b)); *Russian Entm't Wholesale, Inc. v. Close–Up*

*Intern., Inc.*, 482 Fed. Appx. 602, 604 (2d Cir. 2012) ("[T]he legal or beneficial owner of an

*exclusive right* under a copyright is entitled . . . to institute an action for any infringement of that

particular right committed while he or she is the owner of it."); *Eden Toys, Inc. v. Florelee*

*Undergarment Co., Inc.*, 697 F.2d 27, 32 (2d Cir. 1982), *superseded on other grounds by* Fed. R.

Civ. P. 52(a) ("The Copyright Act authorizes only two types of claimants to sue for copyright

infringement:  [i] owners of copyrights, and [ii] persons who have been granted exclusive

licenses by owners of copyrights."); *John Wiley & Sons, Inc. v. DRK Photo*, 998 F. Supp. 2d

262, 276–77 (S.D.N.Y. 2014) ("Although the right to prosecute an accrued cause of action for

infringement is also an incident of copyright ownership, it is not an exclusive right under" the

Copyright Act.) (citations, alterations, and quotation marks omitted) *aff'd*, 882 F.3d 394 (2d Cir.

2018).  Nor does "a parent company [have] standing to bring claims on behalf of its subsidiary."

20

**SAppx20**

*EMI Entm't World, Inc. v. Karen Records, Inc.*, No. 05 CIV. 390 LAP, 2013 WL 2480212, at *3 (S.D.N.Y. June 10, 2013); *Yong Ki Hong v. KBS Am., Inc.*, 951 F. Supp. 2d 402, 430 (E.D.N.Y. 2013) ("although the contract purports to delegate . . . authority . . . to protect [the] copyrights from infringement, *Eden Toys* makes clear that a copyright owner cannot, by contract or otherwise, grant a non-exclusive licensee the right to sue for copyright infringement").

The Court, however, granted Plaintiffs leave to join its subsidiaries, Towser Tunes, Inc. and Towser Newco Ltd., which indisputably do have standing to sue, *see* Defs.' Sur-Reply at 6, concluding that their joinder would not prejudice Defendants as no new discovery was required, and the subsidiaries had the same officers, executives and business operations as Spirit. *See* Fed. R. Civ. P. 17(a)(3) ("The court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action.").

## II.   LEGAL STANDARD

### A.   Motion for Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). A fact is "material" if it might affect the outcome of the litigation under the governing law. *Id.* The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue

21

**SAppx21**

of fact for trial in order to avoid summary judgment." *Saenger v. Montefiore Med. Ctr.*, 706 F.

Supp. 2d 494, 504 (S.D.N.Y. 2010) (internal quotation marks omitted) (citing *Jaramillo v.*

*Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

  In deciding a motion for summary judgment, the Court must "'construe the facts in the

light most favorable to the non-moving party and must resolve all ambiguities and draw all

reasonable inferences against the movant.'" *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir.

2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)).  However,

in opposing a motion for summary judgment, the non-moving party may not rely on unsupported

assertions, conjecture or surmise.  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14,

18 (2d Cir. 1995).  To defeat a motion for summary judgment, "the non-moving party must set

forth significant, probative evidence on which a reasonable fact-finder could decide in its favor."

*Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 256–57

(1986)).

  "When confronted with cross-motions for summary judgment, the Court analyzes each

motion separately, 'in each case construing the evidence in the light most favorable to the non-

moving party.'" *Peterson v. Kolodin*, No. 13 Civ. 793 (JSR), 2013 WL 5226114, at *1

(S.D.N.Y. Sept. 10, 2013) (quoting *Novella v. Westchester Cty.*, 661 F.3d 128, 139 (2d Cir.

2011)); *see also Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) ("[E]ach

party's motion must be examined on its own merits, and in each case all reasonable inferences

must be drawn against the party whose motion is under consideration.") (citation omitted).  The

Court is not required to resolve the case on summary judgment merely because all parties move

for summary judgment.  *Morales*, 249 F.3d at 121.

B.    **Copyright Infringement**

To establish copyright infringement, a plaintiff must demonstrate "'(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" *Kwan v. Schlein*, 634 F.3d 224, 229 (2d Cir. 2011) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361 (1991)). Copyright owners and their exclusive licensees are entitled to bring an action for copyright infringement. *See* 17 U.S.C. § 501(a)–(b); *Random House, Inc. v. Rosetta Books LLC*, 283 F.3d 490, 491 (2d Cir. 2002). "A certificate of copyright registration is prima facie evidence that the copyright is valid." *Fonar Corp. v. Domenick*, 105 F.3d 99, 104 (2d Cir. 1997) (citing 17 U.S.C. § 410(c); *Folio Impressions, Inc. v. Byer Cal.*, 937 F.2d 759, 763 (2d Cir. 1991)).

Once a plaintiff establishes infringement, a defendant may proffer as a defense proof that it held a valid license to use that copyrighted work. *See Associated Press v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537, 561 (S.D.N.Y. 2013) (citing *Graham v. James*, 144 F.3d 229, 236 (2d Cir. 1998)). A valid nonexclusive license "immunizes the licensee from a charge of copyright infringement, provided that the licensee uses the copyright as agreed with the licensor." *Davis v. Blige*, 505 F.3d 90, 100 (2d Cir. 2007) (citing *Graham v. James*, 144 F.3d 229, 236 (2d Cir. 1998) ("A copyright owner who grants a nonexclusive license to use his copyrighted material waives his right to sue the licensee for copyright infringement.")).

The party raising the defense bears the burden of proving that a valid license exists. *Associated Press*, 931 F. Supp. 2d at 561; *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 107 (2d Cir. 1998) (noting that it is the "proponent" of an "affirmative defense to a claim of infringement" that bears "the burden of proof") (citing *Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 590 (1994)); *Am. Geophysical Union v. Texaco, Inc.* 60 F.3d 913, 918 (2d Cir. 1994)

23

(stating that a party claiming fair use "typically carries the burden of proof as to all issues in the dispute").

## III.   DISCUSSION

### A.   Copyright Ownership and Copying

Here, there is no dispute that Plaintiffs have produced copyright registrations for each of the Musical Works at issue, entitling them to a prima facie presumption of validity. *Fonar Corp.*, 105 F.3d at 104 (citing 17 U.S.C. § 410(c); *Folio Impressions, Inc.*, 937 F.2d at 763); Defs' Counter 56.1 ¶ 78. As noted, Defendants concede Plaintiffs' copyright ownership for purposes of their summary judgment motion and ultimately challenged the chain of title for the 45 Townshend Works only. *See* Defs.' MSJ n.2; Defs.' Sur-Reply at 5. The joinder of Plaintiff Spirit's subsidiaries, Towser Tunes, Inc. and Towser Newco Ltd., resolved that chain-of-title challenge and it is undisputed that Plaintiffs now have standing to sue for the entirety of the Musical Works. *See* Doc. 234; *id.* Ex. A, Supplemental Declaration of Audrey Ashby, Exs. 202–210; Ex. B, Supplemental Declaration of Tal. E. Dickstein, Ex. 57A (addressing each of the chain-of-title issues raised by Defendants). Nor is there any dispute that Defendants have exploited, in audio or audiovisual format, more than 1,175 recordings of Plaintiffs' Musical Works, and manufactured physical records of certain of those works. Defs.' Counter 56.1 ¶¶ 47, 50. Accordingly, Plaintiffs have established infringement and the burden shifts to Defendants to demonstrate that they hold valid licenses authorizing the exploitation of Plaintiffs' Musical Works. *See Associated Press*, 931 F. Supp. 2d at 561; *Infinity Broad. Corp.*, 150 F.3d at 107.

**SAppx24**

**B.    Defenses**

In disputing Plaintiffs' copyright infringement claim, Defendants contend that, from 2007 to the present,[20] they have held valid mechanical licenses—either in the form of compulsory licenses acquired by their licensing vendors pursuant to Section 115's notice requirements, or equivalent licenses through HFA—authorizing them to exploit the Musical Works.  Defs' MSJ at 22 (stating that in "Defendants first began acquiring mechanical licenses and paying Plaintiffs under such licenses" in 2007).  Defendants' Reply ("Defs.' Reply"), Doc. 217 at 2 ("Defendants obtained compulsory mechanical licenses pursuant to 17 U.S.C. § 115.").  Plaintiffs, on the other hand, contend that Defendants do not have valid mechanical licenses and advance several bases in support of their claim.  *First*, they assert that audiovisual works—video recordings of the works being performed live in concert—are not eligible for Section 115 compulsory mechanical licenses.  *Second*, Plaintiffs argue that none of Defendants' live concert recordings are eligible for mechanical licenses because (i) they were not "lawfully fixed" in the first instance, (ii) Defendants cannot show that they obtained the necessary authorization from the performers reflected in those recordings, and (iii) Defendants cannot show that the recordings made prior to February 15, 1972 were fixed pursuant to licenses from the owners of copyrights in the underlying Musical Works, i.e., Plaintiffs or their predecessors.  *Third*, Plaintiffs contend that Defendants issued untimely and fraudulent NOIs that provide an independent basis for finding their compulsory mechanical licenses invalid.  *Fourth*, and finally, Plaintiffs assert that Defendants' HFA licenses cannot shield them from the infringement alleged here.  Plaintiffs'

---

[20] Defendants implicitly concede that they did not have authority to exploit the works when they first made certain of them available in 2006.  However, they assert a statute of limitations defense with respect to that infringing activity, which is addressed below.

25

Cross-Motion for Summary Judgment ("Pls.' MSJ"), Doc. 191, at 22  34.  The Court addresses

each of these arguments in turn.

### 1.  Audiovisual Recordings

Relying on the text of the Copyright Act, Plaintiffs assert that Defendants' *audiovisual*

recordings are ineligible for Section 115 compulsory mechanical licenses.  Pls.' MSJ at 22, 25–

26.[21]  As Plaintiffs explain, "Section 115 grants a limited license to 'make and to distribute

*phonorecords* of [musical] works[.]'"  Pls.' MSJ at 25 (citing 17 U.S.C. § 115) (emphasis

added).  The Copyright Act, in turn, defines "phonorecords" as:

> material objects in which sounds, *other than those accompanying a*
> *motion picture or other audiovisual work*, are fixed . . ., and from
> which the sounds can be perceived, reproduced, or otherwise
> communicated, either directly or with the aid of a machine or device.
> The term "phonorecords" includes the material object in which the
> sounds are first fixed.

17 U.S.C. § 101 (emphasis added).

Notwithstanding the statute's clear language, Defendants contend that the Copyright

Act's text compels the opposite result.  For support they rely on the last sentence of the definition

of phonorecords, which states:  "The term 'phonorecords' includes the material object in which

the sounds are first fixed."  17 U.S.C. § 101; Defs.' Reply at 12.  Defendants claim that because

their live concert recordings "first fixed" the sounds in those recordings as part of an audiovisual

work, the resulting "material object" qualifies as a phonorecord.  *Id.*  To conclude otherwise,

Defendants contend, would fail to give effect to both sentences and result in the second sentence

being "completely redundant, since 'material objects in which sounds . . . are fixed' plainly

includes the material objects in which sounds are first fixed."  *Id.*

---

[21] The parties agree that Defendants have exploited 206 audiovisual recordings that cover 146 of the
Musical Works.  *See* Defs.' MSJ at 15; Pls.' MSJ at 23; Lundberg Decl., Ex. 5.

26

The Court finds Defendants' interpretation unpersuasive. The second sentence cannot save Defendants from the first sentence's categorical exclusion of audiovisual works. That is because the second sentence speaks only in terms of "*the* material object in which *the sounds* are first fixed." Pursuant to its terms, then, the second sentence itself reinforces the concept that phonorecords include only sounds, and makes no mention of *audiovisual* works. Moreover, as Plaintiffs note, Plaintiffs Reply ("Pls.' Reply"), Doc. 230 at 9, the use of the definite article "the" to reference the concepts "material objects" and "sounds" can only be read to refer to these terms as *previously* defined in the first sentence, that is to say, as expressly excluding audiovisual works. *See Am. Bus Ass'n v. Slater*, 231 F.3d 1, 4–5 (D.C. Cir. 2000) ("[I]t is a rule of law well established that the definite article 'the' particularizes the subject which it precedes.") (citations and internal quotation marks omitted); *see also S.E.C. v. KPMG LLP*, 412 F.Supp.2d 349, 387–88 (S.D.N.Y. 2006) ("A [statute's] use of the definite article 'the,' as opposed to the indefinite 'a,' 'an,' or 'any,' indicates that Congress intended the term modified to have a singular referent.").[22]

The Court does not make this determination on a blank slate. The Second Circuit has held that the "plain language of [Section 101 of] the Copyright Act refutes" the claim that

---

[22] Nor is the Court persuaded that the general preference of statutory construction that courts avoid redundancy merits adopting Defendants' interpretation. As Plaintiffs explain, the more natural interpretation is that Congress intended to ensure that the Copyright Act protected as phonorecords material objects such as studio equipment on which "sounds are first fixed," just as it protected commercially available objects such as records and CDs. Pls.' Reply at 8–9. Where "[s]urplusage does not . . . produce ambiguity [the Court's] preference for avoiding surplusage constructions is not absolute." *Lamie v. U.S. Tr.*, 540 U.S. 526, 536 (2004); *Alliance for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 430 F. Supp. 2d 222, 247 (S.D.N.Y. 2006), *aff'd*, 651 F.3d 218 (2d Cir. 2011), *aff'd sub nom. Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013) ("[W]hen construing a statute, the general preference against surplusage is constrained by the requirement that a construction avoiding surplusage must be a reasonable one."); *see also Sabre, Inc. v. Dep't of Transp.*, 429 F.3d 1113, 1122 (D.C. Cir. 2005) ("Legislative drafters often use apparently redundant language in order to emphasize . . . .").

"audiovisual works" fall "within the grant of [a] compulsory license[]." *ABKCO Music, Inc. v. Stellar Records, Inc.*, 96 F.3d 60, 65 (2d Cir. 1996) *abrogated on other grounds by Salinger v. Colting*, 607 F.3d 68, 75 (2d Cir. 2010). In reaching that conclusion, the Court explained that "[p]honorecords are defined as objects on which 'sounds' are fixed," but that the definition does not include "objects on which sounds *and* visual representations . . . are fixed." *Id.* (emphasis in original). The Court further noted that the term "phonorecords" excludes "audiovisual works," which, by definition, "'consist of a series of related images . . . together with accompanying sounds." *Id.* (quoting 17 U.S.C. § 101). There is no dispute that Defendants' "audiovisual recordings" (a term they employ almost exclusively) meet this definition.[23] Accordingly, Defendants' license defense fails with respect to each of the 206 audiovisual recordings.[24]

## 2. **Lawful Fixation**

Section 115(a)(1) provides that:

> [a] person may not obtain a compulsory license for use of the [musical] work in the making of phonorecords duplicating a sound recording fixed by another, *unless*: (i) such sound recording was *fixed lawfully*; and (ii) the making of the phonorecords was

---

[23] For the reasons stated above, the Court declines Defendants' invitation to reject the holding of *ABKCO Music, Inc.*, on the basis that that the Court would have reached a different conclusion had the case concerned a "first fixed" recording. Defs.' Reply at 14.

[24] In their papers, the parties dispute whether Defendants need "synchronization" licenses to exploit their audiovisual recordings. *See* Pls.' MSJ at 23–24; Defs.' MSJ at 15. But the issue before the Court is whether Defendants had valid licenses for their audiovisual recordings that immunizes them from a charge of infringement. Because the Court concludes that mechanical licenses do not cover audiovisual recordings, it need not address whether Defendants needed synchronization licenses (which they never obtained) to exploit audiovisual recordings of the Musical Works. Defendants sought adjudication of that issue as part of their counterclaims against Plaintiffs. *See* Doc. 9 at 20–23. In Defendants' Notice of Motion for Summary Judgment and/or Summary Adjudication, however, they moved only on "Plaintiffs' claims of copyright infringement against Defendants," but did *not* seek summary judgment on their counterclaims. Doc. 161 at 1. Nor have Plaintiffs cross-moved for summary judgment on Defendants' counterclaims. *See* Doc. 191 at 2 (seeking a "grant[] [of] summary judgment on liability for Defendants' infringements of Plaintiffs' copyrights in and to each of the musical works at issue," but not moving for summary judgment on Defendants' counterclaims); Pls.' Reply at 8 ("the Court need not define the scope of a synch license in order to decide this motion").

> *authorized by the owner of copyright in the sound recording* or, if
> the sound recording was fixed before February 15, 1972, *by any*
> *person who fixed the sound recording pursuant to an express license*
> *from the owner of the copyright in the musical work or pursuant to*
> *a valid compulsory license* for use of such work in a sound
> recording.

17 U.S.C. § 115(a)(1) (emphasis added).

In order for a work to be lawfully fixed it cannot "constitute[] copyright infringement

under federal law, or common law copyright infringement, unfair competition," or any other

violation of state law. 2 Nimmer § 8.04[E][2] n.88. The parties are in agreement that Section

115(a)(1)(i) requires Defendants to have obtained the consent of the musical performers for their

recordings to be lawfully fixed. *See* Pls.' MSJ at 29 ("Defendants must show that [the concert

recordings] were made with the consent of . . . the performing artists . . . ."); Defs.' Reply at 6

("Whether a fixation is 'lawful' depends exclusively on whether the performer's consent was

obtained.") (alteration omitted). This is because it is a violation of state and federal law to record

a live musical performance "without the consent of the performer or performers involved." 17

U.S.C. § 1101(a); *see also* N.Y. Penal Law § 275.15 (criminalizing the manufacture or sale of an

unauthorized recording of a performance where, among other things, a person sells, resells, or

rents any recording "the person knows" was produced "without the consent of the performer").

The parties disagree, however, as to whether consent of the performers was properly obtained.

They also dispute whether lawful fixation requires the consent of the holder of a copyright in a

musical work. *See* Pls.' MSJ at 31, 33; Defs.' Reply at 6–8.

The Court turns to the issue of the performers' consent first, because if it is resolved in

Plaintiffs' favor, the Court need not reach the question of whether lawful fixation also requires

the consent of the holder of a copyright in the musical work.

     *i.   Performer Consent*

     In support of their claim that their live concert recordings were lawfully fixed,

Defendants rely on the three Joint Exploitation Agreements entered into with third-party record

labels years after they began exploiting their collection of live recordings and a sales agreement

conveying to Defendants a collection of live recordings covering six of the Musical Works.

Defs.' Reply at 9.  According to Defendants, those agreements purport to show that "performers

duly consented to the[] first fixation of their live performances."  *Id.*  Plaintiffs contend that these

agreements are insufficient because they are not proof of consent from the performers

themselves and because they are inadmissible hearsay that may not be considered on a motion

for summary judgment.  Pls.' Reply at 3.  The Court agrees.

     The Joint Exploitation Agreements, which were entered into in 2009, in most cases

decades after the recordings were fixed, are insufficient to demonstrate that the initial fixation of

those recordings was lawful because, contrary to Defendants' characterization, the agreements

do not purport to "acknowledge that the recordings were lawfully made." Defs.' Reply at 9.[25]

---

[25] The Court separately concludes that the joint exploitation and sales agreements are inadmissible for the
purposes of proving that the artists gave their consent. The agreements purport to contain out of court
statements by the artists (i.e., that they consented to the fixation and exploitation of their recordings),
within a document that is itself an out of court statement. While the contract itself is admissible because
it is a verbal act, Fed. R. Evid. Note to 801(c), the document may not be used to prove artist consent
because the artists are not signatories to the agreement and their statements are hearsay, for which
Defendants have not offered an applicable exception. *See* Fed. R. Evid. 801(c); *cf. id.* 805; (noting that
"each part of the combined statements [must] conform[] with an exception to the [hearsay] rule").
Accordingly, because factual assertions must be supported by admissible evidence, the Court may not
consider these documents on summary judgment for the purpose of determining that the performing
artists consented to the fixation and exploitation of their performances. *See* Fed. R. Civ. P. 56(c)(2).

On March 23, 2018, Defendants requested leave to submit replacement copies of the Joint Exploitation
Agreements, which, unlike the version of those Agreements addressed above, do provide schedules of the
artists and performances to which those agreements apply. Those agreements, however, still do not
include the actual artist authorizations and do not purport to provide consent for the fixation of the
recordings. Moreover, those documents also contain the same hearsay issue noted above. As such, the
Court denies Defendants' request to supplement these documents into the summary judgment record as
this late hour.

Rather, the Sony and Warner agreements contain representations and warranties from the third-party record labels that purport to have the consent of artists that authorize the record labels to grant Defendants the right to exploit the sound recordings in which those artists' performances are embodied. ███████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████ Neither of these agreements provide any written consent from the artists themselves or purport to say anything about whether the artists consented to the initial *fixation* of these recordings.

Defendants cannot rely on documents purporting to grant exploitation rights as proof that artists consented to the initial fixation of their performance decades prior. *See* 17 U.S.C. § 101 ("A work is 'fixed' in a tangible medium of expression when its embodiment in a copy or phonorecord, by or under the authority of the author, is sufficiently permanent or stable to permit it to be perceived . . . ."). This requirement is not pure semantics. The requirement that the recording be "fixed lawfully," which requires performer consent, is separate from the requirement that copyright holders in the performance authorize the "making of the phonorecords," i.e., that the reproduction and distribution of the recording is also authorized. *See id.* § 115(a)(1)(i)–(ii). At best, the Sony and Warner agreements purport to do the latter, and are insufficient even in that respect.

As Plaintiffs point out, Pls.' Reply at 4, the agreements do not identify the performers, or attach any written consents from those performers. There is therefore no basis on which a trier

31

of fact could determine which performers or recordings these Joint Exploitation Agreements ostensibly cover.  Finally, even if those agreements were proof that the Defendants were authorized to reproduce and distribute those works, neither the Sony nor the Warner agreement applies to any audiovisual recordings of the Musical Works.  *See* Lundberg Decl., Ex. 2 ███████

██████████████████████████████████████████████████████████████

██████

    The UMG agreement is even less helpful to Defendants' case.  █████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████

    Defendants similarly rely on a sales agreement conveying to Defendants a collection of live recordings covering six of the Musical Works. Defs.' Reply at 9.  In that agreement, the music venue operator, the Great Music Hall, represented and warranted that █████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████    Although that agreement at least purports to have contemporaneous consents from artists to lawfully fix recordings of their performances, the agreement does not attach any

32

of the artist consents.  Moreover, that agreement provides that Defendants were required █

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

*Id.*  As Plaintiffs note, nothing in the record indicates that Defendants have complied with that

requirement.  Pls.' Reply at 3 n.8.

    Moreover, Defendants' claim of artist consent is belied by contrary admissible evidence

that consent does not exist.  As an initial matter there is no dispute that Defendants have not

produced a single performance agreement or consent from any of the performing artists at issue.

Defs.' Counter 56.1 ¶ 20.  The BGA collection contained a side letter to that purchase agreement

that provided:  ███████████████████████████████████████████████

█████████████████  *Id.* ¶ 18 (citing Dickstein Decl., Ex. 7 at *2).  And Defendants never

viewed any artist performance contracts authorizing the recording of those performances, nor

were they made aware that such agreements existed.  *Id.* ¶ 19.  Krassner, the attorney who

represented the seller in connection with the BGA sale, specially ███████████████████

██████████████████████████████████████████████████████████████████

*Id.* ¶ 25.

    Likewise, David Hewitt, from whom Defendants purchased a collection of recordings,

acknowledged that he did not have written consents from performers because it was not industry

custom to acquire such consents when those performances were recorded.  Defs.' Counter 56.1 ¶

33.  That collection contains 303 recordings covering 86 of the Musical Works.  Dickstein Decl.

Ex. 11 (Columns E & F).  Similarly, the agreement by which Festival Network acquired a

collection of concert recordings later sold to Defendants in 2009 noted that Festival Network's

predecessor did ████████████████████████████████████████████

████████████████████ Defs.' Counter 56.1 ¶ 34.  Finally, there is undisputed

evidence that the three performing artists whom Defendants sought to depose—Keith Richards,

David Byrne, and Michael Stipe—could not recall ever consenting to the recording of their

performances.  Defs.' Counter 56.1 ¶ 30.  As a result, Defendants have not sustained their burden

of demonstrating that any of their recordings were lawfully fixed.[26]

    *ii.*    *Pre-1972 Musical Works*

      Section 115 separately requires that, for "sound recordings . . . fixed before February 15,

1972," compulsory licensees must demonstrate that the making of phonorecords was authorized

"by any person who fixed the sound recording pursuant to an express license from the owner of

the copyright in the musical work or pursuant to a valid compulsory license for use of such work

in a sound recording."  17 U.S.C. § 115(a)(1)(ii); *see also Blagman v. Apple, Inc.*, No. 12 Civ.

5453 (ALC) (JCF), 2014 WL 1285496, at *7 (S.D.N.Y. Mar. 31, 2014) ("Federal copyright law

further provides that a compulsory license in the underlying composition may not issue unless,

for sound recordings fixed prior to 1972, the duplicator obtains authorization from the person

who fixed the sound recording, who must themselves have had authorization [from] the

copyright owner of the . . . underlying composition.") (citation and quotation marks omitted); 2

Nimmer § 8.04[E][2] ("The compulsory licensee must be authorized to make that duplication by

the person who fixed the sound recording, who must, in turn, have made the fixation pursuant to

a consensual or compulsory license from the copyright owner of the musical work that was thus

---

[26] For precisely the same evidentiary reasons, Defendants cannot show that "the making of the
phonorecords was authorized by the owner of copyright in the sound recording."  17 U.S.C. §
115(a)(1)(ii); *see also In re Cellco P'ship*, 663 F. Supp. 2d 363, 369 (S.D.N.Y. 2009) (The owner of a
copyright in the sound recording "is the performer(s) whose performance is fixed, or the record producer
who processes the sounds and fixes them in the final recording, or both."); *In re Porter*, 498 B.R. 609,
670 (Bankr. E.D. La. 2013) ("A sound recording is owned by the person whose performance is reflected
on the recording.").

fixed."). That is because the Copyright Act does not protect "sound recording[s] fixed before February 15, 1972." 17 U.S.C.A. § 301(c); *see* 2 Nimmer § 8.04[E][2] (noting that sound recordings fixed prior to February 15, 1972 are "not subject to statutory copyright").

Defendants claim that Plaintiffs have not refuted the evidence that pre-1972 recordings were properly authorized. Defs.' Reply at 5. This argument is totally without merit. As an initial matter it is Defendants who bear the burden of proving that their licenses were valid. *See Associated Press*, 931 F. Supp. 2d at 561; *Infinity Broad. Corp.*, 150 F.3d at 107. But more importantly, there is nothing for Plaintiffs to refute: Defendants point to *no* evidence that the sound recordings were fixed pursuant to an express license or valid compulsory license from the holders of copyrights in the Musical Works, i.e., Plaintiffs or their predecessors. *See* 17.U.S.C. § 115(a)(1)(ii). As such, Defendants have failed to establish that they hold valid licenses for any of the pre-1972 recordings.

### 3. **HFA Licenses**

From 2007 to 2010, prior to hiring RightsFlow to manage their licenses, Defendants worked directly through HFA. Lundberg Decl. ¶¶ 41–47. Defendants contend that these licenses are "negotiated licenses" that are not subject to the requirements of Section 115. Defs.' MSJ at 19; Defs.' Reply at 15. Plaintiffs disagree, claiming that the HFA licenses are Section 115 compulsory licenses and invalid for the same reasons set forth above. Pls. MSJ at 13, 34–35. The Court concludes that Defendants' HFA licenses are insufficient to establish that licenses are valid because those licenses do not alter the substantive requirements of Section 115.

Most mechanical licensees do not use Section 115's notice requirements. Rather, they acquire licenses through HFA, which is authorized to issue mechanical licenses on behalf of publishers. *See EMI Entm't World, Inc. v. Karen Records, Inc.*, 603 F. Supp. 2d 759, 763

35

(S.D.N.Y. 2009); *Rodgers & Hammerstein Org. v. UMG Recordings, Inc.*, No. 00 CIV. 9322 (JSM), 2001 WL 1135811, at *2 (S.D.N.Y. Sept. 26, 2001). Although HFA acts to "streamline the procedures created by §§ 115(b) and 115(c)," the "[l]icenses issued by [HFA] do not . . . alter the basic rights and obligations of the licensee under § 115." *EMI Entm't World, Inc.*, 603 F. Supp. 2d at 763–64; *see also Rodgers & Hammerstein Org.*, 2001 WL 1135811, at *2.[27]

That understanding is borne out by the undisputed record evidence. Defendants' communications with HFA confirm that the licenses HFA issued were ███████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████ Defendants have put forward no evidence to support their contention that the HFA licenses they obtained deviated from Section 115's substantive requirements.

Defendants' HFA licenses are therefore invalid as a matter of law: They are substantively invalid because, as set forth above, there is no indication that the recordings were lawfully fixed, or that the pre-1972 recordings were fixed pursuant to express or compulsory licenses from Plaintiffs or their predecessors. And just as a Section 115 mechanical license does not apply to audiovisual works, the HFA licenses do not either. *See Sony/ATV Publ'g, LLC v. Marcos*, 651 F. App'x 482, 485 (6th Cir. 2016) (HFA licenses are a "standard compulsory

---

[27] Defendants take out of context language in *Rodgers & Hammerstein Org.*, which states that "HFA waives the statutory notice requirements." 2001 WL 1135811, at *2. Understood in context, that case stands for the proposition that HFA acts as the publishers' "agent to receive notice[s] of the intention to obtain a compulsory license, and to collect and distribute royalties." *Id.* It does not stand for the proposition that parties need not have HFA licenses prior to distributing phonorecords of a musical work.

license limited to distribution of phonorecords and incorporates the statutory definition of that

term, which excludes 'audiovisual work[s].'") (quoting 17 U.S.C. § 101).  Moreover, because

Defendants concede they began exploiting certain recordings in 2006, but only obtained HFA

licenses beginning in 2007, recordings exploited prior to obtaining an HFA license are, as set

forth directly below, independently barred by Section 115's filing requirements, and any

reproduction or distribution made pursuant to those untimely licenses, constitutes infringement.

###    4.  **Untimely NOIs**

As a further independent basis for finding Defendants' mechanical licenses invalid,

Plaintiffs contend that Defendants' NOIs were not filed prior to the reproduction and distribution

of their phonorecords, and are therefore invalid pursuant to Section 115(b).  Pls.' MSJ at 26.  For

support they cite to a spreadsheet showing that for all but five recordings Defendants filed NOIs

months or years after they admittedly began exploiting those recordings.  *See* Pls.' MSJ at 12;

Defs.' Counter 56.1 ¶ 60; Dickstein Decl. Ex. 52; Dickstein Decl. Ex. 1, Lundberg Dep. at

245:13–257:25 (stating "we always publish [songs] before we file [NOIs]").[28]  For their part,

Defendants advance two positions, one factual, the other legal.  As a factual matter, Defendants

assert that they held HFA licenses prior to submitting NOIs pursuant to Section 115's notice

requirements.  Defs.' Reply at 15.  As a result, they explain, Plaintiffs' claim that NOIs were

filed months or years after the exploitation of the relevant recording is without basis.  For

support, they point to Lundberg's declaration, which avers that Defendants have held a

---

[28] On March 23, 2016, Defendants requested leave to file a supplemental declaration on behalf of Lundberg, in which he attempts to explain away his prior sworn deposition testimony that Defendants had a practice of making recordings available on their websites prior to filing NOIs.  Doc. 252.  Because the proposed supplemental declaration contradicts Lundberg's prior sworn testimony, the Court denies Defendants' request.  *See Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 572 (2d Cir. 1991) ("The rule is well-settled in this circuit that a party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing    prior sworn testimony.").

mechanical licensing account with HFA since 2007 and licensed musical works through HFA

until 2010. Lundberg Decl. ¶¶ 42–44. They also point to a spreadsheet that contains each

recording that was licensed through Defendants' HFA account along with the HFA license

number. *Id.* Ex. 29; Defs.' Counter 56.1 ¶ 62. Having reviewed the record evidence, the Court

concludes that there is a disputed question of fact as to whether and which NOIs were actually

submitted after the first download or streaming of a phonorecord and in the absence of an HFA

license. Although the parties offer evidence which they claim resolves this issue, as best the

Court can tell, neither the affidavits or spreadsheets relied on by the parties on their own terms

bridge the gap between the HFA licenses and the submission of NOIs.

     Second, Defendants contend that as a legal matter the incorrect date of distribution on

their NOIs is "harmless error." *See* Defs.' Reply at 25 (citing 37 C.F.R. § 201.18(h) ("Harmless

errors in a Notice that do not materially affect the adequacy of the information required to serve

the purposes of section 115(b)(1) of title 17 of the United States Code, shall not render the

Notice invalid.").

     Section 115(b)(1) expressly provides that "[a]ny person who wishes to obtain a

compulsory license under this section *shall*, before or within thirty days after making, and before

distributing any phonorecords of the work, serve notice of intention to do so on the copyright

owner." 17 U.S.C. § 115(b)(1) (emphasis added). Section 115(b)(2) then states that "[f]ailure to

serve or file the notice required by clause (1) forecloses the possibility of a compulsory license

and, in the absence of a negotiated license, renders the making and distribution of phonorecords

actionable as acts of infringement . . . ." *Id.* § 115(b)(2). In view of this language, and the

absence of case law to the contrary, the Court declines to read the regulation's harmless error

exception as an exemption from the mandatory filing period in Section 115(b)(1). *See e.g.*,

38

*Cherry River Music Co.*, 38 F. Supp. 2d at 312 ("[T]he failure to serve the [NOI] before distributing phonorecords . . . before the start of distribution *precludes* the creation of a compulsory license, and it does so both as to copies distributed prior to service and as to copies distributed thereafter.") (emphasis added).  Rather, the Court construes the harmless error exception to apply to the clerical filing formalities contained in that provision.  *See* 17 U.S.C. § 115(b)(1) (providing that the NOI "shall comply, in form, content, and manner of service, with requirements that the Register of Copyrights shall prescribe by regulation").

*     *     *

To summarize, the Court concludes that Defendants hold no valid licenses authorizing the reproduction and distribution of the Musical Works.  Audiovisual recordings are not covered by Section 115 mechanical licenses, and Defendants have not met their burden of establishing that the balance of their recordings were fixed or manufactured with the consent of the artists featured in them, nor have they demonstrated that the pre-1972 recordings were fixed pursuant to an express or valid compulsory license from the copyright holders in the Musical Works, i.e., Plaintiffs or their predecessors.  Moreover, any mechanical licenses    whether procured by NOIs or through HFA—that were not filed prior to the distribution of the related phonorecords are, as a legal matter, invalid.  However, there remain questions of fact as to whether certain of the NOIs were untimely filed, or covered by preexisting HFA licenses.  While that issue does not alter the Court's analysis of infringement, as discussed below, it does raise a triable issue on whether untimely NOIs were recklessly or willfully filed after the distribution of phonorecords.

39

C.    **Additional Defenses**[29]

1.    **Implied License**

"[T]he existence of an implied license to use the copyright for a particular purpose precludes a finding of infringement." *Johnson v. Jones*, 149 F.3d 494, 500 (6th Cir. 1998). Because non-exclusive licenses do not transfer ownership and therefore are not subject to the writing requirement of Section 204 of the Copyright Act, *id.*, "[a] nonexclusive license may be granted orally, or may even be implied from conduct." 3 Nimmer § 10.03[A].

"'[T]he Second Circuit has not yet ruled on the precise circumstances under which an implied non-exclusive license will be found.'" *Psihoyos v. Pearson Educ., Inc.*, 855 F. Supp. 2d 103, 120 (S.D.N.Y. 2012) (quoting *Weinstein Co. v. Smokewood Entm't Grp., LLC*, 664 F. Supp. 2d 332, 344 (S.D.N.Y. 2009)).  It has, however, endorsed the view of other circuits "and cautioned that implied non-exclusive licenses should be found 'only in narrow circumstances where one party created a work at the other's request and handed it over intending that the other copy and distribute it.'" *Weinstein Co.*, 664 F. Supp. 2d at 344 (alterations and second internal quotation marks omitted) (quoting *SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharm., Inc.*, 211 F.3d 21, 25 (2d Cir. 2000) (addressing implied license on interlocutory appeal)

---

[29] Defendants half-heartedly contend that the Copyright Act's three-year statute of limitations bars Plaintiffs' claims as to any "issues" that existed with their licenses prior to May 27, 2012. Defs.' MSJ at 24; Defs.' Reply at 26–27. That is incorrect. As Plaintiffs correctly point out, *see* Pls.' MSJ at 40, the statute of limitations bars any "actions" that are not "commenced within three years after the claim accrued." 17 USC § 507(b).  The "issues" that Plaintiffs raise with Defendants' license defense, for which it bears the burden, are not the claims of "infringement" that Plaintiffs allege.  There is no dispute that Defendants have exploited each of the Musical Works within three years of the filing of the Complaint. Defs.' Counter 56.1 ¶ 87 (citing Dickstein Decl., Exs. 26 (showing dates of download in Column C), 56 (showing the month and year of streams in Columns I and J)).  Accordingly, those claims for infringement are timely and Plaintiffs may recover on them, irrespective of when "issues" with Defendants' licenses arose. *See Kwan v. Schlein*, 634 F.3d 224, 228 (2d Cir. 2011) (although "[a]n ownership claim accrues only once . . . an infringement action maybe commenced within three years of *any* infringing act, regardless of any prior acts of infringement") (citations omitted).  Defendants' reliance on *Simmons v. Stanberry*, is misplaced because that case concerned a claim of copyright ownership, not copyright infringement.  810 F.3d 114 (2d Cir. 2016).

40

(citing *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 558 (9th Cir. 1990)); *see also I.A.E., Inc. v. Shaver*, 74 F.3d 768, 776 (7th Cir. 1996) (finding an implied license where: "(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes that particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work"); *Lulirama Ltd. v. Axcess Broad. Servs., Inc.*, 128 F.3d 872, 879–81 (5th Cir. 1997) (finding implied license where licensor created song at request of defendant); *Jacob Maxwell, Inc. v. Veeck*, 110 F.3d 749, 752‒53 (11th Cir. 1997) (same).

     Although some courts have applied a more lenient test, those courts fall outside of this circuit or predate the Second Circuit's decision in *SmithKline. See, e.g.*, *Field v. Google Inc.*, 412 F. Supp. 2d 1106, 1116 (D. Nev. 2006) ("Consent to use the copyrighted work need not be manifested verbally and may be inferred based on silence where the copyright holder knows of the use and encourages it."); *Keane Dealer Servs., Inc. v. Harts*, 968 F. Supp. 944, 947 (S.D.N.Y. 1997) (noting that "consent given in the form of mere permission or lack of objection is also equivalent to a nonexclusive license and is not required to be in writing") (citation omitted). Under either formulation, the touchstone of implied consent analysis is whether there was a "meeting of the minds." *Psihoyos*, 855 F. Supp. 2d at 124 (citing *Ulloa v. Universal Music and Video Distrib. Corp.*, 303 F. Supp. 2d 409, 416 (S.D.N.Y. 2004); *Design Options, Inc. v. BellePointe, Inc.*, 940 F. Supp. 86, 92 (S.D.N.Y. 1996) (requiring evidence that "both parties to the transaction, not just the defendant, intended that the defendant could use or copy the plaintiff's work without liability for copyright infringement"); *Viacom Int'l. Inc. v. Fanzine Int'l. Inc.*, No. 98 Civ. 7448 (KMW), 2000 WL 1854903, at *3 (S.D.N.Y. July 12, 2000) ("As with all copyright licenses, an implied license protects the licensee only to the extent the copyright

**SAppx41**

owners intended that their copyrighted works be used in the manner in which they were eventually used.") (quotation marks omitted).

Defendants contend that Plaintiffs granted them an implied license by accepting their payments for several years and failing to object to their exploitation of the recordings at issue. *See* Defs.' MSJ at 18–20.  They assert that this "longstanding course of dealing with Plaintiffs has permitted them to believe that they have properly licensed the compositions in question." *Id.* at 20.  Plaintiffs counter that Defendants' implied-license defense is barred by their unclean hands, and that, in any event, Defendants fail to demonstrate that Plaintiffs granted them an implied license.  *See* Pls.' MSJ at 41–45.  The Court concludes it need not reach the unclean hands issue, because Defendants cannot meet their burden under either version of the implied license test.

Under the more rigid formulation endorsed by the Second Circuit, Defendants falter at the gate, as they do not even contend—and there is no admissible evidence to support—that they "'created [their] [recordings] at the [Plaintiffs'] request.'" *Weinstein Co.*, 664 F. Supp. 2d at 344 (quoting *SmithKline Beecham Consumer Healthcare, L.P.*, 211 F.3d at 25).

Even under the more lenient test, Defendants cannot show that there was a meeting of the minds.  Defendants assert that the meeting of the minds is manifest from their royalty payments and Plaintiffs' acceptance of those payments.  *See* Defs.' MSJ at 19.  For support, they rely on *Keane Dealer Servs., Inc.*, for the proposition that a meeting of the minds can be inferred from "lack of objection."  968 F. Supp. at 947.  On that basis, they conclude that "knowledge of, and acquiescence in, the use of copyrighted material . . . may constitute an implied license."  *See* Defs.' MSJ at 19.  That case has no persuasive force under these circumstances.

42

**SAppx42**

As Plaintiffs note, the parties in that case had extensive communications with each other and plaintiff admitted that it was aware of the nature of defendant's use of the software at issue. 968 F. Supp. at 946.  Indeed, the software, "an automated trading system[] [that] traded a proprietary account . . . against incoming retail order flow," had but one clear use.  *Id.*  Here, aside from Plaintiff ABKCO's cease and desist letters in August of 2013 and 2014, Defs.' Counter 56.1 ¶ 64, there is no evidence that the parties communicated with each other and no evidence that Plaintiffs understood the nature of the use that they were licensing.  This lack of understanding is in large part due to the nature of the *compulsory* licensing scheme.  That is to say, copyright holders in musical works have no say in whether to grant these licenses.  Instead, when a licensee manifests their intention to manufacture "phonorecords" pursuant to Section 115, Plaintiffs are entitled to rely on the compulsory licensees' compliance with the requirements of that provision.[30]

Under these circumstances, prudential concerns also counsel against imputing intent to compulsory licensors who accept payments made pursuant to ostensibly valid NOIs and HFA licenses.  As Plaintiffs persuasively argue, by conditioning the availability of the compulsory license on the timely filing of the NOI, Congress sought to impose strict liability on manufacturers who fail to comply with the terms of Section 115.  Pls.' MSJ at 44 (citing 17 U.S.C. § 115(b)(2) ("Failure to serve or file the [NOI] required by clause (1) forecloses the possibility of a compulsory license and, in the absence of a negotiated license, renders the

---

[30] The terms of the agreements entered into with HFA, RightsFlow, and MediaNet all indicate that the statutory requirements of Section 115 control the availability of the compulsory licenses Defendants obtained.  *See* Lundberg Decl. ¶ 50(h), Ex. 31 (HFA licenses) at 1–2; Dickstein Decl. Ex. 31 (RightsFlow Agreement) ¶¶ 1(a), 7(b)(iii); Ex. 32 (MediaNet Agreement) ¶¶ 1.16, 4(a).

43

making and distribution of phonorecords actionable as acts of infringement . . . .")).[31]  Finding an implied license whenever a licensee remits payments under Section 115 would require songwriters to "investigate the *bona fides* of every NOI they receive," or risk granting an implied license for otherwise unlawful use.  *Id.*

Defendants' payments were expressly conditioned on the lawful fixation of phonorecords (but not audiovisual works) and the filing of NOIs prior to the date of distribution.  Where, as here, a licensee fails to meet the substantive and procedural requirements of that provision, they cannot claim that there was a meeting of the minds as to how those licenses would be used.  The inherent assumption was compliance with the commands of Section 115.  Defendants' failure to satisfy those conditions defeats their claim that a meeting of the minds existed between the parties.  *Cf. Graham v. James*, 144 F.3d 229, 237 (2d Cir. 1998) (noting that "'if the nature of a licensee's violation consists of a failure to satisfy a condition to the license . . . , it follows that the rights depend[e]nt upon satisfaction of such condition have not been effectively licensed, and therefore, any use by the licensee is without authority from the licensor and may therefore, constitute an infringement of copyright'") (citing 3 Nimmer § 10.15[A]).  Indeed, "no court has found an implied license where the nature of the use is contested."  *SHL Imaging, Inc. v. Artisan House, Inc.*, 117 F. Supp. 2d 301, 317 (S.D.N.Y. 2000).

The objective facts concerning the course of conduct between the parties do not support a finding that an implied license existed.  There is no evidence that Defendants intended audiovisual recordings of their Musical Works to be exploited under the guise of Section 115

---

[31] Prior to the 1972 Copyright Act, manufacturers who "faile[d] to serve a notice of intention to use," were liable only for the statutory royalty rate plus a minimal award of damages of "not more than 6 cents per record."  S. REP. 94-473.  This limitation on liability, however, was "strongly criticized as inadequate either to compensate the copyright owner or to deter infringement."  *Id.*  Section 115(b)(2) of the 1972 Act was therefore intended to deter non-compliance with Section 115's notice provision by making violators strictly liable for copyright infringement.

44

compulsory mechanical licenses.  Nor is there any indication that Plaintiffs intended recordings

that were not fixed or exploited with the appropriate consents to be laundered into lawful

reproductions by reason of the compulsory license regime.  Accordingly, Defendants' implied

license defense fails.

### 2.  Estoppel

For substantially the same reasons, Defendants have not established a basis for estoppel.

To prevail on an estoppel defense in the copyright context, a defendant must show that:

> (1) plaintiff had knowledge of the defendant's infringing conduct;
> (2) plaintiff either (a) intended that defendant rely on plaintiff's acts
> or omissions suggesting authorization, or (b) acted or failed to act in
> such a manner that defendant had a right to believe it was intended
> to rely on plaintiff's conduct; (3) defendant was ignorant of the true
> facts; *and* (4) defendant relied on plaintiff's conduct to its detriment.

*SimplexGrinnell LP v. Integrated Sys. & Power, Inc.*, 642 F. Supp. 2d 167, 194 (S.D.N.Y.2009)

(citation and quotation marks omitted) (emphasis added).  "Courts have warned that '[e]stoppel

is a drastic remedy and must be utilized sparingly.  Clearly, a successful application of this

remedy requires the party asserting estoppel to use due care and not fail to inquire as to its rights

where that would be the prudent course of conduct.'"  *Psihoyos*, 855 F. Supp. 2d at 129 (quoting

*Keane*, 968 F. Supp. at 948).

Defendants rely on two bases to support their claim of estoppel.  First, they argue that

Plaintiffs "knew" of Defendants "allegedly infringing conduct" and profited "from that conduct

since 2007," when Defendants acquired an account with HFA and began paying Plaintiffs under

HFA licenses.  Defs.' MSJ at 22.  Defendants assert that those continued payments are proof of

their detrimental reliance.  *Id.* at 23.  Second, Defendants contend that the Joint Exploitation

Agreements are proof of their "good faith belief that they were acting under the proper licenses

and authority."  *Id.* at 22.

45

Defendants' sole proof of knowledge is the fact that they made payments to Plaintiffs pursuant to mechanical licenses. *See id.* at 22 (citing Defs.' 561. ¶ 6); Lundberg Dec. Exs. 7 (Transaction Statement for ABKCO), 10 (Transaction Statement for EMI), 13 (Transaction Statement for Imagem), 16 (Transaction Statement for Peer), 19 (Transaction Statement for Spirit), Ex. 22 (Transaction Statement for Warner); Defs.' Reply at 24 (citing Defs.' 561. ¶ 7; Lundberg Decl. Ex. 21 (NOIs sent by MediaNet to Warner)). But just as Defendants could not show that there was a "meeting of the minds" in the implied license context, they cannot show that Plaintiffs "knew" that their conduct was infringing. The transaction statements relied on by Defendants are summaries of the checks cashed by Plaintiffs and are not proof that Plaintiffs knew Defendants' conduct was infringing. Nor are NOIs or HFA licenses that explicitly state that Defendants seek licenses for "phonorecords" as "authorized pursuant to 17 U.S.C. § 115." Lundberg Decl. Ex. 21 (NOIs sent by MediaNet to Warner); *see id.* Ex. 31 at 1–2 (HFA informing Defendants that they were receiving ███████████████████ ███████████████████████████████ As a result, Defendants cannot prove the first element of their equitable estoppel defense, and it must therefore fail.[32]

---

[32] The Court separately notes that Defendants' estoppel claim fails because they were not ignorant of the facts at issue. As discussed above in detail, when Defendants acquired their collection they were well aware of the myriad licensing and authorization issues they faced with respect to performing artists and the holders of copyrights in the compositions. Indeed, the record is clear that Defendants were repeatedly and specifically told that the sales agreements did *not* convey the intellectual property rights that Defendants now claim entitlement to exploit. The Joint Exploitation Agreements that they entered into three years after they began exploiting some portion of the Musical Works—did not purport to resolve a number of those issues. On their terms, those agreements said nothing about whether the recordings were *fixed* with the consent of the performing artist. *See* Lundberg Decl., Exs. 2, 3, 4. Likewise, Defendants cannot credibly claim ignorance with respect to any of the audiovisual works, as the Sony and Warner agreements expressly excluded audiovisual recordings, *see* Lundberg Decl., Ex. 2, § 3.6(f), *id.* Ex. 3, § 10.3; Defs.' 56.1 ¶ 79, and the definition of phonorecords expressly excludes audiovisual works, *see* 17 U.S.C. §§ 101, 115. In addition, there is no reasonable basis to conclude that Defendants were ignorant to the fact that sound recordings fixed prior to 1972 were required to be fixed pursuant to a license from the holder of the copyright in the musical work. That is an unambiguous requirement of Section 115.

D.   **Willful Infringement**

The Copyright Act permits a court to "increase the award of statutory damages to a sum

of not more than $150,000" where a defendants infringement is willful.  17 U.S.C. § 504(c)(2).

"A copyright holder seeking to prove that a copier's infringement was willful must show that the

infringer 'had knowledge that its conduct represented infringement or . . . recklessly disregarded

the possibility.'"  *Bryant v. Media Right Prods., Inc.*, 603 F.3d 135, 143 (2d Cir. 2010) (quoting

*Twin Peaks Prods., Inc. v. Publ'ns. Int'l Ltd.*, 996 F.2d 1366, 1382 (2d Cir. 1993).  The Second

Circuit's "decisions clearly recognize that, even in the absence of evidence establishing the

infringer's actual knowledge of infringement, a plaintiff can still prove willfulness by proffering

circumstantial evidence that gives rise to an inference of willful conduct."  *Island Software &*

*Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 264 (2d Cir. 2005).  "Although courts are

generally reluctant to dispose of a case . . . when mental state is at issue, it is permissible to do so

where there are sufficient undisputed material facts on the record to make the question

appropriate for summary judgment."  *Lipton v. Nature Co.*, 71 F.3d 464, 472 (2d Cir. 1995).

Plaintiffs contend that, at a minimum, there is undisputed evidence that Defendants acted

with reckless disregard thereby entitling them to a finding of willfulness on all of Defendants'

infringement.  Pls.' MSJ at 47.  In contrast, Defendants assert that they hold a reasonable, good-

faith belief that their conduct does not constitute copyright infringement and that they took the

necessary steps to obtain valid licenses.  Defs.' MSJ at 36.  Defendants rely on the fact that they

enlisted licensing vendors to aid in transmitting their NOIs to Plaintiffs to support their claim

---

*See* 17 U.S.C. § 115(a)(1)(ii).  "Reliance is not justifiable if the party invoking estoppel 'had the means by
which with reasonable diligence he could acquire the knowledge so that it would be negligence on his
part to remain ignorant by not using those means."  *Associated Press v. Meltwater U.S. Holdings, Inc.*,
931 F. Supp. 2d 537, 565 (S.D.N.Y. 2013) (quoting *In re Becker*, 407 F.3d 89, 99 (2d Cir. 2005)).  Thus,
Defendants reliance is not justifiable.

that they reasonably relied on these professional companies. *Id.* at 36 37.  Defendants also

assert that Plaintiffs cannot rely on the cease-and-desist demands from third parties as they are

hearsay.  Defs.' Reply at 37; *see supra* n.18.

      As an initial matter, the Court agrees with Plaintiffs that there is voluminous, undisputed

record evidence demonstrating that Defendants were on notice that the recordings they acquired

lacked the consents and authorizations necessary to exploit them, both from performing artists

and the copyright holders in the songs.  The collections, which were at least in part conveyed

through quit-claim transfer, Defs.' Counter 56.1 ¶ 17, informed Defendants that they were not

acquiring intellectual property rights, *id.*, warned of the significant licensing issues that

Defendants would need to overcome, *id.* ¶¶ 18–22, and either made "no representation . . .

regarding original performance contracts," *id.*, or simply never provided Defendants with any

performer contracts, *id.* ¶ 33 35.  Moreover, there is no factual assertion in the record that

Defendants ever obtained the consent of the copyright holders in the Musical Works.

      There is also ample evidence that during the course of Defendants' exploitation, they

were made aware of the statutory provision with which they were obligated to comply.  Indeed,

in invoking their licensing vendors as a show of good faith, Defendants fail to acknowledge that

both the HFA and RightsFlow agreements stressed that Defendants were bound by the

requirements of Section 115.  Emails from HFA expressly informed Defendants that they were

being issued ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████  And Defendants

represented and warranted in their agreement with RightsFlow that Defendants would remain

████████████████████████████████████████████████████

████████████████████████████   Defs.' Counter 56.1 ¶ 57.

Having been put on notice as to their obligations, Defendants obtained Joint Exploitation Agreements to ensure they had consent from artists to exploit those agreements.  The Sony and Warner agreements expressly excluded audiovisual recordings, *see* Lundberg Decl., Ex. 2, § 3.6(f), *id.* Ex. 3, § 10.3; Defs.' 56.1 ¶ 79, and so there is no good faith basis to conclude that those audiovisual recordings were authorized by the performers.  Likewise, although Section 115 may give rise to reasonable disagreement as to certain of its terms, two things cannot reasonably be disputed:  that phonorecords do not include audiovisual works, and that sound recordings fixed prior to 1972 must have been "fixed pursuant to an express license from the owner of the copyright in the musical work or pursuant to a valid compulsory license for use of such work in a sound recording."  17.U.S.C. § 115(a)(1)(ii).  In this latter respect, Defendants have made a business of exploiting vintage concert recordings.  No less than 122 of the 1,175 recordings at issue were fixed before 1972.  Dickstein Decl. Ex. 23.  There is also no reasonable argument that, in the absence of a Section 1 Notice under the UMG agreement, that the UMG recording alone was sufficient to authorize any exploitation of sound recordings featuring UMG artists.  Taken together, the record evidence establishes that Defendants' conduct was, at a minimum, reckless with respect to their audiovisual recordings, the pre-1972 recordings, and recording featuring UMG artists.

There is, however, contrary admissible evidence that precludes a finding of willful infringement based on the untimely filing of the NOIs and the post-1972 sound recordings.  Lundberg testified that, based on his communications with licensing vendors, he understood it was industry custom to file NOIs after the date of distribution.  Defs.' Counter 56.1 ¶ 33.  That

49

creates a genuine dispute of fact as to whether the untimely filing of NOIs was willful.  There are also genuine disputes of fact as to whether licenses obtained directly from HFA covered the distribution of recordings prior to Defendants' filing of NOIs directly with Plaintiffs.  Likewise, although the Court concludes that the Joint Exploitation Agreements are insufficient to show lawful fixation and, in any event, inadmissible hearsay for the purposes of proving artist consent, the Sony and Warner agreements are sufficient to create a triable issue as to whether the post-1972 sound recordings ostensibly covered under those agreements were exploited with reckless intent.  There is at least a reasonable argument that Defendants believed the Sony and Warner agreements authorized the exploitation of recordings featuring those record companies' artists.

Accordingly, summary judgment is granted to Plaintiffs on their claim of willful infringement as to all audiovisual recordings, pre-1972 audio recordings, and all recordings covered by the UMG agreement, and denied in all other respects.

**E.   Liability for Sagan in his Individual Capacity**

"It is well established that all persons and corporations who participate in, exercise control over or benefit from an infringement are jointly and severally liable as copyright infringers and that an individual, including a corporate officer, who has the ability to supervise infringing activity and has a financial interest in that activity, or who personally participates in that activity is personally liable for infringement." *Capitol Records LLC v. Redigi Inc.*, No. 12-CV-95 RJS, 2014 WL 4354675, at *2 (S.D.N.Y. Sept. 2, 2014) (citing *Arista Records LLC v. Lime Grp. LLC*, 784 F.Supp.2d 398, 437 (S.D.N.Y.2011)) (punctuation marks omitted).

The Court has already ruled that Defendants are liable for copyright infringement. The undisputed record evidence establishes that Sagan is personally liable for direct infringement.  Sagan is the founder, president, CEO, and sole owner of Defendant Norton LLC.

Defs.' Counter 56.1 ¶ 10.  He was deeply involved in the acquisition of the recordings at issue

and the agreements that conveyed those recordings clearly disclaimed intellectual property rights

and in many instances documented the licensing issues the collections presented.  Defs.' Counter

56.1 ¶¶ 17–19, 21, 27, 33–35.  On several occasions Sagan pressed sellers for artist consents,

only to turn up empty handed.  *Id.* ¶ 34–35.  At his deposition, Sagan confirmed that he had

"final decision-making authority" over the Defendant entities.  *Id.* ¶ 55; Dickstein Decl., Ex. 2,

Sagan Dep. at 43:1–3.  Moreover, Lundberg, the Chief Technology Officer for Wolfgang's

Vault, stated in his deposition that it was Sagan who instructed him as to "which concerts to

make available for download or not," who "manage[d] [the companies] original agreements,"

and made plans "to start digitizing tape recordings with an eye towards making them available

on a public website."  *Id.*  at 54:3–9, 55:23–56:5

          As the sole owner of Norton, and based on Sagan's testimony and that of his Chief

Technology Officer, the record evidence establishes that Sagan "has the ability to supervise

infringing activity and has a financial interest in that activity."  *Capitol Records LLC*, 2014 WL

4354675, at *2.  Sagan's acknowledgement that he had "final decision-making authority" and the

testimony from Lundberg regarding Sagan's direction and management of Defendants'

operations is sufficient to establish that Sagan personally participated in the infringing activity.

*See Id.*; *see also Arista Records LLC*, 784 F. Supp. 2d at 437–38 (granting summary judgment on

claim that CEO was personally liable for copyright infringement, where CEO was "100%

shareholder" of corporate defendant and testified that he "ran" and was the "ultimate

decisionmaker" for corporate defendant); *Capitol Records LLC.*, 2014 WL 4354675, at *2

(concluding at motion to dismiss stage that allegation that corporate officer who controlled

operations, personally conceived of business model, was "ultimate decision maker[] concerning

51

the development and implementation of the infringing activity," and "directed and approved"

key aspects of infringing activity, could be held directly liable for infringement) (alterations

omitted); *Arista Records LLC v. USENET.com, Inc.*, 633 F. Supp. 2d 124, 158-59 (S.D.N.Y.

2009) (granting summary judgment on claim that "sole shareholder" was "personally responsible

for a major share of Defendants' infringing activities" and the "moving force behind the entire

business"). Accordingly, summary judgment is granted to Plaintiffs on their claim of direct

infringement by individual Defendant Sagan.[33]

## F.   **Injunctive Relief**

"A plaintiff seeking a permanent injunction must satisfy a four-factor test before a court

may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury;

(2) that remedies available at law, such as monetary damages, are inadequate to compensate for

that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a

remedy in equity is warranted; and (4) that the public interest would not be disserved by a

permanent injunction." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156 57 (2010)

(quoting *eBay Inc. v. MercExchange, L.L. C.*, 547 U.S. 388, 391 (2006)) (alterations and

quotation marks omitted). A permanent injunction is an extraordinary remedy that may be

granted in the exercise of a court's sound discretion. *See Winter v. Nat. Res. Def. Council, Inc.*,

555 U.S. 7, 24 (2008).

---

[33] Defendants' sole argument in response to Plaintiffs' claim that Sagan is personally liable for
infringement, is that Plaintiffs did not allege vicarious liability in their complaint and are barred from
asserting it now. Defs.' Reply at 27 33. Although Defendants cast Plaintiffs claim as one for vicarious
liability (and spill much ink arguing it), Plaintiffs never frame it as such, and Defendants concede that
Plaintiffs' Complaint alleged direct infringement by the "Defendants," among whom Sagan is clearly
named. They further concede that the Complaint alleges that Sagan "authorized, ratified, *participated in*
and benefitted from each of the acts" identified in the Complaint. *Id.* at 28 n.22 (citing Doc. 141, Supp.
Compl.) (emphasis added). Although the Court agrees that Plaintiffs did not plead vicarious liability,
they have pleaded direct liability and their motion is granted on that basis alone.

Plaintiffs argue that they are entitled to this extraordinary remedy because, absent the injunction, Defendants will continue their infringing conduct and hamper Plaintiffs' "negotiating leverage with prospective licensees." Pls.' MSJ at 53. Plaintiffs also suggest that their damages would be too difficult to quantify. *Id.*; Pls.' Reply at 15 (citing Declaration of Alisa Coleman, COO of ABKCO, Doc. 192, ¶ 4). The Court is unpersuaded by these arguments.

While there is no question that Plaintiffs have been harmed by Defendants, that harm is not irreparable because they can be compensated. *See Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 37 (2d Cir. 1995) ("Irreparable harm is an injury . . . for which a monetary award cannot be adequate compensation.") (citation and internal quotation marks omitted); *Roach v. Morse*, 440 F.3d 53, 56 (2d Cir. 2006) (identifying irreparable harm as essential to claim for permanent injunction)

Plaintiffs have argued throughout their summary judgment submissions that there are ways in which Defendants could have lawfully licensed these works; either through the mechanical licensing regime, negotiated licenses, or through synchronization licenses for their audiovisual recordings. *See* Pls.' MSJ at 23–24 (asserting that Plaintiffs "have identified numerous synchronization licenses that they have issued for live concert recordings"); Pls.' 56.1 ¶ 8 (same); *see also* Docs. 1, 43. Indeed, in filing its cease-and-desist letters, Plaintiff ABKCO informed Defendants that they needed synchronization licenses to exploit certain audiovisual recordings. Pls.' 56.1 ¶ 64. Plaintiff ABKCO cannot now be heard to argue that calculating the fees for such licenses would be too difficult to do. *See* Pls.' Reply at 15; Declaration of Alisa Coleman, COO of ABKCO, Doc. 192, ¶ 4. That's what experts are for.

Finally, the Court finds that the balance of hardships and consideration of the public interest does not tip in Plaintiffs' favor. Setting aside any copyright ownership issues, there is no

53

question that Defendants own the recordings at issue.  Although that is insufficient to entitle

them to exploit these recordings without the proper licenses, these licensing hurdles are not

insurmountable.  Defendants provide recordings of iconic songs and entertainers in a platform

that makes them accessible to the general public.  Licensing issues notwithstanding, the Court

finds that the public's interest in having access to these recordings counsels against the

imposition of a permanent injunction.  Plaintiffs request for a permanent injunction is therefore

denied.

## IV.    CONCLUSION

For the reasons set forth above, the parties' motions for summary judgment are

GRANTED in part and DENIED in part as follows:

- Plaintiffs' claim of copyright infringement is GRANTED against all Defendants and as to all infringement within the statute of limitations; Defendants' motion on Plaintiffs' claim of copyright infringement is DENIED in all respects.

- Plaintiffs' claim for willful infringement is GRANTED with respect to the audiovisual recordings, pre-1972 recordings, and recordings ostensibly covered by the UMG agreement, and DENIED in all other respects; Defendants' motion on Plaintiffs' claim of willful infringement is DENIED in all respects.

- Plaintiffs' request for a permanent injunction is DENIED; and Defendants' motion is GRANTED.

- Defendants' request to supplement the record, Doc. 252, is GRANTED only with respect to the HFA spreadsheet, Ex. 1, and DENIED in all other respects.

The Clerk of the Court is respectfully directed to terminate the motions, Docs. 161, 191, 252.

SO ORDERED.

Dated:    March 30, 2018
          New York, New York

Edgardo Ramos, U.S.D.J.

54

**SAppx54**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ABKCO MUSIC, INC., COLGEMS-EMI MUSIC,
INC., EMI ALGEE MUSIC CORP., EMI APRIL
MUSIC INC., EMI BLACKWOOD MUSIC, INC.,
EMI CONSORTIUM MUSIC PUBLISHING, INC.
d/b/a EMI FULL KEEL MUSIC, EMI
CONSORTIUM SONGS, INC. d/b/a  EMI
LONGITUDE MUSIC, EMI FEIST CATALOG
INC., EMI ROBBINS CATALOG INC., EMI
UNART CATALOG, INC., JOBETE MUSIC CO.,
INC., SCREEN-GEMS-EMI MUSIC INC.,
STONE AGATE MUSIC, STONE DIAMOND
MUSIC CORP., RODGERS & HAMMERSTEIN
HOLDINGS LLC, PEER INTERNATIONAL
CORPORATION, PSO LIMITED, PEERMUSIC
LTD., PEERMUSIC III, LTD., SONGS OF PEER,
LTD., SPIRIT CATALOG HOLDINGS S.A.R.L.,
TOWSER TUNES, INC., TOWSER NEWCO
LTD., SPIRIT TWO MUSIC, INC., WARNER-
TAMERLANE PUBLISHING CORP., and WB
MUSIC CORP.,

**OPINION AND ORDER**

15 Civ. 4025 (ER)

Plaintiffs/Counterclaim-Defendants,

– against –

WILLIAM SAGAN, NORTON LLC, BILL
GRAHAM ARCHIVES, LLC d/b/a
WOLFGANG'S VAULT, BILL GRAHAM
ARCHIVES, LLC d/b/a CONCERT VAULT,
BILL GRAHAM ARCHIVES, LLC d/b/a MUSIC
VAULT, and BILL GRAHAM ARCHIVES, LLC
d/b/a DAYTROTTER,

Defendants/Counterclaim-Plaintiffs.

Ramos, D.J.:

    This case concerns whether Defendants properly licensed Plaintiffs' copyrights in

approximately 200 musical compositions ("Musical Works") included in live concert recordings

that Defendants made available for download and streaming on their websites.  On March 30,

**SAppx55**

2018, the Court granted in part and denied in part the parties' cross-motions for summary judgment.  Doc. 255; Doc. 262 ("Op.").  The Court assumes familiarity with the facts and holdings contained in that Opinion.

Defendants have moved for reconsideration of nearly every aspect of the Court's Opinion.  Doc. 257.  Because Defendants' arguments are incorrect, newly raised, or immaterial to the Court's holdings, Defendants' motion is DENIED.

## I.        LEGAL STANDARD

Under Local Civil Rule 6.3, reconsideration may be granted only where the Court has overlooked controlling decisions of law or factual matters that were "put before it on the underlying motion . . . and which, had they been considered, might have reasonably altered the result."  *Mikol v. Barnhart*, 554 F. Supp. 2d 498, 500 (S.D.N.Y. 2008) (quoting *Greenwald v. Orb Commc'ns & Mktg., Inc.*, No. 00 Civ. 1939 (LTS) (HBP), 2003 WL 660844, at *1 (S.D.N.Y. Feb. 27, 2003)).  Under such circumstances, a motion for reconsideration may be granted "to correct a clear error or prevent manifest injustice."  *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.*, 729 F.3d 99, 104 (2d Cir. 2013) (quoting *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992)).  "Reconsideration of a court's previous order is an 'extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources.'"  *Parrish v. Sollecito*, 253 F. Supp. 2d 713, 715 (S.D.N.Y. 2003) (quoting *In re Health Mgmt. Sys., Inc. Sec. Litig.*, 113 F. Supp. 2d 613, 614 (S.D.N.Y. 2000)).  "Where the movant fails to show that any controlling authority or facts have actually been overlooked, and merely offers substantially the same arguments he offered on the original motion or attempts to advance new facts, the motion for reconsideration must be denied."  *Mikol*, 554 F. Supp. 2d at 500.

## II.    DISCUSSION

As noted, Defendants have challenged nearly every aspect of the Court's Opinion (as well as earlier orders).  The Court will address each argument in turn.

### A.    Discovery

As an initial matter, Defendants complain of certain discovery rulings issued by Magistrate Judge Pitman or this Court.  Defs.' Mem. 4–6.  However, Defendants never opposed summary judgment on the grounds that they "cannot present facts essential to justify [their] opposition."  Fed. R. Civ. P. 56(d).  Accordingly, Defendants cannot now, through a motion for reconsideration of the Court's Opinion, claim they need additional discovery or challenge discovery rulings that were issued months before they briefed the summary judgment motion.[1]

### B.    Joinder of Towser Tunes, Inc. and Towser Newco Ltd.

As explained in the Opinion, at oral argument on March 26, 2018, the Court granted Plaintiffs leave to join Towser Tunes, Inc. and its subsidiary Towser Newco Ltd. as the "real part[ies] in interest" to resolve Defendants' objection in its sur-reply that the ultimate parent of those entities, Plaintiff Spirit Catalog Holdings, S.a.r.l., did not have standing to sue.  Op. 19–21 (quoting Fed. R. Civ. P. 17(a)(3)).  As the Court explained, there was no dispute that the Towser entities had standing to sue, and "their joinder would not prejudice Defendants as no new discovery was required, and the subsidiaries had the same officers, executives and business

---

[1] Defendants also claim that Plaintiffs, by "deny[ing] that Defendants have paid all sums owed," Pls.' Counter 56.1 ¶ 7, reneged on an earlier promise to not dispute that Defendants made payments pursuant to purported compulsory licenses, Ranahan Decl. Ex. M, at 21:6–16.  There is no contradiction between these two positions.  Although Defendants indisputably made certain payments pursuant to purported compulsory licenses, Plaintiffs assert (and the Court held) that those licenses are invalid, and thus those payments are insufficient to compensate Plaintiffs for what was actually infringing use of the Musical Works.

**SAppx57**

operations as Spirit."  Op. 21; *see also* Fed. R. Civ. P. 21 ("On motion or on its own, the court may at any time, on just terms, add or drop a party [to correct misjoinder or nonjoinder].").

Defendants argue that joinder of the Towser entities violated due process because Defendants had not had a chance to take any discovery from them or respond to any pleading filed by them.  However, before the Court joined the Towser entities, Defendants could not specify any discovery that they needed from them.  Oral Arg. Tr. 10:21–11:6.  Defendants now contend that they need "an investigation into actual damages or lack thereof . . . , payments made, the value of their copyrights, among other issues."  Defs.' Mem. 9.  However, Defendants have not explained how this discovery would in any respect differ from the discovery they have already taken from two related entities:  Plaintiff Spirit Catalog Holdings, S.a.r.l., which is the Towser entities' ultimate parent; and Plaintiff Spirit Two Music, Inc., which shares offices and officers with Towser Tunes, Inc.[2]  Nor is there any need for further pleadings from the Towser entities, as they are asserting the same copyright claims already pleaded.  *See* Fed. R. Civ. P. 17(a)(3) ("After ratification, joinder, or substitution, the action proceeds as if it had been originally commenced by the real party in interest."); *Clorox Int'l Co. v. Int'l Trade Expo, Inc.*, No. 94 Civ. 0938 (JSM), 1995 WL 106104, at *8 (S.D.N.Y. Mar. 9, 1995) ("[E]ven if plaintiff's corporate parent were the real party in interest, all that would be necessary would be a change in the caption of this case.").  Accordingly, Defendants are not prejudiced by joining these parties, and it was not clearly erroneous or manifestly unjust to do so.[3]

---

[2] Although Defendants point out that Plaintiff Spirit Catalog Holdings, S.a.r.l. does not share offices and officers with Towser Tunes, Inc., they ignore that Plaintiff Spirit Two Music, Inc. does.

[3] In a footnote, Defendants similarly object to the substitution of Rodgers & Hammerstein Holdings LLC for Imagem Music LLC after the latter transferred its interest in certain musical works to the former. Defs.' Mem. 10 n.16.  For the same reasons, it was not clearly erroneous or manifestly unjust to order "the transferee to be substituted in the action."  Op. 1 n.1 (quoting Fed. R. Civ. P. 25(c)).

For the first time, Defendants now contend that Towser Newco Ltd. dissolved in 2013 and thus cannot be a Plaintiff.  Defs.' Mem. 8–9.  While Defendants may make any applications concerning the capacity of Towser Newco Ltd. to sue that they deem appropriate, a motion for reconsideration is not an appropriate vehicle to raise this new argument and new fact for the first time.

### C.   Applicability of § 115(a)(1)

Next, Defendants contend that the Court erred in holding that they were required to comply with the additional substantive requirements of § 115(a)(1) of the Copyright Act that apply when seeking a compulsory license for a musical work to make phonorecords duplicating a sound recording "fixed by another."[4]  Op. 5 (quoting 17 U.S.C. § 115(a)(1) (2016)[5]).

Defendants argue that these provisions do not apply because they are not duplicating Plaintiffs' sound recordings.  Defs.' Mem. 10–11.  This argument totally misapprehends what this case is about.  The issue is whether they properly obtained compulsory licenses to use Plaintiffs' Musical Works that are reflected in Defendants' phonorecords.  Those phonorecords duplicate sound recordings that were "fixed by another" because they were originally recorded by persons other than Defendants—i.e., concert promoters or venue operators who engineered

---

[4] Those requirements are that (i) such sound recording must be "fixed lawfully"; and (ii) the licensee must have authorization from "the owner of copyright in the sound recording," or "if the sound recording was fixed before February 15, 1972," from a person who fixed the sound recording "pursuant to an express license from the owner of the copyright in the musical work or pursuant to a valid compulsory license for use of such work in a sound recording."  17 U.S.C. § 115(a)(1).

[5] On October 11, 2018, the Orrin G. Hatch–Bob Goodlatte Music Modernization Act, Pub. L. No. 115-264, 132 Stat. 3676 (2018), went into effect and amended § 115.  The parties have not identified any amendments that affect this case.  Because the Court's prior Opinion and the parties' briefs cite the pre-amendment version of § 115, the Court will continue to do so here for consistency and clarity.

the recordings.  Accordingly, Defendants must comply with the requirements of § 115(a)(1)

concerning sound recordings "fixed by another."

In their reply, Defendants argue that the sound recordings were not fixed by "another"

because those concert promoters or venue operators, from whom Defendants acquired the

recordings, were their "predecessors."  Defs.' Reply 4.  However, Defendants have pointed to no

authority—let alone controlling authority—holding that when a person acquires a recording from

another person, the latter person is not "another" for purposes of § 115(a)(1).  Accordingly,

reconsideration of the Court's conclusion to the contrary is not warranted.

### D.    Evidence that the Recordings Were "Fixed Lawfully"

The Court held that Defendants failed to demonstrate that any of their recordings were

fixed lawfully.[6]  Op. 34.  Defendants now contend that the Court overlooked evidence creating a

triable factual issue as to whether the recordings were so fixed.  Defs.' Mem. 11–13.

First, Defendants point to the ███████████████████████████████████████████████

███████████████████████.  Ranahan Summ. J. Opp'n Decl. Ex. H, at 337:14–24.  However,

there is no basis to conclude that Sagan had personal knowledge that those bandmembers ever

consented to the recording of their concert or that his assertion is anything other than hearsay.

*See* Fed. R. Evid. 602, 802.  This testimony is therefore inadmissible to prove the consent of

those bandmembers.

Second, Defendants submit a 1993 license agreement purporting to license numerous

concert recordings from a Bill Graham entity to a third party.  Ranahan Decl. Ex. N.  As an

initial matter, this agreement was never submitted on summary judgment and may not be

---

[6] A recording of a live musical performance is not lawfully fixed if it was recorded "without the consent of the performer or performers involved."  17 U.S.C. § 1101(a); *see* Op. 29.

considered on reconsideration.  In any event, the license agreement provides no evidence that the recordings were fixed lawfully, as the agreement explicitly makes no representations as to artists' consents and requires that such consents be obtained before using the recordings. *Id.* ¶¶ 3.03, 7.03.

Third, Defendants argue that the concert producers and sound engineers who recorded the concerts—and who Defendants claim are their predecessors—are joint owners of the copyright in the sound recordings. *See In re Cellco P'ship*, 663 F. Supp. 2d 363, 369 (S.D.N.Y. 2009) ("[T]he author of a sound recording is the performer(s) whose performance is fixed, or the record producer who processes the sounds and fixes them in the final recording, or both." (citation omitted)).  However, Defendants "bear[] the burden of establishing that each of the putative co-authors (1) made independently copyrightable contributions to the work; and (2) fully intended to be co-authors." *Thomson v. Larson*, 147 F.3d 195, 200 (2d Cir. 1998).  Here, where there is no admissible evidence that any performers ever consented to being recorded, let alone fully intended to be co-authors with recording engineers (some of whom are unidentified), Defendants have not sustained their burden of establishing joint ownership of the copyright in the sound recordings.

Even assuming Defendants had sustained that burden, Defendants might then be able to argue that their exploitation of the post-1972 recordings was "authorized by the owner of copyright in the sound recording."  17 U.S.C. § 115(a)(1).  However, this would do nothing to establish that the sound recordings were "fixed lawfully," which remains an independent requirement. *Id.*  To do so, Defendants would need to show that the recordings were made with "the consent of the performer or performers involved."  17 U.S.C. § 1101(a); *see also* 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 8E.03[A][3] (2018) ("[F]ixation of their

work, without permission from each performer, violates the statute."). Defendants have entirely failed to create a triable issue on this score, and their joint ownership argument does not change that.

Fourth, Defendants claim that the Court added a requirement that performers' consent be "written." The Court did no such thing. Rather, ruling on summary judgment, the Court required that there be "admissible evidence sufficient to support a finding" of performer consent. *Fitzgerald v. Henderson*, 251 F.3d 345, 361 (2d Cir. 2001). Defendants adduced no admissible evidence that the performers consented, whether in writing or orally. David Hewitt's testimony that it was "common practice" for the engineer to have a recorded copy of the concert, Defs.' Counter 56.1 ¶ 33, does not support a finding that any particular performers actually consented to recording, of which Hewitt had no personal knowledge, *see* Fed. R. Evid. 602.

Fifth, as explained in the Court's Opinion, the Joint Exploitation Agreements submitted by Defendants did not purport to acknowledge that the recordings were lawfully made with performer consent. Op. 30–32. Defendants now submit four agreements with artists or their entities purporting to release claims concerning certain recordings or license recordings from Bill Graham Archives LLC. Sagan Decl. B–E. These agreements were never submitted on summary judgment and may not be considered now. Moreover, Defendants do not explain how these agreements acknowledge that the original fixation of these recordings was consensual and lawful.

In sum, Defendants have adduced no admissible evidence that the recordings at issue were lawfully fixed. The Court's holding that there was no triable issue on that question was not clearly erroneous or manifestly unjust.[7]

---

[7] In addition, Defendants suggest that Plaintiffs had the burden to show that Defendants' recordings were unauthorized. That misstates the law. It was Defendants that asserted the defense that they held valid

E.    **Implied License and Estoppel**

The Court held that Defendants did not have an implied license for Plaintiffs' Musical

Works because there was no "meeting of the minds." Op. 42–44. While the Court noted that the

parties never had communications with each other indicating a meeting of the minds, Defendants

now contend that the Court should have focused on Defendants' interactions with the Harry Fox

Agency ("HFA"), who Defendants claim acted as Plaintiffs' agent.[8] Defs.' Mem. 14–16.

Defendants' argument fails. The "inherent assumption" of HFA—just like Plaintiffs—

was Defendants' "compliance with the commands of Section 115." Op. 44. Indeed, HFA's

communications with Defendants explicitly stated that ██████████████████████

█████████████████████████████████. Op. 36 ██████████████████

██. Because Defendants failed to comply with § 115, including the requirement of lawful

fixation, there was no meting of the minds with Plaintiffs or HFA.

For the same reason, Defendants cannot show that Plaintiffs or HFA "'knew' that their

conduct was infringing" as required to establish the first element of estoppel. Op. 46. HFA and

Plaintiffs were operating under the assumption that Defendants were *not* infringing by complying

with § 115. Defendants have submitted no evidence to rebut that premise.[9]

---

licenses, and "[t]he burden of proving that a license exists falls on the party invoking the defense."
*Associated Press v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537, 561 (S.D.N.Y. 2013) (citing
*Graham v. James*, 144 F.3d 229, 236 (2d Cir. 1998)); *see also FameFlynet, Inc. v. Shoshanna Collection,
LLC*, 282 F. Supp. 3d 618, 625 (S.D.N.Y. 2017) ("Where the dispute turns on whether a license is held by
the accused infringer, the defendant bears the burden to come forward with evidence of a license."
(quoting *Agence France Presse v. Morel*, 769 F. Supp. 2d 295, 302 (S.D.N.Y. 2011))).

[8] "Although HFA acts to 'streamline the procedures created by §§ 115(b) and 115(c),' the '[l]icenses
issued by [HFA] do not . . . alter the basic rights and obligations of the licensee under § 115.'" Op. 36
(alteration in original) (quoting *EMI Entm't World, Inc. v. Karen Records, Inc.*, 603 F. Supp. 2d 759,
763–64 (S.D.N.Y. 2009), *amended in part on other grounds*, 681 F. Supp. 2d 470 (S.D.N.Y. 2010)).

[9] Relatedly, Defendants' contention that there is a "factual question as to whether an HFA license is
negotiated or compulsory" misses the mark. Defs.' Mem. 14. However one labels the license, the fact
remains that Defendants and HFA's communications expressly indicated that ████████████████

9

**SAppx63**

**F.    Audiovisual Works**

Section 115 provides for a "compulsory license to make and distribute phonorecords" of

a musical work.  17 U.S.C. § 115(a)(1).  "Phonorecords" are "material objects in which sounds,

other than those accompanying a motion picture or other audiovisual work, are fixed."  17 U.S.C.

§ 101.  Based on the clear exclusion of audiovisual works from the statutory definition of

"phonorecords," the Court concluded that Defendants could not obtain compulsory licenses for

any of the audiovisual recordings that they offered online.  Op. 26–28.

Defendants claim that this was erroneous but cannot cite a single case—let alone a

controlling case—supporting their contrary and counterintuitive interpretation of the statute.[10]

Reconsideration of this point is denied.

**G.    Willfulness**

"A copyright holder seeking to prove that a copier's infringement was willful must show

that the infringer 'had knowledge that its conduct represented infringement or . . . recklessly

disregarded the possibility.'"  *Bryant v. Media Right Prods., Inc.*, 603 F.3d 135, 143 (2d Cir.

2010) (quoting *Twin Peaks Prods., Inc. v. Publ'ns Int'l Ltd.*, 996 F.2d 1366, 1382 (2d Cir.

1993)).  The Court held as a matter of law that Defendants willfully infringed with respect to all

---

████████████████████████████████████.  Op. 36.
Defendants have submitted no evidence indicating that HFA varied the key § 115 requirements at issue
here, including the requirement of lawful fixation.

[10] Because "[t]he term 'phonorecords' includes the material object in which the sounds are first fixed," 17
U.S.C. § 101, the Court recognized in a footnote that phonorecords include "studio equipment on which
'sounds are first fixed,'" as well as "commercially available objects such as records and CDs."  Op. 27
n.22.  Misinterpreting this footnote, Defendants suggest that the Court erroneously stated that "studio
equipment" that enables the recording process, such as a tape recorder or mixing board, is a phonorecord.
That is clearly not the kind of "studio equipment" to which the Court was referring.  Rather, the studio
recording medium in which sounds are first fixed, such as a reel-to-reel tape or computer hard drive,
qualifies as a phonorecord.

audiovisual recordings, pre-1972 audio recordings, and recordings covered by the UMG

agreement.  Op. 50.

Defendants challenge that ruling principally by citing to a single sentence in Bill Graham

Archives marketing materials stating that ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████. Defendants suggest that this sentence left "open" the possibility that

the recordings could be exploited without artist approval.  Defs.' Mem. 19.  However, the same

document stated that ██████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████. This document's reference to ███████████████████

███████████████████, in conjunction with other voluminous,

undisputed evidence of willfulness, does not create a triable issue of willfulness as to the

categories of recordings described above.[11]  Rather, this material supports a finding that

Defendants, at a minimum, recklessly disregarded the possibility of infringement.

As the Court explained, this evidence includes the following:

• The acquired collections informed Defendants that they were not necessarily acquiring
  intellectual property rights, warned of the significant licensing issues that Defendants
  would need to overcome, and made no representation regarding, or did not provide,
  performer contracts, Defs.' Counter 56.1 ¶¶ 17–22, 33–35;

• Defendants never obtained the consent of the copyright holders in the Musical Works;

• The HFA agreements informed Defendants ████████████████████████████
  ██████████████████████

---

[11] Defendants also point to their efforts to secure licenses from HFA and record labels as evidence of non-willfulness.  As the Court explained, this evidence creates a triable issue of willfulness as to certain recordings covered by HFA licenses and post-1972 audio recordings covered by the Sony and Warner agreements, but does not create a triable issue as to any audiovisual recordings, pre-1972 audio recordings, or recordings covered by the UMG agreement.  Op. 49–50.

- Defendants represented in their agreement with RightsFlow ████████████████████ ██████████████████████████████████████████

- Defendants' Joint Exploitation Agreements with Sony and Warner expressly excluded audiovisual recordings, Lundberg Decl. Ex. 2, § 3.6(f); *id.* Ex. 3, § 10.3; Defs.' Counter 56.1 ¶ 79;

- Pre-1972 recordings were not "fixed pursuant to an express license from the owner of the copyright in the musical work or pursuant to a valid compulsory license for use of such work in a sound recording," 17 U.S.C. § 115(a)(1); and

- There were no Section 1 Notices under the UMG agreement purporting to authorize the exploitation of any recordings featuring UMG artists.

*See* Op. 48–49.

Accordingly, Defendants have pointed to no overlooked evidence that could reasonably alter the Court's conclusion on the issue of willfulness.

**H.   Sagan's Individual Liability**

Defendants contend that the Court conflated direct and vicarious liability for purposes of assessing Sagan's individual liability. Defs.' Mem. 20–23. That is incorrect. Although the Court noted that, in light of his authority over the Defendant entities and his ownership of Norton LLC, Sagan "has the ability to supervise infringing activity and has a financial interest in that activity," which could establish his vicarious liability, Op. 51 (quoting *Capitol Records LLC v. Redigi Inc.*, No. 12 Civ. 95 (RJS), 2014 WL 4354675, at *2 (S.D.N.Y. Sept. 2, 2014)), the Court explicitly granted summary judgment to Plaintiffs for "direct infringement by individual Defendant Sagan," Op. 52; *see also* Op. 52 n.33 (granting summary judgment "on that basis [of direct liability] alone" since Plaintiffs did not plead vicarious liability).

Contrary to Defendants' contentions, undisputed evidence supports the conclusion that Sagan directly infringed as a matter of law. "[A]n individual, including a corporate officer, . . . who personally participates in [infringing] activity[] is *personally* liable for infringement."

12

*UMG Recording, Inc. v. Escape Media Grp., Inc.*, No. 11 Civ. 8407, 2014 WL 5089743, at *25 (S.D.N.Y. Sept. 29, 2014) (first alteration in original) (quoting *Arista Records LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 398, 437 (S.D.N.Y. 2011)) (holding company co-founders directly and secondarily liable because they directed the infringements).  Here, not only did Sagan have "final decision-making authority" over the Defendant entities, Dickstein Decl. Ex. 2, at 43:1–3, as well as knowledge of the licensing problems presented by the collection, Defs.' Counter 56.1 ¶¶ 17–19, 21, 27, 33–35, he actually instructed his employees with respect to "which concerts to make available for download or not" and his plans to "start digitizing tape recordings with an eye towards making them available on a public website," Dickstein Decl. Ex. 1, at 54:3–9, 55:23–56:5, 107:3–15.  Because Sagan personally directed the infringing activity, and Defendants point to no evidence disputing that, Sagan is personally liable for infringement as a matter of law.[12]

## I.   Evidentiary Issues

Defendants also claim that the Court made several evidentiary errors warranting reconsideration.  Defs.' Mem. 23–25.  Defendants are mistaken.

First, Defendants contend that cease-and-desist letters that they received from third parties constituted hearsay.  However, "[c]ease-and-desist letters are not hearsay when offered to show bad faith and willful infringement."  *John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 327 F. Supp. 3d 606, 629 (S.D.N.Y. 2018).  Here, the letters warned that Defendants potentially lacked necessary licenses and could be infringing, and they were admissible for the limited

---

[12] Because Sagan "authorized the [infringing] use," he may also be liable for "contributory infringement." *Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc.*, 118 F.3d 955, 971 (2d Cir. 1997) (alteration in original) (quoting *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 437 (1984)). Nonetheless, Sagan may be held liable under either direct or secondary theories for his personal direction of infringement.  *See UMG Recording*, 2014 WL 5089743, at *25.

purpose to show that "Defendants were on notice as to their allegedly infringing activity."  Op. 17 & n.16.[13]

Second, Defendants contend that the Court should not have excluded a supplemental declaration from Matthew Lundberg explaining that a spreadsheet indicating the date that songs were first streamed in many cases actually indicated simply the date the song was streamed internally as a test rather than to the public.  The date that songs were made publicly available was relevant to the issue of whether Defendants timely filed a Notice of Intention to Obtain Compulsory License ("NOI") before exploiting the work.  The Court excluded Lundberg's supplemental declaration on the basis that it impermissibly created a material issue of fact by contradicting his prior sworn testimony that Defendants always published songs online before filing NOIs.  Op. 37 n.28 (citing *Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 572 (2d Cir. 1991)).  Regardless of whether the Court considered or excluded this declaration, which purported to create additional factual issues surrounding the dates, it would not affect the Court's holding, because other record evidence already led the Court to conclude that "there is a disputed question of fact as to whether and which NOIs were actually submitted after the first download or streaming of a phonorecord and in the absence of an HFA license."  Op. 38.  Given that there is already a disputed issue on NOI timeliness, considering Lundberg's supplemental declaration would not have reasonably altered the result, so reconsideration of this issue is unwarranted.

---

[13] Nor are the third-party cease-and-desist letters improper character evidence.  "Rule 404(b) does not preclude [the] letters because 'evidence of [other] bad actions may be admissible to show "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  On this basis . . . [c]ourts . . . consider the alleged infringer's receipt of and response to cease-and-desist letters . . . .'"  *John Wiley*, 327 F. Supp. 3d at 630 (second and third alterations in original) (quoting *Gucci Am., Inc. v. Guess?, Inc.*, 858 F. Supp. 2d 250, 253 (S.D.N.Y. 2012)).

Third, Defendants appear to challenge the Court's decision to exclude replacement copies of the Joint Exploitation Agreements that included schedules of covered artists and performances.  The Court did not admit these supplemental submissions because they did not include artist authorizations and did not purport to provide artist consent for fixation of the recordings, which in any event would be hearsay.  Op. 30 n.25.  Defendants provide no explanation why this decision was erroneous.  Defendants further argue that the Court misinterpreted the UMG agreement in concluding that ██████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████  Defendants do not explain how the plain text of the UMG agreement leads to any other conclusion or how the Court's interpretation was erroneous, much less clearly erroneous.

**III.    CONCLUSION**

For the reasons set forth above, Defendants' motion for reconsideration is DENIED.  The

parties are directed to appear before the Court for a status conference on **April 18, 2019, at 4:00**

**p.m.**  The Clerk of the Court is respectfully directed to terminate the motion, Doc. 257.

It is SO ORDERED.

Dated:  March 25, 2019
        New York, New York

_____
Edgardo Ramos, U.S.D.J.

16

**SAppx70**

**17 U.S.C.**
United States Code, 2017 Edition
Title 17 - COPYRIGHTS
CHAPTER 1 - SUBJECT MATTER AND SCOPE OF COPYRIGHT
Sec. 115 - Scope of exclusive rights in nondramatic musical works: Compulsory license for making and distributing
phonorecords
From the U.S. Government Publishing Office, www.gpo.gov

## §115. Scope of exclusive rights in nondramatic musical works: Compulsory license for making and distributing phonorecords

In the case of nondramatic musical works, the exclusive rights provided by clauses (1) and (3) of section 106, to make and to distribute phonorecords of such works, are subject to compulsory licensing under the conditions specified by this section.

(a) AVAILABILITY AND SCOPE OF COMPULSORY LICENSE.—

(1) When phonorecords of a nondramatic musical work have been distributed to the public in the United States under the authority of the copyright owner, any other person, including those who make phonorecords or digital phonorecord deliveries, may, by complying with the provisions of this section, obtain a compulsory license to make and distribute phonorecords of the work. A person may obtain a compulsory license only if his or her primary purpose in making phonorecords is to distribute them to the public for private use, including by means of a digital phonorecord delivery. A person may not obtain a compulsory license for use of the work in the making of phonorecords duplicating a sound recording fixed by another, unless: (i) such sound recording was fixed lawfully; and (ii) the making of the phonorecords was authorized by the owner of copyright in the sound recording or, if the sound recording was fixed before February 15, 1972, by any person who fixed the sound recording pursuant to an express license from the owner of the copyright in the musical work or pursuant to a valid compulsory license for use of such work in a sound recording.

(2) A compulsory license includes the privilege of making a musical arrangement of the work to the extent necessary to conform it to the style or manner of interpretation of the performance involved, but the arrangement shall not change the basic melody or fundamental character of the work, and shall not be subject to protection as a derivative work under this title, except with the express consent of the copyright owner.

(b) NOTICE OF INTENTION TO OBTAIN COMPULSORY LICENSE.—

(1) Any person who wishes to obtain a compulsory license under this section shall, before or within thirty days after making, and before distributing any phonorecords of the work, serve notice of intention to do so on the copyright owner. If the registration or other public records of the Copyright Office do not identify the copyright owner and include an address at which notice can be served, it shall be sufficient to file the notice of intention in the Copyright Office. The notice shall comply, in form, content, and manner of service, with requirements that the Register of Copyrights shall prescribe by regulation.

(2) Failure to serve or file the notice required by clause (1) forecloses the possibility of a compulsory license and, in the absence of a negotiated license, renders the making and distribution of phonorecords actionable as acts of infringement under section 501 and fully subject to the remedies provided by sections 502 through 506 and 509.

(c) ROYALTY PAYABLE UNDER COMPULSORY LICENSE.—

(1) To be entitled to receive royalties under a compulsory license, the copyright owner must be identified in the registration or other public records of the Copyright Office. The owner is entitled to royalties for phonorecords made and distributed after being so identified, but is not entitled to recover for any phonorecords previously made and distributed.

**SAppx71**

(2) Except as provided by clause (1), the royalty under a compulsory license shall be payable for every phonorecord made and distributed in accordance with the license. For this purpose, and other than as provided in paragraph (3), a phonorecord is considered "distributed" if the person exercising the compulsory license has voluntarily and permanently parted with its possession. With respect to each work embodied in the phonorecord, the royalty shall be either two and three-fourths cents, or one-half of one cent per minute of playing time or fraction thereof, whichever amount is larger.

(3)(A) A compulsory license under this section includes the right of the compulsory licensee to distribute or authorize the distribution of a phonorecord of a nondramatic musical work by means of a digital transmission which constitutes a digital phonorecord delivery, regardless of whether the digital transmission is also a public performance of the sound recording under section 106(6) of this title or of any nondramatic musical work embodied therein under section 106(4) of this title. For every digital phonorecord delivery by or under the authority of the compulsory licensee —

    (i) on or before December 31, 1997, the royalty payable by the compulsory licensee shall be the royalty prescribed under paragraph (2) and chapter 8 of this title; and

    (ii) on or after January 1, 1998, the royalty payable by the compulsory licensee shall be the royalty prescribed under subparagraphs (B) through (E) and chapter 8 of this title.

(B) Notwithstanding any provision of the antitrust laws, any copyright owners of nondramatic musical works and any persons entitled to obtain a compulsory license under subsection (a)(1) may negotiate and agree upon the terms and rates of royalty payments under this section and the proportionate division of fees paid among copyright owners, and may designate common agents on a nonexclusive basis to negotiate, agree to, pay or receive such royalty payments. Such authority to negotiate the terms and rates of royalty payments includes, but is not limited to, the authority to negotiate the year during which the royalty rates prescribed under this subparagraph and subparagraphs (C) through (E) and chapter 8 of this title shall next be determined.

(C) Proceedings under chapter 8 shall determine reasonable rates and terms of royalty payments for the activities specified by this section during the period beginning with the effective date of such rates and terms, but not earlier than January 1 of the second year following the year in which the petition requesting the proceeding is filed, and ending on the effective date of successor rates and terms, or such other period as the parties may agree. Such terms and rates shall distinguish between (i) digital phonorecord deliveries where the reproduction or distribution of a phonorecord is incidental to the transmission which constitutes the digital phonorecord delivery, and (ii) digital phonorecord deliveries in general. Any copyright owners of nondramatic musical works and any persons entitled to obtain a compulsory license under subsection (a)(1) may submit to the Copyright Royalty Judges licenses covering such activities. The parties to each proceeding shall bear their own costs.

(D) The schedule of reasonable rates and terms determined by the Copyright Royalty Judges shall, subject to subparagraph (E), be binding on all copyright owners of nondramatic musical works and persons entitled to obtain a compulsory license under subsection (a)(1) during the period specified in subparagraph (C), such other period as may be determined pursuant to subparagraphs (B) and (C), or such other period as the parties may agree. Such terms and rates shall distinguish between (i) digital phonorecord deliveries where the reproduction or distribution of a phonorecord is incidental to the transmission which constitutes the digital phonorecord delivery, and (ii) digital phonorecord deliveries in general. In addition to the objectives set forth in section 801(b)(1), in establishing such rates and terms, the Copyright Royalty Judges may consider rates and terms under voluntary license agreements described in subparagraphs (B) and (C). The royalty rates payable for a compulsory license for a digital phonorecord delivery under this section shall be established de novo and no precedential effect shall be given to the amount of the royalty payable by a compulsory licensee for digital phonorecord deliveries on or before December 31, 1997. The Copyright Royalty Judges shall also establish requirements by which copyright owners may receive reasonable notice of the use of their works under this section, and under which records of such use shall be kept and made available by persons making digital

phonorecord deliveries.

(E)(i) License agreements voluntarily negotiated at any time between one or more copyright owners of nondramatic musical works and one or more persons entitled to obtain a compulsory license under subsection (a)(1) shall be given effect in lieu of any determination by the Librarian of Congress and Copyright Royalty Judges. Subject to clause (ii), the royalty rates determined pursuant to subparagraph [1] (C) and (D) shall be given effect as to digital phonorecord deliveries in lieu of any contrary royalty rates specified in a contract pursuant to which a recording artist who is the author of a nondramatic musical work grants a license under that person's exclusive rights in the musical work under paragraphs (1) and (3) of section 106 or commits another person to grant a license in that musical work under paragraphs (1) and (3) of section 106, to a person desiring to fix in a tangible medium of expression a sound recording embodying the musical work.

(ii) The second sentence of clause (i) shall not apply to—

(I) a contract entered into on or before June 22, 1995, and not modified thereafter for the purpose of reducing the royalty rates determined pursuant to subparagraph [1] (C) and (D) or of increasing the number of musical works within the scope of the contract covered by the reduced rates, except if a contract entered into on or before June 22, 1995, is modified thereafter for the purpose of increasing the number of musical works within the scope of the contract, any contrary royalty rates specified in the contract shall be given effect in lieu of royalty rates determined pursuant to subparagraph [1] (C) and (D) for the number of musical works within the scope of the contract as of June 22, 1995; and

(II) a contract entered into after the date that the sound recording is fixed in a tangible medium of expression substantially in a form intended for commercial release, if at the time the contract is entered into, the recording artist retains the right to grant licenses as to the musical work under paragraphs (1) and (3) of section 106.

(F) Except as provided in section 1002(e) of this title, a digital phonorecord delivery licensed under this paragraph shall be accompanied by the information encoded in the sound recording, if any, by or under the authority of the copyright owner of that sound recording, that identifies the title of the sound recording, the featured recording artist who performs on the sound recording, and related information, including information concerning the underlying musical work and its writer.

(G)(i) A digital phonorecord delivery of a sound recording is actionable as an act of infringement under section 501, and is fully subject to the remedies provided by sections 502 through 506, unless—

(I) the digital phonorecord delivery has been authorized by the copyright owner of the sound recording; and

(II) the owner of the copyright in the sound recording or the entity making the digital phonorecord delivery has obtained a compulsory license under this section or has otherwise been authorized by the copyright owner of the musical work to distribute or authorize the distribution, by means of a digital phonorecord delivery, of each musical work embodied in the sound recording.

(ii) Any cause of action under this subparagraph shall be in addition to those available to the owner of the copyright in the nondramatic musical work under subsection (c)(6) and section 106(4) and the owner of the copyright in the sound recording under section 106(6).

(H) The liability of the copyright owner of a sound recording for infringement of the copyright in a nondramatic musical work embodied in the sound recording shall be determined in accordance with applicable law, except that the owner of a copyright in a sound recording shall not be liable for a digital phonorecord delivery by a third party if the owner of the copyright in the sound recording does not license the distribution of a phonorecord of the nondramatic musical work.

(I) Nothing in section 1008 shall be construed to prevent the exercise of the rights and remedies allowed by this paragraph, paragraph (6), and chapter 5 in the event of a digital phonorecord

delivery, except that no action alleging infringement of copyright may be brought under this title against a manufacturer, importer or distributor of a digital audio recording device, a digital audio recording medium, an analog recording device, or an analog recording medium, or against a consumer, based on the actions described in such section.

(J) Nothing in this section annuls or limits (i) the exclusive right to publicly perform a sound recording or the musical work embodied therein, including by means of a digital transmission, under sections 106(4) and 106(6), (ii) except for compulsory licensing under the conditions specified by this section, the exclusive rights to reproduce and distribute the sound recording and the musical work embodied therein under sections 106(1) and 106(3), including by means of a digital phonorecord delivery, or (iii) any other rights under any other provision of section 106, or remedies available under this title, as such rights or remedies exist either before or after the date of enactment of the Digital Performance Right in Sound Recordings Act of 1995.

(K) The provisions of this section concerning digital phonorecord deliveries shall not apply to any exempt transmissions or retransmissions under section 114(d)(1). The exemptions created in section 114(d)(1) do not expand or reduce the rights of copyright owners under section 106(1) through (5) with respect to such transmissions and retransmissions.

(4) A compulsory license under this section includes the right of the maker of a phonorecord of a nondramatic musical work under subsection (a)(1) to distribute or authorize distribution of such phonorecord by rental, lease, or lending (or by acts or practices in the nature of rental, lease, or lending). In addition to any royalty payable under clause (2) and chapter 8 of this title, a royalty shall be payable by the compulsory licensee for every act of distribution of a phonorecord by or in the nature of rental, lease, or lending, by or under the authority of the compulsory licensee. With respect to each nondramatic musical work embodied in the phonorecord, the royalty shall be a proportion of the revenue received by the compulsory licensee from every such act of distribution of the phonorecord under this clause equal to the proportion of the revenue received by the compulsory licensee from distribution of the phonorecord under clause (2) that is payable by a compulsory licensee under that clause and under chapter 8. The Register of Copyrights shall issue regulations to carry out the purpose of this clause.

(5) Royalty payments shall be made on or before the twentieth day of each month and shall include all royalties for the month next preceding. Each monthly payment shall be made under oath and shall comply with requirements that the Register of Copyrights shall prescribe by regulation. The Register shall also prescribe regulations under which detailed cumulative annual statements of account, certified by a certified public accountant, shall be filed for every compulsory license under this section. The regulations covering both the monthly and the annual statements of account shall prescribe the form, content, and manner of certification with respect to the number of records made and the number of records distributed.

(6) If the copyright owner does not receive the monthly payment and the monthly and annual statements of account when due, the owner may give written notice to the licensee that, unless the default is remedied within thirty days from the date of the notice, the compulsory license will be automatically terminated. Such termination renders either the making or the distribution, or both, of all phonorecords for which the royalty has not been paid, actionable as acts of infringement under section 501 and fully subject to the remedies provided by sections 502 through 506.

(d) DEFINITION.—As used in this section, the following term has the following meaning: A "digital phonorecord delivery" is each individual delivery of a phonorecord by digital transmission of a sound recording which results in a specifically identifiable reproduction by or for any transmission recipient of a phonorecord of that sound recording, regardless of whether the digital transmission is also a public performance of the sound recording or any nondramatic musical work embodied therein. A digital phonorecord delivery does not result from a real-time, non-interactive subscription transmission of a sound recording where no reproduction of the sound recording or the musical work embodied therein is made from the inception of the transmission through to its receipt by the transmission recipient in order to make the sound recording audible.

(Pub. L. 94–553, title I, §101, Oct. 19, 1976, 90 Stat. 2561; Pub. L. 98–450, §3, Oct. 4, 1984, 98 Stat.

U.S.C. Title 17 - COPYRIGHTS

1727; Pub. L. 104–39, §4, Nov. 1, 1995, 109 Stat. 344; Pub. L. 105–80, §§4, 10, 12(a)(7), Nov. 13, 1997, 111 Stat. 1531, 1534; Pub. L. 108–419, §5(d), Nov. 30, 2004, 118 Stat. 2364; Pub. L. 109–303, §4(c), Oct. 6, 2006, 120 Stat. 1482; Pub. L. 110–403, title II, §209(a)(3), Oct. 13, 2008, 122 Stat. 4264; Pub. L. 111–295, §6(g), Dec. 9, 2010, 124 Stat. 3181.)

### HISTORICAL AND REVISION NOTES

#### HOUSE REPORT NO. 94–1476

The provisions of section 1(e) and 101(e) of the present law [sections 1(e) and 101(e) of former title 17], establishing a system of compulsory licensing for the making and distribution of phonorecords of copyrighted music, are retained with a number of modifications and clarifications in section 115 of the bill. Under these provisions, which represented a compromise of the most controversial issue of the 1909 act, a musical composition that has been reproduced in phonorecords with the permission of the copyright owner may generally be reproduced in phonorecords by another person, if that person notifies the copyright owner and pays a specified royalty.

The fundamental question of whether to retain the compulsory license or to do away with it altogether was a major issue during earlier stages of the program for general revision of the copyright law. At the hearings it was apparent that the argument on this point had shifted, and the real issue was not whether to retain the compulsory license but how much the royalty rate under it should be. The arguments for and against retention of the compulsory license are outlined at pages 66–67 of this Committee's 1967 report (H. Rept. No. 83, 90th Cong., 1st Sess.). The Committee's conclusion on this point remains the same as in 1967: "that a compulsory licensing system is still warranted as a condition for the rights of reproducing and distributing phonorecords of copyrighted music," but "that the present system is unfair and unnecessarily burdensome on copyright owners, and that the present statutory rate is too low."

**Availability and Scope of Compulsory License.** Subsection (a) of section 115 deals with three doubtful questions under the present law: (1) the nature of the original recording that will make the work available to others for recording under a compulsory license; (2) the nature of the sound recording that can be made under a compulsory license; and (3) the extent to which someone acting under a compulsory license can depart from the work as written or recorded without violating the copyright owner's right to make an "arrangement" or other derivative work. The first two of these questions are answered in clause (1) of section 115(a), and the third is the subject of clause (2).

The present law, though not altogether clear, apparently bases compulsory licensing on the making or licensing of the first recording, even if no authorized records are distributed to the public. The first sentence of section 115(a)(1) would change the basis for compulsory licensing to authorized public distribution of phonorecords (including disks and audio tapes but not the sound tracks or other sound records accompanying a motion picture or other audiovisual work). Under the clause, a compulsory license would be available to anyone as soon as "phonorecords of a nondramatic musical work have been distributed to the public in the United States under the authority of the copyright owner."

The second sentence of clause (1), which has been the subject of some debate, provides that "a person may obtain a compulsory license only if his or her primary purpose in making phonorecords is to distribute them to the public for private use." This provision was criticized as being discriminatory against background music systems, since it would prevent a background music producer from making recordings without the express consent of the copyright owner; it was argued that this could put the producer at a great competitive disadvantage with performing rights societies, allow discrimination, and destroy or prevent entry of businesses. The committee concluded, however, that the purpose of the compulsory license does not extend to manufacturers of phonorecords that are intended primarily for commercial use, including not only broadcasters and jukebox operators but also background music services.

The final sentence of clause (1) provides that a person may not obtain a compulsory license for use of the work in the duplication of a sound recording made by another, unless the sound recording being duplicated was itself fixed lawfully and the making of phonorecords duplicated from it was authorized by the owner of copyright in the sound recording (or, if the recording was fixed before February 15, 1972, by the voluntary or compulsory licensee of the music used in the recording). The basic intent of this sentence is to make clear that a person is not entitled to a compulsory license of copyrighted musical works for the purpose of making an unauthorized duplication of a musical sound recording originally developed and produced by another. It is the view of the Committee that such was the original intent of the Congress in enacting the 1909 Copyright Act, and it has been so construed by the 3d, 5th, 9th and 10th Circuits in the following cases: *Duchess Music Corp. v. Stern*, 458 F.2d 1305 (9th Cir.), cert. denied, 409 U.S. 847 (1972) [93 S.Ct.

**SAppx75**

U.S.C. Title 17 - COPYRIGHTS

52, 34 L.Ed.2d 88]; *Edward B. Marks Music Corp. v. Colorado Magnetics, Inc.*, 497 F.2d 285, aff'd on rehearing en banc, 497 F.2d 292 (10th Cir. 1974), cert. denied, 419 U.S. 1120 (1975) [95 S.Ct. 801, 42 L.Ed.2d 819]; *Jondora Music Publishing Co. v. Melody Recordings, Inc.*, 506 F.2d 392 (3d Cir. 1974, as amended 1975), cert. denied, 421 U.S. 1012 (1975) [95 S.Ct. 2417, 44 L.Ed.2d 680]; and *Fame Publishing Co. v. Alabama Custom Tape, Inc.*, 507 F.2d 667 (5th Cir.), cert. denied, 423 U.S. 841 (1975) [96 S.Ct. 73, 46 L.Ed.2d 61].

Under this provision, it would be possible to obtain a compulsory license for the use of copyrighted music under section 115 if the owner of the sound recording being duplicated authorizes its duplication. This does not, however, in any way require the owner of the original sound recording to grant a license to duplicate the original sound recording. It is not intended that copyright protection for sound recordings be circumscribed by requiring the owners of sound recordings to grant a compulsory license to unauthorized duplicators or others.

The second clause of subsection (a) is intended to recognize the practical need for a limited privilege to make arrangements of music being used under a compulsory license, but without allowing the music to be perverted, distorted, or travestied. Clause (2) permits arrangements of a work "to the extent necessary to conform it to the style or manner of interpretation of the performance involved," so long as it does not "change the basic melody or fundamental character of the work." The provision also prohibits the compulsory licensee from claiming an independent copyright in his arrangement as a "derivative work" without the express consent of the copyright owner.

**Procedure for Obtaining Compulsory License.** Section 115(b)(1) requires anyone who wishes to take advantage of the compulsory licensing provisions to serve a "notice of intention to obtain a compulsory license," which is much like the "notice of intention to use" required by the present law. Under section 115, the notice must be served before any phonorecords are distributed, but service can take place "before or within 30 days after making" any phonorecords. The notice is to be served on the copyright owner, but if the owner is not identified in the Copyright Office records, "it shall be sufficient to file the notice of intention in the Copyright Office."

The Committee deleted clause (2) of section 115(b) of S. 22 as adopted by the Senate. The provision was a vestige of jukebox provisions in earlier bills, and its requirements no longer served any useful purpose.

Clause (2) [formerly clause (3)] of section 115(b) [cl. (2) of subsec. (b) of this section] provides that "failure to serve or file the notice required by clause (1) * * * forecloses the possibility of a compulsory license and, in the absence of a negotiated license, renders the making and distribution of phonorecords actionable as acts of infringement under section 501 and fully subject to the remedies provided by sections 502 through 506." The remedies provided in section 501 are those applicable to infringements generally.

**Royalty Payable Under Compulsory License.** *Identification of Copyright Owner*.—Under the present law a copyright owner is obliged to file a "notice of use" in the Copyright Office, stating that the initial recording of the copyrighted work has been made or licensed, in order to recover against an unauthorized record manufacturer. This requirement has resulted in a technical loss of rights in some cases, and serves little or no purpose where the registration and assignment records of the Copyright Office already show the facts of ownership. Section 115(c)(1) therefore drops any formal "notice of use" requirements and merely provides that, "to be entitled to receive royalties under a compulsory license, the copyright owner must be identified in the registration or other public records of the Copyright Office." On the other hand, since proper identification is an important precondition of recovery, the bill further provides that "the owner is entitled to royalties for phonorecords manufactured and distributed after being so identified, but is not entitled to recover for any phonorecords previously made and distributed."

*Basis of Royalty*.—Under the present statute the specified royalty is payable "on each such part manufactured," regardless of how many "parts" (i.e., records) are sold. This basis for calculating the royalty has been revised in section 115(c)(2) to provide that "the royalty under a compulsory license shall be payable for every phonorecord made and distributed in accordance with the license." This basis is more compatible with the general practice in negotiated licenses today. It is unjustified to require a compulsory licensee to pay license fees on records which merely go into inventory, which may later be destroyed, and from which the record producer gains no economic benefit.

It is intended that the Register of Copyrights will prescribe regulations insuring that copyright owners will receive full and prompt payment for all phonorecords made and distributed. Section 115(c)(2) states that "a phonorecord is considered 'distributed' if the person exercising the compulsory license has voluntarily and permanently parted with its possession." For this purpose, the concept of "distribution" comprises any act by which the person exercising the compulsory license voluntarily relinquishes possession of a phonorecord (considered as a fungible unit), regardless of whether the distribution is to the

public, passes title, constitutes a gift, or is sold, rented, leased, or loaned, unless it is actually returned and the transaction cancelled. Neither involuntary relinquishment, as through theft or fire, nor the destruction of unwanted records, would constitute "distribution."

The term "made" is intended to be broader than "manufactured," and to include within its scope every possible manufacturing or other process capable of reproducing a sound recording in phonorecords. The use of the phrase "made and distributed" establishes the basis upon which the royalty rate for compulsory licensing under section 115 is to be calculated, but it is in no way intended to weaken the liability of record pressers and other manufacturers and makers of phonorecords for copyright infringement where the compulsory licensing requirements have not been met. As under the present law, even if a presser, manufacturer, or other maker had no role in the distribution process, that person would be regarded as jointly and severally liable in a case where the court finds that infringement has taken place because of failure to comply with the provisions of section 115.

Under existing practices in the record industry, phonorecords are distributed to wholesalers and retailers with the privilege of returning unsold copies for credit or exchange. As a result, the number of recordings that have been "permanently" distributed will not usually be known until some time—six or seven months on the average—after the initial distribution. In recognition of this problem, it has become a well-established industry practice, under negotiated licenses, for record companies to maintain reasonable reserves of the mechanical royalties due the copyright owners, against which royalties on the returns can be offset. The Committee recognizes that this practice may be consistent with the statutory requirements for monthly compulsory license accounting reports, but recognizes the possibility that, without proper safeguards, the maintenance of such reserves could be manipulated to avoid making payments of the full amounts owing to copyright owners. Under these circumstances, the regulations prescribed by the Register of Copyrights should contain detailed provisions ensuring that the ultimate disposition of every phonorecord made under a compulsory license is accounted for, and that payment is made for every phonorecord "voluntarily and permanently" distributed. In particular, the Register should prescribe a point in time when, for accounting purposes under section 115, a phonorecord will be considered "permanently distributed," and should prescribe the situations in which a compulsory licensee is barred from maintaining reserves (e.g., situations in which the compulsory licensee has frequently failed to make payments in the past.)

*Rate of Royalty.*—A large preponderance of the extensive testimony presented to the Committee on section 115 was devoted to the question of the amount of the statutory royalty rate. An extensive review and analysis of the testimony and arguments received on this question appear in the 1974 Senate report (S. Rep. No. 94–473) at page 71–94.

While upon initial review it might be assumed that the rate established in 1909 would not be reasonable at the present time, the committee believes that an increase in the mechanical royalty rate must be justified on the basis of existing economic conditions and not on the mere passage of 67 years. Following a thorough analysis of the problem, the Committee considers that an increase of the present two-cent royalty to a rate of 2¾ cents (or .6 of one cent per minute or fraction of playing time) is justified. This rate will be subject to review by the Copyright Royalty Commission, as provided by section 801, in 1980 and at 10-year intervals thereafter.

**Accounting and Payment of Royalties; Effect of Default.** Clause (3) of Section 115(c) provides that royalty payments are to be made on a monthly basis, in accordance with requirements that the Register of Copyrights shall prescribe by regulation. In order to increase the protection of copyright proprietors against economic harm from companies which might refuse or fail to pay their just obligations, compulsory licensees will also be required to make a detailed cumulative annual statement of account, certified by a Certified Public Accountant.

A source of criticism with respect to the compulsory licensing provisions of the present statute has been the rather ineffective sanctions against default by compulsory licensees. Clause (4) of section 115(c) corrects this defect by permitting the copyright owner to serve written notice on a defaulting licensee, and by providing for termination of the compulsory license if the default is not remedied within 30 days after notice is given. Termination under this clause "renders either the making or the distribution, or both, of all phonorecords for which the royalty had not been paid, actionable as acts of infringement under section 501 and fully subject to the remedies provided by sections 502 through 506."

### REFERENCES IN TEXT

The date of enactment of the Digital Performance Right in Sound Recordings Act of 1995, referred to in subsec. (c)(3)(J), is the date of enactment of Pub. L. 104–39, which was approved Nov. 1, 1995.

## Amendments

**2010**—Subsec. (c)(3)(G)(i). Pub. L. 111–295 made technical correction to directory language of Pub. L. 110–403, §209(a)(3)(A). See 2008 Amendment note below.

**2008**—Subsec. (c)(3)(G)(i). Pub. L. 110–403, §209(a)(3)(A), as amended by Pub. L. 111–295 struck out "and section 509" after "506" in introductory provisions.

Subsec. (c)(6). Pub. L. 110–403, §209(a)(3)(B), struck out "and 509" before period at end.

**2006**—Subsec. (c)(3)(B). Pub. L. 109–303, §4(c)(1), substituted "this subparagraph and subparagraphs (C) through (E)" for "subparagraphs (B) through (F)".

Subsec. (c)(3)(D). Pub. L. 109–303, §4(c)(2), inserted "in subparagraphs (B) and (C)" after "described" in third sentence.

Subsec. (c)(3)(E)(i), (ii)(I). Pub. L. 109–303, §4(c)(3), substituted "(C) and (D)" for "(C) or (D)" wherever appearing.

**2004**—Subsec. (c)(3)(A)(ii). Pub. L. 108–419, §5(d)(1), substituted "(E)" for "(F)".

Subsec. (c)(3)(B). Pub. L. 108–419, §5(d)(2)(C), which directed substitution of "this subparagraph and subparagraphs (C) through (E)" for "subparagraphs (C) through (F)", could not be executed because "subparagraphs (C) through (F)" does not appear in text.

Pub. L. 108–419, §5(d)(2)(A), (B), substituted "under this section" for "under this paragraph" and inserted "on a nonexclusive basis" after "common agents".

Subsec. (c)(3)(C). Pub. L. 108–419, §5(d)(3), substituted first sentence for former first sentence which read: "During the period of June 30, 1996, through December 31, 1996, the Librarian of Congress shall cause notice to be published in the Federal Register of the initiation of voluntary negotiation proceedings for the purpose of determining reasonable terms and rates of royalty payments for the activities specified by subparagraph (A) during the period beginning January 1, 1998, and ending on the effective date of any new terms and rates established pursuant to subparagraph (C), (D) or (F), or such other date (regarding digital phonorecord deliveries) as the parties may agree.", substituted "Copyright Royalty Judges" for "Librarian of Congress" in third sentence, and struck out "negotiation" before "proceeding" in last sentence.

Subsec. (c)(3)(D). Pub. L. 108–419, §5(d)(4), substituted first sentence for former first sentence which read: "In the absence of license agreements negotiated under subparagraphs (B) and (C), upon the filing of a petition in accordance with section 803(a)(1), the Librarian of Congress shall, pursuant to chapter 8, convene a copyright arbitration royalty panel to determine a schedule of rates and terms which, subject to subparagraph (E), shall be binding on all copyright owners of nondramatic musical works and persons entitled to obtain a compulsory license under subsection (a)(1) during the period beginning January 1, 1998, and ending on the effective date of any new terms and rates established pursuant to subparagraph (C), (D) or (F), or such other date (regarding digital phonorecord deliveries) as may be determined pursuant to subparagraphs (B) and (C).", substituted "Copyright Royalty Judges may consider" for "copyright arbitration royalty panel may consider" and "described" for "negotiated as provided in subparagraphs (B) and (C)" in third sentence, and "Copyright Royalty Judges shall also establish" for "Librarian of Congress shall also establish" in last sentence.

Subsec. (c)(3)(E)(i). Pub. L. 108–419, §5(d)(5)(A), substituted "Librarian of Congress and Copyright Royalty Judges" for "Librarian of Congress" in first sentence and "(C) or (D) shall be given effect as to digital phonorecord deliveries" for "(C), (D) or (F) shall be given effect" in second sentence.

Subsec. (c)(3)(E)(ii)(I). Pub. L. 108–419, §5(d)(5)(B), substituted "(C) or (D)" for "(C), (D) or (F)" in two places.

Subsec. (c)(3)(F) to (L). Pub. L. 108–419, §5(d)(6), redesignated subpars. (G) to (L) as (F) to (K), respectively, and struck out former subpar. (F), which read as follows: "The procedures specified in subparagraphs (C) and (D) shall be repeated and concluded, in accordance with regulations that the Librarian of Congress shall prescribe, in each fifth calendar year after 1997, except to the extent that different years for the repeating and concluding of such proceedings may be determined in accordance with subparagraphs (B) and (C)."

**1997**—Subsec. (c)(3)(D). Pub. L. 105–80, §4, struck out "and publish in the Federal Register" before "a schedule of rates and terms".

Subsec. (c)(3)(E)(i). Pub. L. 105–80, §12(a)(7)(A), substituted "paragraphs (1) and (3) of section 106" for "sections 106(1) and (3)" in two places.

Subsec. (c)(3)(E)(ii)(II). Pub. L. 105–80, §12(a)(7)(A), substituted "paragraphs (1) and (3) of section 106" for "sections 106(1) and 106(3)".

Subsec. (d). Pub. L. 105–80, §10, amended directory language of Pub. L. 104–39, §4. See 1995 Amendment note below.

**1995**—Subsec. (a)(1). Pub. L. 104–39, §4(1), substituted "any other person, including those who make phonorecords or digital phonorecord deliveries," for "any other person" in first sentence and inserted before period at end of second sentence ", including by means of a digital phonorecord delivery".

Subsec. (c)(2). Pub. L. 104–39, §4(2), inserted "and other than as provided in paragraph (3)," after "For this purpose," in second sentence.

Subsec. (c)(3) to (6). Pub. L. 104–39, §4(3), added par. (3) and redesignated former pars. (3) to (5) as (4) to (6), respectively.

Subsec. (d). Pub. L. 104–39, §4(4), as renumbered by Pub. L. 105–80, §10, added subsec. (d).

**1984**—Subsec. (c)(3) to (5). Pub. L. 98–450 added par. (3) and redesignated existing pars. (3) and (4) as (4) and (5), respectively.

### Effective Date of 2006 Amendment

Amendment by Pub. L. 109–303 effective as if included in the Copyright Royalty and Distribution Reform Act of 2004, Pub. L. 108–419, see section 6 of Pub. L. 109–303, set out as a note under section 111 of this title.

### Effective Date of 2004 Amendment

Amendment by Pub. L. 108–419 effective 6 months after Nov. 30, 2004, subject to transition provisions, see section 6 of Pub. L. 108–419, set out as an Effective Date; Transition Provisions note under section 801 of this title.

### Effective Date of 1995 Amendment

Amendment by Pub. L. 104–39 effective 3 months after Nov. 1, 1995, see section 6 of Pub. L. 104–39, set out as a note under section 101 of this title.

### Persons Operating Under Predecessor Compulsory Licensing Provisions

Pub. L. 94–553, title I, §106, Oct. 19, 1976, 90 Stat. 2599, provided that: "In any case where, before January 1, 1978, a person has lawfully made parts of instruments serving to reproduce mechanically a copyrighted work under the compulsory license provisions of section 1(e) of title 17 as it existed on December 31, 1977, such person may continue to make and distribute such parts embodying the same mechanical reproduction without obtaining a new compulsory license under the terms of section 115 of title 17 as amended by the first section of this Act [this section]. However, such parts made on or after January 1, 1978, constitute phonorecords and are otherwise subject to the provisions of said section 115 [this section]."

[1](#) *So in original. Probably should be "subparagraphs".*

## CERTIFICATE OF SERVICE

I hereby certify that on March 8, 2021, an electronic copy of the foregoing brief and Special Appendix was filed and served on counsel of record via this Court's CM/ECF system, which will send a notice of filing to all registered users.

s/Michael S. Elkin
Michael S. Elkin