# 20-3816-cv(L),
# 20-4020-cv(CON), 20-4099-cv(XAP)

## United States Court of Appeals
*for the*
## Second Circuit

ABKCO MUSIC, INC., COLGEMS-EMI MUSIC INC., EMI ALGEE MUSIC
CORP., EMI APRIL MUSIC INC., EMI BLACKWOOD MUSIC INC., EMI
CONSORTIUM MUSIC PUBLISHING, INC., DBA EMI FULL KEEL MUSIC,
EMI CONSORTIUM SONGS, INC., DBA EMI LONGITUDE MUSIC, EMI
FEIST CATALOG INC., EMI ROBBINS CATALOG INC., EMI UNART
CATALOG, INC., JOBETE MUSIC CO., INC., SCREEN-GEMS-EMI MUSIC
INC., STONE AGATE MUSIC, STONE DIAMOND MUSIC CORP., IMAGEM
MUSIC LLC, PEER INTERNATIONAL CORPORATION, PSO LIMTED,
PEERMUSIC LTD., PEERMUSIC III, LTD., SONGS OF PEER, LTD.,

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFFS-COUNTER-DEFENDANTS-
## APPELLEES-CROSS-APPELLANTS

BARRY I. SLOTNICK
CHRISTIAN D. CARBONE
TAL E. DICKSTEIN
SARAH SCHACTER
PRIY SINHA
LOEB & LOEB LLP
*Attorneys for Plaintiffs-Counter-
Defendants-Appellees-Cross-
Appellants*
345 Park Avenue
New York, New York 10154
(212) 407-4000

SPIRIT CATALOG HOLDINGS S.A.R.L., SPIRIT TWO MUSIC, INC.,
WARNER-TAMERLANE PUBLISHING CORP., WB MUSIC CORP.,

*Plaintiffs-Counter-Defendants-Appellees-Cross-Appellants,*

– v. –

WILLIAM SAGAN, NORTON LLC, BILL GRAHAM ARCHIVES, LLC, DBA
WOLFGANG'S VAULT, DBA CONCERT VAULT, DBA MUSIC VAULT,
DBA DAYTROTTER,

*Defendants-Third-Party Plaintiffs-Counter Claimants-Appellants-Cross-Appellees.*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Plaintiffs-Appellees/Cross-Appellants ("Plaintiffs"), by and through their attorneys, Loeb & Loeb LLP, hereby disclose the following pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure:

| Plaintiff | Parent corporation or publicly held corporation owning 10% or more of its stock |
|---|---|
| ABKCO Music, Inc. | ABKCO Music, Inc. is a wholly owned subsidiary of ABKCO Music & Records, Inc. No publicly traded company owns 10% or more of the stock of ABKCO Music, Inc. |
| Colgems-EMI Music Inc. | Colgems-EMI Music Inc. is a wholly owned, indirect subsidiary of Sony Group Corporation, a publicly traded company organized under the laws of Japan. No publicly traded company other than Sony Group Corporation owns more than 10% of the stock of Colgems-EMI Music Inc. |
| EMI Algee Music Corp., now known as Sony Music Publishing (US) LLC | EMI Algee Music Corp., now known as Sony Music Publishing (US) LLC, is a partially owned, indirect subsidiary of Sony Group Corporation, a publicly traded company organized under the laws of Japan. No publicly traded company other than Sony Group Corporation owns more than 10% of the stock of Sony Music Publishing (US) LLC. |
| EMI April Music Inc. | EMI April Music Inc. is a wholly owned, indirect subsidiary of Sony Group Corporation, a publicly traded company organized under the laws of Japan. No publicly traded company other than Sony Group Corporation owns more than 10% of the stock of EMI April Music Inc. |
| EMI Blackwood Music Inc. | EMI Blackwood Music Inc. is a wholly owned, indirect subsidiary of Sony Group Corporation, a publicly traded company organized under the laws of |

| | |
|---|---|
| | Japan. No publicly traded company other than Sony Group Corporation owns more than 10% of the stock of EMI Blackwood Music Inc. |
| EMI Consortium Music Publishing, Inc. d/b/a EMI Full Keel Music | EMI Consortium Music Publishing, Inc. d/b/a EMI Full Keel Music is a wholly owned, indirect subsidiary of Sony Group Corporation, a publicly traded company organized under the laws of Japan. No publicly traded company other than Sony Group Corporation owns more than 10% of the stock of EMI Consortium Music Publishing, Inc. d/b/a EMI Full Keel Music. |
| EMI Consortium Songs, Inc. d/b/a EMI Longitude Music | EMI Consortium Songs, Inc. d/b/a EMI Longitude Music is a wholly owned, indirect subsidiary of Sony Group Corporation, a publicly traded company organized under the laws of Japan. No publicly traded company other than Sony Group Corporation owns more than 10% of the stock of EMI Consortium Songs, Inc. d/b/a EMI Longitude Music |
| EMI Feist Catalog Inc. | EMI Feist Catalog Inc. is a wholly owned, indirect subsidiary of Sony Group Corporation, a publicly traded company organized under the laws of Japan. No publicly traded company other than Sony Group Corporation owns more than 10% of the stock of EMI Feist Catalog Inc. |
| EMI Robbins Catalog Inc. | EMI Robbins Catalog Inc. is a wholly owned, indirect subsidiary of Sony Group Corporation, a publicly traded company organized under the laws of Japan. No publicly traded company other than Sony Group Corporation owns more than 10% of the stock of EMI Robbins Catalog Inc. |
| EMI Unart Catalog Inc. | EMI Unart Catalog Inc. is a wholly owned, indirect subsidiary of Sony Group Corporation, a publicly traded company organized under the laws of Japan. No publicly traded company other than Sony |

| | |
|---|---|
| | Group Corporation owns more than 10% of the stock of EMI Unart Catalog Inc. |
| Jobete Music Co., Inc. | Jobete Music Co., Inc. is a wholly owned, indirect subsidiary of Sony Group Corporation, a publicly traded company organized under the laws of Japan. No publicly traded company other than Sony Group Corporation owns more than 10% of the stock of Jobete Music Co., Inc. |
| Screen Gems-EMI Music Inc. | Screen Gems-EMI Music Inc. is a wholly owned, indirect subsidiary of Sony Group Corporation, a publicly traded company organized under the laws of Japan. No publicly traded company other than Sony Group Corporation owns more than 10% of the stock of Screen-Gems-EMI Music Inc. |
| Stone Agate Music | Stone Agate Music is a division of Jobette Music Co., Inc., a wholly owned, indirect subsidiary of Sony Group Corporation, a publicly traded company organized under the laws of Japan. No publicly traded company other than Sony Group Corporation owns more than 10% of the stock of Stone Agate Music. |
| Stone Diamond Music Corp. | Stone Diamond Music Corp. is a wholly owned, indirect subsidiary of Sony Group Corporation, a publicly traded company organized under the laws of Japan. No publicly traded company other than Sony Group Corporation owns more than 10% of the stock of Stone Diamond Music Corp. |
| Rodgers & Hammerstein Holdings, LLC | Rodgers & Hammerstein Holdings, LLC is a wholly-owned indirect subsidiary of Concord Music Group, Inc. No publicly traded company owns more than 10% of the stock of Rodgers & Hammerstein Holdings, LLC. |
| Peer International Corporation | Peer International Corporation is a wholly owned indirect subsidiary of Peermusic III, Ltd. No |

| | publicly traded company owns 10% or more of the stock of Peer International Corporation. |
|---|---|
| PSO Limited | PSO Limited is a wholly owned indirect subsidiary of Peermusic III, Ltd. No publicly traded company owns 10% or more of the stock of PSO Limited. |
| Peermusic Ltd. | Peermusic Ltd. is a wholly owned indirect subsidiary of Peermusic III, Ltd. No publicly traded company owns 10% or more of the stock of Peermusic Ltd. |
| Peermusic III, Ltd. | Peermusic III, Ltd. has no corporate parents, and no publicly traded company owns 10% or more of the stock of Peermusic III, Ltd. |
| Songs of Peer, Ltd. | Songs of Peer, Ltd. is a wholly owned subsidiary of Peermusic III, Ltd. No publicly traded company owns 10% or more of the stock of Songs of Peer, Ltd. |
| Spirit Catalog Holdings S.A.R.L. | Spirit Catalog Holdings S.A.R.L. is a wholly owned indirect subsidiary of Lyric Capital Holdings I, L.P. No publicly traded company owns 10% or more of the stock of Spirit Catalog Holdings S.A.R.L. |
| Towser Tunes, Inc. | Towser Tunes, Inc. is a wholly owned indirect subsidiary of Lyric Capital Holdings I, L.P. No publicly traded corporation owns 10% or more of the stock of Spirit Two Music, Inc. |
| Spirit Two Music, Inc. | Spirit Two Music, Inc. is a wholly owned indirect subsidiary of Lyric Capital Holdings I, L.P. No publicly traded corporation owns 10% or more of the stock of Spirit Two Music, Inc. |
| Warner-Tamerlane Publishing Corp. | Warner-Tamerlane Publishing Corp. is a wholly owned indirect subsidiary of Warner Music Group Corp., which is a publicly traded company with more than 10% of its stock owned by AI Entertainment Holdings LLC and certain of its affiliates, which are not publicly traded companies. |

| | |
|---|---|
| WB Music Corp. | W Chappell Music Corp. (f/k/a WB Music Corp.) is a wholly owned indirect subsidiary of Warner Music Group Corp., which is a publicly traded company with more than 10% of its stock owned by AI Entertainment Holdings LLC and certain of its affiliates, which are not publicly traded companies. |

LOEB & LOEB LLP

By: */s/ Barry I. Slotnick*
     Barry I. Slotnick
     Christian D. Carbone
     Tal E. Dickstein
     Sarah Schacter
     Priy Sinha
     345 Park Avenue
     New York, NY 10154
     Telephone: 212.407.4000

*Attorneys for Plaintiffs-Appellees/Cross-Appellants*

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................1

INTRODUCTION ......................................................................1

JURISDICTIONAL STATEMENT ..................................................3

STATEMENT OF ISSUES ...........................................................4

STATEMENT OF THE CASE.........................................................5

    I.      Bill Graham's Personal Archive of Concert Tapes.............................5

    II.    Sagan Purchases Bootleg Concert Recordings He Knew He Could Not Lawfully Exploit..................................................6

    III.   Sagan Begins to Commercially Exploit the Bootleg Concert Tapes.........................................................................8

    IV.   Sagan's Fraudulent Efforts to Claim Entitlement to Compulsory Mechanical Licenses .........................................9

    V.    Plaintiffs File Suit and Sagan Is Unable to Produce Any Evidence to Support His Purported Licenses......................11

    VI.   The District Court Finds Sagan Liable for Willful Infringement, But Declines to Enjoin His Ongoing Infringement ..................................................................12

    VII.  The District Court Permits Sagan to Admit Irrelevant and Highly Confusing Evidence at the Damages Trial.............................14

         A.    The District Court Allows Sagan to Introduce Evidence of Payments for Works Not at Issue .........................14

         B.    The District Court Allows Sagan to Introduce Evidence of His Settlement Agreements with Non-Party Record Companies.............................................16

    VIII. The District Court Precludes Plaintiffs from Introducing a Highly Probative Admission By Sagan's Music Licensing Agent .........................................................................17

i

**TABLE OF CONTENTS CONTINUED**

**Page**

IX.   The Jury Reaches a Verdict After Rushed Deliberations
      Heavily Influenced By the Emerging Pandemic ................................. 19

SUMMARY OF ARGUMENT ............................................................... 20

STANDARD OF REVIEW ................................................................... 23

ARGUMENT ....................................................................................... 23

I.    The District Court Properly Granted Summary Judgment ................. 23

      A.    The District Court Properly Concluded That Sagan
            Does Not Have Compulsory Mechanical Licenses
            Under Section 115 ................................................................... 24

            1.    Sagan's Exploitation of Musical Works in
                  Audiovisual Format Is Not Eligible for Section
                  115 Licenses ................................................................ 24

            2.    Sagan Cannot Satisfy the Requirements for
                  Obtaining Compulsory Mechanical Licenses
                  Under Section 115(a)(1) .............................................. 29

                  (a)   Sagan Bears the Burden of Showing
                        Compliance with Section 115(a)(1) ................... 29

                  (b)   Sagan's Bootleg Recordings Were Not
                        Lawfully Fixed .................................................. 31

                  (c)   Sagan Does Not Have Authorization from
                        the Owners of the Sound Recording
                        Copyrights ........................................................ 38

                  (d)   Sagan Does Not Have Authorization from
                        the Owners of Musical Compositions
                        Embodied in Pre-1972 Sound Recordings .......... 42

                  (e)   Sagan Waived Any Argument That
                        Section 115(a)(1) Does Not Apply .................... 42

                  (f)   Section 115(a)(1) Applies to Sagan Under
                        the Statute's Plain Language ............................ 44

ii

# TABLE OF CONTENTS CONTINUED

**Page**

       3.    Sagan's Purported Licenses from the Harry Fox Agency Are Invalid ......................................................47

       4.    Sagan's Admitted Failure to Send Timely NOIs Disqualifies Him from Obtaining Compulsory Licenses .......................................................................49

   B.    Sagan's Equitable Defenses Were Properly Rejected .............51

       1.    Implied License ............................................................51

       2.    Estoppel ........................................................................55

   C.    Sagan Was Properly Held Individually Liable Because He Personally Directed the Infringing Acts of His Companies.................................................................................56

II.   In the Shadow of the Impending Shutdown, the District Court Erroneously Permitted Sagan to Introduce Irrelevant and Highly Confusing Evidence at Trial.............................................59

   A.    Sagan's Evidence of Payments for Works Not at Issue Is Irrelevant and Highly Confusing ...........................................59

   B.    Sagan's Agreements with Non-Party Record Companies Are Irrelevant and Highly Confusing ...................61

   C.    The District Court Erred By Precluding Plaintiffs from Offering a Key Admission Made By Sagan's Music Licensing Agent .......................................................................63

III.  The District Court Abused its Discretion in Denying Plaintiffs' Motion for a New Trial ........................................................64

IV.  The District Court Abused its Discretion in Denying a Permanent Injunction ..........................................................................67

   A.    The District Court Ignored Evidence of Plaintiffs' Irreparable Injury Based on Sagan's Continuing Willful Infringements...................................................................67

   B.    The Balance of Hardships and Public Interest Factors Firmly Favor Plaintiffs............................................................70

## **TABLE OF CONTENTS CONTINUED**

**<u>Page</u>**

CONCLUSION ...................................................................................71

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*16 Casa Duse, LLC v. Merkin*,
 791 F.3d 247 (2d Cir. 2015) ................................................................23

*24/7 Records, Inc. v. Sony Music Entm't, Inc.*,
 429 F.3d 39 (2d Cir. 2005) .................................................................49

*A&M Records v. Napster, Inc.*,
 239 F.3d 1004 (9th Cir. 2001) ............................................................24

*ABKCO Music, Inc. v. Stellar Records, Inc.*,
 96 F.3d 60 (2d Cir. 1996) ...................................................................25

*Andrews v. Barr*,
 799 F. App'x 26 (2d Cir. 2020) ..........................................................63

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
 992 F.3d 99 (2d Cir. 2021) .................................................................23

*AP v. Meltwater U.S. Holdings, Inc.*,
 931 F. Supp. 2d 537 (S.D.N.Y. 2013) ................................................30

*Ariel (U.K.) Ltd. v. Reuters Grp. PLC*,
 2006 U.S. Dist. LEXIS 79319 (S.D.N.Y. Oct. 31, 2006),
 *aff'd*, 277 F. App'x 43 (2d Cir. 2008)................................................36

*Arista Records LLC v. Lime Grp.*,
 784 F. Supp. 2d 398 (S.D.N.Y. 2011) ...........................................57, 58

*Arista Records LLC v. Usenet.com*,
 633 F. Supp. 2d 124 (S.D.N.Y. 2009) .................................................58

*Blagman v. Apple, Inc.*,
 2014 U.S. Dist. LEXIS 45401 (S.D.N.Y. March 31, 2014) ...........38, 42

*Broad. Music, Inc. v. Living Room Steak House, Inc.*,
 No. 14-CV-6298, 2016 U.S. Dist. LEXIS 23676
 (E.D.N.Y. Feb. 26, 2016)....................................................................70

*Broad. Music, Inc. v. Prana Hosp., Inc.*,
  158 F. Supp. 3d 184 (S.D.N.Y. 2016) ..............................................68, 69, 70, 71

*Broad. Music v. Hub at Cobb's Mill, LLC*,
  No. 3:13-CV-01237 (VLB), 2015 U.S. Dist. LEXIS 43315
  (D. Conn. Apr. 2, 2015) ......................................................................................69

*Cameron v. City of N.Y.*,
  598 F.3d 50 (2d Cir. 2010) ................................................................................23

*Capitol Records LLC v. ReDigi Inc.*,
  No. 12-cv-95 (RJS), 2014 U.S. Dist. LEXIS 122711
  (S.D.N.Y. Sept. 2, 2014).......................................................................... 57, 58-59

*Carcieri v. Salazar*,
  555 U.S. 379 (2009).............................................................................................44

*CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.*,
  850 F.3d 58 (2d Cir. 2017) ................................................................................51

*Centrifugal Force, Inc. v. Softnet Commc'n, Inc.*,
  No. 08 Civ. 5463 (CM), 2011 U.S. Dist. LEXIS 20536
  (S.D.N.Y. Mar. 1, 2011) .....................................................................................57

*Chamberlain Grp., Inc.v. Skylink Tech.*,
  381 F.3d 1178 (Fed. Cir. 2004) .........................................................................30

*Cherry River Music. Co. v. Simitar Entm't, Inc.*,
  38 F. Supp. 2d 310 (S.D.N.Y. 1999) ......................................................30, 49, 50

*Childress v. Taylor*,
  945 F.2d 500 (2d Cir. 1991) ..............................................................................40

*DeWitt v. N.Y. State Hous. Fin. Agency*,
  97 Civ. 4651 (SAS), 1999 U.S. Dist. LEXIS 13057
  (S.D.N.Y. Aug. 24, 1999)....................................................................................65

*Dutchess Music Corp. v. Stern*,
  458 F.2d 1305 (9th Cir. 1972) ..........................................................................46

*Edward B. Marks Music Corp. v. Colo. Magnetics, Inc.*,
  497 F.2d 285 (10th Cir. 1974) ..........................................................................24

*Elder v. McCarthy*,
967 F.3d 113 (2d Cir. 2020) ........................................................35, 44

*EMI Entm't World, Inc. v. Karen Records, Inc.*,
603 F. Supp. 2d 759 (S.D.N.Y. 2009) ..............................................47

*Fame Publ. Co. v. Ala. Custom Tape, Inc.*,
507 F.2d 667 (5th Cir. 1975) ...............................................24, 38, 52

*FameFlynet, Inc. v. Shoshanna Collection, LLC*,
282 F. Supp. 3d 618 (S.D.N.Y. 2017) ..............................................29

*Famous Music Corp. v. Seeco Records, Inc.*,
201 F. Supp. 560 (S.D.N.Y. 1961) ...................................................50

*FDIC v. Giammettei*,
34 F.3d 51 (2d Cir. 1994) ........................................................... 23-24

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
499 U.S. 340 (1991) .........................................................................23

*Fitzpatrick v. Sony-BMG Music Entm't, Inc.*,
No. 07 Civ. 2933 (SAS), 2007 U.S. Dist. LEXIS 91446
(S.D.N.Y. Dec. 7, 2007) ..................................................................55

*Forward v. Thorogood*,
985 F.2d 604 (1st Cir. 1993) ...........................................................39

*Fox Television Stations, Inc. v. Aereokiller, LLC*,
851 F.3d 1002 (9th Cir. 2017) ........................................................24

*Fred Ahlert Music Corp. v. Warner/Chappell Music, Inc.*,
155 F.3d 17 (2d Cir. 1998) ..............................................................25

*HarperCollins Publrs., LLC v. Open Rd. Integrated Media, LLP*,
58 F. Supp. 3d 380 (S.D.N.Y 2014) ........................................... 68-69

*Harry Fox Agency, Inc. v. Mills Music, Inc.*,
720 F.2d 733 (2d Cir. 1983), *rev'd on other grounds sub nom.*,
*Mills Music, Inc. v. Snyder*, 469 U.S. 153 (1985) ....................... 47-48

*Hirt v. Equitable Ret. Plan for Emples., Managers & Agents*,
533 F.3d 102 (2d Cir. 2008) ............................................................45

*Hounddog Prods., LLC v. Empire Film Grp., Inc.*,
    826 F. Supp. 2d 619 (S.D.N.Y. 2011) ..................................................69

*In re Porter*,
    498 B.R. 609 (Bankr. E.D. La. 2013) ..................................................40

*In re WRT Energy Sec. Litig.*,
    246 F.R.D. 185 (S.D.N.Y. 2007) ........................................................31

*Keane Dealer Servs., Inc. v. Harts*,
    968 F. Supp. 944 (S.D.N.Y. 1997) ....................................................52

*Kihn v. Bill Graham Archives, LLC*,
    445 F. Supp. 3d 234 (N.D. Cal. 2020).........................................26, 30

*Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Star Mark Mgmt.*,
    628 F. Supp. 2d 312 (E.D.N.Y. 2009) ...............................................69

*Leadsinger, Inc. v. BMG Music Publ*,
    429 F. Supp. 2d 1190 (C.D. Cal. 2005), *aff'd,* 512 F.3d 522
    (9th Cir. 2008).............................................................................. 25-26

*Leo Feist, Inc. v. Apollo Records, N.Y. Corp.*,
    300 F. Supp. 32 (S.D.N.Y.), *aff'd*, 418 F.2d 1249 (2d Cir. 1969) ....................50

*Lucas v. Am. Mfg. Co.*
    630 F.2d 291 (5th Cir. 1980) ..............................................................66

*Luft v. Crown Publishers, Inc.*,
    772 F. Supp. 1378 (S.D.N.Y. 1991) ..................................................58

*Mango v. Buzzfeed, Inc.*,
    970 F.3d 167 (2d Cir. 2020) ..............................................................23

*Merchant v. Lymon*,
    828 F. Supp. 1048 (S.D.N.Y. 1993) ..................................................56

*Merkos Lyinyonei Chinuch, Inc. v. John Doe Nos. 1-25*,
    172 F. Supp. 2d 383 (E.D.N.Y 2001) ......................................... 51-52

*Merrill Lynch, Pierce, Fenner & Smith v. Curran*,
    456 U.S. 353 (1982)...........................................................................46

*Metropolitan Opera Ass'n v. Wagner-Nichols Recorder Corp.*,
   199 Misc. 786 (Sup. Ct. N.Y. Cty. 1950),
   *aff'd*, 279 A.D. 632 (1st Dep't 1951)...............................................32

*Miller v. Universal Pictures Co.*,
   18 Misc. 2d 626 (Sup. Ct. N.Y. Cty. 1959),
   *rev'd on other grounds*, 11 A.D.2d 47 (1st Dep't 1960)....................................32

*Mint, Inc. v. Iddi Amad*,
   No. 10 Civ. 9395 (SAS), 2011 U.S. Dist. LEXIS 49813
   (S.D.N.Y. May 9, 2011)...............................................70

*Moore v. City of New York*,
   2010 U.S. Dist. LEXIS 19183 (S.D.N.Y. Mar. 2, 2010)....................................50

*Palmer/Kane LLC v. Gareth Stevens Publ'g*,
   No. 1:15-cv-7404-GHW, 2017 U.S. Dist. LEXIS 145103
   (S.D.N.Y. Sept. 7, 2017).......................................52

*Palmieri v. Lynch*,
   392 F.3d 73 (2d Cir. 2004) ...............................................38

*Pappas v. Middle Earth Condo. Ass'n*,
   963 F.2d 534 (2d Cir. 1992) ...............................................64

*Pavlica v. Behr*,
   397 F. Supp. 2d 519 (S.D.N.Y. 2005) ...............................................52

*Psihoyos v. Pearson Educ., Inc.*,
   855 F. Supp. 2d 103 (S.D.N.Y. 2012) ...............................51, 52, 56

*RCA Mfg. Co. v. Whiteman*,
   28 F. Supp. 787 (S.D.N.Y. 1939), *rev'd on other grounds*,
   114 F.2d 86 (2d Cir. 1940) ...............................................32

*Register.com, Inc. v. Verio, Inc.*,
   356 F.3d 393 (2d Cir. 2004) ...............................................70

*Rivas v. Brattesani*,
   94 F.3d 802 (2d Cir. 1996) ...............................................23, 65

ix

*Rodgers & Hammerstein Org. v. UMG Recordings Inc.*,
  No. 00 Civ. 9322 (JSM), 2001 U.S. Dist. LEXIS 16111
  (S.D.N.Y. Sept. 25, 2001) ...................................................................55

*Rosenfeld v. Basquiat*,
  78 F.3d 84 (2d Cir. 1996) ...................................................................60

*Rovio Entm't, Ltd. v. Allstar Vending, Inc.*,
  97 F. Supp. 3d 536 (S.D.N.Y. 2015) ...................................................69

*S.E.C. v. KPMG LLP*,
  412 F. Supp. 2d 349 (S.D.N.Y. 2006) .................................................27

*Sadhu v. Ajit*,
  503 F. Supp. 2d 577 (E.D.N.Y. 2007) .................................................30

*Sierra-Pascual v. Pina Records, Inc.*,
  660 F. Supp. 2d 196 (D.P.R. 2009) ...............................................39, 40

*Singh Mgmt. Co v. Singh Dev. Co*,
  774 F. App'x 921 (6th Cir. 2019) ........................................................63

*Smith & Smith v. Bowsmith, Inc.*,
  No. 91-16137, 1992 U.S. App. LEXIS 23041 (9th Cir. Sept. 17, 1992) ...........63

*SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharms., Inc.*,
  211 F.3d 21 (2d Cir. 2000) .................................................................51

*Sohm v. Scholastic Inc.*,
  959 F.3d 39 (2d Cir. 2020) .................................................................30

*Sony Music Entm't Inc. v. Robison*,
  01 Civ. 6415 (LMM), 2002 U.S. Dist. LEXIS 3100
  (S.D.N.Y. Feb. 25, 2002) ...................................................................33

*Sony/ATV Publ'g, LLC v. Marcos*,
  651 F. App'x 482 (6th Cir. 2016) ........................................................48

*Spadaro v. United States Customs & Border Prot.*,
  978 F.3d 34 (2d Cir. 2020) ...........................................................44-45

*Stumm v. Drive Entm't, Inc.*,
  No. 00 Civ. 4676 (DC), 2001 U.S. Dist. LEXIS 21675
  (S.D.N.Y. Dec. 27, 2001) ...................................................................57

*Sygma Photo News, Inc. v. High Soc'y Magazine, Inc.*,
  778 F.2d 89 (2d Cir. 1985) ................................................................57

*Thomson v. Larson*,
  147 F.3d 195 (2d Cir. 1998) ..............................................................40

*Ulloa v. Universal Music & Video Dist. Corp.*,
  303 F. Supp. 2d 409 (S.D.N.Y. 2004) ...............................................54

*UMG Recording v. Escape Media Grp.*,
  No. 11 Civ. 8407, 2014 U.S. Dist. LEXIS 137491
  (S.D.N.Y. Sept. 29, 2014)..................................................................58

*UMG Recordings, Inc. v. Veoh Networks, Inc.*,
  No. CV 07-5744 AHM, 2009 U.S. Dist. LEXIS 14955
  (C.D. Cal. Feb. 2, 2009)....................................................................59

*Underpinning & Found. Skanska, Inc. v. Travelers Cas. & Sur. Co. of Am.*,
  726 F. Supp. 2d 339 (S.D.N.Y. 2010) ...............................................34

*United States v. Al-Farekh*,
  956 F.3d 99 (2d Cir. 2020) ................................................................45

*United States v. Holmes*,
  44 F.3d 1150 (2d Cir. 1995) ..............................................................60

*United States v. McDermott*,
  245 F.3d 133 (2d Cir. 2001) ..............................................................60

*United States v. Morgan*,
  786 F.3d 227 (2d Cir. 2015) ..............................................................61

*Woodman v. WWOR-TV, Inc.*,
  411 F.3d 69 (2d Cir. 2005) ................................................................36

*Woods v. Bourne Co.*,
  60 F.3d 978 (2d Cir. 1995) ........................................................ 24-25

*WPIX, Inc. v. ivi, Inc.*,
   691 F.3d 275 (2d Cir. 2012) ............................................................71

*WPIX, Inc. v. ivi, Inc.*,
   765 F. Supp. 2d 594 (S.D.N.Y. 2011) ...............................................70

*Yesh Music, LLC v. Amazon.com., Inc.*,
   249 F. Supp. 3d 645 (E.D.N.Y. 2017) ...............................................49

*Yong Ki Hong v. KBS Am., Inc.*,
   951 F. Supp. 2d 402 (E.D.N.Y. 2013) ...............................................33

*Zappa v. Rykodisk, Inc.*,
   819 F. Supp. 2d 307 (S.D.N.Y. 2011) ...............................................52

**Statutes**

17 U.S.C. § 101 ...................................................................24, 28, 40

17 U.S.C. § 104A(h)(4) ................................................................45

17 U.S.C. § 115 ...................................................................*passim*

17 U.S.C. § 115(a)(1) .............................................................*passim*

17 U.S.C. § 115(a)(1)(ii) ......................................................38, 42, 43

17 U.S.C. § 115(b)(1) ...................................................................49

17 U.S.C. § 115(b)(2) ...............................................................49, 55

17 U.S.C. § 203(a)(4) ...................................................................45

17 U.S.C. § 203(b)(4) ...................................................................45

17 U.S.C. § 304(a)(3)(A) ...............................................................45

17 U.S.C. § 304(c)(4) ...................................................................45

17 U.S.C. § 304(c)(6)(D) ...............................................................45

17 U.S.C. § 502 .......................................................................68

17 U.S.C. § 502(a) ....................................................................67

17 U.S.C. § 504 ................................................................................68

17 U.S.C. § 1101(a) ..........................................................................32

17 U.S.C. § 1311 ..............................................................................45

**Rules**

Fed. R. Civ. P. 37(c) .........................................................................34

Fed. R. Civ. P. 56(d) .........................................................................38

Fed. R. Civ. P. 59(a)(1)(A) ...............................................................65

Fed. R. Evid. 103(b) ..........................................................................60

Fed. R. Evid. 401 ........................................................................60, 63

Fed. R. Evid. 402 ..............................................................................60

Fed. R. Evid. 403 ........................................................................61, 63

Fed. R. Evid. 801 ..............................................................................33

Fed. R. Evid. 801(d)(2)(D) ...............................................................63

Fed. R. Evid. 802 ..............................................................................33

**Regulations**

37 CFR 201.18 ..................................................................................49

**Other Authorities**

2 Nimmer on Copyright § 8.04 (2020) ..................................25, 32, 42

3 Nimmer on Copyright § 8E.03[A][3] (2018).................................32

H.R. No. 94-1476 .......................................................................26, 28

Copyright Office Circular 73A .........................................................26

## **INTRODUCTION**

William Sagan built an online music business using bootleg concert tapes that were recorded without the consent of either the performers or Plaintiffs, the owners of the copyrights in many of the musical compositions performed at the concerts.

At the very outset, Sagan[1] was told that he needed to obtain licenses from the music publishers, performing artists and others in order to operate lawfully. Instead, he claimed entitlement to compulsory mechanical licenses under Section 115 of the Copyright Act. However, Sagan knew that his bootleg tapes were not eligible for mechanical licenses, because Section 115 does not apply to the musical works that Sagan exploited in audiovisual format, the tapes were recorded without the consent of the performing artists, and Sagan failed to notify the copyright owners *before* he distributed recordings of their works. Defendants admit they did not send the statutorily required notices ("NOIs") until long after they started exploiting those recordings. Yet, Defendants misrepresented that they began exploiting the recordings on the date they sent the NOIs, when their internal records showed they began exploiting the recordings months or years earlier.

Everything about Sagan's business was based on fraud and deceit. Defendants represented to both the Copyright Office and Plaintiffs that they had

---

[1] William Sagan and his wholly-owned companies Norton LLC and Bill Graham Archives LLC are collectively referred to as "Sagan" or "Defendants".

written consents from the performers. When that was exposed as a lie, Sagan claimed he had "implied licenses," or that Plaintiffs were "estopped" from claiming infringement, based on payments to Plaintiffs shortly before they filed suit. Of course, those payments were made pursuant to fraudulent NOIs and purported mechanical licenses Sagan was not entitled to obtain because he distributed recordings in audiovisual format and otherwise failed to comply with Section 115.

Although both Sagan and his companies were found culpable as willful infringers summary judgment, they continued to infringe Plaintiffs' musical works even after the Court's decision.

Despite this extraordinary record of bad faith and deceit, Plaintiffs were denied a full measure of justice at the March 2020 damages trial. The District Court made a series of erroneous evidentiary rulings—including admitting evidence of payments Sagan made to non-parties and for works not at issue, admitting agreements that the Court itself recognized were irrelevant and could not reasonably have been relied upon by Sagan, and refusing to admit a statement made by Sagan's own licensing agent as to the types of licenses Sagan should have obtained.

The prejudicial effect of these rulings was compounded by New York City's emergence as the epicenter of the Covid-19 pandemic just as the trial was ending. The District Court observed that the "[t]he world is falling apart around us" and one

juror stated that the damages at issue were "not worth the life of my mother or any of the lives of the jurors."

Under these circumstances, it is no wonder the jury rushed through their "deliberations" in less than an hour, and before any of the exhibits or testimony could even be brought into the jury room. A new trial is needed to remedy this miscarriage of justice.

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction over Plaintiffs' copyright infringement claims under 28 U.S.C. §§ 1331, 1338(a).

The District Court granted Plaintiffs' motion for summary judgment on March 30, 2018 (Dkt. 262) and denied Sagan's motion for reconsideration on March 25, 2019 (Dkt. 272). Judgment was entered on July 23, 2020. (Dkt. 373.) Plaintiffs timely moved for an award of their attorneys' fees and costs, and for a new trial. (Dkt. 353, 374, 377.) On November 5, 2020, the District Court partially granted Plaintiffs' attorneys' fee motion, and denied their new trial motion. (Dkt. 390, 394.)

Sagan appealed from the summary judgment and reconsideration decisions on November 6, 2020 (Dkt. 391) and from the attorneys' fee decision on December 2, 2020 (Dkt. 395). On December 7, 2020, Plaintiffs timely cross-appealed from the denial of their motion for a new trial and from evidentiary rulings at trial. (Dkt. 365.) This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1.      Did the District Court properly grant summary judgment based on Sagan's (i) exploitation of musical compositions in audiovisual format, which are ineligible for compulsory mechanical licenses under the plain language of the Copyright Act, (ii) failure to show that his bootleg concert tapes were recorded with the consent of the performing artists, as required by Section 115, and (iii) failure to obtain authorization from the owners of the copyrights in the sound recordings contained in his concert tapes, or from individuals who recorded the concerts before February 15, 1972 with the consent of the owner of the underlying musical works, as required by Section 115?

2.      Can the grant of summary judgment be affirmed because Sagan admittedly failed to send timely NOIs before distributing the concert recordings containing Plaintiffs' musical works, as required by Section 115?

3.      Did the District Court erroneously (i) admit evidence about Sagan's payments to non-parties and for works that are not at issue, (ii) admit agreements with non-parties that the Court determined were irrelevant to the infringements in the case and could not be reasonably relied upon, and (iii) exclude statements by Sagan's licensing agent as to the types of licenses he needed to obtain which would have further demonstrated Sagan's culpable mindset?

4

4.      Did the District Court err in denying Plaintiffs' motion for a new damages trial where, in the midst of the Covid-19 outbreak in New York, the Court recognized that "the world is falling apart around us," the jury reached its verdict in less than an hour, without reviewing any of the evidence submitted during nine days of trial, and one juror stated "this matter doesn't seem all that important compared to [the] lives at stake" and that Plaintiffs' damages were "not worth the life of my mother or any of the lives of the jurors"?

5.      Did the District Court err in denying Plaintiffs' request for injunctive relief to halt Sagan's repeated, willful and ongoing infringement?

## STATEMENT OF THE CASE

## I.      Bill Graham's Personal Archive of Concert Tapes

Bill Graham was a legendary concert promoter who staged concerts from the 1960s until his tragic death in 1991.  (SA1360.)[2]  Unbeknownst to the performers, Graham taped their musical performances in order to create a personal archival record of the concert.  (SA1371,1442.)  Graham also recorded the video signal that was being captured by cameras and projected onto large screens at certain venues. (SA1879¶13; Appx451-52.)[3]

---

[2] "SA" refers to Plaintiffs/Appellees/Cross-Appellants' Supplemental Appendix.

[3] "Appx" refers to Defendants/Appellants/Cross-Appellees' Appendix.

After Graham passed away, Bill Graham Archives LLC ("BGA") was created to maintain his personal archives. In 1998, BGA was acquired by SFX Entertainment, which was then acquired by ClearChannel Communications in 2000. (Appx448-49; SA1410-11,1043.9.) Except for a limited number of special events and documentary films, none of Graham, SFX or ClearChannel ever commercially exploited Graham's archive. (SA264¶20,1366,1373,1380-81.)

## II. Sagan Purchases Bootleg Concert Recordings He Knew He Could Not Lawfully Exploit

In 2002, Sagan bought BGA from SFX. To act as a vehicle for that acquisition, Sagan founded Norton LLC and became its president, CEO and sole owner. (SA1879¶10,1249-1252.)

The BGA purchase agreement stated that Sagan was acquiring only physical concert recordings, without rights from either the performing artists or the owners of the underlying musical compositions. (SA1880¶16,1260.) SFX made "no representation regarding whether the Assets or their past or future use or exploitation infringed or infringes on the Intellectual Property rights of any person" and merely granted a quitclaim transfer of any intellectual property rights "*to the extent [it] possess such rights*." (SA1880¶17,1333-35.)

A side letter given to Sagan stated that "no representation is made regarding original performance contracts, which are not included in the Assets" that Sagan acquired. (SA1880¶18,1432.) Accordingly, Sagan admitted he has no artist

performance contracts that would have allowed anyone to record the Bill Graham concerts, and Sagan does not know whether any such contracts ever existed. (SA1881¶19,1256,1258,1262.)

Sagan was advised that he had no right to exploit the Bill Graham concert recordings. An appraisal report warned Sagan that SFX "owns the physical materials, but … [a]ny party wishing to exploit the collection in other media and markets would first need to resolve a plurality of licensing issues, including but not limited to, music publishing rights, performance rights [and] performer releases …[N]o significant reuse can be contemplated without securing the customary clearances from performers, publishers and possibly other parties." (SA1881-82¶¶ 21-22,1264,1367-68,1373-74.)

SFX's attorney, Michael Krassner, told Sagan's attorneys that "your client … needs to know that he may be buying the world['s] greatest private collection [of recordings] that no one will ever hear." (SA1882-83¶25; Appx453-55,458, 460,462.)

Nicholas Clainos, a longtime employee of Bill Graham, testified that the "audiovisual component of the archives was not cleared, and other than us being the owners of the physical property … we didn't have intellectual property rights[.]" (SA1882¶23,1410.) Clainos acknowledged that "nobody had gone to artists [or] entities and licensed the right to use [the recordings]." (*Id.*)

Between 2002 and 2015, Sagan acquired at least a dozen other collections of bootleg concert tapes. (SA1883¶26,1471-1508,1255.) As with the Bill Graham recordings, Sagan acquired only physical recordings. None of his vendors provided evidence that any of the performers had consented to the recording of their performances. (SA1884-85¶¶31-35,1513-14,1525,1266,1545,1567-72,1611,1268, 1648-48,1627-29,1269.)

When Sagan applied to register copyrights in the remixes of the recordings he had acquired, the Copyright Office repeatedly asked for written confirmation that the performing artists had consented to the recording of their performances. (SA1885¶36, SA1666,1670.) Defendants lied to the Copyright Office, representing that they had such agreements, though none exist. (SA2064,2069,2071-73,2094-96.)

## III. Sagan Begins to Commercially Exploit the Bootleg Concert Tapes

Undeterred, in 2006, Sagan began to commercially exploit the bootleg concert recordings in both audio and audiovisual format. (SA1886-87¶¶39,40,48; SA195,202,266,268,1277-78.) Sagan offered those recordings for paid digital downloads and on-demand (or "interactive") streaming on a series of websites, including WolfgangsVault.com[4] (later re-named Wolfgangs.com), ConcertVault.com, MusicVault.com, a Music Vault channel on YouTube, and a

---

[4] "Wolfgang" was Bill Graham's nickname.

Wolfgang's mobile application (collectively, the "Websites"). (*Id.*) Sagan also manufactured and sold physical records containing certain of Plaintiffs' musical works. (SA1888¶50; SA1270-72.)

All told, Sagan has exploited more than 1,175 recordings containing Plaintiffs' musical works at issue in audio or audiovisual format, by selling more than 96,000 downloads**,** and streaming those recordings more than 10 million times. (SA1887¶47.)

Sagan is the sole owner of the corporate Defendants, serves as their CEO, and has "final decision making authority" over their activities. (SA1888¶51; SA200,1253.) Accordingly, he determined which recordings to make available on, or take down from, their Websites. (*Id.*)

## IV. Sagan's Fraudulent Efforts to Claim Entitlement to Compulsory Mechanical Licenses

Rather than negotiate for licenses to use the musical compositions embodied in the recordings he acquired, Sagan purported to invoke Section 115 of the Copyright Act. That provision permits the exploitation of musical works in phonorecords (audio-only recordings), *provided*, among other things, (i) the original recordings were "fixed lawfully" with the consent of the performing artists, (ii) the prospective licensee has the permission of the sound recording copyright owner, and, for pre-1972 sound recordings, of someone who created the recordings with a license from the owner of the underlying musical works, and (iii) the prospective licensee

serves NOIs on the musical work owner *before* distributing copies of the phonorecords.

Sagan engaged two licensing agents, RightsFlow in 2010, and MediaNet in 2013, to obtain licenses by processing and sending NOIs, although RightsFlow never actually sent any NOIs on Sagan's behalf. (SA1889¶56,1673,1686.) Sagan retained MediaNet to "clear the rights required in connection with the music compositions distributed through" his Websites, and to work with Defendants "on best practices [f]or reducing its publishing liabilities[.]" (SA1686,1699.) Nevertheless, Defendants acknowledged that mechanical licenses would need to be in place "prior to" distributing any musical compositions, and that they would be liable for any infringements taking place on their Websites. (SA1889¶57,1674,1678,1679-80.)

Through MediaNet, Sagan finally began sending NOIs to Plaintiffs in 2013 (SA1713-1870), though he did not make any payments pursuant to those NOIs until 2015 (Appx298-311). Defendants routinely sent NOIs months or even *years* after they began exploiting the recordings, if they ever sent NOIs at all. (SA1713-1870.) Indeed, Sagan admits Defendants' practice is to send NOIs *after* exploiting a corresponding recording. (DB20-21,23.)[5]

---

[5] "DB" refers to Defendants/Appellants/Cross-Appellees' opening brief.

10

In an attempt to cover up the fact that their NOIs were untimely, Defendants misrepresented in each of their NOIs that they began distributing the subject recordings on the same date as the NOI itself, even though their own documents show that they began exploiting those recordings months or years earlier. (SA1889-91¶¶59,62; SA214-217,1713-1870.) Sagan's brother-in-law, Matthew Lundberg, who served as Defendants' Chief Technology Officer, admitted that the date of distribution listed in their NOIs was false "for a large number of the recordings at issue[.]" (SA709.)

## V. Plaintiffs File Suit and Sagan Is Unable to Produce Any Evidence to Support His Purported Licenses

As Sagan increased the number of recordings on his Websites, Plaintiffs sent numerous letters from January 2010 through September 2014, demanding that he stop exploiting their musical works. (SA979,982,986,991,998,1703,1706,1708, 1711.) Sagan's infringements continued unabated, forcing Plaintiffs to file suit in May 2015. (Appx109.)

In his answer, Sagan alleged that "all of the recordings which make up Defendants' collection were created (and have been exploited) with permission and proper legal consent from the various artists who controlled the copyrights in the musical compositions they performed." (SA38¶4; SA45¶50.) Sagan similarly represented in his Initial Disclosures that he obtained written "[l]icense agreements"

with "the artists whose musical compositions and/or recordings [Plaintiffs] now allege to control." (SA285.)

Sagan's representations were false. During discovery Defendants produced no artist agreements permitting the recording of their concerts. (SA1883¶28; SA1260,1269.) Indeed, each of the performing artists from whom Sagan took discovery provided sworn statements that they either had not consented to the recording of the concerts at issue, or that they had no recollection of having done so. (Appx490-92,494-96,505-506,522-29.)

## VI.  The District Court Finds Sagan Liable for Willful Infringement, But Declines to Enjoin His Ongoing Infringement

After the close of discovery, both parties moved for summary judgment. In March 2018, the District Court granted summary judgment to Plaintiffs as to all of the works at issue, and held that Defendants, including Sagan, were willful infringers as to the audiovisual works, the pre-1972 recordings, and the recordings purportedly covered by Sagan's agreement with a third-party record label, which together constituted 167 of the 197 works at issue. (SA1952.1 to SA1952.54) ("SJ Order").

The Court recognized that "Defendants have not produced a single performance agreement or consent from any of the performing artists at issue" (SA1952.33), and that Defendants' representations to the Copyright Office that they had received written authority from the artists to record their performances were false. (SA1952.10-11.)

12

The District Court rejected Sagan's argument that Section 115 licenses were available for audiovisual works, noting the "categorical exclusion of audiovisual works" from the definition of phonorecords. (SA1952.26-28.) Indeed, the District Court held it "cannot reasonably be disputed" that "phonorecords do not include audiovisual works," which led the Court to find that Sagan's infringements in audiovisual format were willful. (SA1952.49.) As a result, the Court concluded that "Defendants hold no valid licenses authorizing the reproduction and distribution of the Musical Works." (SA1952.39.)

The District Court declined to grant an injunction, in large part because Sagan could theoretically negotiate for licenses to legitimize his infringing conduct. (SA1952.53-54.) Rather than seeking licenses, Sagan added hundreds of recordings of Plaintiffs' musical works to his Websites while this action was pending (SA1894¶77; SA172,1712.1-26), and Sagan exploited at least 20 recordings of Plaintiffs' musical works even after the SJ Order. (SA967-77,1018-23,1026-27.)

Defendants moved for reconsideration and for certification of an interlocutory appeal of the SJ Order, which the District Court denied. (SA1952.58-73.)

## VII. The District Court Permits Sagan to Admit Irrelevant and Highly Confusing Evidence at the Damages Trial

### A. The District Court Allows Sagan to Introduce Evidence of Payments for Works Not at Issue

Plaintiffs moved *in limine* to exclude three categories of irrelevant and highly confusing evidence of payments—(i) reports reflecting bulk licensing payments, identifying only check number and amount, but not the works or publishers to which the payments relate (Appx313-15), (ii) spreadsheets reflecting the total amounts of checks Sagan purportedly issued to Plaintiffs, without identifying the amounts paid for any particular work (Appx298-311), and (iii) royalty statements that include itemized payments for works *not* at issue, as well as aggregate amounts paid for works at issue and works not at issue (SA945-62).

Although it had twice ruled that Sagan had no compulsory mechanical licenses, the District Court denied Plaintiffs' motion *in limine*, reasoning that all of the payment evidence was relevant to Sagan's "level of willfulness," including state of mind, the conduct and attitude of the parties, Plaintiffs' lost revenue, and unspecified "other factors." (Appx756-757,760-766.) As a result, the District Court permitted Defendants to introduce evidence of payments to non-parties and for works not at issue. (*Id.*)

Based on the District Court's *in limine* ruling, Sagan introduced at trial evidence of Defendants' gross royalty payments, without distinguishing between

14

works in suit and those that were not, or even whether those royalty payments were paid to Plaintiffs. Those documents included lists of checks purportedly sent to Plaintiffs without identifying any corresponding works, royalty statements that included works not at issue, and a list of checks Defendants purportedly sent to their licensing agents, without identifying to whom the payments were ultimately made, or for which musical works. (*E.g.*, SA756-65,945-62; Appx298-311,313-15.)

On March 11, 2020, the day before the verdict, Defendants' counsel referred to a "composite" exhibit consisting of "five boxes" purportedly containing "14,000 pages" of documents, while eliciting testimony from Lundberg that he "believe[d] we've paid every license fee that is due for our activities." (SA765-67.) However, the contents of the boxes, which were never shown to the jury, consisted of a collection of the royalty statements discussed above that included numerous songs not at issue.

In its rush to conclude the trial as the pandemic escalated, the District Court repeatedly admonished counsel to "get this done as soon as possible" and to "finish up," as "we may be surrounded by the National Guard" (Appx1889; SA791), effectively precluding Plaintiffs from questioning Lundberg about the voluminous contents of the "five boxes." Because the jury never reviewed a single exhibit in connection with their rushed deliberations, all they knew about the contents of the boxes was defense counsel's and Lundberg's conclusory assertions. This misled the

jury as to whether Defendants' payments related to the works at issue, and as to whether Defendants had the right to make such payments despite having no valid licenses.

## B. The District Court Allows Sagan to Introduce Evidence of His Settlement Agreements with Non-Party Record Companies

The District Court also denied Plaintiffs' motion *in limine* to prevent Sagan from introducing three agreements that settled claims brought against him by non-party record companies. Those agreements were irrelevant to Plaintiffs' claims, because none of the Plaintiffs are parties to those agreements, and because the agreements *expressly exclude* any rights to exploit audiovisual recordings or to exploit musical compositions—*i.e.*, the only works at issue. (SA2111-16,2335-36,2339,2341-44,2149-150,2154,2159,2162,2166,1952.46; Appx727.)

At the final pre-trial conference, the District Court acknowledged that "the court does not see how agreements that explicitly carve out the kinds of copyrights in question would have any bearing on the state of mind or be relevant to any other issue to be considered." (Appx757-758.) Nevertheless, it allowed Sagan to admit the agreements with an instruction limiting their consideration to Sagan's exploitation of audio-only recordings, even though the agreements exclude *any* rights to musical compositions, whether in audio-only or audiovisual format. (*Id.*)

Indeed, when it granted Plaintiffs' attorneys' fees motion, the District Court recognized that "there was no good faith basis for Defendants to have relied on [the

16

record company agreements]" (Appx820), reinforcing that the jury should not have considered those agreements as to Sagan's supposed innocent state of mind.

Further contradicting its own reasoning, the District Court *granted* Plaintiffs' motion to exclude settlement agreements with two musical artists, which, like the record label agreements, excluded any rights to musical compositions and audiovisual works. (Appx758-759.) The Court stated "it [did] not see how agreements that specifically exclude the rights at issue in this litigation [were] relevant," while seemingly ignoring the fact that it had agreed to admit the record label settlement agreements that similarly excluded the rights at issue in this litigation. (*Id.*)

Sagan introduced all three record company settlement agreements at trial, characterizing two of the companies as having "sister company relationship[s]" with Plaintiffs, even though they are separate companies. (Appx1750-51.) Sagan also misrepresented that the agreements granted Defendants the right to exploit "tens of thousands of *songs*," as opposed to sound recordings, falsely implying that they granted rights to the musical compositions at issue. (Appx1754) (emphasis added).

## VIII.  The District Court Precludes Plaintiffs from Introducing a Highly Probative Admission By Sagan's Music Licensing Agent

At trial, Plaintiffs sought to establish that Sagan had reason to know that Defendants could not exploit Plaintiffs' musical works in audiovisual format without

obtaining synchronization licenses, as Sagan had repeatedly denied that synchronization licenses were required.  (SA838,1220-24.)

Plaintiffs therefore sought to question Sagan about a June 2015 article published by Defendants' licensing agent, MediaNet (the "MediaNet Article"), which states that, in order to exploit music in audiovisual format, "[s]ynchronization licenses for the musical composition in each track used must also be obtained from the appropriate music publisher(s)."  (SA2107-8.)

Sagan testified that MediaNet served as his companies' agent for music licensing and their dealings with music publishers since 2013, and that he considered MediaNet "the gold standard agent" for music licensing.  (Appx1578,1813.) Lundberg further admitted that Defendants relied on MediaNet for advice as to what licenses were required.  (SA657.)

The District Court found that Defendants "certainly" had a "close" relationship with MediaNet, and that the MediaNet Article was published during the course of their agency relationship. (Appx1816-17; SA661-62.)  The Court nevertheless concluded that the MediaNet Article's statements about what licenses were needed to exploit audiovisual works were not within the scope of the agency. (SA661.)

**IX.    The Jury Reaches a Verdict After Rushed Deliberations Heavily Influenced By the Emerging Pandemic**

The trial on damages began on March 2, 2020, amidst the news of the spreading novel coronavirus.  On March 10, the Court told counsel that "we may be surrounded by National Guard tomorrow morning, and I say that because the National Guard has been deployed for New Rochelle.  I want to get this done as soon as possible, okay?"  (Appx1889.)  By March 11, the day before the jury rendered its verdict, there were 1,267 known cases in the United States, and the growth of cases in New York City and its suburbs was even more alarming.  (SA1031-32.)  That same day, the Court stated, "*[t]he world is falling apart around us*, and I would like to get this done … it would be very, very helpful to get this done as soon as possible." (SA791) (emphasis added).

On March 12, 2020, the last day of the trial, Mayor de Blasio declared a state of emergency.  (SA1031.)  That same day, Juror Five asked to speak in open court. Although he said the jury intended to do their jobs and "get this done," he made clear that the jury's focus was on the life-threatening risk of the emerging pandemic:

> We have been coming here for two weeks, all of us in this room.  ***We have been exposing ourselves.  Whether we know it or not, it's happening. And, quite frankly, this matter doesn't seem all that important compared to lives at stake, such as my mom who has lupus***. She has a very compromised immune system.  Sorry.  Let me catch my breath here.  I'm a little nervous. ….  We are here to decide damages and money.  ***And, quite frankly, money, to me, is not worth the life of my mother or any of the lives of the jurors in there who also there are***

19

***several who are older, and that's my concern***.  (SA797-98) (emphasis added).

Juror Five's concerns were understandable, particularly given that he lived less than 10 miles from the Covid-19 "containment zone" that had been established in New Rochelle the day before.(SA2048.)  The District Court nevertheless ruled *sua sponte* that the juror's comments did not warrant his exclusion.  (SA800).

That same day, the jury reached a verdict less than an hour after they retired to the jury room, and without reviewing any of the 326 exhibits that had been admitted during the nine-day trial.  (SA1043.2.)  The jury awarded statutory damages of $1,000 for each of the 167 works the Court found to be willfully infringed, and the statutory minimum of $750 per work for each of the 30 works where willfulness had not been determined.  (Appx790-792.)

Because the jury failed to actually deliberate, Plaintiffs moved for a new trial. The District Court denied the motion on November 5, 2020.  (Appx802.)

## SUMMARY OF ARGUMENT

Sagan cannot satisfy the strict requirements for compulsory licenses under Section 115.  His concert videos are ineligible for such licenses because Section 115 only applies to phonorecords, which do not include audiovisual works.  No amount of linguistic gymnastics can change that fact.

Sagan is also unable to show that his bootleg concert recordings were lawfully fixed with the consent of the performing artists.  He submitted no evidence of artist

consent on summary judgment, and, indeed, the only testimony from any artists in the record shows that they either could not recall or did *not* consent to the recording and exploitation of their performances. Nor can Sagan show consent from the performers as the owners of the sound recording copyrights, or from anyone who recorded the pre-1972 concerts with permission from the owners of the underlying musical works—*i.e.*, Plaintiffs or their predecessors. Sagan's argument that these requirements do not apply to him is belied by the statute itself, as well as Sagan's own arguments to the District Court and another Court of Appeals.

Sagan's admission that Defendants failed to serve NOIs before distributing recordings of Plaintiffs' musical works—while trying to cover up that fact by sending fraudulent NOIs—also disqualifies Defendants from eligibility for Section 115 licenses.

Defendants' implied license and estoppel defenses were properly rejected. Section 115 states that music users must either comply with its requirements, or negotiate for licenses. Defendants did neither. Moreover, Plaintiffs' only involvement with Defendants was their repeated demands that Defendants stop infringing their copyrighted works. No court has ever found an implied license or estoppel under those circumstances.

Sagan was properly held individually liable, as he personally directed his companies' infringements—going so far as to tell them which concert recordings to digitize and stream from his Websites.

The District Court's denial of an injunction based on the possibility that Sagan might negotiate licenses would make injunctions unavailable in any copyright case, eviscerating the Copyright Act. The Court also failed to consider that Sagan has continued to willfully infringe Plaintiffs' musical works, which constitutes irreparable harm.

The District Court made a number of erroneous evidentiary rulings at the damages trial, which coincided with the explosion of the pandemic in New York. The Court permitted Sagan to introduce royalty payments that were not tied to any of the works at issue or even to any of the Plaintiffs, as well as settlement agreements with non-party record labels that the Court itself recognized were irrelevant and could not support a good faith defense. At the same time, the Court refused to admit a statement by Sagan's licensing agent, which directly undercut Sagan's testimony about what licenses he needed.

The District Court also erred in denying a new trial due to the exploding pandemic. In the rushed final days of the trial, the Court recognized that "the world is falling apart around us," and one of the jurors openly stated that the case "doesn't

seem all that important compared to the lives at stake." These extreme circumstances require a new trial.

## STANDARD OF REVIEW

This Court reviews summary judgment rulings, and mixed questions of fact and law, *de novo*. *See Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 992 F.3d 99 (2d Cir. 2021); *Mango v. Buzzfeed, Inc.*, 970 F.3d 167, 170 (2d Cir. 2020).

Decisions about whether to grant a motion for permanent injunction, to admit evidence at trial, and to grant a new trial, are reviewed for abuse of discretion. *See 16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 254 (2d Cir. 2015); *Rivas v. Brattesani*, 94 F.3d 802, 807 (2d Cir. 1996); *Cameron v. City of N.Y.*, 598 F.3d 50, 61 (2d Cir. 2010).

## ARGUMENT

### I. The District Court Properly Granted Summary Judgment

Plaintiffs indisputably satisfied both elements of their infringement claims—"(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).

Because Sagan cannot demonstrate that he has licenses to exploit Plaintiffs' musical works, the summary judgment ruling should be affirmed. *See FDIC v.*

*Giammettei*, 34 F.3d 51, 54-55 (2d Cir. 1994) (summary judgment affirmed where "there is an absence of evidence to support an essential element of a defense").

### A. The District Court Properly Concluded That Sagan Does Not Have Compulsory Mechanical Licenses Under Section 115

Section 115 of the Copyright Act is a limited exception to copyright owners' exclusive rights. Courts therefore "narrowly construe" compulsory licensing provisions such as Section 115. *A&M Records v. Napster, Inc.*, 239 F.3d 1004, 1028 (9th Cir. 2001); *Fox Television Stations, Inc. v. Aereokiller, LLC*, 851 F.3d 1002, 1011 (9th Cir. 2017) ("compulsory licenses represent a 'limited exception'" and courts should "not 'expand the scope of the compulsory license provision beyond what Congress intended'"); *Fame Publ. Co. v. Ala. Custom Tape, Inc.*, 507 F.2d 667, 670 (5th Cir. 1975) ("compulsory license provision … must be construed narrowly"); *Edward B. Marks Music Corp. v. Colo. Magnetics, Inc.*, 497 F.2d 285, 288 (10th Cir. 1974) (compulsory licensing statute "should be strictly construed").

### 1. Sagan's Exploitation of Musical Works in Audiovisual Format Is Not Eligible for Section 115 Licenses

Section 115 only permits the copying and distribution of musical works embodied in "phonorecords." 17 U.S.C. § 115. "Phonorecords" are "material objects in which sounds, ***other than those accompanying a motion picture or other audiovisual work***, are fixed …." 17 U.S.C. § 101 (emphasis added); *see Woods v. Bourne Co.*, 60 F.3d 978, 986 n.3 (2d Cir. 1995) ("a phonorecord … is the tangible

thing on which the sounds (other than sounds accompanying an audiovisual work) are fixed."). Motion pictures and audiovisual works are not, by definition, "phonorecords," and are therefore not entitled to the benefits of a Section 115 license. 17 U.S.C. § 101.[6]

In *ABKCO Music, Inc. v. Stellar Records, Inc.*, 96 F.3d 60, 65 (2d Cir. 1996), this Court held that karaoke recordings consisting of both music and a visual depiction of song lyrics were not phonorecords, and were therefore ineligible for Section 115 licenses. The Court explained that "the term phonorecord expressly excludes 'audiovisual works,' yet [defendants' recordings] constitute 'audiovisual works,' since they 'consist of a series of related images'—the lyrics— 'together with accompanying sounds'—the music." *Id.* at 65; *see also Fred Ahlert Music Corp. v. Warner/Chappell Music, Inc.*, 155 F.3d 17, 19 n.1 (2d Cir. 1998) (mechanical license does not permit exploitation of a "song in a motion picture in synchronism with the on-screen image"); *Leadsinger, Inc. v. BMG Music Publ*, 429 F. Supp. 2d 1190, 1194-95 (C.D. Cal. 2005) ("The plain meaning of § 115 does not permit Plaintiff to

---

[6] Musical compositions can be exploited in audiovisual format only with a synchronization license, not a Section 115 mechanical license. *See* 2 Nimmer on Copyright § 8.04 (2020) ("the mechanical compulsory license does not convey the right to record the work on a film sound track; rather, a consensual license (known as a 'synchronization' license) must be obtained for that purpose.").

display visually images and lyrics in 'real time' with music."), *aff'd,* 512 F.3d 522, 526 (9th Cir. 2008).

The video concert recordings that Sagan distributed on his Websites consist of a series of related images together with accompanying sounds, and are therefore ineligible for Section 115 licenses. Other courts examining Sagan's concert videos have reached the same conclusion. *See Kihn v. Bill Graham Archives, LLC*, 445 F. Supp. 3d 234, 253 (N.D. Cal. 2020) ("With respect to the audiovisual recordings on the Websites, section 115's automatic mechanical license does not apply at all.").

The legislative history confirms that any recording that includes a visual component is not a phonorecord. In enacting Section 115, Congress explained that phonorecords "includ[e] disks and audio tapes but *not* the sound tracks or other sound records accompanying a motion picture or other audiovisual work." H.R. No. 94-1476 at 108 (emphasis added).

The Copyright Office has similarly recognized that "[a] phonorecord does *not* include sounds accompanying a motion picture or other audiovisual work." Copyright Office Circular 73A (emphasis added).

Sagan argues (DB59-61) that the second sentence of the definition of phonorecords in 17 U.S.C. § 101—which states that "[t]he term 'phonorecords' includes the material object in which the sounds are first fixed"—somehow negates the express exclusion of audiovisual works in the first sentence. However, the

26

second sentence merely clarifies that—*assuming a material object otherwise qualifies as a phonorecord*—it will not be excluded solely because it happens to be the object in which the sounds were first fixed, such as reel-to-reel studio tapes,[7] as opposed to objects onto which the sounds are later copied, such as CDs or mp3 files.

By using the definite article "*the* sounds," the second sentence refers to the sounds identified in the first sentence—*i.e.*, sounds "other than those accompanying a motion picture or other audiovisual work[.]"  *See S.E.C. v. KPMG LLP*, 412 F. Supp. 2d 349, 387-88 (S.D.N.Y. 2006) ("A [statute's] use of the definite article 'the' … indicates that Congress intended the term modified to have a singular referent."). Thus, the second sentence actually "reinforces the concept that phonorecords include only sounds, and makes no mention of *audiovisual* works."  (SA1952.27.)

Sagan argues that objects containing sounds and accompanying audiovisual works qualify as a phonorecord if the sounds and motion pictures were recorded at the same time, as in a live concert performance.  (DB61-63.)  There is no legal basis for distinguishing between recordings in which the sounds and images were captured at the same time, and recordings where the sounds were later added to existing images.  As long as the material objects that the prospective licensee seeks to exploit

---

[7] It was this kind of studio equipment, not "microphones, mixing boards, and audio interfaces" (DB61), to which the District Court and Plaintiffs referred when explaining the meaning of the second sentence of the phonorecords definition.

contain sounds accompanied by motion pictures, they are not phonorecords, and they are ineligible for Section 115 licenses.

The legislative history supports this conclusion. Congress explained that a recording of a live sporting event—which is analogous to a live concert recording—"*would be considered a 'motion picture'*." H.R. No. 94-1476 at 52 (emphasis added).

In a last-ditch effort, Sagan argues that his concert videos do not constitute motion pictures or audiovisual works, because the visual elements in those videos supposedly "do not 'accompany' anything." (DB61-62.) That argument is absurd. The visual elements of a concert video are unquestionably "a series of related images which, when shown in succession, impart an impression of motion, together with accompanying sounds" as well as "a series of related images which are intrinsically intended to be shown … together with accompany sounds …." 17 U.S.C. § 101 (definitions of "motion pictures" and "audiovisual works"). The fact that the 1976 House Report included "filmstrips, slide sets, and sets of transparencies" as *examples* of motion pictures (DB62) does not mean that concert videos are not *also* types of audiovisual works.

Summary judgment should therefore be affirmed for all musical works that Sagan exploited in audiovisual format.

### 2. Sagan Cannot Satisfy the Requirements for Obtaining Compulsory Mechanical Licenses Under Section 115(a)(1)[8]

Section 115(a)(1) imposes strict limitations as to who may obtain a compulsory license:

> A person may not obtain a compulsory license for use of the work in the making of phonorecords duplicating a sound recording fixed by another, unless:
>
>> (i) such sound recording was fixed lawfully; and
>>
>> (ii) the making of the phonorecords was authorized by the owner of copyright in the sound recording or, if the sound recording was fixed before February 15, 1972, by any person who fixed the sound recording pursuant to an express license from the owner of the copyright in the musical work or pursuant to a valid compulsory license for use of such work in a sound recording.

### (a) Sagan Bears the Burden of Showing Compliance with Section 115(a)(1)

Contrary to Defendants' assertion (DB49-50), the District Court properly placed the burden on Defendants to satisfy each element of their license defense, including that the recordings were fixed lawfully with the performers' consent. *See FameFlynet, Inc. v. Shoshanna Collection, LLC*, 282 F. Supp. 3d 618, 625 (S.D.N.Y. 2017) ("Where the dispute turns on whether a license is held by the accused infringer, the defendant bears the burden to come forward with evidence of a

---

[8] The provisions of Section 115(a)(1) were moved to 115(b) in October 2018, but the substantive requirements remain the same. The version of Section 115 that existed when the SJ Order was issued in March 2018 is used herein. (Defendants' Supplemental Appendix ("SAppx") at 71.)

license."); *AP v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537, 561 (S.D.N.Y. 2013); (citing *Graham v. James*, 144 F.3d 229, 236 (2d Cir. 1998)); *Cherry River Music. Co. v. Simitar Entm't, Inc.*, 38 F. Supp. 2d 310, 317 (S.D.N.Y. 1999).

The fact that some courts have formulated the elements of an infringement claim as including "unauthorized copying" (DB49) does not place the burden of disproving the existence of a license on the plaintiff. As this Court held in *Sohm v. Scholastic Inc.*, 959 F.3d 39, 48 (2d Cir. 2020):

> In a copyright infringement case, the plaintiff must show: (i) ownership of a valid copyright; and (ii) unauthorized copying of the copyrighted work. ***The existence of a license to engage in the challenged copying, however, is an affirmative defense to a claim of copyright infringement… that the alleged infringer must plead and prove.*** (quotations and citations omitted). (emphasis added).[9]

Another court hearing infringement claims against Sagan similarly held that he bears the burden of proving artist consent. *See Kihn, LLC*, 445 F. Supp. 3d at 261 ("[T]he burden to establish that the recordings at issue were authorized by the performers ought to be placed on the party asserting the recordings that were authorized, *i.e.*, the defendants. To hold otherwise would require plaintiffs to prove the *negative*—that the recording defendants are exploiting (made by someone else

---

[9] Sagan's reliance on *Sadhu v. Ajit*, 503 F. Supp. 2d 577, 583 (E.D.N.Y. 2007) (cited at DB49) is misplaced, as that case did not address which party has the burden of establishing a license defense. *Chamberlain Grp., Inc.v. Skylink Tech.*, 381 F.3d 1178, 1204 (Fed. Cir. 2004) (cited at DB49) is similarly inapposite, as it addressed the anti-circumvention provisions of the DMCA, not a copyright infringement claim.

who is not a party here and perhaps unknown) was made and distributed *without* the consent and authorization of the performers.").

The lapse in time since the concerts were recorded (DB49-50) does not change this conclusion. Sagan knew he was buying tapes of concerts that took place decades ago, and that he needed licenses from music publishers and performers in order to lawfully exploit the concert tapes. Plaintiffs, on the other hand, had no reason to know that these bootleg recordings even existed until Sagan expanded his Websites and claimed the right to exploit the recordings under compulsory licenses. Any risk of fading memories or loss of evidence should therefore be borne by Sagan. *See In re WRT Energy Sec. Litig.*, 246 F.R.D. 185, 196 (S.D.N.Y. 2007) (citing *Residential Funding Corp. v. DeGeorge Financial Corp*, 306 F.3d 99, 108 (2d Cir. 2002)).[10]

### (b) Sagan's Bootleg Recordings Were Not Lawfully Fixed

In order to prove that the concert tapes were fixed lawfully under Section 115(a)(1)(i), Sagan must show that they were made with the consent of the performing artists. "A sound recording is not lawfully fixed if that fixation constitutes either copyright infringement under federal law, or common law copyright infringement, unfair competition, or other violation of state law." 2

---

[10] Sagan's argument that "Plaintiffs, not Defendants, are seeking to invalidate the legality of works under a certain statute" (DB49) is nonsensical. Plaintiffs are not seeking to "invalidate" any works. They are holding Sagan liable for his willful infringement of their iconic musical compositions.

Nimmer § 8.04[E][2] n.88. Both the federal anti-bootlegging statute and analogous state law make it unlawful to record a musical performance without the performers' consent. *See* 17 U.S.C. § 1101(a); 3 Nimmer on Copyright § 8E.03[A][3] (2018) ("[F]ixation of their work, without permission from each performer, violates the statute.").[11]

Yet, Sagan provided *no* evidence that any of the performing artists had authorized the recording of their performances. Instead, the evidence shows that the performances were recorded *without* the artists' consent—including the appraisal report and marketing documents prepared by the prior owners of the Bill Graham recordings; testimony of executives and attorneys for the prior owners of those recordings; and sworn interrogatory responses from three of the performing artists themselves. *Supra* 6-8.

Sagan's reliance on his acquisition agreements is misplaced. Sagan's vendors sold him physical assets and specifically disclaimed the right to use any intellectual

---

[11] *See also Miller v. Universal Pictures Co.*, 18 Misc. 2d 626, 632 (Sup. Ct. N.Y. Cty. 1959) ("the owner of musical performances can prevent unauthorized reproduction on phonograph records and … common-law property right is not lost by a public performance or radio broadcast"), *rev'd on other grounds*, 11 A.D.2d 47 (1st Dep't 1960); *Metropolitan Opera Ass'n v. Wagner-Nichols Recorder Corp.*, 199 Misc. 786 (Sup. Ct. N.Y. Cty. 1950), *aff'd*, 279 A.D. 632 (1st Dep't 1951) (recording live performance violates opera company's exclusive rights to their performances); *RCA Mfg. Co. v. Whiteman*, 28 F. Supp. 787, 791-92 (S.D.N.Y. 1939), *rev'd on other grounds*, 114 F.2d 86 (2d Cir. 1940) (recognizing performing artists' common law property right in their performances).

property. Moreover, because none of the performing artists are parties to those agreements, they constitute hearsay if offered to prove artist consent. *See* Fed. R. Evid. 801, 802; *Yong Ki Hong v. KBS Am., Inc.*, 951 F. Supp. 2d 402, 430 n.12 (E.D.N.Y. 2013) (letter which purported to be "a *post hoc* confirmation of an exclusive license" is inadmissible hearsay).

Similarly, Sagan's settlement agreements with non-party record labels do not even purport to retroactively authorize the taping of live concerts which occurred years or decades earlier. Even if they did, there is no evidence that any of the record labels were the "agents" of the performing artists such that they were "contracting here on the artists' behalf." (DB57.) Sagan cites no evidence of "custom in the music industry" for record labels to authorize the taping of live concerts by artists with whom they have record deals (DB58),[12] and courts have "repeatedly rejected the existence of a fiduciary relationship between recording artists and their record label." *Sony Music Entm't Inc. v. Robison*, 01 Civ. 6415 (LMM), 2002 U.S. Dist. LEXIS 3100, at *9 (S.D.N.Y. Feb. 25, 2002).

Indeed, Sagan recently argued to the Ninth Circuit Court of Appeals that "an *individualized* inquiry would be required to determine if a performing artist assigned any purported rights to a record label" (*Kihn v. Bill Graham Archives LLC*, No. 20-

---

[12] Sagan's bald assertion that there was an "industry custom" for artists themselves to consent to the recording of their concerts orally (DB57) is similarly unsupported.

17397 (9th Cir. Apr. 19, 2021), Dkt. Entry 12 at 38) (emphasis added), directly undercutting his argument here as to a supposed industry "custom."[13]

Sagan also claims to have agreements with three performing artists—Van Morrison, Carlos Santana and the Grateful Dead. (DB58-59.) However, Sagan did not submit those agreements in the summary judgment briefing. Indeed, Sagan did not produce the Grateful Dead and Santana agreements until after discovery when he moved for reconsideration of the SJ Order. (SA1952.57.) Those documents could not have been considered on summary judgment, and are irrelevant to this appeal. *See* Fed. R. Civ. P. 37(c); *Underpinning & Found. Skanska, Inc. v. Travelers Cas. & Sur. Co. of Am.*, 726 F. Supp. 2d 339, 348 (S.D.N.Y. 2010).

In any event, those agreements *expressly exclude* any rights to musical compositions or to any audiovisual recordings (Appx662-2 to 662-4, Appx663-2 to 663-4, Appx665-2 to 665-4), yet Sagan exploited audiovisual recordings of the compositions performed by those artists (SA1045-1120). Sagan also failed to serve a timely NOI for each concert recording by those artists (SA1713-1870.) Thus, even if those agreements were admissible to show artist consent—which they are not—

---

[13] Sagan's testimony at trial about what unidentified performers may have said, or what discussions he may have had with non-parties as part of his "diligence" in deciding to purchase the recordings (DB52), is obviously not part of the summary judgment record, and, in any event, is rank hearsay, as Sagan did not attend any of the concerts (SA1259).

Sagan would still be liable for infringing all of the musical compositions at issue which those artists performed, because audiovisual works are not eligible for Section 115 licenses, and Sagan's failure to send timely NOIs disqualifies him for such licenses.

While Sagan suggests that testimony from recording engineer David Hewitt could have allowed a jury to infer that there was artist consent (DB45-46,54-55), Hewitt testified that he could not recall a single instance where a performer actually consented to his recording of their concert (SA1884¶33,1043.7,1567-72).

For the first time on appeal, Sagan speculates that the concert videos themselves are evidence of artist consent, surmising that they "*appear* to be *obvious* professional recordings," and the artists "*plainly* knew they were being recorded." (DB26,51) (emphasis added). Because Sagan never raised that argument below, it should not be considered on appeal. *See Elder v. McCarthy*, 967 F.3d 113, 125 (2d Cir. 2020).

In any event, Sagan's characterization of the recordings as "professional" or of "high quality" (DB26,51) is irrelevant to whether they were made with the performers' consent. A high-quality bootleg can be even more damaging than one of low-quality.

Sagan's speculation that some artists may have *seen* video cameras at their concerts in no way implies that they *consented* to the recording of those concerts.

Even if the artists saw the cameras, they no doubt understood that the cameras were being used to display their image on the large screens at the concert venue, not to *create recordings* of those concerts. Sagan's speculation that the artists impliedly consented to the recording of their performances is insufficient to create an issue of fact to preclude summary judgment. *See Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 85 (2d Cir. 2005) ("'[C]onclusory statements, conjecture, or speculation' are inadequate to defeat a motion for summary judgment.") (quoting *Opals on Ice Lingerie v. Body Lines, Inc.*, 320 F.3d 362, 370 n.3 (2d Cir. 2003)).

This argument also fails because it is necessarily limited to "*audiovisual* recordings" (DB26-27,51-52), which are ineligible for compulsory licenses, irrespective of any artist consent.

Moreover, to the extent Sagan argues the artists impliedly licensed the concert promoters and venue operators to exploit their performances (DB57), there is no evidence of any such license, which, in any event, could not be assigned to Sagan. *See Ariel (U.K.) Ltd. v. Reuters Grp. PLC*, 2006 U.S. Dist. LEXIS 79319, at *18 n.8 (S.D.N.Y. Oct. 31, 2006) ("a non-exclusive license holder cannot assign the license unless expressly authorized to do so"), *aff'd*, 277 F. App'x 43 (2d Cir. 2008).

Contrary to Sagan's assertions (DB29,56-59), the District Court did *not* require that artist consent be in writing. It merely noted two instances where written agreements were lacking, while also noting that there was no *other* evidence of

36

consent.  (SA1952.10,1952.30-34.)    Tellingly, Sagan does not point to any admissible evidence of consent, whether written or otherwise.

Sagan's claim that he was not permitted to take discovery regarding artist consents (DB3,17,29-30,46,50-51) is demonstrably false.  After Sagan sought to exceed the 10-deposition limit and depose 27 artists, Magistrate Judge Pitman allowed Sagan to take sample depositions of two performing artists, without prejudice to his right to later seek additional artist depositions.  (SA57,105-106,167.) Sagan ignored that order, and subpoenaed depositions from *six* performing artists.[14] Judge Pitman quashed Sagan's subpoenas, but allowed him to serve written questions on each artist.   (Appx238-39.)    Critically, that order was "without prejudice to a further application by defendants to conduct the oral examination of the Non-Party Witnesses if the answers to the written questions demonstrate that such discovery is appropriate."  (*Id.*)  Sagan has only himself to blame for any failure to pursue evidence of artist consent.

Moreover, Sagan did not oppose summary judgment on the ground that he needed more discovery, and, in fact, affirmatively moved for summary judgment, demonstrating that he was not denied the opportunity to take discovery.  *See Palmieri v. Lynch*, 392 F.3d 73, 87 (2d Cir. 2004) (argument waived where litigant

---

[14] Sagan only able to effect service on three of those six artists.

"failed to pursue appropriate remedies below for inadequate discovery"); Fed. R. Civ. P. 56(d).

Summary judgment should therefore be affirmed for all compositions at issue.

### (c) Sagan Does Not Have Authorization from the Owners of the Sound Recording Copyrights

In order to qualify for compulsory licenses, Defendants must also have authorization from the owners of the copyrights in the sound recordings in their bootleg tapes. *See* 17 U.S.C. § 115(a)(1)(ii); *Blagman v. Apple, Inc.*, 2014 U.S. Dist. LEXIS 45401, at *21 (S.D.N.Y. March 31, 2014).[15]  Although Sagan argues the individuals who recorded the concerts jointly owned the sound recording copyrights with the performers, and that Defendants acquired those copyrights when they purchased the concert tapes (DB55), that argument fails for two reasons.

First, in order to acquire a copyright interest in the sound recordings, the individuals who taped the concerts must have "engage[d] in artistically supervising and editing the production." *Forward v. Thorogood*, 985 F.2d 604, 605-07 (1st Cir. 1993); *Sierra-Pascual v. Pina Records, Inc.*, 660 F. Supp. 2d 196, 203 (D.P.R. 2009)

---

[15] Sagan's argument (DB45) that Plaintiffs do not own sound recording copyrights is a red-herring.  The requirement of obtaining consent from the owner of the sound recording copyright is a condition of obtaining compulsory licenses to exploit the underlying musical compositions, which Plaintiffs indisputably do own. *See Fame Publ. Co.*, 507 F.2d at 668 n.1 (rejecting argument that music publishers lacked standing to sue defendants who claimed compulsory license without authorization from sound recording owner).

("'[I]f the producer's only basis for claiming original contribution were the act of 'setting up the recording session,' it would be ill-based.") (quoting *Forward*, 985 F.2d at 604).

Although Sagan relies on H.R. Rep. 94-1476 for the proposition that "the producer of a sound recording will *usually* be considered an author of the recording" (DB53) (emphasis added), courts have recognized that "the 'producer' envisaged by the committee is one who engages in artistically supervising and editing the production." *Forward*, 985 F.2d 604, 607 (1st Cir. 1993) (citing 1 Nimmer § 2.10[A](2)(b), at 2-150 to 2-151)).

There is no evidence that any of the individuals who taped the concerts at issue contributed sufficient artistic expression to be entitled to a copyright interest. Unlike a record producer who arranges the musicians, selects their performances, and combines and edits the various tracks, the bootleg tapes at issue here are simply recordings of live concert performances. The only testimony from anyone who actually recorded any of the concerts, David Hewitt, shows that the recordings were unedited "rough mixes" that were "just afterthoughts" and "not the real focus of what we were doing," as they were simply the result of "leav[ing] the 2-track going." (Appx653-11, 653-15.)

Second, in order for the individuals who recorded the concerts to be deemed joint authors, the artists themselves must have intended to contribute their expression

39

into a joint work that would be co-owned by those individuals. *See* 17 U.S.C. § 101 (definition of "joint work"); *Thomson v. Larson*, 147 F.3d 195, 200 (2d Cir. 1998); *Childress v. Taylor*, 945 F.2d 500, 507 (2d Cir. 1991).

It is the artists' performances, after all—along with Plaintiffs' musical compositions—that are featured in the recordings. *See Forward*, 985 F.2d at 605 ("The performer of a musical work is the author, as it were, of the performance."); *Sierra-Pascual*, 660 F. Supp. 2d at 203 ("[T]here is little question but that a performer's rendition of a work written by another may in itself constitute an original work") (quotation omitted); *In re Porter*, 498 B.R. 609, 670 (Bankr. E.D. La. 2013) ("A sound recording is owned by the person whose performance is reflected on the recording."). Indeed, Sagan himself cites legislative history indicating that a sound recording copyright must include the authorship of the "performers whose performance is captured[.]" (DB54) (citing H.R. Rep. No. 94-1476, 9 (1976)).

As the District Court correctly found, "there is no admissible evidence that any performers ever consented to being recorded, let alone fully intended to be co-authors with recording engineers (some of whom are unidentified)[.]" (Appx726.) Any introductions that Bill Graham may have given *before* the concert performances (DB54) obviously does not demonstrate that the artists intended their performances to be captured in a copyrighted recording owned by someone else. Nor, as Sagan contends (*id.*), did Hewitt testify that any particular artists entered his recording truck

40

to have recordings made, much less that they manifested an intent that Hewitt own a copyright in their recorded performance.

Furthermore, when Defendants applied to register copyrights in the concert recordings, the Copyright Office repeatedly asked for confirmation that they had written consent from the performing artists. (SA1666,1670.) Defendants' responses that they had such consent were shown to be outright lies, as was Defendants' representation in their Initial Disclosures that they had written license agreements with the performing artists. (SA285,1952.33,2069,2071,2094.) The few copyright registrations that Sagan produced in discovery were limited to *re-mixes* of the underlying sound recordings, and were certainly not for joint ownership of the sound recordings with the artists themselves. Significantly, in opposition to summary judgment, Sagan did not submit any registrations to show his purported ownership of any sound recording copyrights.

Similarly, Sagan's agreements with third-party record labels do not constitute authorization from the sound recording copyright owners. While those agreements allowed Sagan to share in whatever rights the record labels may have had in the live concert recordings, there is no showing that the labels actually had any rights to the decades-old live concert recordings. *Supra* 33.

Summary judgment should therefore be affirmed for all musical compositions that Sagan exploited in a recording created after February 15, 1972.

### (d) Sagan Does Not Have Authorization from the Owners of Musical Compositions Embodied in Pre-1972 Sound Recordings

For recordings created before February 15, 1972, Section 115(a)(1)(ii) requires that the prospective licensee establish that the individuals who fixed the recordings did so with the permission of the owners of the underlying musical compositions. *See* 17 U.S.C. § 115(a)(1); *Blagman*, 2014 U.S. Dist. LEXIS 45401, at *20 (S.D.N.Y. Mar. 31, 2014); 2 Nimmer § 8.04[E][2]. No such permission was ever granted.

Sagan's argument (DB10) that his agreements with non-party record labels somehow "acknowledged the right of [Defendants] to exploit the compositions in the recordings at issue" is belied by the language of the agreements themselves, which *expressly exclude* rights to any musical compositions. *Supra* 16.

Summary judgment should therefore be affirmed for all musical compositions that Sagan exploited in recording created before February 15, 1972.

### (e) Sagan Waived Any Argument That Section 115(a)(1) Does Not Apply

Recognizing that he cannot satisfy the requirements of Section 115(a)(1)(i) and (ii), Sagan argues (DB45-49) that those requirements do not apply, because Defendants are allegedly successors-in-interest of the individuals who recorded the concerts, and the recordings therefore were not "fixed by another."

42

Sagan took the opposite position below, where he admitted that he *is* required to satisfy Section 115(a)(1), including the requirement that the recordings were fixed lawfully. (SA329) (conceding "the recordings must have been 'fixed lawfully'").[16] The District Court therefore recognized that "*[t]he parties are in agreement* that Section 115(a)(1)(i) requires Defendants to have obtained the consent of the musical performers for their recordings to be lawfully fixed." (SA1952.29) (emphasis added).

Sagan argued that same position to the Ninth Circuit less than three months ago. In an effort to de-certify a class action infringement lawsuit filed against him, Sagan argued that he *is* required to comply with Section 115(a)(1), including the lawful fixation requirement. (*Kihn v. Bill Graham Archives LLC*, No. 20-17397 (9th Cir. Apr. 19, 2021), Dkt. Entry 12 at 35-38) ("[Q]uestions of 'lawful fixation' would *still* apply to thousands upon thousands of separate audio-only recordings, which compromise the majority of Defendants' collection.").

Sagan should not be permitted to rely on Section 115(a)(1) when it helps him, and to disregard it when it does not. Because Sagan has waived any argument that

---

[16] Defendants' need for artist consent to exploit the concert tapes is further demonstrated by the fact that they prepared a form performer agreement that would "authorize Wolfgang to fully utilize and exploit the Masters in exchange for sharing with the Artist a portion of the revenue from such activity[.]" (SA1883¶29,1274-76,1463) Tellingly, not a single performing artist has signed that form agreement.

Section 115(a)(1) does not apply, the Court should not consider it.  *See Elder*, 967 F.3d at 125.

### (f)    Section 115(a)(1) Applies to Sagan Under the Statute's Plain Language

Well aware that he cannot meet the requirements of Section 115(a)(1), Sagan urges this Court to simply ignore the Section altogether.  As shameless as his contention that "audio only" really means "audio plus visual," Sagan claims that Section 115(a)(1) does not apply because the works in question (presumably both audio and audiovisual) were not "fixed by another."  Of course, none of the Defendants actually recorded the concerts and, in many instances, did not even acquire the bootleg recordings from the person who did fix the recordings.

Consequently, under the plain language of the statute, Sagan's concert tapes were "fixed by another," which triggers the requirements of Section 115(a)(1).  *See Carcieri v. Salazar*, 555 U.S. 379, 387 (2009) (if "statutory text is plain and unambiguous … we must apply the statute according to its terms."); *Spadaro v. United States Customs & Border Prot.*, 978 F.3d 34, 46 (2d Cir. 2020) ("[w]hen the language of a statute is unambiguous, judicial inquiry is complete.") (internal quotation omitted).  That conclusion is reinforced by the fact that courts must "narrowly construe" compulsory licensing provisions such as Section 115.  *Supra* 24.

If Congress intended individuals who purchase recordings from others to be exempt from Section 115(a)(1), it would have said so. The Copyright Act uses the term "successor" numerous times in a variety of contexts,[17] indicating that Congress knew how to apply provisions to legal successors when it wanted to. *See United States v. Al-Farekh*, 956 F.3d 99, 107 (2d Cir. 2020) (use of language in one section of statute but not another presumed intentional); *Hirt v. Equitable Ret. Plan for Emples., Managers & Agents*, 533 F.3d 102, 108 (2d Cir. 2008) (citing *Russello v. United States*, 464 U.S. 16, 23 (1983)).[18]

Indeed, the fact that Congress substantially revised Section 115 several months after the SJ Order, but left Section 115(a)(1)'s requirements intact,[19] shows that Congress intended not to disturb the District Court's interpretation of the statute. *See Merrill Lynch, Pierce, Fenner & Smith v. Curran*, 456 U.S. 353, 381-82 (1982) ("the fact that a comprehensive reexamination and significant amendment of the CEA left intact the statutory provisions under which the federal courts had implied

---

[17] *See, e.g.*, 17 U.S.C. §§ 104A(h)(4), 203(a)(4), 203(b)(4), 304(a)(3)(A), 304(c)(4), 304(c)(6)(D), 1311.

[18] Sagan himself urges the Court to apply this principle of statutory interpretation. (DB56) ("Had Congress intended to include a requirement that consent be written, the statute would include such language," noting that "other sections of the Copyright Act include writing requirements").

[19] They were simply moved to Section 115(b).

45

a cause of action is itself evidence that Congress affirmatively intended to preserve that remedy.").

Congressional intent confirms that Sagan is required to satisfy Section 115(a)(1). Section 115 was passed as part of the 1976 Copyright Act in order to combat both record piracy and the practice of recording musical performances without the artists' consent (i.e., bootlegging). Record piracy is addressed through the requirement that licensees obtain consent from the sound recording copyright owner, and, for pre-1972 sound recordings (which were not entitled to federal copyright protection), from the individual who fixed the recording with the permission of the musical composition owner. Bootlegging is addressed by the requirement that the sound recording have been lawfully fixed with the permission of the performing artist. Indeed, one of the cases whose reasoning Congress expressly adopted, *Dutchess Music Corp. v. Stern*, 458 F.2d 1305, 1311 (9th Cir. 1972) (cited at H.R. No. 94-1476 at 108), explained that prospective licensees may "record [publishers'] songs, when [they] hire[] musicians, artists, and technicians" but not when they "steal[] the genius and talent of others."

Sagan's conduct implicates both of these Congressional concerns. He acquired physical concert tapes knowing that the artists had not consented to the recording or exploitation of their performances, and he failed to obtain consent from the owners of the sound recording copyrights, which, as explained above, also

46

required the consent of the performing artists. To allow Sagan to exploit those illegal bootleg recordings through a compulsory mechanical license would frustrate the purposes of the statute.

Under Sagan's strained interpretation of the law, anyone present at a concert with a good cellphone (or his "legal" successor) could record a concert without the performer's or copyright owner's consent and make and sell copies with impunity because he was the perpetrator, not "another." Of course, one could also interpret Sagan's bizarre statutory construction to mean that none of Section 115 applies, no compulsory license is available, and Sagan and others of his ilk must obtain an actual license from the owners of the intellectual property rights.

### 3. Sagan's Purported Licenses from the Harry Fox Agency Are Invalid

Licenses issued by the Harry Fox Agency ("HFA") are merely Section 115 licenses with slight variations with respect to the method and frequency of royalty payments. *See EMI Entm't World, Inc. v. Karen Records, Inc.*, 603 F. Supp. 2d 759, 763-64 (S.D.N.Y. 2009) ("Licenses issued by Harry Fox do not, however, alter the basic rights and obligations of the licensee under § 115"); *Harry Fox Agency, Inc. v. Mills Music, Inc.*, 720 F.2d 733, 737 (2d Cir. 1983), *rev'd on other grounds sub nom.*, *Mills Music, Inc. v. Snyder*, 469 U.S. 153 (1985); *Sony/ATV Publ'g, LLC v. Marcos*, 651 F. App'x 482, 485 (6th Cir. 2016) ("[T]he HFA license is a standard compulsory license limited to distribution of phonorecords and incorporates the

47

statutory definition of that term, which excludes 'audiovisual work[s].'") (quoting 17 U.S.C. § 101).

Therefore, Sagan's purported HFA licenses are invalid for the same reason that his purported Section 115 licenses are invalid—because (i) HFA licenses do not apply to audiovisual works, (ii) Sagan's bootleg recordings were not fixed lawfully with the artists' consent, and (iii) Sagan did not have consent from the owners of the sound recording copyrights, or from individuals who created the pre-1972 recordings with the consent of the owners of the underlying musical works.

Sagan's argument (DB20,67) that he acquired HFA licenses for audiovisual recordings is belied by the record.  The HFA email Sagan relies upon references the making of "digital *phonorecord* deliveries (as defined in Section 115 of the Copyright Act)" (Appx422) (emphasis added), and Sagan's application for an HFA account references "the manufacture and distribution of CDs, Audio Cassettes, LP's, etc." (Appx380)—not audiovisual works.

In any event, only a small fraction of the works at issue are even listed on the HFA spreadsheet Sagan relies upon.  (SA1891¶63,272-76; Appx384-420.)  Of the 197 works at issue, 180 of them have at least one recording that does not appear on the HFA spreadsheet.  (*Id.*)  Moreover, Sagan admits that Defendants stopped paying royalties pursuant to any such HFA licenses in 2013, yet they continued exploiting— and therefore infringing—all of the musical works at issue.  (SA372-74.)

### 4.  Sagan's Admitted Failure to Send Timely NOIs Disqualifies Him from Obtaining Compulsory Licenses

"To obtain a compulsory license to a musical work, a person must serve an NOI on the copyright owner '… before distributing any phonorecords of the work ….'"  *Yesh Music, LLC v. Amazon.com., Inc.*, 249 F. Supp. 3d 645, 654 (E.D.N.Y. 2017) (quoting 17 U.S.C. § 115(b)(1)); *see also* 37 CFR 201.18.

This requirement "is strictly enforced: '[f]ailure to serve or file the notice required by [§ 115(b)(1)] forecloses the possibility of a compulsory license and, in the absence of a negotiated license, renders the making and distribution of phonorecords actionable as acts of infringement.'"  *24/7 Records, Inc. v. Sony Music Entm't, Inc.*, 429 F.3d 39, 42-43 (2d Cir. 2005) (quoting 17 U.S.C. § 115(b)(2)); *see also Cherry River Music Co.*, 38 F. Supp. 2d at 312.

Despite this statutory mandate, Sagan repeatedly admitted he sent NOIs *after* distributing the corresponding recording on his Websites.  (DB20-21,23-24.)  Though Sagan argues it is "accepted practice" for licensees to send NOIs after starting to distribute a recording of a musical composition (DB16), Defendants conceded they have no basis for that bald assertion (SA1890¶61; SA213-14), and it should therefore be disregarded.  *See Moore v. City of New York*, 2010 U.S. Dist. LEXIS 19183, at *17 (S.D.N.Y. Mar. 2, 2010) ("Allegations that a defendant acted pursuant to a 'policy' or 'custom' 'without any facts suggesting the policy's

existence, are plainly insufficient.'") (quoting *Missel v. Cty. of Monroe*, 351 F. App'x 543, 545 (2d Cir. 2009)).

Even if there were such an "accepted practice," it could not vary the black letter terms of the statute. *See Leo Feist, Inc. v. Apollo Records, N.Y. Corp.*, 300 F. Supp. 32, 43 (S.D.N.Y.), *aff'd*, 418 F.2d 1249 (2d Cir. 1969) ("it is no excuse that the defendants relied upon a custom or trade practice of awaiting completion of manufacture and distribution of a recording before filing a notice of intention to use copyrighted material"); *Cherry River Music Co.*, 38 F. Supp. 2d at 319-20 (same); *cf. Famous Music Corp. v. Seeco Records, Inc.*, 201 F. Supp. 560 (S.D.N.Y. 1961) (industry custom cannot justify deviation from statutory requirements).

Although the District Court found an issue of fact "as to whether and which NOIs were actually submitted after the first download or streaming of a phonorecord and in the absence of an HFA license" (SA1952.38), it overlooked the undisputed fact that, for each of the works at issue, Defendants exploited at least one recording before serving an NOI (SA1890-91¶62; SA1713-1870), and for 180 of the works at issue, Defendants exploited at least one recording that does not even appear on their HFA license spreadsheet, *supra* 49.

Sagan's failure to serve timely NOIs therefore provides an independent basis for affirming the grant of summary judgment. *See CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.*, 850 F.3d 58, 78 (2d Cir. 2017).

50

## B.    Sagan's Equitable Defenses Were Properly Rejected

### 1.    Implied License

"[C]ourts have found implied licenses only in 'narrow' circumstances where one party 'created a work at [the other's] request and handed it over, intending that [the other] copy and distribute it.'" *SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharms., Inc.*, 211 F.3d 21, 25 (2d Cir. 2000). That is not the case here. The musical works at issue were created by Plaintiffs' songwriters long before Sagan purchased the tapes from third parties and began exploiting them online.

Moreover, as Sagan acknowledges, no implied license will be found unless there is a "meeting of the minds" between the putative licensee and putative licensor as to the nature of the use, as well as "knowledge and cooperation" by the putative licensor with the conduct of the putative licensee. (DB57,65) (citing *Psihoyos v. Pearson Educ., Inc.*, 855 F. Supp. 2d 103, 124 (S.D.N.Y. 2012)). A "meeting of the minds" has been found "where parties have closely collaborated or engaged in joint projects." *Merkos Lyinyonei Chinuch, Inc. v. John Doe Nos. 1-25*, 172 F. Supp. 2d 383, 387 (E.D.N.Y 2001).

Neither Plaintiffs nor the performers ever collaborated or engaged in any joint projects with Sagan. He simply purchased and commercially exploited bootleg tapes that contain hundreds of Plaintiffs' copyrighted musical works, without any attempt to negotiate licenses from Plaintiffs. The implied license cases Sagan cites are all

51

distinguishable (DB57,64-65,68), as they involved extensive interactions between the parties about the subject uses.[20]

Sagan's unsolicited payments to Plaintiffs, just before the lawsuit was filed, and after Plaintiffs demanded that Sagan stop infringing their works, do not evidence a "meeting of the minds" that might give rise to an implied license. Until discovery in this action, Plaintiffs had no reason to believe that Sagan's NOIs were fraudulent and untimely, or that the artists whose performances are captured in Sagan's tapes had not consented to the recording, thereby rendering Sagan ineligible for compulsory licenses. Plaintiffs' passive receipt of Sagan's payments signaled, at

---

[20] There are no facts here even remotely analogous to those in the cases Defendants cite. In *Psihoyos*, 855 F. Supp. 2d at 124, the plaintiffs "deliver[ed] the works to Defendants (via the Agencies) with the intent that Defendants copy and distribute them," and the plaintiffs' agent supplied invoices to defendants approving of their practice of utilizing the works before a formal license was in place. *Id.* at 108-109, 124. In *Pavlica v. Behr*, 397 F. Supp. 2d 519, 523 (S.D.N.Y. 2005), the plaintiff used his copyrighted teaching manual as part of a grant application that he prepared in collaboration with the defendants, distributed copies of that manual at workshops administered by the defendant, and even "instruct[ed] teachers to make photocopies of sections of the manual." In *Keane Dealer Servs., Inc. v. Harts*, 968 F. Supp. 944 (S.D.N.Y. 1997), the court *denied* defendant's motion for summary judgment on implied license, even though there were extensive communications between the parties about the defendants' use of the copyrighted work, and the plaintiff admitted it was aware of the nature of the defendants' use. *Id.* at 945-47. In *Palmer/Kane LLC v. Gareth Stevens Publ'g*, No. 1:15-cv-7404-GHW, 2017 U.S. Dist. LEXIS 145103, at *47 (S.D.N.Y. Sept. 7, 2017), the plaintiff negotiated a series of licensing agreements with the defendant. And in *Zappa v. Rykodisk, Inc.*, 819 F. Supp. 2d 307, 319 (S.D.N.Y. 2011), there was evidence that the licensor "delivered the[] tracks to [the licensee], and that [licensor's agent] cooperated in the album's release by drafting liner notes and designing the album's cover art."

most, that he was operating as though he had valid compulsory licenses, not that Plaintiffs somehow intended to grant Sagan an implied negotiated license. *See Fame Publ. Co.* 507 F.2d at 668-69 n.1 (rejecting argument that "plaintiffs cannot have been injured since defendants tendered the … statutory royalty for each reproduction" and stating "only if [defendants complied with compulsory licensing statute] are they permitted to tender the royalty and entitled to be licensed.").

The fact that Sagan claims to have made payments pursuant to licenses purportedly issued by HFA for a small fraction of the works at issue does not change this result. As shown above, the conditions to Section 115 also apply to HFA licenses, and there is no evidence whatsoever that HFA granted Sagan mechanical licenses "for uses that are otherwise ineligible for a compulsory license." (DB67.) Thus, any receipt of payments pursuant to purported HFA licenses would merely reflect that Sagan appeared to be operating under the conditions of those licenses, not that HFA gave an implied license for uses that do *not* meet those conditions.

Contrary to Sagan's arguments (DB66), the cease-and-desist letters Plaintiffs sent to Sagan demanding that he *stop* exploiting their musical works are not evidence of intent that the use *continue*. And of course, once Plaintiffs commenced this action, Sagan could not possibly have reasonably believed that they consented to his uses of their musical works. *See Ulloa v. Universal Music & Video Dist. Corp.*, 303 F. Supp. 2d 409, 417 (S.D.N.Y. 2004) ("Even assuming that Plaintiff's conduct created

an implied license, Plaintiff clearly terminated any implied license prior to filing this suit and is thus still entitled to damages for copyright infringement.").[21]  Tellingly, Sagan does not (and cannot) cite a single case where an implied license was found based on payments pursuant to fraudulent (but facially valid) NOIs, and certainly not where the copyright owner demanded that the defendant cease its unauthorized use.

If the Court were to adopt Sagan's argument, it would place the burden on music publishers and songwriters to investigate the *bona fides* of every NOI they receive.  That is precisely what Congress sought to avoid when it provided in Section 115 that "[f]ailure to serve or file the [NOI] required by clause (1) forecloses the possibility of a compulsory license and, in the absence of a negotiated license, renders the making and distribution of phonorecords actionable as acts of infringement …."  17 U.S.C. § 115(b)(2).  A music user thus has two choices: (1) serve a timely NOI in compliance with Section 115, or (2) negotiate with the

---

[21] Nor did Plaintiffs signal any consent to Sagan's activities after the lawsuit was filed.  Shortly after Plaintiffs filed suit in 2015, they began rejecting Defendants' purported license payments.  (Appx298-311.)  And once the District Court ruled in 2018 that Sagan had no licenses and was willfully infringing Plaintiffs' copyrights, Plaintiffs wrote to Sagan's licensing agent, MediaNet, to demand that it cease any further payments on Defendants' behalf.  (SA944.1,944.2,944.3,944.4,944.5, 944.60.)  Sagan's assertion that "Plaintiffs did not produce any evidence in this case that they ever rejected any payment from MediaNet on WV's behalf" (DB24) is flatly incorrect.

copyright owner for a consensual license.[22]  Sagan cannot use his implied license

defense as an excuse for his failure to follow these statutory requirements.

### 2. Estoppel

"Estoppel is a drastic remedy and must be utilized sparingly." *Fitzpatrick v.*

*Sony-BMG Music Entm't, Inc.*, No. 07 Civ. 2933 (SAS), 2007 U.S. Dist. LEXIS

91446, at *10 (S.D.N.Y. Dec. 7, 2007).  To prevail on an estoppel defense, the

defendant must show that "a) the plaintiff knew of the defendant's wrongful conduct;

b) the plaintiff intended that his conduct be acted upon or acted in a way that the

defendant had a right to believe it was so intended; c) the defendant was ignorant of

the true facts; and d) the defendant relied on plaintiff's conduct to his detriment."

*Merchant v. Lymon*, 828 F. Supp. 1048, 1064 (S.D.N.Y. 1993) (citing *Basic Books,*

*Inc. v. Kinko's Graphics Corp.*, 758 F. Supp. 1522, 1539-1540 (S.D.N.Y. 1991)).  In

the copyright context, the defense of estoppel is largely "subsumed within the

'implied license' inquiry." *Psihoyos*, 855 F. Supp. 2d at 129.

Sagan's estoppel defense fails for the same reasons discussed above with

respect to his implied license defense.  Furthermore, as the District Court noted,

Sagan was far from "ignorant of the true facts" that his bootleg concert recordings

---

[22] *See Rodgers & Hammerstein Org. v. UMG Recordings Inc.*, No. 00 Civ. 9322
(JSM), 2001 U.S. Dist. LEXIS 16111, at *14 (S.D.N.Y. Sept. 25, 2001) ("Congress
clearly recognized that those like Defendants who wished to obtain a license to
include a copyrighted work in a phonorecord had a choice either to serve the notice
required to obtain a compulsory license or to obtain a 'negotiated license.'").

did not qualify for compulsory licenses.  Sagan knew from the outset that he lacked the necessary artist authorizations, that he had to send NOIs before distributing copies of the recordings, and that he could not exploit concert recordings in audiovisual format under compulsory mechanical licenses.  *See Merchant*, 828 F. Supp. at 1064 (no estoppel where "the defendant is in a position to ascertain the extent of the competing claim").

Contrary to Sagan's argument (DB69-70), none of his acquisition agreements or his agreements with non-party record labels can save his estoppel defense, as none of those agreements were with Plaintiffs, and none of them grant any rights to exploit musical compositions.  Those agreements therefore could not have led Sagan to reasonably believe that Plaintiffs would not take action with respect to his infringements of their musical works.

## C.  Sagan Was Properly Held Individually Liable Because He Personally Directed the Infringing Acts of His Companies

This Court has held that "[a]ll persons and corporations who participate in, exercise control over, or benefit from the infringement are jointly and severally liable as copyright infringers."  *Sygma Photo News, Inc. v. High Soc'y Magazine, Inc.*, 778 F.2d 89, 92 (2d Cir. 1985); *see also Arista Records LLC v. Lime Grp.*, 784 F. Supp. 2d 398, 437-38 (S.D.N.Y. 2011).  Therefore, "an individual, including a corporate officer, who ... personally participates in [infringing] activity is personally

liable for infringement." *Stumm v. Drive Entm't, Inc.*, No. 00 Civ. 4676 (DC), 2001 U.S. Dist. LEXIS 21675, at *15 (S.D.N.Y. Dec. 27, 2001) (citation omitted).

"These principles apply equally to claims of direct infringement and claims based on secondary liability." *Lime Grp.*, 784 F. Supp. 2d at 438; *see also Centrifugal Force, Inc. v. Softnet Commc'n, Inc.*, No. 08 Civ. 5463 (CM)(GWG), 2011 U.S. Dist. LEXIS 20536, at *29 (S.D.N.Y. Mar. 1, 2011). A corporate officer who personally participates in his corporation's infringing activity will therefore be jointly and severally liable regardless of whether the corporation is directly or secondarily liable. *See Capitol Records LLC v. ReDigi Inc.*, No. 12-cv-95 (RJS), 2014 U.S. Dist. LEXIS 122711, at *7-8 (S.D.N.Y. Sept. 2, 2014) (rejecting argument that plaintiff "must separately plead each theory of liability as to the Individual Defendants," because "their liability is predicated on their direction of and supervision over [corporate defendant's] infringing activity.").

Sagan personally (i) "decid[ed] to purchase the recordings" that contained Plaintiffs' musical works, (ii) instructed the corporate Defendants to "start digitizing tape recordings with an eye towards making them available on a public website," and (iii) determined "which concerts to make available" on their Websites. (DB52; SA200,208.) The District Court had ample basis to hold him liable. *See UMG Recordings, Inc. v. Escape Media Grp.*, No. 11 Civ. 8407, 2014 U.S. Dist. LEXIS 137491, at *68-69 (S.D.N.Y. Sept. 29, 2014) (co-founders and chief executives held

liable where they "directed the infringements at issue," by "creating a business model that was based upon the unlicensed sharing of copyright protected material," "deciding to launch the … streaming service" and "instructing … employees to upload files for that service"); *Arista Records LLC v. Usenet.com*, 633 F. Supp. 2d 124, 159 (S.D.N.Y. 2009) (individual held liable where he "direct[ed] employees to … filter certain conduct" but not to "limit the extent of copyright infringement on their service"); *Lime Grp.*, 784 F. Supp. 2d at 438 (CEO held liable where he "was the company's 'ultimate decisionmaker,'" "had the authority to 'veto' decisions" of the company, and "directed and approved many aspects of [the company's] design and development."); *Luft v. Crown Publishers, Inc.*, 772 F. Supp. 1378, 1379 (S.D.N.Y. 1991) (corporate officer held liable where he "negotiated the purchase of the infringing recordings, and he supervised their manufacture, distribution, and sale."); *cf. ReDigi Inc.*, 2014 U.S. Dist. LEXIS 122711, at *5-6 (S.D.N.Y. Sept. 2, 2014) (claims stated against individuals who were "ultimate decision makers concerning the development and implementation of [the] infringing activity," and "each of [corporation's] key activities was performed either at the behest of, or with the approval of, the two Individual Defendants").

*UMG Recordings, Inc. v. Veoh Networks, Inc.*, No. CV 07-5744 AHM (AJWx), 2009 U.S. Dist. LEXIS 14955, at *9 (C.D. Cal. Feb. 2, 2009) is readily distinguishable, as that case alleged that individual investors "had actual knowledge

of direct infringement, but d[id] not sufficiently allege that they gave material assistance in achieving it[.]"

Similarly, whether Sagan was involved with any "licensing decisions" is irrelevant. (DB43-44.) Sagan's direct involvement in the affirmative acts of infringement is enough to hold him liable.

## II. In the Shadow of the Impending Shutdown, the District Court Erroneously Permitted Sagan to Introduce Irrelevant and Highly Confusing Evidence at Trial

As the District Court rushed the parties to complete the trial as "the world was falling apart," it erroneously permitted Sagan to offer a variety of evidence that was both irrelevant and highly prejudicial.

### A. Sagan's Evidence of Payments for Works Not at Issue Is Irrelevant and Highly Confusing

Evidence is irrelevant and should be excluded if it lacks any connection to the actions or transactions at issue. *See United States v. Holmes*, 44 F.3d 1150, 1157 (2d Cir. 1995); Fed. R. Evid. 401, 402.

Payments that Sagan made to non-parties, or for works on which Plaintiffs did not sue, cannot possibly bear on the damages he should pay for infringing the works on which Plaintiffs did sue.[23] Yet, in the rushed final days of the trial leading to the

---

[23] Plaintiffs preserved their objections both at trial and by moving *in limine* before trial. *See* Fed. R. Evid. 103(b) ("Once the court rules definitively on the record— either before or at trial—a party need not renew an objection or offer of proof to

jury's hastened verdict just before the Covid-19 state-wide shutdown, the Court admitted Sagan's payment evidence, including his "five boxes," wholesale. It did not require a showing that the payments were made to any of the Plaintiffs, let alone for any of the works at issue, or that the documents—rather than just the "boxes"— be placed into evidence. This indiscriminate evidence sheds no light on Sagan's state of mind, or on the "conduct and attitude of the parties" with respect to the works at issue in the case. "Absent some connection between the testimony and the [works] at issue in this case," this evidence should have been excluded as irrelevant. *Holmes*, 44 F.3d at 1157.

Sagan's evidence of payments for works not at issue should also have been excluded because its probative value, if any, was substantially outweighed by the danger of confusing and misleading the jury. *See* Fed. R. Evid. 403; *United States v. Morgan*, 786 F.3d 227, 231-32 (2d Cir. 2015) ("Where there was … a failure to adequately consider the risk of unfair prejudice and to balance this risk against probative value, we will reverse an evidentiary determination as an abuse of discretion") (internal quotation marks and citation omitted).

At trial, Sagan created the impression that he paid Plaintiffs substantial sums for the works at issue. Defendants argued more than forty times that they paid

---

preserve a claim of error for appeal"); *United States v. McDermott*, 245 F.3d 133, 140 n.3 (2d Cir. 2001); *Rosenfeld v. Basquiat*, 78 F.3d 84, 91 (2d Cir. 1996).

Plaintiffs "in full," even though they have no licenses under which any particular amount was owed, and the vast majority of their payments evidence related to works that were not at issue. Lundberg testified that Sagan's companies had supposedly paid in full for all "700-800 million" streams from their Website, even though many of those payments and streams do not relate to the works at issue. (SA775). Sagan's counsel also referred to the "five boxes" purportedly containing "14,000 pages" of documents, while eliciting testimony from Lundberg that he "believe[d] we've paid every license fee that is due for our activities." (SA766-67.) Defense counsel did not present Lundberg with a single document from those boxes to review. The mere suggestion of voluminous payments was enough to mislead the jury into believing the payments related to the works at issue, and with the pandemic shutdown looming, Plaintiffs had an inadequate opportunity to dispel the confusion Defendants created. The jury did not even wait for the boxes—or any of the other exhibits introduced at trial—to be brought into the jury room before rendering their verdict. Defendants' misleading evidence, together with the jury's express lack of regard for the damages Plaintiffs were seeking, led to a perfect storm of jury confusion and manifest injustice.

### B. Sagan's Agreements with Non-Party Record Companies Are Irrelevant and Highly Confusing

The District Court's admission of Sagan's agreements with non-party record labels over Plaintiffs' objections was inconsistent with its own findings. The District

Court ruled on summary judgment and again on reconsideration that those agreements gave Sagan no right to exploit the works at issue, and in granting Plaintiffs' attorneys' fees motion, the Court specifically recognized that Sagan *could not have relied on those agreements in good faith* (Appx817-18), which means Sagan should not have been allowed to use them at trial to try to mitigate his willfulness.

The District Court's admission of Sagan's record label agreements is also irreconcilable with its *exclusion* of Sagan's settlement agreements with two artists. The Court excluded those artist settlement agreements because they expressly exclude any rights to musical compositions and audiovisual works, yet the same is true for the label agreements which the Court inexplicably admitted. (Appx758.) These obvious inconsistencies demonstrate that the District Court abused its discretion. *See Andrews v. Barr*, 799 F. App'x 26, 28 (2d Cir. 2020) (rulings made in a "'plainly inconsistent manner across similar situations evinces such a lack of rationality as to be arbitrary and capricious,' i.e., an abuse of discretion."); *Singh Mgmt. Co v. Singh Dev. Co*, 774 F. App'x 921, at *927-28 (6th Cir. 2019) ("facially inconsistent" rulings constituted an abuse of discretion); *Smith & Smith v. Bowsmith, Inc.*, No. 91-16137, 1992 U.S. App. LEXIS 23041, at *9-10 (9th Cir. Sept. 17, 1992) (same).

Sagan used the record label agreements at trial to misleadingly suggest that they granted him some rights to exploit the musical works at issue. He testified those agreements granted him rights to "songs," even though they expressly exclude any rights to musical compositions, and none of the agreements are with the Plaintiffs who own those compositions. (Appx1754.) Sagan's record label agreements should therefore have been excluded because they are irrelevant and confused the jury. *See* Fed. R. Evid. 401, 403.

### C.   The District Court Erred By Precluding Plaintiffs from Offering a Key Admission Made By Sagan's Music Licensing Agent

Statements made by the agent of a party opponent are considered "vicarious admissions" and not hearsay. Fed. R. Evid. 801(d)(2)(D). A "vicarious admission" requires (1) the existence of an agency relationship, and (2) a statement made during the course of the relationship, (3) that relates to a matter within the scope of the agency. *See Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534, 537 (2d Cir. 1992)).

Although MediaNet indisputably served as Defendants' music licensing agent at the time the MediaNet Article was published, the District Court excluded the Article because it supposedly did not relate to a matter within the scope of the agency. But Defendants' agreement with MediaNet, as well as Sagan's and Lundberg's own testimony, defined the scope of the agency broadly, including "clear[ing] the rights required in connection with the music compositions distributed

through [the Website]," "working with [Defendants] on best practices [f]or reducing its publishing liabilities[,]" and providing "[a]dvice with respect to what licenses were required." (SA657,1686,1699,2075,2088.)

The MediaNet Article fell squarely within that scope. Its admission that "Streaming Video with Music" required "[s]ynchronization licenses for the musical composition in each track used … from the appropriate music publisher(s)" (SA2107-8) relates directly to clearing rights for musical compositions and providing advice with respect to what licenses were required. The MediaNet Article would also have been powerful impeachment evidence undercutting Sagan's stubborn refusal to admit that synchronization licenses, not mechanical licenses, were required to stream concert videos.

## III. The District Court Abused its Discretion in Denying Plaintiffs' Motion for a New Trial

Courts may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court" Fed. R. Civ. P. 59(a)(1)(A), including "if the trial was not fair to the moving party," *Rivas v. Brattesani*, 94 F.3d 802, 807 (2d Cir. 1996) (citing *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940)), and to avoid a "miscarriage of justice," *DeWitt v. N.Y. State Hous. Fin. Agency*, 97 Civ. 4651 (SAS), 1999 U.S. Dist. LEXIS 13057, at *3 (S.D.N.Y. Aug. 24, 1999). New trials may be granted "even if there is

substantial evidence to support the verdict.'" *Id.* at *3 n.1 (quoting *Bevevino v. Saydjari*, 574 F.2d 676, 683 (2d Cir. 1978)).

Although the jury's fear of exposure to the novel coronavirus was understandable, it is also evident that this fear resulted in a rushed determination and an unfair verdict. After nine days of trial, including testimony from 12 witnesses and admission of 326 exhibits, the jury reached a verdict that should have entailed numerous computations and the consideration of a number of factors, yet only consisted of deliberations for just *a fraction of an hour without reviewing a single one of the exhibits introduced at trial*.

The rush to judgment confirmed that all of the jurors shared Juror Five's feeling that the case "doesn't seem all that important compared to lives at stake" (SA797-98). The jury awarded just $1,000 for each of the musical works that Sagan infringed willfully, and just $750 (the statutory minimum) for each of the other works that Sagan infringed, even though the works include some of the most popular and celebrated songs of all time. (Appx667.)

Thus, it was not simply that the jurors were rushed (which they were), but that the once-in-a-generation pandemic, combined with the District Court's admission of irrelevant and prejudicial evidence, caused them to lose focus on the extent of Sagan's willful infringements and the need to deter Sagan and other would-be infringers.

In *Lucas v. Am. Mfg. Co.*, the Fifth Circuit reversed the denial of a motion for a new trial where the jury returned a verdict within forty-five minutes after three days of trial, and shortly before a hurricane made landfall near the courthouse. 630 F.2d 291, 293 (5th Cir. 1980). The Fifth Circuit recognized that "the extraordinary circumstances surrounding the jury's deliberations, when considered along with the obvious inadequacy of the verdict, require that this verdict be set aside." *Id.*

The facts here are even more extreme than in *Lucas*. As the District Court observed on the second to last day of trial, "[t]he world is falling apart around us" due to the exponential spread of the novel coronavirus (SA791), and Juror Five's comments indicated that the jurors were unable to deliberate rationally given the unprecedented threat to their lives and the lives of their loved ones.

In denying Plaintiffs' motion for a new trial, the District Court noted that no party moved to exclude Juror Five after he made his statements, explaining that, had he been excluded, the jury could have still proceeded to a verdict with seven jurors. (Appx812.) This ignores the fact that the District Court ruled *sua sponte* that Juror Five's comments did not warrant his exclusion from the jury. (CSA1216.) Moreover, the issue is not only that Juror Five was under duress and improperly permitted to remain on the jury, but that his statements were indicative of the palpable unease felt by all the jurors as the pandemic crippled the City, and they were under growing pressure to escape the courthouse.

66

Similarly, the fact that it was "reasonable" or "understandable" for the jurors to want the trial to proceed and conclude quickly (Appx812), does not mean that the resulting verdict was any less unfair. The issue is not that the Court acted unreasonably in speeding trial along, or that the jury acted unreasonably in rushing its deliberations. The issue is that, because the jury was acting based on unprecedented factors, the resulting rush and inability to deliberate in a calm and rational manner requires a new trial.

## IV. The District Court Abused its Discretion in Denying a Permanent Injunction

Courts may grant injunctions "on such terms as [they] may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). In determining whether an injunction is appropriate, courts consider (1) whether the plaintiff will suffer an irreparable injury absent an injunction; (2) whether remedies at law, such as monetary damages, are adequate; (3) the balance of hardships; and (4) whether an injunction would serve the public interest. *See Broad. Music, Inc. v. Prana Hosp., Inc.*, 158 F. Supp. 3d 184, 195-96 (S.D.N.Y. 2016).

### A. The District Court Ignored Evidence of Plaintiffs' Irreparable Injury Based on Sagan's Continuing Willful Infringements

In denying Plaintiffs' motion for an injunction, the District Court held that the harm to Plaintiffs was not irreparable, because Sagan could obtain licenses to exploit Plaintiffs' works. (SA1952.53.) In addition to being in tension with the Copyright

Act itself, that reasoning is at odds with the prevailing view of irreparable harm in copyright infringement cases.

The Copyright Act expressly provides for both damages and injunctive relief as potential remedies. *See* 17 U.S.C. §§ 502, 504. Yet, the District Court essentially held that injunctions are not available where the defendant could negotiate for a license post-litigation. But that is true in every copyright case. If the District Court's holding were allowed to stand, it would effectively eliminate injunctive relief in all copyright cases, notwithstanding its express availability under the Copyright Act.

Furthermore, "courts have consistently found that '[h]arm can be irreparable, and adequate remedies at law lacking, where … absent an injunction, the defendant is likely to continue infringing the copyright.'" *HarperCollins Publrs., LLC v. Open Rd. Integrated Media, LLP*, 58 F. Supp. 3d 380, 386-87 (S.D.N.Y 2014) (quoting *Broad. Music, Inc. v. PAMDH Enters.*, 2014 U.S. Dist. LEXIS 84409, at *13 (S.D.N.Y June 19, 2014)); *see, e.g.*, *Broad. Music, Inc. v. Prana Hospitality, Inc.*, 158 F. Supp. 3d 184, 195 (S.D.N.Y. 2016); *Rovio Entm't, Ltd. v. Allstar Vending, Inc.*, 97 F. Supp. 3d 536, 547 (S.D.N.Y. 2015); *Hounddog Prods., LLC v. Empire Film Grp., Inc.*, 826 F. Supp. 2d 619, 633 (S.D.N.Y. 2011).

A likelihood of continued infringement, and thus irreparable harm supporting an injunction, will also be found where, as here, the defendants' infringement was willful. *See Broad. Music v. Hub at Cobb's Mill, LLC*, No. 3:13-CV-01237 (VLB),

2015 U.S. Dist. LEXIS 43315, at *23-25 (D. Conn. Apr. 2, 2015); *Hounddog Prods., LLC*, 826 F. Supp. 2d 634; *cf. Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Star Mark Mgmt.*, 628 F. Supp. 2d 312, 328 (E.D.N.Y. 2009) (permanent injunction in trademark case where defendant's "repeated run-ins with infringement claims, and his lack of candor when testifying at trial, sufficiently demonstrate the threat of a continuing violation").

There is every reason to believe that Sagan will continue his infringing conduct. He ignored the cease-and-desist demands Plaintiffs sent before the lawsuit was filed and dramatically expanded the scope of his infringements while the case was pending. *Supra* 13. Sagan continued infringing Plaintiffs' works after Plaintiffs filed suit, and after he was found liable for willful infringement, and even after the damages trial in March 2020. (SA690-91,732-38,806-07.)

Irreparable harm will also be found where the infringer competes in the same market as the copyright owner. *See Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004); *WPIX, Inc. v. ivi, Inc.*, 765 F. Supp. 2d 594, 618 (S.D.N.Y. 2011) (allowing viewers to access programming from unsanctioned sources would inevitably damage plaintiffs' ability to profit from sanctioned sources; "such losses are notoriously difficult to prove and nearly impossible to quantify").

Plaintiffs themselves license the musical works at issue for use in live concert recordings. (SA1878-79.) Sagan's infringing service therefore threatens Plaintiffs'

relationships with their existing licensees, and undermines their negotiating leverage with prospective licensees in ways that are impossible to quantify (SA176-77), fully supporting an injunction.

### B. The Balance of Hardships and Public Interest Factors Firmly Favor Plaintiffs

The balance of hardships overwhelmingly favors Plaintiffs. Absent an injunction, Plaintiffs will be forced to "commence litigation for each future violation" which "would pose a considerable hardship." *Prana Hosp.*, 158 F. Supp. 3d at 196; *see also Broad. Music, Inc. v. Living Room Steak House, Inc.*, No. 14-CV-6298, 2016 U.S. Dist. LEXIS 23676, at *21 (E.D.N.Y. Feb. 26, 2016) ("Plaintiffs' burden of time and cost of litigating every future violation outweighs the burdens on the Defendants to obtain a license or to not infringe altogether"). In essence, the Court's ruling deprives Plaintiffs of the absolute right to choose who will be their licensees. It also forces Plaintiffs to engage in costly litigation to combat Sagan's ongoing infringements, with uncertain prospects of recovery. (Dkt. 394) (awarding Plaintiffs $2.4 million in attorneys' fees and costs).

Conversely, Sagan will suffer no undue hardship from an injunction preventing him from continuing to infringe Plaintiffs' musical works. *See Mint, Inc. v. Iddi Amad*, No. 10 Civ. 9395 (SAS), 2011 U.S. Dist. LEXIS 49813, at *10-11 (S.D.N.Y. May 9, 2011) (defendant "cannot be heard to complain if an injunction against continuing infringement destroys the business.") (quotation omitted); *Prana*

*Hosp., Inc.*, 158 F. Supp. 3d at 196 ("the Court cannot detect any hardship that an injunction obliging defendants to comply with their legal duties would impose on them.").

Finally, "the public has a compelling interest in protecting copyright owners' marketable rights to their work and the economic incentive to continue creating …." *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 287 (2d Cir. 2012). Sagan is exploiting some of the most beloved and valuable musical works of all time, without the permission of the performing artists or the music publishers who own those works. Allowing Sagan's infringing conduct to continue would distort the incentives that copyright law is designed to protect, and lead to fewer creative works for the public to enjoy.

## CONCLUSION

Plaintiffs respectfully ask that the Court affirm the District Court's summary judgment ruling, reverse its refusal to grant a permanent injunction, and remand the case with instructions to hold a new trial on damages.

Dated: New York, New York
      June 7, 2021

LOEB & LOEB LLP

By: */s/ Barry I. Slotnick*
    Barry I. Slotnick
    Christian D. Carbone
    Tal E. Dickstein
    Sarah Schacter
    Priy Sinha
    345 Park Avenue
    New York, NY 10154
    Telephone: 212.407.4000

    *Attorneys for Plaintiffs-Appellees/Cross-Appellants*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Rule 32(a)(5) of the Federal Rules of Appellate Procedure, the foregoing brief is in <u>14-Point Times New Roman</u> proportional font and contains 16,391 words and thus is in compliance with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.

Dated: New York, New York
      June 7, 2021

LOEB & LOEB LLP

By:*/s/ Barry I. Slotnick*
    Barry I. Slotnick
    Christian D. Carbone
    Tal E. Dickstein
    Sarah Schacter
    Priy Sinha
    345 Park Avenue
    New York, NY 10154
    Telephone: 212.407.4000

*Attorneys for Plaintiffs-Appellees/Cross-Appellants*