# No. 20- 3816 (L)

## No. 20-4020 (CON)
## No. 20-4099 (XAP)

# United States Court of Appeals for the Second Circuit

————

ABKCO Music, Inc., Colgems-EMI Music Inc., EMI Algee Music Corp., EMI April Music Inc., EMI Blackwood Music Inc., EMI Consortium Music Publishing, Inc., DBA EMI Full Keel Music, EMI Consortium Songs, Inc., DBA EMI Longitude Music, EMI Feist Catalog Inc., EMI Robbins Catalog Inc., EMI Unart Catalog, Inc., Jobete Music Co., Inc., ScreenGems-Emi Music Inc., Stone Agate Music, Stone Diamond Music Corp., Imagem Music LLC, Peer International Corp., PSO Ltd., Peermusic Ltd., Peermusic III, Ltd., Songs of Peer, Ltd., Spirit Catalog Holdings S.A.R.L., Spirit Two Music, Inc., Warner-Tamerlane Publishing Corp., WB Music Corp,
Plaintiffs-Appellees-Cross-Appellants

*v.*

William Sagan, Norton LLC, Bill Graham Archives, LLC, DBA Wolfgang's Vault, Defendants-Appellants-Cross-Appellees.

————

*APPEAL FROM THE UNITED STATES DISTRICT COURT*
*FOR THE SOUTHERN DISTRICT OF NEW YORK, NO. 1:15-CV-04025*

————

## RESPONSE-AND-REPLY BRIEF FOR
## DEFENDANTS-APPELLANTS-CROSS-APPELLEES
## WILLIAM SAGAN ET AL.

————

MICHAEL S. ELKIN
*Winston & Strawn LLP*
*200 Park Avenue*
*New York, NY 10166*
*(212) 294-6729*
*MElkin@winston.com*

ERIN R. RANAHAN
*Winston & Strawn LLP*
*333 South Grand Avenue*
*Los Angeles, CA 90071*
*(213) 615-1835*
*Eranahan@winston.com*

*Counsel for Appellants-Cross-Appellees William Sagan et al.*

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ...................................................................................i

TABLE OF AUTHORITIES .........................................................................iii

INTRODUCTION ...........................................................................................1

LEGAL STANDARD .....................................................................................4

ARGUMENT ..................................................................................................5

    I.    The District Court's Erroneous Finding of Individual Liability
          Against Sagan Was Improper and Should Be Reversed ...........................5

    II.   The District Court Committed Reversible Errors With Respect to
          Defendants' § 115 Licenses ...................................................................9

          A.    Subsection 115(a)(1) Does Not Apply Here Because
                   Defendants Own the Sound Recordings that Their
                   Predecessors Lawfully Fixed ......................................................9

          B.    The Burden Should Fall on Plaintiffs to Disprove Facts
                   About the Original Lawful Creation of the Recordings
                   That Were Made Decades Ago .................................................14

          C.    Authorization/Consent Presents At Least a Fact Question.......21

          D.    The District Court Erred In Its Interpreting
                   "Phonorecords" To Exclude WV's Original Live Music
                   Recordings ................................................................................29

    III.  There Are Fact Questions Regarding Defendants' Equitable
          Defenses ..............................................................................................31

    IV.  Plaintiffs Have Not Identified Any Reversible Evidentiary Errors
          by The District Court During the Damages Trial ...................................34

          A.    The District Court Properly Allowed In Defendants'
                   Extensive Payment History .......................................................34

B.    Defendants' Agreements with Major Record Labels Acknowledging Defendants' Copyright Interests In Recordings Were Properly Admitted ......................................36

C.    The District Court Was Within Its Discretion in Precluding A Website Statement Made by A Third Party That Defendants Had Not Seen or Relied On.........................38

V.    The District Court Properly Denied Plaintiffs' Motion for a New Trial ....................................................................................................42

    A.    Factual Background ................................................................42

        1.    Plaintiffs Call All Twelve Trial Witnesses ...................42

        2.    Juror No. 5 ................................................................44

        3.    The Amount Awarded to Plaintiffs Was Fair and Fell Squarely Within the Available Statutory Range ..............................................................................45

    B.    Legal Standard ........................................................................46

    C.    The District Court Properly Denied Plaintiffs a New Trial Because They Were Given Sufficient Time to Present Their Case to The Jury..............................................................46

VI.    The District Court Did Not Abuse Its Discretion In Denying A Permanent Injunction .................................................................................54

CONCLUSION ....................................................................................................59

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, Typeface Requirements, and Type-Style Requirements ..............................60

CERTIFICATE OF SERVICE.............................................................................61

ii

# TABLE OF AUTHORITIES

**Page**

## Cases

*ABKCO Music, Inc. et al v. Sagan et al.*,
  No. 1:15-cv-04025-ER (S.D.N.Y.) ............................................................26, 27

*ABKCO Music, Inc. v. Stellar Records, Inc.*,
  96 F.3d 60 (2d. Cir. 1996) .......................................................................30

*Ali v. Kipp*,
  891 F.3d 59 (2d Cir. 2018) ......................................................................46

*Alpha Capital Anstalt v. Oxysure Sys. Inc.*,
  216 F.Supp.3d 403 (S.D.N.Y. 2016) ..........................................................6

*Arista Records LLC v. Usenet.com, Inc.*,
  633 F. Supp. 2d 124 (S.D.N.Y. 2009) ........................................................8

*Arista Recs. LLC v. Lime Grp. LLC*,
  784 F. Supp. 2d 398 (S.D.N.Y. 2011) ........................................................8

*Bouchat v. Baltimore Ravens Football Club, Inc.*,
  346 F.3d 514 (4th Cir. 2003) ...................................................................47

*Broad. Music, Inc. v. Pamdh Enters., Inc.*,
  No. 13-CV-2255, 2014 WL 2781846 (S.D.N.Y. June 19, 2014) ......................56

*Capitol Records LLC v. ReDigi Inc.*,
  No. 12-cv-95 (RJS), 2014 U.S. Dist. LEXIS 122711 (S.D.N.Y.
  Sept. 2, 2014) .......................................................................................7

*Close-Up Int'l, Inc. v. Berov*,
  No. CIVA 02-CV-2363 DGT, 2007 WL 4380154 (E.D.N.Y. Dec.
  13, 2007) .............................................................................................47

*Computer Generated Solutions Inc. v. Koral*,
  No. 97 Civ. 6298, 1998 WL 1085945 (S.D.N.Y. Dec. 9, 1998) ......................56

*DLC Mgmt. Corp. v. Town of Hyde Park*,
  163 F.3d 124 (2d Cir. 1998) ...................................................................46

*Encyclopedia Brown Prods. v. Home Box Office, Inc.*,
No. 91 CIV. 4092 (PKL), 1998 WL 734355 (S.D.N.Y. Oct. 15,
1998) ................................................................................................32, 35

*FameFlynet, Inc. v. Shoshonna Collection, LLC*,
282 F.Supp.3d 618 (S.D.N.Y. 2017) ...............................................19

*Fitzgerald Pub. Co. v. Baylor Pub. Co.*,
807 F.2d 1110 (2d Cir. 1986) ...........................................................48

*Fred Ahlert Music Corp. v. Warner/Chappell*,
155 F.3d 17 (2d Cir. 1998) ...............................................................30

*Graham v. Long Island R.R.*,
230 F.3d 34 (2d Cir. 2000) .................................................................5

*Gunning v. Cooley*,
281 U.S. 90 (1930) ............................................................................28

*Int'l Bus. Machines Corp. v. BGC Partners, Inc.*,
*No.* 10 Civ. 00128 (PAC) (FM), 2010 WL 1924715 (S.D.N.Y.
May 12, 2010) ...................................................................................56

*Kihn v. Bill Graham Archives LLC*,
No. 20-17397 (9th Cir. Apr. 19, 2021)........................................11, 19

*Kihn v. Bill Graham Archives LLC*,
No. 4:17-cv-05343 (N.D. Cal. Dec. 19, 2019) .................................16

*Leadsinger, Inc. v. BMG Music Publ.*,
429 F. Supp. 2d 1190 (C.D. Cal 2005) .............................................30

*Lucas v. Am. Mfg. Co.*,
630 F.2d 291 (5th Cir. 1980) ..............................................51, 52, 53

*Luft v. Crown Publishers, Inc*,
772 F. Supp. 1378 (S.D.N.Y. 1991) ...................................................8

*N.A.S. Imp., Corp. v. Chenson Enterprises, Inc.*,
968 F.2d 250 (2d Cir. 1992) .............................................................48

*Pavlica v. Behr*,
397 F. Supp. 2d 519 (S.D.N.Y. 2005) ..................................32, 33, 39

iv

*Psihoyos v. Pearson Educ., Inc.*,
  855 F. Supp. 2d 103 (S.D.N.Y. 2012) ................................................31

*Register.com, Inc. v. Verio, Inc.*,
  356 F.3d 393 (2d Cir. 2004) ................................................57

*Salinger v. Colting*,
  607 F.3d 62 (2d Cir. 2010) ................................................58

*The GMA Assocs., Inc. v. Olivia Miller, Inc.*,
  No. 03 CIV.4906 (MBM), 2004 WL 1277997 (S.D.N.Y. June 8,
  2004).....................................................................47

*The New York Chinese TV Programs, Inc. v. U.E. Enterprises, Inc.*,
  No. 89 CIV.6082RWS (KAR), 1991 WL 113283 (S.D.N.Y. June
  14, 1991), aff'd, 954 F.2d 847 (2d Cir. 1992) ....................47

*The Tattoo Art, Inc. v. TAT Int'l, LLC*,
  794 F. Supp. 2d 634 (E.D. Va. 2011), aff'd, 498 F. App'x 341 (4th
  Cir. 2012)...............................................................47

*Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*,
  60 F.3d 27 (2d Cir. 1995) ................................................55, 57

*UMG Recording, Inc. v. Escape Media Group*,
  2014 WL 5089743 (S.D.N.Y. Sep. 29, 2014) ....................7

*United States v. Cooper*,
  No. 1:18-CR-00126 EAW, 2020 WL 4474071 (W.D.N.Y. Aug. 4,
  2020).....................................................................51

*United States v. Dermen*,
  No. 218CR00365JNPBCW, 2020 WL 1676770 (D. Utah Apr. 6,
  2020).....................................................................49, 50, 51

*United States v. Kuznetsov*,
  No. 05 CR. 916 DAB, 2007 WL 2020110 (S.D.N.Y. July 11,
  2007).....................................................................51

*United States v. Shkolir*,
  17 F. Supp. 2d 263 (S.D.N.Y. 1998), aff'd in part, 182 F.3d 902
  (2d Cir. 1999) ..........................................................50

*United States v. Vorley*,
    No. 18 CR 00035, 2021 WL 1057903 (N.D. Ill. Mar. 18, 2021) .....................49

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ...........................................................................54

*WPIX, Inc. v. Ivi, Inc.*,
    765 F. Supp. 2d 594 (S.D.N.Y. 2011), aff'd, 691 F.3d 275 (2d Cir.
    2012)........................................................................................57

*In re WRT Energy Sec. Litig.*,
    246 F.R.D. 185 (S.D.N.Y. 2007).............................................20, 21

*Zervos v. Verizon N.Y., Inc.*,
    252 F.3d 163 (2d Cir. 2001) ..............................................................4

**Statutes**

17 U.S.C. § 504
    ...............................................................................45, 46

17 U.S.C. § 1101
    .......................................................................................11

17 U.S.C. § 1101(a)
    .......................................................................................17

Copyright Act
    ..................................................................40, 45, 46, 47

**Other Authorities**

Fed. R. Civ. P. 33
    .......................................................................................51

Fed. R. Civ. P. 59
    .......................................................................................46

## INTRODUCTION

The District Court's summary judgment ruling on liability eviscerates long-standing principles of corporate law, misconstrues copyright law, and ignores a host of factual disputes that should have been resolved by the jury. Plaintiffs' Brief ("PB") resorts to smearing Defendants with unsupported assertions steeped in factual disputes, and ignores fundamental errors in the District Court's liability Order on summary judgment. That Order, in turn:

- shreds basic notions of pleading and fairness in finding Mr. Sagan individually liable for direct copyright infringement by applying a portion of the standard for secondary vicarious infringement, a claim that Plaintiffs never pled, without any regard for longstanding principles of corporate separateness;

- erroneously applies portions of Section 115(a)(1) that do not apply here because the recordings were fixed by Defendants' predecessors, then shifts the burden to nullify years of Section 115 licenses by requiring Defendants to prove a negative to counter Plaintiffs' counsel's pure speculation about whether the recordings were "fixed lawfully;"

- prematurely disposes of Defendants' licensing and equitable defenses that are grounded in years of payments and riddled with factual disputes that at the very least should have been resolved by the jury.

To distract from the District Court's errors, Plaintiffs have manufactured complaints about several of the District Court's evidentiary rulings during the damages trial, all of which were well within its discretion. Disappointed with the low jury award,[1] Plaintiffs also seek a do-over of the damages trial solely because the jury—who was subjected to the longest damages-only copyright trial on record—supposedly did not deliberate long enough. But the jury performed its civic duty in compliance with the law and their instructions—none of which Plaintiffs complain about. Plaintiffs' excuse is to blame external circumstances, namely the trial concluding in the earliest days of the pandemic, though courts have repeatedly rejected this ground, and there is no evidence that it impacted the award here.

The award was rendered after the jury listened to the twelve witnesses called by Plaintiff billionaire publishers. To be sure, Plaintiffs likely did not endear themselves to the jury by keeping Defendants' representatives on the stand for an inordinate amount of time, questioning Mr. Sagan for four days and Mr. Lundberg for three. But the result was that the jury heard *extensive* testimony from Defendants about the good faith upon which they operated while navigating and doing their best to comply with a complex licensing system in an unsettled area of copyright law.

---

[1] Though Plaintiffs asked the jury for the maximum of $30 million, the jury awarded near the minimum of $189,500. SA963; Appx802; Appx826. The District Court subsequently awarded a discretionary fees award exceeding $2 million (out of $6 million Plaintiffs sought ). *Id.*; Dkt. 389 at 1-2; Appx826.

Defendants still believe that they complied with the law, which is why they have appealed to reinstate those licensing and equitable defenses. At the very least, given the long payment and licensing history, there were factual issues that should have been left for the jury to decide in the context of liability, as opposed to the jury only hearing the evidence in the context of deciding which level of damages is fair.

Because "state of mind" and conduct between the parties, amongst others, were factors that the jury could consider, the District Court properly allowed in evidence of years of payments Defendants made to Plaintiffs, as well as joint exploitation agreements with the major record labels—in which the authenticity and Defendants' ownership to copyrights of the recordings was expressly acknowledged. The District Court, at Plaintiffs' request, provided the jury limiting instructions for both items, and was well within its discretion in allowing such evidence.

Plaintiffs further complain that the District Court excluded a notation on an unauthenticated unverified third-party (MediaNet's) website, about certain negotiated licenses that Plaintiffs never sought assistance or advice from MediaNet about. Defendants had never seen or relied upon the MediaNet statement, and in fact it contradicts Defendants' legal advice and understanding of the subject. The extraneous MediaNet statement was properly excluded.

Finally, Plaintiffs appeal the District Court's denial of Plaintiffs' motion for a permanent injunction. The District Court correctly concluded that Plaintiffs could

not show irreparable harm because any damage could be monetary, which could be shown through an expert (which Plaintiffs declined to do). The District Court further recognized the public was better served if the historic recordings at issue that Defendants indisputably owned were made available rather than locked away.

Due to the factual disputes and errors of law at the liability phase, the Court should reverse the District Court's summary judgment order on the grounds set forth in Defendants' appeal, including reversing the District Court's erroneous finding of individual liability against Sagan and reinstating Defendants' equitable and licensing defenses to be considered by the jury in the context of liability. Otherwise, none of the grounds Plaintiffs raise reflect that the District Court abused its discretion.

## LEGAL STANDARD

Plaintiffs' appeal of evidentiary rulings, a new trial and the grant of an injunction requires Plaintiffs to demonstrate that the District Court abused its discretion, while Defendants' appeal is subject to *de novo* review, which provides this Court a broader lens to review and overrule decisions.

With respect to Plaintiffs' appeal, a district court "abuses" or "exceeds" the "discretion accorded to it when (1) its decision rests on an error of law…or a clearly erroneous factual finding, or (2) its decision…cannot be located within the range of permissible decisions." *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 168–69 (2d Cir. 2001).

4

On the other hand, as to Defendants' appeal, this Court reviews the grant of summary judgment "de novo applying the same standard as the district court." *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).

## ARGUMENT

## I. The District Court's Erroneous Finding of Individual Liability Against Sagan Was Improper and Should Be Reversed

In a decision that shatters long-standing principles of the corporate veil and individual separateness, as well as basic pleading standards that require a plaintiff to plead a claim before it succeeds upon it, the District Court held Sagan individually liable for direct copyright infringement without sufficient facts to support that he engaged in conduct to satisfy this claim.

In so doing, the District Court relied on half of[2] the inapplicable standard for vicarious liability—a theory not pled against any defendant in the case. Appx715-717; DB35-44 ("Defendant's Brief"). Defendants had no opportunity to investigate or prepare a defense for such a claim, because it was never asserted. Such backdoor liability based on an unpled theory, especially for conduct carried out in his corporate capacity, should be reversed.

Plaintiffs do not respond to several of Defendants' cases in this regard, nor Sagan's argument that it would violate due process to hold him liable on a claim that

---

[2] The District Court did not analyze at all the second component of vicarious liability, direct financial benefit, which Plaintiffs would have been unable to show. Appx715-717.

was never pled. *See Alpha Capital Anstalt v. Oxysure Sys. Inc.*, 216 F.Supp.3d 403, 411 (S.D.N.Y. 2016) ("A court cannot grant summary judgment regarding a [] claim if the plaintiffs have failed to plead the claim in the Complaint.")  And even if Plaintiffs had pled vicarious liability, there was no (or at most disputed) evidence of a "direct financial benefit" necessary to establish vicarious copyright infringement. DB38.  Plaintiffs do not respond to this argument either.

Plaintiffs also never explain what "volitional conduct" could establish direct infringement against Sagan—which requires proving that *he personally* copied, distributed, or publicly performed any of the works.  PB57-58.  Still unable to keep their own theory of liability straight, Plaintiffs have repeatedly suggested that licensing deficiencies are what caused the infringement here (*see* PB1, "Sagan was told that he needed to obtain licenses from the music publishers"; Dkt. 201 at 1, "…all without a proper license"), but then oddly insist that "whether Sagan was involved with any 'licensing decisions' is irrelevant." PB59.

Plaintiffs assert generally that the "District Court had ample basis" to hold Sagan personally liable. PB57.  But Plaintiffs do not and cannot point to anything in the record showing that Sagan personally engaged in direct infringement. Plaintiffs instead rely on a string of inapposite cases involving situations where executives were held secondarily liable for infringement, or the individuals in question had personally performed the act of infringement.  PB57-58.

Plaintiffs do not dispute that the District Court sought to impose the standard for vicarious copyright liability against Sagan. Plaintiffs again rely on a case where the court is merely paraphrasing the vicarious liability standard at the motion to dismiss stage, *e.g.*, *Capitol Records LLC v. ReDigi Inc.,* No. 12-cv-95 (RJS), 2014 U.S. Dist. LEXIS 122711 at *7-8 (S.D.N.Y. Sept. 2, 2014) (elements of the ***secondary liability claim of vicarious liability*** require the "direction of and supervision over" a corporate defendant's liability.)

This is materially distinguishable because it is not a case of vicarious liability—Plaintiffs did not assert a claim of vicarious liability against *any* party. Conduct that may be relevant to an asserted claim against a separate party cannot be imputed where no such claim is asserted at all.

Liability for direct infringement requires evidence that a party engaged directly in the alleged infringement. In *UMG Recording, Inc. v. Escape Media Group*, relied on by the District Court and Plaintiffs, for example, two executives were liable for direct infringement because of undisputed evidence that they had personally "uploaded works-in-suit … without authorization." *Id.* at *25. 2014 WL 5089743 at *3, *25 (S.D.N.Y. Sep. 29, 2014).

Here, in contrast, Plaintiffs have put forth no evidence that Sagan ever directly infringed Plaintiffs' copyrights, or uploaded or even instructed his employees to upload knowingly infringing files.

7

Plaintiffs' reliance on *Arista Records LLC v. Usenet.com, Inc*. is also unjustified. There, the court never imposed direct infringement liability against a corporate executive, but found him jointly and severably liable on a *secondary* (not direct) theory of liability and based on a "multitude" of "evidence that show[ed] [his] intent to foster infringement," including the defendant's directing "promotional items specifically to attract…direct infringer customers to engage in direct infringement through its website." 633 F. Supp. 2d 124, 159 (S.D.N.Y. 2009). That is a far cry from the evidentiary record here.

Here, Plaintiffs' account of Sagan's purported "involvement" contains not a single fact showing that he personally copied or distributed any of the works at issue or cultivated a market of known infringers. Indeed, there is not even evidence that he was involved in the licensing except to understand any necessary licenses had been secured. *See* Appx1813; SA1952.56.[3]

There is no precedent where no secondary liability claim is asserted at all in a case against any defendant, and yet the lower court uses a portion of the secondary liability standard to impose direct liability against an individual. It was plainly a reversible error of law to do so here.

---

[3] *Arista Recs. LLC v. Lime Grp. LLC* considered whether a CEO could be held liable for LimeWire's secondary (not direct) infringement. 784 F. Supp. 398, 438 (S.D.N.Y. 2011). And in *Luft v. Crown Publishers, Inc*, the court considered whether to hold a corporate officer jointly and severally liable on a secondary vicarious liability claim. 772 F. Supp. 1378, 1380 (S.D.N.Y. 1991).

## II.    The District Court Committed Reversible Errors With Respect to Defendants' § 115 Licenses

Plaintiffs claim that §115 licenses must be narrowly construed, and yet they cite no case where such licenses were invalidated after many years, instead citing several cases with technologies that did not fit within the purpose of compulsory licensing. PB24.

### A.    Subsection 115(a)(1) Does Not Apply Here Because Defendants Own the Sound Recordings that Their Predecessors Lawfully Fixed

Defendants are not taking the position that Section 115 does not apply at all. Instead, Defendants' position is that a certain subsection of §115(a)(1), §115(a)(1)(B), does not apply because Defendants are not "duplicating" any sound recordings "fixed by another."   Defendants are duplicating only their own sound recordings fixed by their predecessors, to which they now indisputably own the sound-recording copyrights. *See* SA1208; DB45. Because § 115(a)(1)(B) is inapplicable, no inquiry into whether the Defendants' recordings were "fixed lawfully" is required.   To ignore the fact that Defendants have now stepped into the shoes of their predecessor would undermine all transfers or transactions in which the rights have been lawfully acquired, including Plaintiffs' own rights, as they too did not own all the rights claimed in this lawsuit at the time the recordings were created. *See* Dkt. 282 at 7-10.

Plaintiffs argue that Defendants have somehow "waived" this argument, even

9

though it was raised in the pleadings below and at the summary judgment hearing. Dkt. 269 at 4 ("The substantive requirements of subsection 115(a)(1) have no application here… even if such requirements still applied, the sound recordings were not fixed by 'another.'"); Appx580 (Summary Judgment Hr'g.: "So I just want to point out that the evidence that we have in the record, and it is not in dispute, is that all of these recordings were made by the predecessors in interest of our client. These were concert promoters or people in their employ. These were not fixed by another."). Plaintiffs' argument regarding the applicability of this subsection is thus properly before this Court.

Plaintiffs seek to conflate Defendants' argument that Subsection 115(a)(1)(B) does not apply with Defendants' arguments regarding the burden of proof and what available evidence is needed to decide how "fixed lawfully" can be practically established, especially in the context of historic recordings where neither party was present when they were originally fixed.  But those are separate arguments.  In short, Defendants argued that "fixed lawfully" does not apply *and* that, even if it does, there are still factual disputes inherent in that inquiry. Dkt. 258 at 2 ("[E]ven if those requirements did apply," the court "overlooked triable issues of fact about whether the recordings were 'lawfully fixed").  There is nothing contradictory about raising alternative arguments to cover all appropriate bases.

Plaintiffs also cite to a separate brief in an appeal pending before the Ninth

Circuit. PB38 (citing *Kihn v. Bill Graham Archives LLC*, No. 20-17397 (9th Cir. Apr. 19, 2021), Dkt. Entry 12 at 38). The context of the statement in *Kihn*, a case seeking to piggy-back the District Court's decision here into an unmanageable class action, was to show how individualized the inquiry would be—where the merits are not being decided, and the issue is whether questions could be answered on a *classwide* basis. Plaintiffs have merely cherry-picked a phrase from certification briefing (PB 43), specific to anti-bootlegging claims under 17 U.S.C. § 1101. *Id.* These procedural considerations have no bearing on the industry customs at issue in *this* case.

In sum, the "fixed lawfully" language should not apply because Defendants stand in the shoes of their predecessor. If this section is found applicable even though Defendants' predecessors fixed lawfully the recordings, there were at the very least fact questions about whether they were fixed lawfully.

Plaintiffs also attempt to impose a requirement that the performer consent to the recording, citing "anti-bootlegging" statutes "and analogous state law," though none of those claims are actually at issue here. BP32. In fact, Plaintiffs resisted basic discovery into artist consent, namely depositions of the artists, by insisting that the artist's consent was irrelevant given the rights at issue in this case are the *publishers'* rights to the compositions as opposed to any matter regarding the creation of the

11

recordings.[4]  SA95-97; 169-170. In fact, the District Court declined to allow Defendants the right to depose the artists—ironically finding that the positions and recollections of the artists themselves were not relevant because their consent was not sufficiently relevant to the issues in the case. Appx238-239, 245; Dkt. 311; Appx237-37 (Pitman, J. at Discovery Hr'g "If they transferred the rights before the date of the concert, what they said at the concert's probably immaterial, if they said anything.").

Moreover, the Magistrate Judge, understandably, doubted that any memory would be fresh.  DB50, citing Appx237-9 -10 (Pitman, J.: "It seems to me highly unlikely that the individuals…are gonna have a recollection of who said what to whom at the time of the performance.") And in fact, the few artists who were compelled to respond to written questions conceded that they did not remember. Appx480-535; Appx480-535 (Keith Richards at Appx490: "I have no recollection of ever objecting to, consenting to, or taking any other position regarding any recordings, being made by promoters or recording engineers …") (Michael Stipe at Appx505: "The passage of time and adrenaline of performing have affected my memory or recollection of discussions that took place at concerts or live performances during that period.").  It was only later at the summary judgment stage

---

[4] This makes Plaintiffs' argument that artists and their record labels are not in a fiduciary relationship especially curious given that Plaintiffs are participating in a lawsuit where they claim they represent the interests of the artists. PB33.

that Plaintiffs and the District Court suddenly decided that artist consent went to the heart of this case, after Defendants had been denied this discovery.

In any event, Defendants did indeed provide evidence that the recordings were made with the consent of the performers, including the recordings themselves, numerous written consent agreements, and the agreements with the three major record labels that acknowledge Defendant Bill Graham Archives LLC d/b/a/ Wolfgang's Vault. *See* Appx294-1-296-13; Appx427 (joint exploitation agreements); Appx662-2 – Appx665-6 (exploitation agreements with various artists); Appx1673-1675 (sample video recordings). Plaintiffs attempt to discredit the legal import of the agreements with major record labels does not resolve any issue, but simply highlights yet another factual dispute. And Plaintiffs' suggestion that they are capable of acting on behalf of artists, while record labels who enter exclusive recording agreement with their artists are not, is convenient to say the least.

Plaintiffs make reference to appraisal reports, marketing documents, testimony and interrogatory responses as evidence supporting their position, but there are not any remotely conclusive statements into these matters contained in any of those sources. For instance, the interrogatory responses simply present a few artists disclaiming the ability to recall any consent, while also admitting they do not know if their bandmembers consented. Appx480-535. The appraisal and marketing documents for the Bill Graham collection (not King Biscuit) were likewise not

13

created by artists, but simply those seeking to sell the materials, and made no mention about the recordings being secretly made. *See* SA1358-1388; SA1434-1461. And the recordings themselves suggest that they were professional, consented-to recordings. Appx1829; Appx1823:1-4; *and see* Appx1673-1675 (video recordings cited to in Complaint: Appx132, Appx155, Appx201).

In sum, there were at least factual issues that should have gone to the jury about the viability of Defendants' Section 115 licenses. Plaintiffs cite no support for their statement that "Sagan's vendors…specifically disclaimed the right to use intellectual property." (PB32-33). In fact, the agreements expressly transfer the intellectual property rights (SA1880), which Defendants testified were critical to their decision to obtain the collections they did. Appx1800.

## B. The Burden Should Fall on Plaintiffs to Disprove Facts About the Original Lawful Creation of the Recordings That Were Made Decades Ago

There is no evidence showing that a single one of these recordings are "bootlegs" nor that someone surreptitiously recorded these concerts without consent. But there is ample evidence from the recordings themselves, as well as the knowledge and understanding passed down through the transactions from Defendants' predecessors, that the recordings were consented to by the performers. *See* DB51-55. The recordings were originally created with the creative contributions of the producers and sound engineers. *See* Appx653-10 – 17; Appx654-2 – 13;

Appx657-660; DB 54-55.

There is history of many of the recordings having been licensed previously, including many recordings on MTV and other music history specials, including an audiovisual recording of the infamous Tanglewood concert put on and recorded by Bill Graham, the legendary concert promoter and manager—to which Defendant Bill Graham Archives LLC a/k/a Wolfgang's Vault ("WV") owns the original sound recording copyrights. Appx1737-1739,1659-1661; SA1366,1375 (appraisal discussing exploitation by predecessors, including for audiovisual recording of Tanglewood). Moreover, contrary to Plaintiffs unsupported suggestion that these recordings had never been licensed by Defendants' predecessors before Defendants acquired them, there is evidence in the summary judgment record showing artists, including the Who, licensed the footage from Defendants' predecessors. SA1432 (discussing the Who licensing from Defendants' predecessors of a series of audiovisual recordings of their concerts); SA1366. And witnesses testified at trial such recordings had been previously exploited. *See* Appx1737-1739.

To the extent that lawful fixation is event relevant, the dispute about whether the recordings were "fixed lawfully" cannot be resolved as a matter of law in this case. None of the parties were present at the time the recordings were made, and many of the Plaintiffs owned no rights at the time. But the District Court placed the burden solely on Defendants to go back decades to prove with first-hand accounts

15

and contemporaneous written agreements (though neither written nor contemporaneous agreements are necessary) that each recording was created lawfully. It did so even though Plaintiffs have not presented a shred of admissible evidence to call into question the lawfulness of the recordings purchased and the rights inherited by WV's predecessor.

The District Court's approach would encourage any aggrieved party to attempt to cancel and undermine businesses' rights not because they have actual admissible information or facts that call into question the legality of the original recordings, but because it is in their business or personal interest to suppress the works (or product), and they know it would be incredibly difficult to prove consent decades later.

These recordings were not made in the digital age. There are not perfect computerized records with all the recording agreements retained from decades ago. While it is widely known that there were performer agreements with the recording studio, distributor, promoter or venue owner, Defendants did not obtain complete records in this regard. For instance, Defendants have hundreds of the original King Biscuit contracts (Appx1587-1590; *and see Kihn v. Bill Graham Archives LLC*, No. 4:17-cv-05343 (N.D. Cal. Dec. 19, 2019), Dkt. Entry 166), and in a subsequent acquisition from Dave Hewitt, the King Biscuit sound engineer, the seller expressly represented that it obtained consent for all the recordings. FSAppx8-55 (Stipulating,

16

"Any and all performers whose performance is captured in the Recordings were fully aware of, **and approved of and consented to**, the making of the Recordings…") (emphasis added). Further, Defendants have been informed that some original recording agreements for recordings they obtained were destroyed, including in a well-publicized fire.[5]  SA426 ("The office was firebombed. There was a fire and a lot of stuff was destroyed.").

Defendants provided written agreements with artists in connection with summary judgment, but the District Court amazingly excluded them because they were not entered simultaneously with the production of the recording ––a requirement the statute does not impose.  SAppx30-31; 17 U.S.C. § 1101(a); Appx662-2 – Appx665-6 (written agreements discussed at DB58).  While written contemporaneous evidence was not required, Defendants did produce written evidence of consent, though the District Court actually *excluded* agreements as "hearsay" on summary judgment when these rights were transferred. SAppx30-31.

In addition, it is not disputed that there are thousands of written exclusive recording agreements with record labels wherein the record label controls any music that the performer records during the contract period. WV has agreements with the three major record labels, each of which acknowledges the WV's ownership and ability to exploit these properly fixed recordings. *See* DB10; Appx294-1-296-13;

---

[5] *See e.g.*, LA TIMES, "Bill Graham's Rock Music Lore Destroyed in Fire" (May 8, 1985), https://www.latimes.com/archives/la-xpm-1985-05-08-mn-6432-story.html.

Appx427.

Under the District Court's reasoning, it would be impossible to transfer rights to historical recordings held by the current owner. Indeed, many relevant witnesses would inevitably be unavailable because decades later they are dead, out of jurisdiction, or incapacitated. And those available would not recall every detail from a concert from decades ago. Or, the artists could also be working with Plaintiffs and thus be motivated to undermine any previously conveyed rights. Defendants were not permitted to question the artists in this case, let alone test their credibility.

A party seeking to invalidate a compulsory § 115 license, especially when the recordings at issue were made decades before either side obtained its rights, should bear the burden of providing some threshold evidence suggesting that the recordings were not made lawfully. There is no evidence in the record whatsoever to support that the recordings were "bootlegs" and therefore not "fixed lawfully" in the first place. *See e.g.,* DB52 (Peer Music's witness testified at Appx1075: "I do not know the circumstances those records were made under."); (R&H's witness testified at 1184: "Bootleg is not a word that I could say specifically. The Julie Andrews one was clearly very well shot…"); (Warner Chappell's witness testified that he did not know the circumstances surrounding the creation of the videos at issue). Appx1372:4-7; see also Appx1411:8-16 (Spirit Music witness's lack of knowledge about the Tanglewood concert recordings at issue). Attorney speculation, which is

18

rampant throughout Plaintiffs' brief as it was throughout the case and at trial, is insufficient.

The cases Plaintiffs cite to support placing the burden on Defendants are distinguishable. Those cases stand for the unremarkable proposition that a party seeking to establish a license must come forward with evidence of a license. *E.g.*, *FameFlynet, Inc. v. Shoshonna Collection, LLC,* 282 F.Supp.3d 618, 625 (S.D.N.Y. 2017). But Defendants *have* come forward with evidence of licenses—indeed, with undisputed evidence of over a decade of payments of their licensing fees to Plaintiffs. *See* SA1215.

It is a far cry from requiring evidence of a license to, as the District Court did, shift the burden to Defendants to establish, as a condition to the validity of the licenses that Defendants obtained, an additional requirement to prove consent obtained decades ago. This simply is not the same as providing evidence of license, which Defendants have indisputably done, and in any event, Defendants have provided at least evidence to create disputed issues of consent.

Defendants have raised a similar argument in the pending *Kihn* case*,* where the court lifted the District Court's analysis on the burden issue, but for which the Ninth Circuit has since granted an interlocutory appeal, which is currently pending. *Kihn v. Bill Graham Archives LLC*, No. 20-17397 (9th Cir., Dec. 9, 2021), Dkt. Entry 1. There, the district concluded that putting the burden on Plaintiffs would

require proving a negative. But that reasoning is entirely backwards—the premise of Plaintiffs' case is that the recordings at issue were supposedly made without the proper consent. If they have no evidence to support that notion, their lawsuit should suffer the same fate as a 12(b)(6) motion where the claims are dismissed for being based on pure speculation. A lawsuit must have more, and Plaintiffs' repeated and extensive allegations throughout the complaint and repeated in their brief should not be a presumed true—if Plaintiffs are going to seek to invalidate Defendants' historic collections, Plaintiffs should have to come forward with more than speculation.

The burden should be on the Plaintiffs to demonstrate the novel basis upon which they seek to invalidate the licenses, especially where Defendants have provided ample evidence that there is at least a factual question as to whether there was consent at the time of the recording. While Plaintiffs claim they "had no reason to know" that the recordings existed until Defendants expanded their websites, there was licensing by the Who of the Tanglewood recordings long before that, a highly publicized litigation and settlement in 2007, and Plaintiffs' sister record labels litigated and settled claims with Defendants about these recordings. Indeed, Plaintiffs began receiving payments as early as 2006. Thus, there are at least factual questions on this issue.

Plaintiffs' citation to *In re WRT Energy Sec. Litig.,* a case dealing with a discovery sanctions motion, has no bearing here. In that case the court was

discussing a party that destroyed evidence subject to a court preservation order. Here, there is no allegation that Defendants destroyed any evidence regarding these issues. 246 F.R.D. 185, 196 (S.D.N.Y. 2007). To the contrary, Plaintiffs have provided evidence to support their compliance with Section 115 licenses which should at least be sufficient to present a fact issue for the jury.

## C.  Authorization/Consent Presents At Least a Fact Question

Because neither side of this case is a party who originally created the works, the evidence surrounding the historical works at issue is stale. But as discussed above, Plaintiffs managed to interfere with Defendants' ability to investigate artist consent, first objecting to such discovery as irrelevant, and then opposing calling, and successfully defeating an effort by Defendants to call such witnesses at trial. Dkt. 311 (motion *in limine*). Despite Defendants' efforts to seek depositions of the artists, the District Court agreed with Plaintiffs that the artists' positions or recollections were not important enough to require them to testify. Appx238-239; *see also* Appx759.

Yet by the time it granted summary judgment, the District Court changed course, concluding that Defendants' inability to present contemporaneous evidence of consent (the same evidence that Defendants were blocked from seeking earlier) defeated Defendants' Section 115(a)(1) licenses. Neither side was in a position to present full contemporaneous first-hand evidence from the creation of the

recordings, and thus both sides were relying on what they understood (or in Plaintiffs' case wanted to believe) about the recordings. This creates at least a fact question about whether there is sufficient evidence to deem them fixed unlawfully.

And what "fixed lawfully" meant is also disputed. The District Court acknowledged that the "fixed lawfully" question was novel (Appx567), focusing on it as a key issue during the summary judgment hearing. Because no court had ever interpreted this phrase before, the District Court reached conclusions and applied the burden in a manner that led to inequitable and impractical results.

Indeed, in many cases the professional nature of the recordings themselves support consent (Appx1673-1675 (video recordings)), as the artists often interact with the camera. Defendants cite to the testimony of David Hewitt to infer there was artist consent, which stated that the consent was implied and in the course of conduct. Appx653-10–17; Appx657-660. While Plaintiffs may dispute the import of his testimony, at the very least this creates a fact question for the jury.

Moreover, as Sagan testified at trial, he had King Biscuit agreements that confirmed contemporaneous consent to the recording, and relied on representations in that regard from Hewitt, King Biscuit's legendary sound engineer who was present at the shows. Appx1587-1590. Plaintiffs' rank speculation that "a high quality bootleg can be even more damaging than a low-quality," while perhaps a damages theory that Plaintiffs failed to articulate at trial, does not foreclose that this

issue has at least factual disputes.

The audiovisual recordings themselves—the allegedly infringing works at the center of the case—are plainly professionally recorded and reflect that the artists knew they were being recorded. Appx1829 ("at that high a quality it can't be a bootleg"). Several were recorded with giant video equipment in the performers' plain sight—indicating they had obviously consented to the original recording. Appx1823:1-4 ("I mean, this was a venue that had the cameras right in front of the performers, and all of the performers spoke about the recordings as they were being recorded."). Amazingly, however, Plaintiffs suggest that the recordings are irrelevant to consent. PB35. This is the epitome of legal fiction; these recordings are the centerpiece of this litigation, and an attempt to cabin them from the Court's review is preposterous. The recordings themselves contribute to the disputed fact issues for the jury about the circumstances and consent that was given when these professional recordings were made.[6]

There were representations in each acquisition agreement by those who produced the recordings confirming that the recordings were authorized and that the rights were transferred to WV. *See e.g.,* SA1329; SA1518; FSAppx8-55; Appx1825-1826 (Hewitt acquisition). Defendants testified about discussions he had as part of

---

[6] Plaintiffs' speculation that even if the artists saw the video cameras, they still may not have consented (PB35-36) again only shows that the artists themselves would be the best source to ask these questions, and yet Defendants were not permitted to do so. Appx238-239.

diligence in connection with purchasing the recordings. *See* Appx1597:15-21; Appx1599:10-13; Appx1572.

Plaintiffs' witnesses, on the other hand, confirmed at trial that they had no clue about the circumstances of the original recordings, but were relying on pure speculation in claiming they were unauthorized or bootlegs. Peer Music's witness testified, "I do not know the circumstances those records were made under." Appx1075:3-5. Similarly, Warner Chappell's witness testified that he did not know the circumstances surrounding the creation of the videos at issue. Appx1372:4-7; *see also* Appx1411:8-16 (Spirit Music witness's lack of knowledge about the Tanglewood concert recordings at issue).

Even more fact issues regarding licenses exist with respect to the evidence that many of the recordings had been licensed by the artists to WV and its predecessors. Appx537-6 – 7; Appx655. Indeed, while the District Court suggested in a footnote that such exploitation was limited to what Bill Graham's companies did, that was not the case with, for instance, the Tanglewood Concert—which implicates twenty works at issue—and there was language acknowledging that WV's predecessor took the position that it owned the recording, and exploited it through licensing the audiovisual aspects of the recording, including from the Who itself. SA1432; SA1366; Appx655-1-39. Witnesses could not explain why those rights would have been treated any different than the other recordings. Appx458-

461. Documents and testimony by Michael Krassner also reflect the companies' rights in the Tanglewood concert audiovisual recordings. Appx655-18 – 39; Appx460-461.

Plaintiffs' speculation, without presenting a single artist's testimony, that artists could have simply thought they were being recorded only for a simultaneous rebroadcast is unresolvable without questioning the artists and testing their memories and motives. Even if the artists were testifying, these are classic fact issues that should have gone to the jury.

The District Court has essentially built in a presumption that the recordings were not "fixed lawfully" unless Defendants presented on summary judgment first hand, non-hearsay evidence recreating the original arrangements. What's worse, the District Court made it all but impossible to meet this burden when it denied depositions and testimony from the artists that would have been there. *See* Appx238-239. And if such testimony had been allowed, most of these witnesses are nonetheless unavailable—either dead or outside the jurisdiction—and likely do not remember many details about certain concerts from decades ago in any event.

Plaintiffs claim—without any evidentiary support—that Bill Graham taped musical performers "unbeknownst to the performers." PB5. But the one witness that

25

has been called to testify into these matters, Carlos Santana,[7] testified in a prior lawsuit, that he consented to the recordings. *See, ABKCO Music, Inc. et al v. Sagan et al.*, No. 1:15-cv-04025-ER (S.D.N.Y.), Dkt. 56 at 10.

Defendants have for decades relied on their understanding based on the recordings, the hundreds of agreements that are still available, licenses, discussions with witnesses, predecessors, and new agreements. *See* Appx1687-1688; 1691 (When asked at trial, "What comfort, if any, did you draw from the fact that – from this provision that these recordings were not bootleg?" Sagan answered: "Complete comfort."). While the District Court dismissed this evidence as inadmissible (SAppx30, Appx734), Plaintiffs should have been required to at least meet some evidentiary threshold before they could invalidate many years of licenses and licensing payments on nothing more than speculation.

Plaintiffs misconstrue Defendants' position regarding the import of the original creation. Specifically, the interest in the recordings of Defendants' predecessors—producers of these recordings, including Hewitt—was not a "license" that must be in writing. Rather, it was the exclusive, original rights to the recordings that were owned by Defendants' predecessors, and the related intellectual property that has been transferred in writing with the acquisitions.

Plaintiffs dispute this by claiming that Defendants' predecessors did not

---

[7] Bill Graham discovered and managed Santana, securing him spots at his concerts before he had an album, including Woodstock.

actually create a co-copyright interest as a joint copyright owner because to do so, Defendants' predecessor must have "engaged in artistically supervising and editing the production." Defendants' position is that its predecessors did so.  At the very least, this would once again only create triable issues of fact. Plaintiffs are not the arbiter of what "sufficient artistic expression" would be to create an original copyright interest. PB39. That issue should go to the jury.

To the extent Plaintiffs complain about the timeliness of NOIs, this once again demonstrated factual disputes that should not have been resolved against Defendants as a matter of law. As a preliminary matter, the NOIs were only obtained as belt and suspender payment licenses after WV began to experience administrative issues with its HFA licenses. *See* Appx613-619; Appx421; FSAppx4-6. In other words, there were already negotiated agreements in place, but when WV could no longer count on HFA to timely make those payments, it took out separate back up compulsory agreements through NOIs to ensure all payments owed were made.  *Id.* Thus, any payments made prior to the NOIs going into effect could be counted under the HFA licenses, they just simply were untimely payments because HFA dropped the ball in administering such licenses. Appx617 ("[B]ut there are issues going on in Harry Fox at that moment in time"). There were at the very least factual disputes to support this that the jury should have been able to consider.

Moreover, even if the HFA licenses were disregarded, as part of summary

27

judgment briefing, Lundberg submitted a supplemental declaration explaining that a document he had produced that he stated in his deposition that the first date the work was offered to the public (which is the dates Plaintiffs used to calculate alleged untimeliness), actually only captured the first date of an internal test stream, which created at the very least a factual issue as to timeliness and whether Defendants' NOIs were substantially compliant. FSAppx1-7.

This NOI issue, and the import of Lundberg's supplemental testimony, were both hotly contested during oral argument on summary judgment. *See* Appx615-620, 631-632 (Plaintiff's counsel: "Now he is changing his story."), 638-640 (Defendant's counsel: "This is consistent with what Mr. Lundberg is testifying to.") Ultimately, the court denied Defendants' request to file Lundberg's supplemental declaration, concluding that Mr. Lundberg had contradicted himself, when his testimony reflected was an attempt to correct mistaken testimony. SAppx37; Dkt. 258 at 2.

Thus, the timeliness of Defendants' NOI's not only implicate factual issues, but also issues of witness credibility, which the District Court erred in deciding itself. After all, "the credibility of witnesses and the weight to be given to their testimony are for the jury." *Gunning v. Cooley*, 281 U.S. 90, 97 (1930).

There were ample factual disputes that should have rendered the question of consent or authorization, in the "fixed lawfully" analysis or otherwise, for the jury.

**D.    The District Court Erred In Its Interpreting "Phonorecords" To Exclude WV's Original Live Music Recordings**

The District Court erred as a matter of law in determining that Defendants original audiovisual recordings were not "phonorecords," and thus invalidating all Section 115 licenses for audiovisual recordings. SAppx27-28.  Phonorecords include objects *such as studio equipment.  See* Dkt. 258 at 16; DB61.  Recording studios do not hold a monopoly on the ability to fix an original sound recording conveying some artistic contribution—a sound machine, a multi-level recording device, at a live concert at the Bill Graham shows or in the studio at a King Biscuit[8] recording qualifies too, as there is nothing based in fact or law that would render these recording devices inferior to a record label's studio.

These recordings produced original sound recordings, for which Defendants are now the registered owners with the United States Copyright Office. Appx283. Congressional intent in regulating sections excluding certain works from the compulsory license regime was intended to cover video which synced a separate, unrelated composition, referring expressly to "motion pictures" as an example.  The audiovisual recordings at issue in this case, on the other hand, conveyed original ownership to the producer and sound engineer for their contributions, and resulted in recordings that should be squarely protected by Section 115 notwithstanding the

---

[8]The King Biscuit archive, which composes the largest percentage of the works, was broadcast to millions of listeners over hundreds of radio stations in the 70s, 80s and 90s, and the bands were compensated for these live performance recordings.

live video elements inherent in the original recording. (It is no coincidence, then, that Plaintiffs' witnesses at trial focused on the licensing market for separately-synced media like television and film, as opposed to concert footage. *See, e.g.*, Appx1365-1366; 1429).

Plaintiffs rely on inapplicable authority to support their argument that Defendants' recordings are not phonorecords as a matter of law. For instance, Plaintiffs cite *ABKCO Music, Inc. v. Stellar Records, Inc.,* 96 F.3d 60, 65 (2d. Cir. 1996) where songs had been linked to certain karaoke videos—thus they were not inherently linked since inception like they are in WV's recordings here.

Plaintiffs' additional authority suffers similar infirmities, in that it represents situations where synchronization is appropriate because they involve movies, not live concert recordings. *See Fred Ahlert Music Corp. v. Warner/Chappell,* 155 F.3d 17, 19 n.1 (2d Cir. 1998) (dealing with sound tracks and motion pictures); *Leadsinger, Inc. v. BMG Music Publ.,* 429 F. Supp. 2d 1190, 1194-95 (C.D. Cal 2005) (seeking to extend licensing to display lyrics as opposed to phonorecords). Plaintiffs' reliance on the Copyright Office statement that a "motion picture" or "other audiovisual work" would not be a phonorecord where sounds "accompany" such separate works is misplaced here because the sound recordings do not accompany other visual elements—the sound recordings are the visual elements.

Plaintiffs cite no cases to support their strained interpretation that phonorecords are excluded unless they "include only sounds," as that makes no sense where the visual component of the recordings were created simultaneously and inseparably with the audio component. Defendants' phonorecord recordings are not a series of related images that sounds were then added on to "accompany" those images. Instead, the phonorecords contained the images, which are inherently linked to the recordings, from the outset.[9]

## III. There Are Fact Questions Regarding Defendants' Equitable Defenses

Plaintiffs claim that implied licenses apply only to "narrow" circumstances and estoppel is used "sparingly." But regardless of how common these defenses may be successful, defenses of estoppel and implied licenses often, like they do here, raise fact questions that belong to a jury. *Psihoyos v. Pearson Educ., Inc.*, 855 F. Supp. 2d 103, 129 (S.D.N.Y. 2012) (denying summary judgment on implied license defense where "insufficient evidence in the record for the District Court to resolve this question as a matter of law"); *Pavlica v. Behr*, 397 F. Supp. 2d 519, 527 (S.D.N.Y. 2005) (defenses of implied license and estoppel were questions of fact for

---

[9] Contrary to Plaintiffs' argument that a "live sporting event" is "analogous" based on a stray reference to H.R. No. 94-1476 at 52 (PB28), that is not the case as the purpose of the images being captured at a live sporting event is the game being played, where the purpose of the live concert event is the creation of the music being played. The sporting event is precisely the extraneous series of images otherwise unrelated to the sound recording, whereas here there is no way to extract the images of performing the sound recording from the sound recording.

the jury). Beyond briefly describing these cases in a lengthy footnote (PB52n.20), Plaintiffs do not bother to distinguish these cases or explain why implied license and estoppel defenses involved fact questions in those cases but not here.[10]

Plaintiffs' narrow reading of when implied licenses could apply would eviscerate any new music from being recorded to the extent that it incorporated a composition for which the compulsory licensing scheme has already set what the proper compensation should be. And having accepted those payments for many years, Plaintiffs cannot now take the position that, as a matter of law, there was no "meeting of the minds."

In fact, Plaintiffs testified they simply never bothered analyzing the payments at all, which a jury could certainly infer meant that Plaintiffs were not objecting to the arrangement. When asked, "have you ever seen any of the statements regarding the payments that our clients have made to Peer?" Mary Peer of Plaintiff Peer Music conceded: "I have not, no." Appx1060. And when asked, "So you are not sure how much the payments our clients have paid to Peer for the songs at issue are, is that correct?" Ms. Peer again conceded she was not. *Id.*; *see also* Appx1213-1214 Concord); Appx1357-1358 (Warner). This history of many years of payments

_____

[10] Plaintiffs do not respond to Defendants' authority, *Encyclopedia Brown Prods. v. Home Box Office, Inc.*, No. 91 CIV. 4092 (PKL), 1998 WL 734355, at *14 (S.D.N.Y. Oct. 15, 1998), that holds that central to a claim of estoppel is whether consent was given, "whether express or implied from long acquiescence with knowledge of the infringement."

should have created at least a factual issue on implied license and estoppel.  WV continued to invest in additional acquisitions and operating under the assumption that its licensing hurdles had been cleared.

Indeed, even Plaintiffs must admit, in their argument against implied license proceeding to the jury, that Defendants' "payments signaled, at most, that he was operating as though he had a valid compulsory licenses." PB52-53. Precisely.  And if Defendants were proceeding that way *in reliance* on Plaintiffs' acceptance of such payments and the peace of no complaints or litigation until many years down the road, then a jury could infer estoppel or implied license.

Plaintiffs also argue that Defendants were "far from 'ignorant of the true facts that their "concert recordings did not qualify for compulsory licenses."  PB55. But while that may be Plaintiffs' conclusion, there is no evidence to support that conclusion.  To the contrary, as all Defendants' testimony shows, Defendants believed they were operating within the bounds of copyright law.  Because Defendants relied on the conduct or created implied licenses for the uses at issue, Defendants should have had the opportunity to present these defenses to the jury.

## IV.  Plaintiffs Have Not Identified Any Reversible Evidentiary Errors by The District Court During the Damages Trial

Plaintiffs have cobbled together several baseless grounds upon which they appeal the District Court's evidentiary findings at the damages trial.  None of these rulings are subject to reversal because they were all well within the District Court's

discretion in rendering evidentiary rulings at trial. Indeed, the District Court was plainly justified in its findings.

### A. The District Court Properly Allowed In Defendants' Extensive Payment History

With respect to Plaintiffs' motion *in limine* seeking to exclude undisputed evidence of Defendants' payments to Plaintiffs, the District Court found them relevant to a multitude of factors relevant to the damages inquiry, including the "conduct and attitude of the parties," and the "willfulness" or state of mind of Defendants. Appx756-757. The District Court further held that any "prejudice" to Plaintiffs could be "mitigated with a limiting instruction to the jury" which the District Court provided multiple times. Appx757; SA771.

Plaintiffs also argued that the payment records—which Plaintiffs themselves produced—could be misleading because they noted additional payments by Defendants to Plaintiffs for other works that Plaintiffs decided not to sue about. Appx760-761 (Discovery Hr'g). Defendants' counsel explained to the District Court that because the monthly statements included payments for all such works, so it would be nearly impossible to redact out payments for works that Plaintiffs did not

include in this case.[11]  Appx762-764; Appx298-311; Appx313-315; SA945-62.  In response, as set forth below, the District Court asked Plaintiffs' counsel whether it would want to take on the task of attempting to redact out certain payments from the business records, which Plaintiffs' counsel expressly *declined to do,* seemingly consenting that a limiting instruction would be "fine:"

> THE COURT: …. this could be handled…with a limiting instruction to the jury. If the complaint is one of the pragmatic effort that it's going to take in order to do this… [Plaintiffs' counsel], are you willing to take on that task?
>
> PLAINTIFF'S COUNSEL: Not myself, your Honor… But… **if your Honor is willing to grant a limiting instruction as to what in here is relevant, just the works in suit, then we are fine with that.**
>
> THE COURT: Okay. So that's fine.
>
> Appx765-766 (Discovery Hr'g) (emphasis added).

Having declined to redact the statement, and instead agreeing before the District Court that it would be "fine" with a limiting instruction, Plaintiffs now

---

[11] It is curious that Plaintiffs declined to sue on certain recordings, and yet go on to make exaggerated smear statements without any support like "[e]verything about" Defendants' "business was based in fraud and deceit."  PB1. Plaintiffs also claim that Defendants' "lied to the Copyright Office." PB8. Not so. Plaintiffs misconstrue a handful of Defendants' correspondences with the Copyright Office, e.g. regarding whether two irrelevant concert recordings were made with the "authority" of the performers. SA2096; SA2103. In fact, Defendants make clear in their correspondence that the recordings were "created by employees of the author and had written authority form the artists to record the performance," referring to Defendants' predecessors. *Id.*

appeal that issue anyways claiming the District Court abused its discretion by letting in Plaintiffs' highly relevant payment records.

As a preliminary matter, Plaintiffs waived their right to complain by expressly declining the Court's offer to attempt to make their desired redactions. Plaintiffs agreed to the District Court that Plaintiffs were "fine" with the District Court's ruling if the District Court provided the jury with a limiting instruction, which it did. App765-766; SA771. Having done so, they should not now be heard to complain.[12]

### B. Defendants' Agreements with Major Record Labels Acknowledging Defendants' Copyright Interests In Recordings Were Properly Admitted

Plaintiffs also claim it was an abuse of discretion to allow into evidence—with a specific limiting instruction that Plaintiffs proposed—the joint exploitation agreements Defendants entered over a decade ago with major record labels, including EMI, Warner and UMG. It is understandable why Plaintiffs would not want the jury to see these agreements—they acknowledged that Defendants were the owners of the copyrights to the sound recordings, and that the recordings were

---

[12] In any event, there is no reason to believe that providing such redacted statement would have made any difference. Indeed, Plaintiffs complain that the jury "did not even wait for the boxes" of payment evidence. PB61. Given that the jury exercised its right to not review the payment records—it was under no obligation to *re*-review evidence presented during trial before rendering a verdict—it is plain that the jury was not misled. And where the jury was not misled, there can be no prejudice.

authorized and contemplated Defendants' ongoing use of the recordings for streaming and downloads.[13] Appx294-1-296-13 (agreements); Appx427.

The District Court ruled that it would allow in the Sony and Warner agreements "with an appropriate instruction that these are not being offered for the truth of the matter asserted and should only be considered with respect to works in audio only format." Appx758 (Discovery Hr'g). The District Court agreed to Plaintiffs' request, providing Plaintiffs' requested "limiting instruction" about what consideration the agreements could be given, in particular for the audio only recordings.[14] Appx757-758.

The District Court was well within its discretion to allow these agreements in, especially with the specific limiting instruction requested by Plaintiffs, which was more than sufficient to alleviate Plaintiffs' concerns.

## C. The District Court Was Within Its Discretion in Precluding A Website Statement Made by A Third Party That Defendants Had Not Seen or Relied On

Plaintiffs also complain that the District Court abused its discretion by excluding an unverified hearsay statement on a third party's website. Specially,

---

[13] While these were provided with the understanding that Defendants would secure the mechanical licenses with respect to the compositions through the compulsory royalty scheme—Defendants indeed did that. *See* DB19-20; Appx426.

[14] At trial, the District Court added a limiting instruction that these agreements could only be considered for state of mind. Appx1756-1757. In fact, as explained in the body, these agreement provided evidence that the recordings were "fixed lawfully," because they show major players in the music industry acknowledging, on behalf of their artists, that the recordings are authorized.

Plaintiffs appear to suggest that they were prejudiced because they were not able to impute to Defendants a statement made by a third-party payment administrator, MediaNet, which Defendants had never seen, about a disputed legal issue. Plaintiffs' complaints in this regard are meritless.

As a preliminary matter, the statement had foundational defects. Plaintiffs presented the documents to Defendants at trial to confirm the foundation or context for this statement, but Defendants' witnesses testified that they had never seen the statement.

Regardless, the statement purported to resolve a legal question of when synchronization licenses were required, an issue for which Defendants had never used MediaNet. Appx291-293; Appx1813 (Sagan testifying); SA663 (Lundberg testifying). Indeed, synchronization licenses which would actually require negotiated agreements, implicate a far different scope than the licensing arrangement under which MediaNet collects payments in amounts set by statute from Defendants and administers them to whoever MediaNet believes is the proper recipient for payment. Defendants have never employed or sought advice or services from Medianet involving any individually negotiated agreements at all, let alone synchronization licenses. *Id.*

While MediaNet served as a licensing intermediary for a certain compulsory licenses, in those transactions MediaNet represented both Defendants and Plaintiffs'

payees equally, serving a purely administrative function of calculating the amounts Defendants owed, and making the payments to the designated owners or administrators of the compositions. Appx1821; SA664; SA2075. In other words, there was no "agency" relationship such that Defendants could have MediaNet's statements imputed to them, especially when, like here, the statement at issue was regarding negotiated (not compulsory) synchronization licenses that Defendants never contracted MediaNet to advise or handle.

Indeed, throughout the entire case and even before the lawsuit was filed, the parties here have disputed whether synchronization licenses were required for the live concert music recordings at issue. *See, e.g.*, Appx127 (Complaint). The District Court expressly declined to reach that question on this novel issue, while, as explained below, the jury heard extensive testimony about the parties' respective positions on synchronization licenses.

Plaintiffs claimed that regardless of what Defendants paid Plaintiffs in royalties calculated by statute for the publishing rights in connection with Defendants allowing users to stream and download their compositions, there was another type of license that was required —"synchronization licenses." Notably, many of the recordings at issue are not audiovisual, but audio only, to which Plaintiffs do not even have an argument that a synchronization license is required.

While synchronization licenses are not explicitly covered by the Copyright Act, the evidence confirmed that they were traditionally required when pairing music with visual images, such as putting a song into a movie or a commercial. Appx1429 (Sony/ATV witness, B. Monaco at trial: "I run the synch department, for the most part, which consists of taking our copyrights and putting them into commercials, into films, television shows, merchandise, video games, and stage productions.") Defendants obtained legal advice that gave Defendants comfort that a synchronization license was not required based on Defendants' uses, because the music was inherently already linked—the song was intertwined with visual images that were contemporaneously captured with the live music concert recordings. SA814-815; Appx1575-1577; Appx1728-1729 (Sagan at trial: "Because we don't need [a synchronization license]. We never synced anything to anything. We don't do advertisements. We don't do television shows."). In other words, the music and images were inherently linked and there was nothing to "synchronize." Appx1729 (Sagan at trial: "If you're actually performing live performance and you're being recorded, that is not syncing. They're being done at the same time.").

Under this backdrop, it is understandable that the District Court declined to allow in the MediaNet website statement. Any website statement by third-party-and-not-present MediaNet, that Defendants had never seen or relied on, had no relevance or basis to be used against Defendants.

40

In any event, the issue as to whether synchronization licenses were required for live concert recordings was a question of first impression. Though it found defects in Defendants' other licenses, the District Court expressly declined to reach this novel question.[15] SAppx28.

Defendants testified at trial that they obtained separate legal advice about whether they needed synchronization licenses for the live music recordings at issue here, given that the original sound recording was inherently linked and thus there was no "synching" to be done. Appx1728-1729 (Sagan testifying at trial: "If you're actually performing live performance and you're being recorded, that is not syncing… We went through a huge analysis to determine that."); SA1220-1223. There remains a legal dispute over whether a copyright owner of an original recording would need to secure a synchronization license after that original sound recording of a live music performance was created.

The court ultimately ruled that MediaNet was not an agent, or an agent in which a stray website statement could reasonably bind Defendants on the topic of synchronization licenses. SA661 (District Court: "I'm not convinced that it is within the scope of the -- that the statement you are looking to put in is within the scope of the agency."). There is no basis to disturb the District Court's discretionary ruling.

---

[15] Moreover, to the extent the jury heard testimony about synchronization licenses, most works made no income from synchronization, and very few had any impressive synchronization income streams. *See* Appx1264-1275; Appx1366.

**V.    The District Court Properly Denied Plaintiffs' Motion for a New Trial**

  **A.    Factual Background**

   **1.    Plaintiffs Call All Twelve Trial Witnesses**

Plaintiffs called every single witness that testified at trial, including Defendants' two witnesses. None of the Plaintiffs disputed receiving any of Defendants' payments, though none of their witnesses could calculate any damage or even looked into how much they had received in licensing over the years from Defendants. *See,* Appx1009-1010 (ABKCO); Appx1059-1060 (Peer Music); Appx1064.

The witnesses also were unable to ascribe any specific value to their songs, (Appx1364; Appx1367), though the representative from Concord Music testified they obtained their rights through a recent $500-million-dollar purchase of a 200,000-song catalog, where they ascribed $1000 value attributed per song. Appx1208; Appx1225; Appx1230 (Hoskins). Similarly, the Spirit Plaintiff representative testified to its recent purchase of $350 million to purchase over 75,000 works. Appx1406.

The Warner witness was not aware of any synchronization licenses where a song was part of a live concert video that had already been recorded. Appx1365-1366. Sony's witness testified also to several examples where synchronization licenses apply, including movies, advertisements, and commercials. Appx1429.

42

None included a live music performance. He also testified about his exorbitant bonuses and salaries since merging certain aspects of EMI. Appx1466.

Conversely, Defendants' testimony revealed that their business was not profitable. Mr. Sagan was on the stand for four separate days (3/5/20, 3/6/20, 3/9/20 3/10/20), and Defendants' other representative, Mr. Matt Lundberg, was on the stand on three separate days (3/10/20, 3/11/20 & 3/12/20).

Defendants' witnesses explained during their lengthy testimony that they had followed an incredibly complicated copyright procedure in attempting to pay in good faith the statutory amounts owed. Appx1759 (Sagan).

Sagan testified to the lack of profitability in his business so far, which he continued primarily as a labor of love, with hopes his business would be turn a profit one day. Appx1656-1657; Appx1759-1761. He also testified that he had poured his entire fortune into this business, and recently had to sell his home to make ends meet. Appx1762.

### 2.    Juror No. 5

Plaintiffs' make much of the statement made by "Juror Number 5" on the morning of the same day the case ultimately went to the jury for deliberations. On March 12, 2020, Juror Number 5 stated:

> JUROR NUMBER 5: … I would like to know that you are doing your best to expedite this process so we can do our jobs and get this done. I have no intention on being unfair. I have listened to everything that everybody has said on both sides and, you know, I just want the chance

to do my job… I'm not trying to get us shut down. I don't want us delayed. I want you guys to hurry up so we can do our job.... I'm not trying to get a hung jury. I want to do my job. I want to do my duty. So does everyone in this room, and we plan on doing it fairly.

The COURT: It is still our intention to get the case in the jury's hands by no later than later this afternoon…and once it's in your hands, then it's up to the jury to determine how long they think is required for -- to come to a unanimous verdict...

[Juror excused]

THE COURT: I don't think that, based on what he has said, there is any basis for me to relieve him…

[SA797-SA800].

Plaintiffs' counsel did not dispute that or seek to relieve Juror Number 5. If Plaintiffs' counsel believed that Juror Number 5 would not be able to contribute to a fair deliberation, they could have sought to exclude him then. In fact, the Court indicated that it would begin with a jury of eight, but up to two could drop out, and as few as six jurors could still deliberate for a verdict. Appx771. All eight jurors made it through the entire trial. And Juror Number 5 made abundantly clear that he believed the jury could perform their duties fairly, even in extraordinary times. SA797-SA800.

And indeed, they did. There is no guarantee with any jury that external life forces will not occur during the course of the trial, or that jurors will not have more important things on their mind.

44

Before giving the case to the jury, the Court read in the following guidance about deliberations at the conclusion of his instructions:

> Now that the case is in your hands, you can stay as long as you wish. I'm happy to stay with the usual schedule of 9:30 to 2:30, but if you wish to stay longer, I'll leave that entirely up to you…[SA935]

Like the rest of the case, the Court placed no limits and made clear the jury was free to deliberate for as long as it wished.

After the verdict did not come out as the windfall verdict Plaintiffs had hoped for, they filed a motion for a new trial, which was properly denied.

### 3. The Amount Awarded to Plaintiffs Was Fair and Fell Squarely Within the Available Statutory Range

Plaintiffs were provided a statutory range under the Copyright Act, regarding all 197 of the available works, which allows a jury to award anywhere from as low as $200 for innocent infringement, to as high as $150,000 per work for willful infringement. 17 USC § 504. But it also allows the jury to award anywhere in between $750 and $150,000, even if the infringement is deemed "willful," and if not, between $750-$30,000 per work.

The jury awarded $1000 for the 167 works for which the District Court had previously found willful infringement. Appx791; Dkt. 373. For the remaining 30 where "willfulness" remained a fact question, the jury awarded $750 per work. *Id.* The court rejected an "innocence" finding which could have lowered the award to

45

$200 per work. The jury rejected a "willfulness" finding, which would have raised the available ceiling to $150,000 per work. *Id.*

Plaintiffs do not (and could not) claim that the award was not squarely within the permissible parameters of the Copyright Act.

### B.     Legal Standard

A trial court "should not grant a motion for a new trial unless it is convinced that the jury... reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Ali v. Kipp*, 891 F.3d 59, 64 (2d Cir. 2018). As the Second Circuit has cautioned, a court "considering a Rule 59 motion for a new trial must bear in mind, however, that the court should only grant such a motion when the jury's verdict is 'egregious.'" *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133 (2d Cir. 1998).

### C.     The District Court Properly Denied Plaintiffs a New Trial Because They Were Given Sufficient Time to Present Their Case to The Jury

Plaintiffs are seeking a new trial because they are dissatisfied that the jury determined it was appropriate to award near the minimum available under the wide statutory damages range set forth in the Copyright Act, a decision that was entirely within the jury's discretion. Plaintiffs cannot show that the "jury ... reached a seriously erroneous result or that the verdict is a miscarriage of justice."

The District Court provided Plaintiffs the leeway to take an unlimited,

unusually long time for their damages-only trial. In fact, Defendants' research suggest that the trial in this case was the longest damages-only copyright trial *ever*. Other damages trials in copyright cases were far shorter:

• *The GMA Assocs., Inc. v. Olivia Miller, Inc*., No. 03 CIV.4906 (MBM), 2004 WL 1277997, at *1 (S.D.N.Y. June 8, 2004) (one day);

• *The New York Chinese TV Programs, Inc. v. U.E. Enterprises, Inc*., No. 89 CIV.6082RWS (KAR), 1991 WL 113283, at *1 (S.D.N.Y. June 14, 1991), aff'd, 954 F.2d 847 (2d Cir. 1992) (two days);

• *The Tattoo Art, Inc. v. TAT Int'l, LLC*, 794 F. Supp. 2d 634, 638 (E.D. Va. 2011), aff'd, 498 F. App'x 341 (4th Cir. 2012) (two days);

• *Close-Up Int'l, Inc. v. Berov*, No. CIVA 02-CV-2363 DGT, 2007 WL 4380154, at *1 (E.D.N.Y. Dec. 13, 2007) (five days) (encompassing both statutory damages, and damages for the infringement of non-registered works); and

• *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 519 (4th Cir. 2003) (six days).

During the trial, Plaintiffs' attorneys ignored the mitigating circumstances and demanded that the jury throw the book at Defendants, seeking nothing less than the maximum available amount of $30 million. Plaintiffs presented no cohesive damages theory, no expert witness, and no witness who could measure a single

dollars' worth of damage.[16] Instead, the evidence showed that Defendants indisputably made unreturned payments in amounts set by statute to Plaintiffs for well over a decade for the very same works and uses at issue in this case.

It was Plaintiffs' own decision to stretch out their damages case two weeks, and to call Defendants' two representatives for several days each. Appx1487-1512; Appx1513-1671; Appx1676-1890; SA566-795. Whether the pandemic had emerged or not, the trial could have been shorter. The District Court knew it[17], Plaintiffs knew it, and the jury knew it too.[18]

The jury chose to deliberate quickly—a decision it was free to make if it could reach a unanimous decision. And contrary to Plaintiffs' suggestions to the contrary, there is no precedent to support their assertion that a short deliberation is a deficient one. It would have been just as simple for the jury to have come out quickly with a high end award. Instead the jury decided to award the lowest available for the works that had not previously been found willful by the District Court$750 per work—and awarded $1000 for the rest. It would have been easier to simply come out and award

---

[16] It is well established that in copyright cases, even where statutory damages are elected, actual damages are relevant to where to land on the scale of statutory damages. See *N.A.S. Imp., Corp. v. Chenson Enterprises, Inc*., 968 F.2d 250, 252 (2d Cir. 1992); *see also Fitzgerald Pub. Co. v. Baylor Pub. Co*., 807 F.2d 1110, 1117 (2d Cir. 1986).

[17] SA730 ("The court: There was a lot of empty space there at the end, which led me to hope that you were close to the end.")

[18] SA799 ("Juror: I'm not trying to get us shut down. I don't want us delayed. I want you guys to hurry up so we can do our job.")

the specific number requested by Plaintiffs. The District Court recognized this in its ruling. Appx811-812. The jury was able to render its fair ruling here. There are very few cases that consider overturning jury verdicts by blaming world events or natural disasters for poor outcomes.

Other cases considering these types of objections in the recent COVID context have declined to allow it as an excuse to undo legitimate trials, denying post-verdict motions for a new trial based on reasons similar to those advanced by Plaintiffs here. *See, e.g., United States v. Vorley,* No. 18 CR 00035, 2021 WL 1057903, at *20 (N.D. Ill. Mar. 18, 2021) (rejecting argument that court's "orders to the jury to continue deliberations were unduly coercive in the context of the COVID-19 pandemic").

In *United States v. Dermen*, No. 218CR00365JNPBCW, 2020 WL 1676770, at *1 (D. Utah Apr. 6, 2020), the defendant moved for a mistrial, arguing that the jurors' March 2020 deliberation was unfairly influenced by concerns relating to the outbreak of the coronavirus. The court denied the motion with a very thorough, well-reasoned decision including that the defendant offered no evidence that the jury's decision was compromised in any way by the coronavirus outbreak.[19]

The *Dermen* court distinguished other COVID-related mistrials. The *Dermen* trial (like this trial) were wrapping up as COVID hit, whereas these other cases—

---

[19] Juror 5 brought up his concerns here in the context of his commitment to fulfilling his duty. He did not communicate an intent to carelessly rush through in defiance, or dereliction, of his responsibilities—he expressly stated the precise opposite: he and the jury intended to be fair and wanted to fulfill their service. SA797-SA800.

where mistrials were ordered—were nowhere near finished, and would have dragged

on as the pandemic worsened. The *Dermen* court concluded that: "even assuming …

that jurors were motivated to rush their deliberations because of uneasiness over the

coronavirus, there is nothing to suggest that rushed deliberations would have been

prejudicial to Defendant…" *Id.* at *5. Even if all the jurors felt as Juror 5 did, this

would still not demonstrate prejudice, as there is no indication that the time pressure

would favor a low verdict as opposed to a high verdict.

Like here, the defendant in *Dermen* argued that the jury's hasty deliberation

implied that the jurors were eager to get out of the courthouse, and thus could not

possibly have weighed all the evidence. The court flatly rejected this argument:

> The Defense has repeatedly suggested that the absence of questions
> from the jury and the relatively swift verdict in this case are indicative
> of prejudice towards Defendant Dermen. But these suggestions are
> without factual or legal basis. There is no obligation for jurors to send
> notes or ask questions. Indeed, the absence of questions could be
> explained by the clarity of the jury instructions or the weight of the
> evidence. Similarly, there is no requirement that jurors deliberate for a
> minimum length of time.

*Id*. at *9; *see also United States v. Shkolir*, 17 F. Supp. 2d 263, 270 (S.D.N.Y. 1998),

aff'd in part, 182 F.3d 902 (2d Cir. 1999) (denying motion for new trial and stating

that: "[t]his Court, too, rejects the argument that the celerity with which the jury

returned a verdict indicates in any way that defendants' convictions, which are

supported by the evidence presented at trial, are untrustworthy.") (collecting cases);

*United States v. Kuznetsov*, No. 05 CR. 916 DAB, 2007 WL 2020110, at *20

(S.D.N.Y. July 11, 2007) ("No matter how complicated the case, brevity in jury deliberations is not, in itself, a basis for scuttling a verdict. Courts cannot hold a stopwatch over a deliberating jury.")

The Western District of New York relied on *Dermen* last year in *United States v. Cooper*, No. 1:18-CR-00126 EAW, 2020 WL 4474071 (W.D.N.Y. Aug. 4, 2020). There, the defendant moved for a new trial pursuant to FRCP 33, alleging that "jurors were clearly distracted by the pending national crisis related to the COVID-19 outbreak." *Id*. at *6. The court found "no basis in the record to conclude that any juror was somehow improperly influenced," and Defendant's claims otherwise amount to nothing more than rampant speculation. *Id.* at *10. "Accordingly, Defendant's Rule 33 motion is denied, as is his related request to conduct post-verdict interviews of the jurors." *Id.*

Plaintiffs' sole reliance on *Lucas v. Am. Mfg. Co*. is inapt and unhelpful. 630 F.2d 291, 294 (5th Cir. 1980). Instead of relying on other COVID-era caselaw discussed above, Plaintiffs attempt to draw an analogy to a case involving a Gulf Coast hurricane panic in the 1980's. In any event, *Lucas* is materially distinguishable. There, the Fifth Circuit reversed the Alabama district court for refusing to grant a new trial. Reversal was compelled for two reasons, neither of which are present here.

First, the reviewing court in *Lucas* found "no evidentiary basis for the jury's

award" of only $3,500, considering that the "defendant stipulated before trial that the plaintiff had incurred $8,503 in expenses as a result of his injuries; the verdict, however, was less than half of Lucas' stipulated out-of-pocket losses and reflected no award for pain and suffering." *Id.* at 293. This facially inconsistent award is distinct from the award here. For one, there was no "stipulated" amount from earlier in the case like in *Lucas*. Instead, Defendants maintained that Plaintiffs had not suffered any actual damages because the evidence showed that Defendants had already paid Plaintiffs the amounts owed under statute. Plaintiffs did not dispute that these amounts were paid.

And moreover, the damages Plaintiffs were awarded fell entirely within the authorized statutory range. The jury could have gone lower and could have gone higher by deliberating for the same amount of time, but there is no reason to suggest the amount the jury found to be "just under the circumstances" was not so here.

Second, the reviewing court in *Lucas* noted "the extraordinary circumstances surrounding the jury's deliberations," which included an approaching hurricane "expected to strike Mobile [Alabama]." *Id.* The Lucas plaintiff claimed that the judge informed the retiring jury that "it must reach a verdict within fifteen minutes or return at a later date." *Id*. The trial transcript revealed that "after the jury returned its verdict, the judge urged the jurors to hurry home 'before you get blown away.'" *Id.* The reviewing court held that "concern for the jurors' well-being… does not

52

excuse the court's efforts to coerce a verdict." *Id.*

Here, the District Court did not instruct the jury that it was required or should return a verdict within a certain amount of time. Conversely, the District Court instructed the jury that they could stay as long as they needed that night and could return to deliberate the following day. SA935. An unfolding epidemic cannot be analogized to a hurricane barreling down in real time, where the court instructed the jury to deliberate within fifteen minutes and the immediate threat of a hurricane loomed over.

The District Court did not rush or coerce these proceedings in any way. Plaintiffs simply drew out the case long enough,[20] and as Juror Number 5 confirmed, the jury was prepared to efficiently deliberate so that they could move on with their lives. *Lucas* is therefore wholly distinguishable, and does not support Plaintiffs' motion.

This jury sat through two weeks of witnesses and argument during a time when it might have been expected that jurors would be dropping out, or at least raising concerns. They were incredibly dedicated, came every day, and not one was lost (even though the Court had enough jurors where two jurors could have dropped

---

[20] In fact there were multiple times during the multiple days that Plaintiffs cross-examined Defendants' representatives Mr. Lundberg (three days) and Mr. Sagan (four days) that the District Court noted out of the presence of the jury that Plaintiffs seemed to be wasting time and dragging out a lot of questioning. *See, e.g.*, SA725 ("The court: Let me just ask, Mr. Dickstein, how much more do you have?"); SA730.

out and the case would still have had enough jurors). Juror Number 5's concerns expressed on the final day of trial were the first time the jury made any comment, and they were entirely reasonable and consistent with a fair deliberation.

Unless the Court reverses the District Court's summary judgment decision, the jury award should stand.

## VI. The District Court Did Not Abuse Its Discretion In Denying A Permanent Injunction

The District Court agreed with Defendants below that Plaintiffs failed to demonstrate that the "extraordinary remedy" of an injunction is warranted here. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

Plaintiffs argued to the District Court that it could satisfy this standard because without one, "Defendants' unauthorized service threatens to harm Plaintiffs' relationships with their existing licensees," and "undermine their negotiating leverage with prospective licensees, in ways that are difficult to quantify." Dkt. 201 at 53 (citing Declaration of Alisa Coleman, COO of ABKCO).

The District Court was "unpersuaded by these arguments," finding that any harm is "not irreparable" because Plaintiffs "can be compensated," citing to the licensing Plaintiffs discussed throughout their submissions. The District Court further held that

> the balance of hardships and consideration of the public interest does
> not tip in Plaintiffs' favor. Setting aside any copyright ownership

issues, there is no question that Defendants own the recordings at issue [and that any]… licensing hurdles are not insurmountable.

Defendants provide recordings of iconic songs and entertainers in a platform that makes them accessible to the general public. Licensing issues notwithstanding, the Court finds that the public's interest in having access to these recordings counsels against the imposition of a permanent injunction.

[Appx718-719.]

"Irreparable harm is an injury that is not remote or speculative but actual and imminent, and for which a monetary award cannot be adequate compensation." *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 37 (2d Cir. 1995).

Plaintiffs' two-year delay in initiating legal action, and their failure to seek a preliminary injunction nearly two and a half years ago, are further strong indications that any harm is not irreparable. Plaintiffs claim to "have identified *numerous* synchronization licenses that they have issued for live concert recordings," while insisting that Defendants' uses require the same kinds of licenses. Dkt. 201 at 24; SA1878 (purporting to identify approximately 46 synch licenses granted by Plaintiffs for "live recordings" not at issue here). The testimony about synchronization licenses at trial confirmed that while scant and volatile, the records about which limited number of recordings actually earn any synchronization license revenue let alone a substantial amount is kept and could have been analyzed with an expert. But for whatever reason, Plaintiffs did not do so.

Taken together, this shows not irreparable harm but the opposite: if Plaintiffs

are aware of multiple synchronization licenses for the type of use they claim is at issue here, and have actually granted a synchronization license for one of the very works in this case, then plainly any harm the Court might find would be readily calculable—if not already known.

Where monetary damages are sufficient to remedy harm, and particularly where license fees are at issue, this Court has repeatedly held that injunctive relief is inappropriate. *See, e.g., Broad. Music, Inc. v. Pamdh Enters., Inc.*, No. 13-CV-2255, 2014 WL 2781846, at \*4 (S.D.N.Y. June 19, 2014) (declining to enter permanent injunction where, "had Defendants paid the required licensing fee," plaintiffs would have authorized the use); *Computer Generated Solutions Inc. v. Koral*, No. 97 Civ. 6298, 1998 WL 1085945, \*1 (S.D.N.Y. Dec. 9, 1998) ("[C]ases where an injunctive relief is granted [do not] involve … the mere use of works without paying royalty fees when such works ordinarily would be available in return for payment of such fees."); *Int'l Bus. Machines Corp. v. BGC Partners, Inc., No.* 10 Civ. 00128 (PAC) (FM), 2010 WL 1924715, at \*1 (S.D.N.Y. May 12, 2010) (holding no injunction warranted where "Any [plaintiff] injury due to [defendant's] continued use or misuse of [its copyrighted work] is fully compensable through monetary damages…").

The authorities Plaintiffs relied on are inapposite. The harm that the court in *WPIX, Inc. v. Ivi, Inc.* held "difficult to prove" and "nearly impossible to quantify" involved multiple, complex factors including loss of direct and indirect advertising

revenue, and an intractable maze of territorial and temporal restrictions on terrestrial broadcasting. 765 F. Supp. 2d 594, 618 (S.D.N.Y. 2011), aff'd, 691 F.3d 275, 285–86 (2d Cir. 2012).

And in *Register.com, Inc. v. Verio, Inc.*, which involved a preliminary injunction sought in a non-copyright case involving trespass and false designation of origin, the plaintiffs showed they had actually suffered, and were likely to suffer in the future, "the loss of … relationships with customers and co-brand partners"; in addition, defendants' trespass, if not preliminarily enjoined, was held likely to affect plaintiffs' servers and "incapacitate" their systems. 356 F.3d 393, 399, 404 (2d Cir. 2004).

What is at issue here, by contrast, involves simple calculations of well-known statutory royalty rates (which have already been paid). Plaintiffs' speculation about unidentified potential loss of easily calculable revenue—not loss of existing "relationships"—envisions harm that is "remote or speculative," not "actual and imminent." *Tom Doherty Assocs*, 60 F.3d at 37 (2d Cir. 1995) (to the extent harm from lost royalties from potential business is not speculative, it can be calculated based on statutory royalty rates and the parties' existing licenses.)

The District Court also found it would be against the public interest to grant an injunction, which was within its discretion. Plaintiffs mischaracterize the standard for assessing whether a permanent injunction is in the public interest. As

this Circuit has repeatedly recognized, "[t]he object of copyright law is to promote the store of knowledge available to the public." *Salinger*, 607 F.3d at 82.

Contrary to Plaintiffs' representation, *Salinger* outlines a balancing test, holding that to the extent copyright law accomplishes this end "by providing individuals a financial incentive to contribute to the store of knowledge, the public's interest may…be already accounted for by the plaintiff's interest." *Id*. Plaintiffs put forth no evidence on summary judgment that Defendants' exploitation of these videos and recordings creates a disincentive for "individuals…to contribute to the [public's] store of knowledge." Dkt. 201 at 54.

And as the District Court found, it would be against the public interest to forever keep the recordings at issue from public view.[21] Under Plaintiffs' vague, overbroad proposed injunction, music historians and fans alike would lose access to this irreplaceable record of concerts by some of the most culturally important performers of the last half century, and be deprived the opportunity to witness historic performances of bands and artists who are no longer active, or, in some cases, alive.[22] Plaintiffs' proposed injunction was not in the public interest and the District Court was within its discretion to deny it.

---

[21] While Plaintiffs claim that Defendants could continue to offer such recordings if no injunction is granted, Defendants removed all such works following summary judgment and that would risk another lawsuit with Plaintiffs (unless liability is reversed).

[22] For example, Keith Moon and John Entwistle of The Who passed away in 1978 and 2002 respectively.

## CONCLUSION

The District Court's summary judgment Order on liability should be reversed

for any or all of the grounds presented by Defendants, and the fees award should be

vacated.  Unless the Court orders a new trial that includes issues of liability and/or

Defendants' equitable defenses, the damages trial award should stand, as Plaintiffs

have not presented grounds to disturb the results.

AUGUST 9, 2021

*s/Michael S. Elkin*
Michael S. Elkin

**CERTIFICATE OF COMPLIANCE**
**WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS,**
**AND TYPE-STYLE REQUIREMENTS**

I hereby certify that

1.     This document complies with the type-volume limit of Local Rule 32.1(a)(4)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 13,946 words.

2.     This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

AUGUST 9, 2021

                                        *s/Michael S. Elkin*
                                        Michael S. Elkin

## CERTIFICATE OF SERVICE

I hereby certify that on August 9, 2021, an electronic copy of the foregoing brief was filed and served on counsel of record via this Court's CM/ECF system, which will send a notice of filing to all registered users.

*s/Michael S. Elkin*
Michael S. Elkin