# 20-3816-cv(L)

## 20-4020-cv(CON), 20-4099-cv(XAP)

IN THE

# United States Court of Appeals

### FOR THE SECOND CIRCUIT

◆◆◆

ABKCO MUSIC, INC., COLGEMS-EMI MUSIC INC., EMI ALGEE MUSIC CORP., EMI APRIL MUSIC INC., EMI BLACKWOOD MUSIC INC., EMI CONSORTIUM MUSIC PUBLISHING, INC., DBA EMI FULL KEEL MUSIC, EMI CONSORTIUM SONGS, INC., DBA EMI LONGITUDE MUSIC, EMI FEIST CATALOG INC., EMI ROBBINS CATALOG INC., EMI UNART CATALOG, INC., JOBETE MUSIC CO., INC., SCREEN-GEMS-EMI MUSIC INC., STONE AGATE MUSIC, STONE DIAMOND MUSIC CORP., IMAGEM MUSIC LLC, PEER INTERNATIONAL CORPORATION, PSO LIMTED, PEERMUSIC LTD., PEERMUSIC III, LTD., SONGS OF PEER, LTD., SPIRIT CATALOG HOLDINGS S.A.R.L., SPIRIT TWO MUSIC, INC., WARNER-TAMERLANE PUBLISHING CORP., WB MUSIC CORP.,

*Plaintiffs-Counter-Defendants-Appellees-Cross-Appellants,*

(*Caption continued on inside cover*)

————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## REPLY BRIEF FOR PLAINTIFFS-COUNTER-DEFENDANTS-APPELLEES-CROSS-APPELLANTS

BARRY SLOTNICK
CHRISTIAN CARBONE
TAL DICKSTEIN
PRIY SINHA
LOEB & LOEB LLP
345 Park Avenue
New York, New York 10154
(212) 407-4000

*Attorneys for Plaintiffs-Counter-Defendants-Appellees-Cross-Appellants*

—against—

WILLIAM SAGAN, NORTON LLC, BILL GRAHAM ARCHIVES, LLC, DBA
WOLFGANG'S VAULT, DBA CONCERT VAULT, DBA MUSIC VAULT, DBA
DAYTROTTER,

*Defendants-Third-Party Plaintiffs-Counter Claimants-*
*Appellants-Cross-Appellees.*

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ............................................................................1

ARGUMENT ..................................................................................6

I.   The District Court Made Erroneous Evidentiary Rulings on Critical
     Issues……..................................................................................6

     A.   The District Court Abused Its Discretion in Admitting
          Evidence of Sagan's Payments for Works Not at Issue and
          Payments to Third Parties ....................................................6

     B.   Sagan Cannot Justify the District Court's Illogical and
          Contradictory Decision to Admit Agreements with Non-
          Party Record Companies That Expressly Exclude Any Rights
          to the Works at Issue ..........................................................11

     C.   The District Court Erred in Excluding a Statement Made by
          Sagan's Admitted Licensing Agent About an Issue at the
          Center of This Case ...........................................................15

     D.   Sagan Cannot Raise an "Advice of Counsel" Argument
          Based on Communications Over Which He Asserted
          Privilege.............................................................................19

II.  A New Trial Is Needed to Avoid a Miscarriage of Justice ...........20

     A.   Sagan Ignores the Substantial Effect That the Emerging
          Pandemic Had on the Jury..................................................20

     B.   The Court Should Disregard Sagan's Irrelevant and
          Misleading Characterizations of the Trial...........................24

III. The District Court Erred in Refusing to Enjoin Sagan's Willful
     Infringement .....................................................................28

A.    Sagan's Continuing Infringement and Refusal to Negotiate for Licenses Establish Irreparable Harm ............................................. 28

B.    Sagan's Willful and Widespread Infringement Tips the Balance of the Equities and the Public Interest Firmly in Favor of an Injunction ......................................................................... 32

CONCLUSION ........................................................................................... 34

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Cases

*Am. Family Mut. Ins. Co. v. Miell*,
  569 F. Supp. 2d 841 (N.D. Iowa 2008) ............................................................14

*Andrews v. Barr*,
  799 F. App'x 26 (2d Cir. 2020) .................................................................. 11-12

*Boarding Sch. Review, LLC v. Delta Career Educ. Corp.*,
  2013 U.S. Dist. LEXIS 48513 (S.D.N.Y. Mar. 29, 2013).................................18

*Broad. Music, Inc. v. Living Room Steak House, Inc.*,
  2016 U.S. Dist. LEXIS 23676 (E.D.N.Y. Feb. 26, 2016) ........................... 28-29

*Broad. Music, Inc. v. PAMDH Enters.*,
  2014 U.S. Dist. LEXIS 84409 (S.D.N.Y. June 19, 2014) ...........................29, 30

*Broad. Music, Inc. v. Prana Hosp.*,
  158 F. Supp. 3d 184 (S.D.N.Y. 2016) ..............................................................28

*Broad. Music v. Hub at Cobb's Mill, LLC*,
  2015 U.S. Dist. LEXIS 43315 (D. Conn. Apr. 2, 2015)................................. 31-

*Caruso v. Forslund*,
  47 F.3d 27 (2d Cir. 1995) ................................................................................21

*Computer Generated Solutions, Inc. v. Koral*,
  1998 U.S. Dist. LEXIS 22801 (S.D.N.Y. Dec. 9, 1998)...................................31

*Hounddog Prods., LLC v. Empire Film Grp., Inc.*,
  826 F. Supp. 2d 619 (S.D.N.Y. 2011) ..............................................................32

*IBM v. BGC Partners, Inc.*,
  2010 U.S. Dist. LEXIS 46538 (S.D.N.Y. May 12, 2010) .................................31

*Korzeniewski v. Sapa Pho Vietnamese Rest., Inc.*,
  2019 U.S. Dist. LEXIS 1901 (E.D.N.Y. Jan. 3, 2019),
  *adopted*, 2019 U.S. Dist. LEXIS 10949 (E.D.N.Y. Jan. 23, 2019)....................32

*Lucas v. Am. Mfg. Co.*,
    630 F.2d 291 (5th Cir. 1980) ...............................................................24

*McPherson v. Seaduced, LLC*,
    2015 U.S. Dist. LEXIS 52374 (M.D. Fla. Apr. 21, 2015)........................... 32-33

*NFL v. Primetime 24 Joint Venture*,
    131 F. Supp. 2d 458 (S.D.N.Y. 2001) ........................................................ 26-27

*Ortiz v. Charter Commc'ns., LLC*,
    2012 U.S. Dist. LEXIS 203458 (D. Conn. Mar. 30, 2012) ...............................14

*Pappas v. Middle Earth Condo. Ass'n*,
    963 F.2d 534 (2d Cir. 1992) ...............................................................17

*Patsy's Italian Restaurant, Inc. v. Banas*,
    575 F. Supp. 2d 427 (E.D.N.Y. 2008), *aff'd*, 658 F.3d 254 (2d Cir. 2011)........18

*Rosenfeld v. Basquiat*,
    78 F.3d 84 (2d Cir. 1996) ...............................................................14

*Salinger v. Colting*,
    607 F.3d 68 (2d Cir. 2010) ...............................................................26

*U.S. D.I.D. Corp. v. Windstream Commc'ns., Inc.*,
    775 F.3d 128 (2d Cir. 2014) ...............................................................8

*United States v. Bershchansky*,
    788 F.3d 102 (2d Cir. 2015) ...............................................................16

*United States v. Bilzerian*,
    926 F.2d 1285 (2d Cir. 1991) ...............................................................19

*United States v. Broad. Music, Inc.*,
    207 F. Supp. 3d 374 (S.D.N.Y. 2016) ...............................................................29

*United States v. Cooper*,
    2020 U.S. Dist. LEXIS 138743 (W.D.N.Y. Aug. 4, 2020) ...............................23

*United States v. Defreitas*,
    2010 U.S. Dist. LEXIS 54600 (E.D.N.Y. June 3, 2010) ................................. 6-7

*United States v. Dermen*,
452 F. Supp. 3d 1259 (D. Utah 2020)...............................................22

*United States v. Doe (In re Grand Jury Proceedings)*,
219 F.3d 175 (2d Cir. 2000) ..........................................................19

*United States v. Ferguson*,
653 F.3d 61 (2d Cir. 2011) .............................................................16

*United States v. Kuznetsov*,
2007 WL 2020110 (S.D.N.Y. July 11, 2007).....................................23

*United States v. Lauersen*,
348 F.3d 329 (2d Cir. 2003), *vacated on other grounds*, 2005 U.S. Dist. LEXIS
970 (Jan. 24, 2005) .......................................................................17

*United States v. McDermott*,
245 F.3d 133 (2d Cir. 2001) ...........................................................14

*United States v. Shkolir*,
17 F. Supp. 2d 263 (S.D.N.Y. 1998) ................................................23

*United States v. Vorley*,
2021 U.S. Dist. LEXIS 51142 (N.D. Ill. Mar. 18, 2021) ....................22

*Warner Bros. v. Dae Rim Trading, Inc.*,
877 F.2d 1120 (2d Cir. 1989) .........................................................26

*Weissmann v. Freeman*,
868 F.2d 1313 (2d Cir. 1989) .........................................................32

*WPIX, Inc. v. Ivi, Inc.*,
765 F. Supp. 2d 594 (S.D.N.Y. 2011), *aff'd*, 691 F.3d 275
(2d Cir. 2012)..........................................................................26, 30

## Rules

Fed. R. Evid. 103(b).......................................................................14

Fed. R. Evid. 801(d)(2)(D) .........................................................16, 18

Fed. R. Evid. 1002 ..........................................................................7

**Other Authorities**

5 Weinstein's Federal Evidence § 801.33 (2021).............................................. 17-18

http://portal.mndigital.com/blog/5-major-digital-music-use-types-licenses/ (last visited Aug. 27, 2021)...........................................................................................18

# INTRODUCTION[1]

This Court should order a new trial, because the District Court permitted Sagan[2] to introduce irrelevant and prejudicial evidence, and excluded highly probative evidence offered by Plaintiffs. The prejudice caused by the introduction of Sagan's irrelevant "evidence" was exacerbated by the onslaught of the COVID-19 pandemic and the jury's understandable desire to rush to judgment. The jury "deliberated" for approximately 40 minutes without even waiting for the record and exhibits to be delivered to them. In their haste to flee lower Manhattan for the safety of their homes, the jury rendered a verdict based on irrelevant and confusing evidence presented by Sagan and permitted by the District Court.

This evidence included royalty statements and lists of purported payments that Sagan made to third parties and for songs not at issue. Sagan compounded the confusion with his testimony that he paid $1 million in licensing fees, and his frequent references to "five boxes" of royalty statements, which were never shown to the jury. Although these payments were represented to have been made exclusively to the Plaintiffs and for the songs at issue, they in fact reflected payments

---

[1] This brief is limited to the issues raised on Plaintiffs' cross-appeal. Each of Sagan's arguments with respect to his appeal of the District Court's summary judgment ruling on liability is thoroughly refuted in Plaintiffs' June 7, 2021 opposition brief (Dkt. 142) ("PB").

[2] William Sagan and his wholly-owned companies Norton LLC and Bill Graham Archives LLC are collectively referred to as "Sagan" or "Defendants".

1

for numerous songs not at issue and to third parties not involved in this case. This evidence created the misleading impression that Sagan had paid Plaintiffs substantial sums for the songs at issue, and that Sagan complied with the law, when neither was true.

The District Court also erroneously admitted agreements into evidence that Sagan entered into with non-party record companies, ostensibly to show that Sagan believed those agreements gave him the right to exploit the musical compositions in suit. Yet, as the District Court itself recognized, those agreements expressly excluded any rights to musical compositions, and there was no good faith basis for Sagan to rely on them. Contrary to Sagan's unsupported contentions, those record-company agreements did not convey any rights to concert recordings, nor did they constitute consent by the performing artists, because the record companies could not and did not speak on behalf of the artists. The District Court's illogical and contradictory ruling admitting those irrelevant agreements is a textbook example of an abuse of discretion, and therefore should be reversed.

Unable to justify these erroneous evidentiary rulings, Sagan argues that Plaintiffs waived their objections to exclude his payment evidence and record-company agreements, even though Plaintiffs moved *in limine* to exclude those documents. It is well settled that there is no need to object to the introduction of evidence at trial when a motion *in limine* to exclude that evidence has been denied,

as the District Court did here.  Plaintiffs urged the Court to reconsider its denial of their *in limine* motion at the final pre-trial conference, and rested only when it was clear the District Court would not grant the motion and only grant a limiting instruction.

Sagan also suggests that Plaintiffs somehow waived their objection to his payment evidence by not taking it upon themselves to redact the irrelevant information in Sagan's royalty statements related to songs not at issue.  Not surprisingly, there is no support for that illogical proposition, as the burden of redacting inadmissible material from documents is on the party who seeks to introduce those documents at trial.  There is no basis to find a waiver under these circumstances.

The District Court also erred by excluding an article issued by Sagan's licensing agent, MediaNet, about the types of licenses required to exploit musical compositions in audiovisual format (the "MediaNet Article").  Despite Sagan's self-serving arguments that MediaNet was merely a payment administrator, the record shows that the MediaNet Article fell squarely within the scope of MediaNet's broad relationship with Sagan, which, according to Sagan's own Chief Technology Officer, encompassed all forms of music licenses, including licenses for audiovisual content.  Sagan's argument that the MediaNet Article lacked foundation is similarly meritless.   There is no dispute that MediaNet published the Article, which remains

3

on its website to this day, and there is no requirement that Sagan have personal knowledge of his agents' statements for them to be admissible as a vicarious admission. The jury should have had an opportunity to review the MediaNet Article because it would have directly undercut Sagan's testimony about the types of licenses he needed to exploit the concert videos in his collection.

The trial was also negatively affected by the once-in-a-generation pandemic. This case is unique, in that the jury was forced to deliberate in lower Manhattan in March 2020, just as New York City was emerging as the global epicenter of the pandemic. The District Court itself recognized that the "world is falling apart around us." (SA791.) No speculation is needed to assess the impact that these unprecedented circumstances had on the jury. One of the jurors felt compelled to state in open court that he was fearful for his life and the lives of his family and of his fellow jurors, as the case "doesn't seem all that important compared to [the] lives at stake," and that the damages Plaintiffs were seeking were "not worth the life of my mother or any of the lives of the jurors[.]" (SA797-98.) Contrary to Sagan's suggestion, Plaintiffs had no opportunity to seek to excuse that juror, as the District Court ruled *sua sponte* that his remarks did not provide a basis to relieve him. In any event, the fear and concern expressed by that juror were no doubt felt by all of the jurors.

With the pandemic barreling down on New York City, it is perhaps not surprising that the jury rushed to a verdict, though they did so without reviewing any of the evidence or testimony submitted over the previous two weeks. Instead, the jury was left with their recall of the evidence, including the misleading and prejudicial evidence the District Court permitted Sagan to introduce and reference at every opportunity at trial. Despite their best intentions, the jury was simply unable to render a fair and rational verdict under the circumstances. A new trial is warranted to correct this manifest injustice.

Finally, the District Court ignored well-settled law and the Copyright Act itself in refusing to enjoin Sagan's infringement. There is overwhelming evidence that Sagan is likely to continue infringing Plaintiffs' musical works. Sagan added recordings of Plaintiffs' works to his websites while the case was pending, and the trial testimony confirms that he continued infringing Plaintiffs' works even after he was found willfully liable. Plaintiffs clearly established irreparable harm.

The balance of the equities and the public interest also strongly favor an injunction. The District Court found that Sagan willfully infringed Plaintiffs' works as a matter of law, and Sagan still stubbornly refuses to acknowledge that he needs licenses in order to lawfully operate his bootleg concert business. Refusing to enjoin Sagan's infringement sends the message that Sagan and others like him can continue

to exploit Plaintiffs' copyrights without permission.  That runs contrary to the core

purposes of the Copyright Act.

## ARGUMENT

I.    **The District Court Made Erroneous Evidentiary Rulings on Critical Issues**

    A.    **The District Court Abused Its Discretion in Admitting Evidence of Sagan's Payments for Works Not at Issue and Payments to Third Parties**

Sagan does not dispute that much of his evidence was irrelevant because it

related to payments for musical works that were *not at issue in this lawsuit*.  This

evidence included royalty statements that referenced purported payments for works

that were not the subject of the infringement claims in this case.  (PB59-61; DO34-

36.)[3]  Those statements created the false impression that Sagan had paid far more in

purported license payments for the works in suit than he actually paid.

Sagan claims that his royalty statements were properly admitted because

Plaintiffs did not take it upon themselves to redact the inadmissible information

contained in Sagan's statements.  (DO35-36.)   A party's reluctance to redact

irrelevant and confusing evidence submitted by the other side does not render that

evidence admissible, and Sagan cannot cite any authority to the contrary.  That is

because the party who seeks to introduce documents that contain inadmissible

---

[3] "DO" refers to Sagan's August 10, 2021 Second Corrected Responsive Cross-Appeal Brief (Dkt. 163).

information properly bears the burden of redacting that information. *See United States v. Defreitas*, 2010 U.S. Dist. LEXIS 54600, at \*17 (E.D.N.Y. June 3, 2010) ("the government must redact those portions of the recordings that refer to [the irrelevant information] prior to introduction of these statements at trial.")

In addition to the royalty statements, Sagan was permitted to introduce lists of checks that he purportedly sent to the Plaintiffs. (PB14-15; Appx298-311.) Those checks were not limited to the works in suit, as they reflected the aggregate amounts Sagan paid under purported compulsory licenses—licenses that Sagan was not entitled to—for both songs at issue and for songs not at issue.[4] Because Sagan's lists of checks gave the jury the misleading impression that they all related to works in suit, they should have been excluded. Sagan's lists of checks, which Sagan created specifically for the litigation, should also have been excluded under the Best Evidence Rule, Fed. R. Evid. 1002,[5] as the lists were offered instead of the underlying checks themselves, and there was a dispute as to which checks had actually been cashed. (Appx1000,1104.)

---

[4] Although Sagan falsely claims he started making payments to Plaintiffs pursuant to purported compulsory licenses in 2006 (DO20), his own records show that he did not start making those payments until 2015, just a few months before Plaintiffs filed suit (PB10) (citing Appx298-311). Moreover, Sagan ignores the fact that, beginning in 2010, Plaintiffs sent him a series of demands to stop the unauthorized use of Plaintiffs' works, eliminating any possible "meeting of the minds" that would be required for an implied license. (PB51-55.)

[5] Plaintiffs repeatedly objected on this basis at trial. (SA756,759-761,763- 764,774.)

Sagan was also permitted to introduce evidence of payments to entities that are *not even parties to this lawsuit*, such as a list of checks written to his licensing agent, MediaNet, without any indication as to who ultimately received the funds. (Appx313-315.)  That list of checks was not tied to any of the works in suit, or even to any of the Plaintiffs, and was therefore completely irrelevant and prejudicial.

The District Court's limiting instruction could not have cured the prejudice and confusion created by Sagan's evidence of payments.  Although the District Court instructed the jury that Sagan's evidence of payments to the Plaintiffs was not relevant to whether Sagan was liable for copyright infringement and could only be considered with respect to Sagan's state of mind and other factors (Appx1124; SA772), that instruction failed to account for the fact that much of Sagan's evidence related to payments to *third parties* and for *works not at issue*.  Indeed, the District Court's instruction *compounded* the confusion, by creating the false impression that *all* of the payments identified in Sagan's list of checks were made "to the plaintiffs" (*id.*) when, in fact, numerous payments were made to third parties.  And, here again, Sagan's list of checks to MediaNet should have been excluded under the Best Evidence Rule.

Sagan argues in conclusory fashion that Plaintiffs impliedly waived their motion *in limine* during the final pre-trial conference.  (DO35-36.)  This Court has explained that "[t]he conduct said to constitute a waiver must be clear and

8

unequivocal, as waivers are never to be lightly inferred." *U.S. D.I.D. Corp. v. Windstream Commc'ns., Inc.*, 775 F.3d 128, 136 (2d Cir. 2014). No waiver took place here, let alone one that was clear and unequivocal. Plaintiffs argued *vigorously* at the final pre-trial conference that Sagan's evidence of payments for works not at issue and to non-parties should be excluded. (Appx760-63.) After the Court refused to reconsider its decision denying Plaintiffs' *in limine* motion, and it became clear that the Court would only offer a limiting instruction, Plaintiffs merely acknowledged that the Court had made up its mind to deny the motion and to issue a limiting instruction. (Appx766.) Plaintiffs never withdrew their *in limine* motion.

Finally, Sagan argues in a footnote (DO36n.12) that the payment evidence his counsel introduced and repeatedly referenced at trial had no effect because the jury did not review Sagan's five boxes of royalty statements. The jury's rush to leave the courthouse before they could review Sagan's boxes of statements, or any other documents, for that matter, left intact the misimpression that all of the documents in Sagan's boxes of statements related to payments to Plaintiffs for the works at issue.

Moreover, Sagan ignores the fact that the jury *was* shown samples of Sagan's royalty statements, as well as the lists of checks that he purportedly sent to his licensing agent and to Plaintiffs. As discussed above, Sagan's account statements referenced payments for works that are not at issue in this case, and his lists of checks were not tied to any of the works in suit, and, in some cases, were not even tied to

9

any of the Plaintiffs. It was that irrelevant and confusing evidence, as well as testimony from Sagan's Chief Technology Officer, Matthew Lundberg, that Sagan had "paid in full" for all 700-800 million streams from their websites to the tune of "over a million dollars" (SA774-75), that confused the jury into believing that Sagan paid Plaintiffs substantial sums for the works at issue.

The District Court's decision to deny Plaintiffs' *in limine* motion and to admit Sagan's patently irrelevant and confusing evidence of payments constituted reversible error on its own, as the jury should not have been permitted to see evidence of payments that Sagan made for works not at issue and payments to third parties. That error was exacerbated by the fact that the Court rushed Plaintiffs to close their case, including by directing Plaintiffs to conclude their cross examination of Lundberg in five minutes, leaving no time to demonstrate that Sagan's voluminous payment evidence was irrelevant (SA790), as well as the fact that the jury rushed their deliberations to escape the rapidly spreading pandemic as the "world [was] falling apart" around them (SA791). Under these circumstances, the Court abused its discretion in allowing Sagan to introduce evidence of purported license payments to third parties and for works not at issue.

10

**B.**   **Sagan Cannot Justify the District Court's Illogical and Contradictory Decision to Admit Agreements with Non-Party Record Companies That Expressly Exclude Any Rights to the Works at Issue**

The District Court's ruling admitting Sagan's agreements with non-party record companies for purposes of his state of mind is illogical and irreconcilable with the Court's own rulings that Sagan could not rely on those agreements in good faith, and that similar agreements should be excluded. (PB61-63.) The Court properly excluded two artist agreements because they "contain provisions specifically excluding any rights to musical compositions and audiovisual works," and the District Court explained that it "does not see how [Sagan's record-company] agreements that explicitly carve out the kinds of copyrights in question would have any bearing on the state of mind or be relevant to any other issue to be considered." (Appx758.)[6]   Yet, the Court nevertheless denied Plaintiffs' motion *in limine* to exclude the record-company agreements.

The District Court's explicit rationale requires *exclusion* of Sagan's record-company agreements, because they expressly carve out any rights to audiovisual works and to musical compositions in general (PB16), which are the only kinds of copyrights in suit (Appx294-296). Indeed, in granting Plaintiffs' attorneys' fees motion, the Court again held that "there was no good faith basis for Defendants to

---

[6] Sagan acknowledges that his record-company agreements expressly excluded any rights to musical compositions (DO37n.13), which are the only works at issue here.

have relied on [the record-company agreements]" in exploiting Plaintiffs' musical compositions. (Appx820.) That ruling cannot be squared with the Court's decision to allow the jury to consider those same agreements with respect to his supposed innocent state of mind. (Appx758.) These rulings were therefore made in a "plainly inconsistent manner across similar situations [which] evinces such a lack of rationality as to be arbitrary and capricious, *i.e.*, an abuse of discretion." *Andrews v. Barr*, 799 F. App'x 26, 28 (2d Cir. 2020) (quotation omitted).

Unable to reconcile the District Court's rulings, Sagan misrepresents the contents of his record-company agreements, with the *ipse dixit* that those agreements "acknowledged that Defendants were the owners of the copyrights to the sound recordings." (DO36.) There is no evidence that the record companies had the capacity to "acknowledge" anyone's ownership of the concert recordings, regardless of whether those companies were "major players" in the music industry. (*Id.* at 37 n.14.) While record companies often own the copyrights to *studio recordings* included on commercially released records, Sagan offers no evidence whatsoever that these record companies owned the copyrights in the *live concert recordings* at issue here. Although Sagan alludes to exclusive recording agreements between record companies and artists (DO14,17), he has never produced any such

agreements, much less any that grant the record companies ownership of the copyrights in the live concert recordings at issue here.[7]

Sagan also asserts that his record-company agreements show that the concert recordings were "fixed lawfully" and that they were "authorized"—presumably to suggest that they were authorized by the performing artists. (DO37n.14.) Yet, as the District Court found on summary judgment, "[n]one of these agreements, however, provide any written consent from the artists themselves, nor do they purport to state that the artists consented to the recording of their performances." (SAppx15-16,30-31.) Sagan offers nothing to challenge that conclusion.[8]

_____

[7] Sagan also falsely claims that he has an agreement with "EMI." (DO36.) None of Sagan's agreements are with that entity. (Appx294-2, 295-2, 296-2.)

[8] Sagan makes a series of false and misleading assertions to prop up his fiction that the artists consented to the recording of their concerts. First, while Sagan represented to the Copyright Office that recording engineer David Hewitt "had written authority from the artists to record the performance" (SA2069) (DO35n.11), Hewitt himself testified that he had no knowledge of any written agreements with any artists. (SA1571) ("I never saw any documents like that, no, if that answers the question."). Second, Sagan cites nothing but rank hearsay to support his claim that the band The Who licensed the subject concert recordings from their prior owner. (DO15) (citing SA1366 (third party appraisal report), SA1432 (Sagan's after-the-fact acquisition agreement) and Appx1737-1739 (Sagan's second-hand trial testimony)). Third, Sagan has never submitted or even produced a copy of the deposition transcript where Carlos Santana supposedly testified in a prior lawsuit that he consented to the recordings of his concerts. (DO25-26.) Finally, contrary to Sagan's contention that Plaintiffs somehow hid the "fixed lawfully" requirement (DO11-13, 21-22), Plaintiffs have consistently argued that artist consent was required for Sagan's concert tapes to be "fixed lawfully" and thus potentially eligible for statutory licenses under Section 115. (D.C. Dkt. 55 at 2, n.2) (Dec. 6, 2016 Ltr. to M.J. Pitman) ("Testimony from performing artists could conceivably be relevant

Finally, Sagan argues that Plaintiffs waived their objection to his record-company agreements when they asked the Court to deliver the limiting instruction that the Court offered at the final pre-trial conference. (DO37) (citing Appx757-758.) As an initial matter, contrary to Sagan's suggestion, Plaintiffs did not propose the language of that limiting instruction. The hearing transcript makes clear that the *Court* crafted the instruction. (*Id.*) In any event, because the Court denied Plaintiffs' motion *in limine* to exclude Sagan's record-company agreements (Appx758), Plaintiffs were not required to renew their objection at trial in order to preserve the issue for appeal. *See* Fed. R. Evid. 103(b) ("Once the court rules definitively on the record—either before or at trial—a party need not renew an objection or offer of proof to preserve a claim of error for appeal."); *United States v. McDermott*, 245 F.3d 133, 140 n.3 (2d Cir. 2001) (evidentiary objection preserved through motion *in limine*); *Rosenfeld v. Basquiat*, 78 F.3d 84, 91 (2d Cir. 1996) (same).

Nor did Plaintiffs somehow waive their objection by asking the Court to deliver the limiting instruction it had previously offered. *See Ortiz v. Charter Commc'ns., LLC*, 2012 U.S. Dist. LEXIS 203458, at *4 (D. Conn. Mar. 30, 2012) ("Inclusion of a proposed limiting instruction will not be construed as a waiver of

---

to whether they authorized the recording and exploitation of their concerts in audio only format, which bears on whether Defendants are entitled to compulsory 'mechanical' licenses under Section 115 of the Copyright Act. Those compulsory licenses are not available unless the recording which the prospective licensee seeks to exploit was 'fixed lawfully' in the first place.") (citing 17 U.S.C. § 115(a)(1)).

14

any objection to the evidence at issue."); *Am. Family Mut. Ins. Co. v. Miell*, 569 F. Supp. 2d 841, 849 (N.D. Iowa 2008) ("[Litigant] could have requested that the Court submit a limiting instruction, without waiving his objection to the admissibility of the evidence."). Sagan's waiver arguments should therefore be rejected.

### C. The District Court Erred in Excluding a Statement Made by Sagan's Admitted Licensing Agent About an Issue at the Center of This Case

Plaintiffs demonstrated that the MediaNet Article, which stated that synchronization licenses are required in order to stream audiovisual content on the internet, was critical evidence that Sagan exploited audiovisual recordings containing Plaintiffs' musical compositions without the required licenses. (PB63-64.)[9] Sagan admits as much by arguing that the issue of whether synchronization licenses were required was hotly disputed both during the lawsuit and at trial. (DO39.) The MediaNet Article therefore would have been powerful evidence that Sagan acted with a high degree of willfulness when he exploited Plaintiffs' musical works in audiovisual format without the necessary licenses. Sagan was free to dispute that point, but the jury should at least have been able to review the MediaNet Article and make their own determination. Plaintiffs were therefore severely prejudiced by the District Court's erroneous refusal to admit the MediaNet Article.

---

[9] Sagan's argument that "many of the recordings at issue are not audiovisual" (DO39) ignores the fact that he exploited at least 135 of the 197 musical works at issue in audiovisual format. (D.C. Dkt. 318, Ex. A) (Joint Pre-Trial Order).

Although the District Court ruled that the MediaNet Article was not within the scope of MediaNet's agency relationship with Sagan, and therefore did not qualify as a vicarious admission under Fed. R. Evid. 801(d)(2)(D), the record proves otherwise.[10]  Sagan's agreement with MediaNet provides that MediaNet would "clear the rights required in connection with the musical compositions distributed through [Sagan's websites]" (SA1686), and Lundberg, who "oversee[s] . . . the licensing of all musical compositions embodied in the audio and audiovisual recordings available on [Sagan's] websites" (Appx282), testified that MediaNet serves as Sagan's licensing agent and that he relies on MediaNet's "[a]dvice with respect to what licenses were required" (SA657).  The scope of Sagan's relationship with MediaNet therefore broadly encompasses advice on what licenses are required to exploit both audio and audiovisual recordings on Sagan's websites.

Sagan also attempts to distance himself from MediaNet by arguing that he did not engage MediaNet to advise on "individually negotiated agreements," such as

---

[10] Whether the MediaNet Article satisfies the requirements of Fed. R. Evid. 801(d)(2)(D) involves mixed questions of fact and law, and is therefore subject to *de novo* review. *See United States v. Ferguson*, 653 F.3d 61, 86 (2d Cir. 2011) ("'Whether a statement is hearsay is a question of law, which we review *de novo*.'") (quoting *United States v. Collicott*, 92 F.3d 973, 978 (9th Cir. 1996)); *United States v. Bershchansky*, 788 F.3d 102, 108 (2d Cir. 2015) ("On appeal from a district court's ruling on a motion to suppress evidence, we review legal conclusions *de novo* and findings of fact for clear error.  We also review *de novo* mixed questions of law and fact.") (quotation and citation omitted).

audiovisual synchronization licenses. (DO38.) That too is contradicted by the record. Lundberg submitted a sworn declaration that "MediaNet has been responsible for acquiring licenses and distributing royalty payments for *all of the audio and audiovisual recordings* available on the WV Defendants' Websites" and for "ensuring that *all* of the WV Defendants' Websites' licensing requirements were met" (emphasis added), including by "obtaining licenses directly from the publisher." (Appx291-292.) It is therefore beyond dispute that the scope of MediaNet's agency includes obtaining licenses for audiovisual recordings on Sagan's websites, which is precisely the subject of the MediaNet Article.

Sagan argues that the MediaNet Article lacked foundation and was inadmissible because he claimed to have never seen it before trial. (DO38.) However, this Court has "not required personal knowledge for statements by a party's agent." *United States v. Lauersen*, 348 F.3d 329, 339-40 (2d Cir. 2003), *vacated on other grounds*, 2005 U.S. Dist. LEXIS 970 (Jan. 24, 2005). "A sufficient foundation to support the introduction of vicarious admissions . . . requires *only* that a party establish (1) the existence of the agency relationship, (2) that the statement was made during the course of the relationship, and (3) that it relates to a matter within the scope of the agency." *Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534, 537 (2d Cir. 1992) (citing Fed. R. Evid. 801(d)(2)(D)) (emphasis added). Vicarious admissions "are received into evidence without many of the technical

17

prerequisites of other evidentiary rules—such as, for example, trustworthiness and personal knowledge." *Id.*; *see also* 5 Weinstein's Federal Evidence § 801.33 (2021) ("[T]here is no additional requirement that the proponent show that the statement is trustworthy, or that the declarant had personal knowledge of the facts underlying the statement.").[11]

There is no dispute that MediaNet acted as Sagan's music licensing agent, that the MediaNet Article was created during the course of that agency relationship, and that the subject of the Article—the types of licenses needed to exploit musical compositions in audiovisual format—was squarely within the scope of that relationship. All of the requirements of a vicarious admission under Fed. R. Evid. 801(d)(2)(D) were therefore met, and the District Court erred in excluding the MediaNet Article.

---

[11] Even if there were a requirement to show independent foundation for vicarious admissions of a party opponent—which there is not—that requirement can be satisfied by the Court taking judicial notice of the existence of the MediaNet Article, which remains on MediaNet's website to this day. *See* http://portal.mndigital.com/blog/5-major-digital-music-use-types-licenses/ (last visited Aug. 27, 2021); *Boarding Sch. Review, LLC v. Delta Career Educ. Corp.*, 11 Civ. 8921 (DAB), 2013 U.S. Dist. LEXIS 48513, at *3-4 n.1 (S.D.N.Y. Mar. 29, 2013) (taking judicial notice of websites that are "not subject to reasonable dispute."); *Patsy's Italian Restaurant, Inc. v. Banas*, 575 F. Supp. 2d 427, 443 n.18 (E.D.N.Y. 2008) ("It is generally proper to take judicial notice of articles and Web sites published on the Internet."), *aff'd*, 658 F.3d 254 (2d Cir. 2011).

### D. Sagan Cannot Raise an "Advice of Counsel" Argument Based on Communications Over Which He Asserted Privilege

Sagan argues that he supposedly obtained legal advice that synchronization licenses are not required where "visual images [] were contemporaneously captured with the live music concert recordings." (DO40.) That argument is both substantively frivolous and procedurally barred. As Plaintiffs demonstrated in their opening brief, the express language of the Copyright Act and the legislative history make clear that audiovisual works are not phonorecords and therefore are not eligible for Section 115 licenses, regardless of whether the visual and audio elements were recorded simultaneously or sequentially. (PB24-28.)

Furthermore, Sagan cannot rely on advice he supposedly received from counsel, because he asserted privilege over those communications during discovery. *See United States v. Doe (In re Grand Jury Proceedings)*, 219 F.3d 175, 182 (2d Cir. 2000) ("[A] party cannot partially disclose privileged communications or affirmatively rely on privileged communications to support its claim or defense and then shield the underlying communications from scrutiny by the opposing party."); *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991) ("A defendant may not use the privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes."). Indeed, Sagan's counsel advised him not to waive that privilege at trial (SA814), and the District Court admonished his counsel not to elicit testimony about advice of counsel precisely because Sagan had

19

asserted privilege during discovery. (Appx1730.) This Court should therefore disregard Sagan's arguments about the undisclosed advice he claims to have received from counsel.

## II.   A New Trial Is Needed to Avoid a Miscarriage of Justice

### A.   Sagan Ignores the Substantial Effect That the Emerging Pandemic Had on the Jury

Sagan's opposition to Plaintiffs' appeal of the denial of their motion for a new trial relies primarily on the fact that Juror Number 5 indicated that he intended to fulfil his duties, and that the amount of the award was not outside the statutory range. (DO43-46.)  Neither of those arguments address the debilitating impact that the rapidly encroaching pandemic had on the jury, which was compounded by the Court's erroneous evidentiary rulings.  The jury was asked to consider nine days of trial testimony and hundreds of exhibits the day after the District Court recognized that "the world is falling apart around us," and on the same day that a state of emergency was declared in New York City, where cases of the novel coronavirus were skyrocketing.  (PB19-20.)  This took place in March 2020, when vaccines were not yet available, masks and plexiglass dividers were not yet being used, and social distancing was not yet being practiced.

It was this new life-threatening risk that caused Juror Number 5 to state in open court that "this matter doesn't seem all that important compared to [the] lives at stake, such as my mom who has … a very compromised immune system" and that

"[w]e are here to decide damages and money … [which] is not worth the life of my mother or any of the lives of the jurors in there who also there are several who are older[.]" (SA797-98.)  The fear and anxiety that Juror Number 5 experienced were far from the ordinary "external life forces" (DO44) that occur during the course of a typical trial.

Though Sagan faults Plaintiffs for not seeking to relieve Juror Number 5 (DO44), he ignores the fact that, immediately after the juror's statements, the District Court definitively ruled that exclusion was not warranted.  (SA800) ("I don't think that, based on what he has said, there is any basis for me to relieve him. It is very understandable what he said, his concerns, ***period***.") (emphasis added).  It would therefore have been futile for Plaintiffs to ask the District Court to exclude that juror. *See Caruso v. Forslund*, 47 F.3d 27, 31 (2d Cir. 1995) (appeal preserved where "the trial court has made clear that an objection would be futile").

Sagan's argument (DO48,50) that it was equally likely for the jury's rushed deliberations to have resulted in a large damages award for Plaintiffs is obviously wrong.  The life-threatening pandemic caused the jury to minimize the significance of the monetary damages Plaintiffs were seeking, which, in Juror Number 5's words "doesn't seem all that important compared to [the] lives at stake." (SA797-98.)  Thus, not only did the emerging pandemic prevent the jury from taking the time to

rationally weigh the evidence and consider the various statutory damages factors, it also acted as a heavy weight *against* a significant damages award.

Coupled with the Court's erroneous evidentiary rulings, the jury was left with the impression that Sagan paid $1 million in royalties, as he falsely claimed, and that Plaintiffs were just seeking more. Although this was a damages trial, it was in effect a willfulness trial, which focused on whether Sagan, in good faith, had any basis to believe he was entitled to statutory licenses. The pandemic eliminated the time for reflection or deliberation. A new trial is necessary in order for Plaintiffs to receive the fair trial to which they are entitled.

Not surprisingly, each of the cases Sagan relies upon is inapposite. In *United States v. Vorley*, 2021 U.S. Dist. LEXIS 51142 (N.D. Ill. Mar. 18, 2021), the jury did not deliberate until late September 2020, more than six months after the pandemic emerged, and so "[t]he trial took place in a courtroom modified to permit the observance of strict COVID-19 protocols." *Id.* at *7. Moreover, the jurors who expressed concern about possible exposure to COVID were excused, the remaining jurors deliberated for three days, *id.*, and there was "absolutely nothing in the record to suggest that the jurors were gripped with concern that 'each day that deliberations continued, they had to put their physical health at additional risk[.]'" *Id.* at *114-116. Here, in contrast, the trial took place just as the pandemic was exploding in New York City, no COVID-19 protocols were being followed, and at least one juror

was gripped with concern over the life-threatening risk to himself, his family, and other jurors.

In *United States v. Dermen*, 452 F. Supp. 3d 1259 (D. Utah 2020), the trial took place in Utah, which "was well behind many areas of the country in [the pandemic's] progression" *id.* at 1265, and "[n]o member of the jury raised any concerns or made any attempt to communicate with the court or the jury coordinator regarding the coronavirus outbreak." *Id.* at 1264. As a result, the court found that "there is no reason to conclude that jurors were angry, irritated, frightened, or rushed in their deliberations," which lasted eight hours over a span of four days. *Id.* at 1264-65. In this case, the jury was forced to deliberate in densely populated lower Manhattan just as New York City was becoming the global epicenter of the pandemic, a juror raised grave concerns about the COVID outbreak, and the jury's rushed deliberations lasted less than an hour before they fled the courthouse.[12]

In *United States v. Cooper*, 2020 U.S. Dist. LEXIS 138743 (W.D.N.Y. Aug. 4, 2020), the trial took place in the Buffalo area, far from the COVID epicenter of New York City, "no juror brought any concerns to the Court," and the deliberations

---

[12] Sagan's citations to *United States v. Shkolir*, 17 F. Supp. 2d 263, 270 (S.D.N.Y. 1998) and *United States v. Kuznetsov*, No. 05 CR. 916 DAB, 2007 WL 2020110, at *20 (S.D.N.Y. July 11, 2007) (DO50-51) are also inapposite, as Plaintiffs' motion for a new trial was not based on the brevity of the jury's deliberations alone, but on the fact that those deliberations were rushed because a deadly pandemic was bearing down on the New York metro area and caused the jurors to fear for their lives.

lasted three days.  *Id.* at *18-19.  Indeed, the court in *Cooper* noted that the primary concern in Buffalo at the time was from "students travelling *from the New York City area* potentially bringing the virus back with them."  *Id.* at *26-27 (emphasis added).

Sagan's attempt to distinguish *Lucas v. Am. Mfg. Co.*, 630 F.2d 291 (5th Cir. 1980) (DO51-53) also falls short.  Although the COVID-19 pandemic was in many ways unprecedented, it can be analogized to natural disasters like the hurricane that threatened the courthouse in *Lucas*.  There, as here, there were "extraordinary circumstances surrounding the jury's deliberations" that caused "concern for the jurors' well-being."  *Id.* at 293.  And while the District Court in this case did not impose a time limit on the jury's deliberations as the court in *Lucas* did, the jury here was nonetheless pressured by the spreading pandemic to render a verdict as quickly as possible so they could flee the courthouse.  Moreover, as discussed above, the emerging pandemic weighted the scales of justice against Plaintiffs, as it caused the jurors to minimize the importance of a case about bootleg concert performances and the monetary damages owed to Plaintiffs.

## B. The Court Should Disregard Sagan's Irrelevant and Misleading Characterizations of the Trial

In an attempt to distract from the life-threatening impact that the encroaching pandemic had on the jury, Sagan presents false and misleading claims about the trial, none of which is relevant to the instant appeal.  (DO42-43.)  First, Sagan appears to have made up facts out of whole cloth.  For example, Concord Music did *not* testify

that each of the works in Concord's catalog, much less the iconic works at issue in this case, had a value of $1,000. (*Id.* at 42.) Contrary to Sagan's argument (*id.*), Plaintiffs' witnesses testified *repeatedly* that synchronization licenses are needed any time a musical composition is exploited in timed relation to a moving image, including as part of a concert video (Appx963,1014,1037,1074,1079,1235,1338, 1391). Further, there is nothing "incredibly complicated" (DO43) about the fact that the Copyright Act expressly excludes audiovisual works from the definition of phonorecords that are subject to compulsory licenses under Section 115, or that one must obtain the consent of performing artists before exploiting recordings of their concert performances.

Second, Sagan's assertion that only the Plaintiffs called witnesses at trial is misleading at best, as five of the witnesses that Plaintiffs called were on Sagan's witness list and would have been called by Sagan if Plaintiffs had not done so. (D.C. Dkt. 318 at 7-16.) Sagan's assertion that this trial was the longest damages-only copyright trial ever (DO46-47) is similarly misleading. This case involved decade-long infringement of nearly 200 musical works owned by six separate groups of music publishers, for which they sought statutory damages that required the jury to consider a variety of factors, including Sagan's degree of willfulness and his

fraudulent attempts to comply with statutory licensing provisions.[13]  None of the cases Sagan cites (DO47) involved the circumstances presented here, so it is not surprising that the trials in those cases concluded in a shorter period of time.  In any event, Sagan's assertions are irrelevant, as Plaintiffs' motion for a new trial was not based solely on the length of the trial, but also on the effects of the emerging pandemic just as the jury was set to begin its deliberations, as well as on the District Court's evidentiary abuses of discretion.

Third, the fact that Plaintiffs were not able to quantify the harm caused by Sagan's willful infringement is not surprising, as it is notoriously difficult to calculate the harm caused by copyright infringement, especially when the infringement takes place online.  *See WPIX, Inc. v. Ivi, Inc.*, 765 F. Supp. 2d 594, 618 (S.D.N.Y. 2011) (losses from unauthorized streaming of television programming online is notoriously difficult to prove and "nearly impossible to quantify"), *aff'd*, 691 F.3d 275 (2d Cir. 2012); *Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010) ("to prove the loss of sales due to infringement is . . . notoriously difficult.").  Indeed, that is why the Copyright Act makes statutory damages

---

[13] Contrary to Sagan's suggestion (DO28), the District Court properly excluded the supplemental Lundberg declaration that Sagan submitted on the eve of the summary judgment oral argument, as it directly contradicted Lundberg's deposition testimony that Sagan routinely exploited recordings before sending a corresponding NOI and misrepresented the initial date of exploitation in the NOI.  (SAppx37n.28.)

available. *See Warner Bros. v. Dae Rim Trading, Inc.*, 877 F.2d 1120, 1126 (2d Cir. 1989) ("Statutory damages are awarded when no actual damages are proven or they are difficult to calculate."); *NFL v. Primetime 24 Joint Venture*, 131 F. Supp. 2d 458, 472 (S.D.N.Y. 2001) ("'Since actual damages and profits frequently are difficult to prove, the Copyright Act provides for minimum and maximum statutory damages.'") (quoting 2 William F. Patry, Copyright Law & Practice at 1170).

Fourth, Sagan improperly attempts to prejudice this Court against Plaintiffs— as Sagan did with the jury—by citing the number of songs in Plaintiffs' catalogs and the prices Plaintiffs paid to acquire certain of those catalogs. (DO42.) Once again, those facts have absolutely no relevance to Plaintiffs' motion for a new trial. Plaintiffs' (and their songwriters') success is due, in part, to their ability to legitimately license their songwriters' musical compositions, as well as by enforcing their rights against unscrupulous actors like Sagan who lie about having consent from performing artists, fraudulently claim entitlement to statutory licenses, and refuse to negotiate and pay for the licenses necessary to exploit iconic musical compositions.

## III. The District Court Erred in Refusing to Enjoin Sagan's Willful Infringement

### A. Sagan's Continuing Infringement and Refusal to Negotiate for Licenses Establish Irreparable Harm

In opposing Plaintiffs' appeal of the District Court's refusal to enjoin Sagan's willful infringement, Sagan contends that Plaintiffs' harm was not irreparable because he could theoretically obtain a license to legitimize his bootleg concert business. (DO54.) That argument is entirely disingenuous. Although Sagan has known about Plaintiffs' claims since they started sending cease-and-desist letters more than a decade ago (PB11), and although it has been more than three years since he was found to be a willful infringer as a matter of law (SA1952.1), Sagan has *never* obtained the licenses he needs to legitimately operate his business. Indeed, Sagan dramatically *expanded* the scope of his infringements while this case was pending, and *continued* infringing Plaintiffs' musical works even after he was found to be a willful infringer. (PB13,69.)[14] If copyright owners were precluded from seeking an injunction based solely on the theoretical possibility that the infringing use could be licensed—which is true in every copyright case—the Copyright Act's express provision of both damages and injunctive relieve would be eviscerated. (PB68.)

---

[14] Sagan's assertion that "Defendants removed all such works following summary judgment" (DO58n.21) is flatly refuted by Lundberg's trial testimony that Sagan continued exploiting at least twenty of the works at issue after the summary judgment ruling (PB13; SA967-77, 1018-23, 1026-27).

Courts have recognized that injunctions are appropriate where, as here, the infringement is likely to continue, as the copyright owner would otherwise be forced to bring a never-ending series of infringement suits. *See Broad. Music, Inc. v. Prana Hosp.*, 158 F. Supp. 3d 184, 196 (S.D.N.Y. 2016) (absent an injunction, plaintiffs will be forced to "commence litigation for each future violation" which "would pose a considerable hardship"); *Broad. Music, Inc. v. Living Room Steak House, Inc.*, 2016 U.S. Dist. LEXIS 23676, at *21 (E.D.N.Y. Feb. 26, 2016) ("Plaintiffs' burden of time and cost of litigating every future violation outweighs the burdens on the Defendants to obtain a license or to not infringe altogether").

Sagan cites *Broad. Music, Inc. v. PAMDH Enters.*, 2014 U.S. Dist. LEXIS 84409 (S.D.N.Y. June 19, 2014) (DO56), but that case actually favors *Plaintiffs*, as it recognized that "[h]arm can be irreparable, and adequate remedies at law lacking, where a copyright holder seeks to prevent the use of his or her work and, absent an injunction, the defendant is likely to continue infringing the copyright." *Id.* at *13-14 (citing *Silverstein v. Penguin Putnam, Inc.*, 368 F.3d 77, 84 (2d Cir. 2004) ("[I]t has been said that an injunction should be granted if denial would amount to a forced license to use the creative work of another.")).

Furthermore, the court in *PAMDH* denied an injunction only because there was a pre-determined license fee that the defendant could have paid for the public performance rights at issue in that case, and, indeed, the plaintiff sent the defendant

a proposed license agreement. *See PAMDH Enters.*, 2014 U.S. Dist. LEXIS 84409 at *11-16.[15] Here, by contrast, Plaintiffs never sent Sagan a proposed license agreement, as there are numerous terms that would need to be negotiated, assuming Plaintiffs were even willing to license a business that has willfully infringed their copyrights for more than a decade. (Appx940) (ABKCO Music's Alisa Coleman: "[S]ynchronization use is solely based on the songwriter and publisher's authority. It cannot happen without their authorization. They have the right to say yes or no. It's one of the biggest areas in the copyright law which gives us the right to say, yes, you can use this or, no, you can't use it.").[16] Though Sagan contends that a license here would involve "simple calculations of well-known statutory royalty rates" (DO57), this is yet another example of Sagan's stubborn refusal to acknowledge that *his unauthorized concert tapes and audiovisual recordings are not eligible for*

---

[15] Unlike the negotiated licenses that Sagan would need to obtain here, the public performance licenses at issue in *PAMDH* are subject to strict limitations imposed by antitrust consent decrees, which have resulted in standardized license terms. *See United States v. Broad. Music, Inc.*, 207 F. Supp. 3d 374, 377 (S.D.N.Y. 2016) (describing the limitations on the public performance licenses that BMI may offer).

[16] Sagan's efforts to distinguish *WPIX, Inc. v. Ivi, Inc.*, 765 F. Supp. 2d 594 (S.D.N.Y. 2011), *aff'd*, 691 F.3d 275 (2d Cir. 2012) (DO56-57) fail, as the negotiated licenses that Sagan needed to obtain here mirror the complex licensing issues in *Ivi*. (Appx940-950,1436-1441) (discussing numerous factors that Plaintiffs consider in negotiating licenses).

***statutory mechanical licenses***, and that he must *negotiate* with Plaintiffs for licenses.[17]

*Computer Generated Solutions, Inc. v. Koral*, 1998 U.S. Dist. LEXIS 22801 (S.D.N.Y. Dec. 9, 1998), is also distinguishable, as the plaintiff in that case failed to demonstrate a likelihood of success on the merits. *Id.* at *18. Here, Plaintiffs have already succeeded on the merits, as Sagan was found to have infringed all of the works at issue, the vast majority of which willfully. Moreover, *Koral* involved the use of computer software, which "ordinarily would be available in return for payment of [royalty] fees." *Id.* at *4. As explained above, there is no pre-determined license or royalty rate that would presumptively apply to Sagan's unauthorized concert tapes and video recordings. Sagan would need to negotiate for permission to use Plaintiffs' musical works, and Plaintiffs would be well within their rights to refuse a license.

---

[17] *See WPIX, Inc.*, 765 F. Supp. 2d at 618-19 ("[Defendant ivi's] argument proceeds on the fallacy that ivi qualifies as a cable system. Obviously, if ivi were a cable system, plaintiffs could not complain about lost licensing opportunities and diminution of value as a result of ivi's statutory license. As ivi has no license to broadcast plaintiffs' programming, however, defendants obviously cannot rely on the existence of a preexisting pricing mechanism which does not apply to them in order to rebut plaintiffs' allegations of harm. .… Defendants cannot seriously argue that the existence of thousands of companies who *legitimately* use plaintiffs' programming and pay full freight means that ivi's *illegal* and uncompensated use does not irreparably harm plaintiffs.").

Finally, in *IBM v. BGC Partners, Inc.*, 2010 U.S. Dist. LEXIS 46538 (S.D.N.Y. May 12, 2010), the defendant actually acquired a license to use the computer software at issue, *id.* at *5, which stands in stark contrast to Sagan's unauthorized and unlicensed concert recordings.

### B. Sagan's Willful and Widespread Infringement Tips the Balance of the Equities and the Public Interest Firmly in Favor of an Injunction

The balance of the equities favors an injunction, because Sagan's infringement is not only continuing, but was found to be willful. *See Broad. Music v. Hub at Cobb's Mill, LLC*, 2015 U.S. Dist. LEXIS 43315, at *23-25 (D. Conn. Apr. 2, 2015); *Hounddog Prods., LLC v. Empire Film Grp., Inc.*, 826 F. Supp. 2d 619 (S.D.N.Y. 2011). Sagan does not and cannot dispute this.

Sagan fails to address the fact that the Copyright Act provides strong protections to copyright owners in order to incentivize the pursuit of new creative works for the public to enjoy. *See Weissmann v. Freeman*, 868 F.2d 1313, 1325 (2d Cir. 1989) ("by establishing a right to the use of one's expression … copyright provides the economic incentive to research and disseminate ideas. …. Encouraging authors to use their talents by holding out a promise of reward for their efforts is the surest way to advance the public welfare."). It takes no great leap of logic to conclude that the widespread use of copyrighted works without negotiating and paying for the appropriate licenses erodes that incentive and will ultimately harm the

public. *See Korzeniewski v. Sapa Pho Vietnamese Rest., Inc.*, 2019 U.S. Dist. LEXIS 1901, at *25-26 (E.D.N.Y. Jan. 3, 2019), *adopted*, 2019 U.S. Dist. LEXIS 10949 (E.D.N.Y. Jan. 23, 2019) ("[Plaintiff] has established the public interest would be served, since the absence of an injunction—and the concomitant infringement—would diminish his incentive, and that of other photographers, to create copyrighted works like the Image."); *McPherson v. Seaduced, LLC*, 2015 U.S. Dist. LEXIS 52374, at *8-9 (M.D. Fla. Apr. 21, 2015) (injunctive relief is "in the public interest, not only for the protection of copyrights, but also because of the public's interest in supporting creative pursuits while controlling costs passed on to the public when pirated copyrights cause lost revenues").

Because all of the factors that courts consider in deciding whether to grant a permanent injunction weigh strongly in favor of Plaintiffs, the District Court's denial of Plaintiffs' permanent injunction motion should be overturned.

## <u>CONCLUSION</u>

Plaintiffs respectfully ask that the Court affirm the District Court's summary judgment ruling, reverse its refusal to grant a permanent injunction, and remand the case with instructions to hold a new trial on damages.

Dated: New York, New York
August 31, 2021

LOEB & LOEB LLP

By:*/s/ Barry I. Slotnick*
Barry I. Slotnick
Christian D. Carbone
Tal E. Dickstein
Priy Sinha
345 Park Avenue
New York, NY 10154
Telephone: 212.407.4000

*Attorneys for Plaintiffs-Appellees/Cross-Appellants*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Rule 32(a)(5) of the Federal Rules of Appellate Procedure, the foregoing brief is in <u>14-Point Times New Roman</u> proportional font and contains 6,999 words and thus is in compliance with the type-volume limitation set forth in Local Rules 28.1.1(c) and 32.1(a)(4)(B).

Dated: New York, New York
      August 31, 2021

LOEB & LOEB LLP

By:*/s/ Barry I. Slotnick*
    Barry I. Slotnick
    Christian D. Carbone
    Tal E. Dickstein
    Priy Sinha
    345 Park Avenue
    New York, NY 10154
    Telephone: 212.407.4000

    *Attorneys for Plaintiffs-Appellees/Cross-Appellants*

21121987