# 20-3816-cv(L)

## 20-4020-cv(CON), 20-4099-cv(XAP)

IN THE

# United States Court of Appeals

### FOR THE SECOND CIRCUIT

◆◆

ABKCO MUSIC, INC., COLGEMS-EMI MUSIC INC., EMI ALGEE MUSIC CORP., EMI APRIL MUSIC INC., EMI BLACKWOOD MUSIC INC., EMI CONSORTIUM MUSIC PUBLISHING, INC., DBA EMI FULL KEEL MUSIC, EMI CONSORTIUM SONGS, INC., DBA EMI LONGITUDE MUSIC, EMI FEIST CATALOG INC., EMI ROBBINS CATALOG INC., EMI UNART CATALOG, INC., JOBETE MUSIC CO., INC., SCREEN-GEMS-EMI MUSIC INC., STONE AGATE MUSIC, STONE DIAMOND MUSIC CORP., IMAGEM MUSIC LLC, PEER INTERNATIONAL CORPORATION, PSO LIMTED, PEERMUSIC LTD., PEERMUSIC III, LTD., SONGS OF PEER, LTD., SPIRIT CATALOG HOLDINGS S.A.R.L., SPIRIT TWO MUSIC, INC., WARNER-TAMERLANE PUBLISHING CORP., WB MUSIC CORP.,

*Plaintiffs-Counter-Defendants-Appellees-Cross-Appellants,*

(*Caption continued on inside cover*)

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## PETITION FOR REHEARING AND REHEARING *EN BANC*

BARRY SLOTNICK
CHRISTIAN CARBONE
TAL DICKSTEIN
SARAH SCHACTER
LOEB & LOEB LLP
345 Park Avenue
New York, New York 10154
(212) 407-4000

*Attorneys for Plaintiffs-Counter-Defendants-Appellees-Cross-Appellants*

—against—

WILLIAM SAGAN, NORTON LLC, BILL GRAHAM ARCHIVES, LLC, DBA WOLFGANG'S VAULT, DBA CONCERT VAULT, DBA MUSIC VAULT, DBA DAYTROTTER,

*Defendants-Third-Party Plaintiffs-Counter Claimants-Appellants-Cross-Appellees.*

# **<u>TABLE OF CONTENTS</u>**

<b><u>Page</u></b>

TABLE OF AUTHORITIES ....................................................................... ii

INTRODUCTION AND RULE 35(B) STATEMENT ............................................1

STATEMENT OF THE CASE................................................................................3

ARGUMENT ........................................................................................................6

I.    The Panel Erred in Holding That a Corporate Officer Can Immunize Himself From Liability by Directing a Subordinate to Exploit Copyrighted Works. ..............................................................6

    A.    The Panel's Opinion Conflicts With the Plain Language of the Copyright Act and Supreme Court Precedent. ................................6

    B.    The Panel's Opinion Conflicts with Law in This Circuit and Leading Commentators. ........................................................8

    C.    The Panel's Opinion Conflicts with Decisions of Other Circuits. ..........................................................................12

II.    The Panel Improperly Enlarged the Scope of the Copyright Act's Compulsory Licensing Provision. ..................................................13

CONCLUSION ....................................................................................................17

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A&M Records v. Napster, Inc.*,
    239 F.3d 1004 (9th Cir. 2001) ...........................................................14

*Bostock v. Clayton Cty.*,
    140 S. Ct. 1731 (2020) .....................................................................14

*Burberry Ltd. v. Euro Moda, Inc.*,
    2009 U.S. Dist. LEXIS 53250
    (S.D.N.Y. June 10, 2009) ........................................................... 11-12

*BWP Media USA, Inc. v. Polyvore, Inc.*,
    922 F.3d 42 (2d Cir. 2019) .................................................................8

*Capitol Records LLC v. ReDigi Inc.*,
    2014 U.S. Dist. LEXIS 122711
    (S.D.N.Y. Sept. 2, 2014)...................................................................10

*Cartoon Network LP v. CSC Holdings, Inc.*,
    536 F.3d 121 (2d Cir. 2008) ...............................................................9

*Cmty. for Creative Non-Violence v. Reid*,
    490 U.S. 730 (1989)...........................................................................2

*Fame Publ'g Co. v. Ala. Custom Tape, Inc.*,
    507 F.2d 667 (5th Cir. 1975) ............................................................14

*Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp.*,
    25 F.3d 119 (2d Cir. 1994) ...............................................................12

*Kihn v. Bill Graham Archives LLC*,
    No. 20-17397, 2022 U.S. App. LEXIS 9 (9th Cir. Jan. 3, 2022) ........................6

*Lottie Joplin Thomas Tr. v. Crown Publrs., Inc.*,
    456 F. Supp. 531 (S.D.N.Y. 1977), *aff'd*, 592 F.2d 651 (2d Cir. 1978) ...... 10-11

*MGM Studios Inc. v. Grokster, Ltd.*,
545 U.S. 913 (2005)..........................................................................................8

*Silvers v. Sony Pictures Entm't. Inc.*,
402 F.3d 881 (9th Cir. 1989) ...........................................................................2

*Society of the Holy Transfiguration Monastery, Inc. v. Gregory*,
689 F.3d 29 (1st Cir. 2012)......................................................................12, 13

*Sohm v. Scholastic Inc.*,
959 F.3d 39 (2d Cir. 2020) .............................................................................16

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
464 U.S. 417 (1984)...................................................................................... 6-7

*Star Pac. Corp. v. Star Atl. Corp.*,
574 F. App'x 225 (3d Cir. 2014) ....................................................................13

*UMG Recordings, Inc. v. Escape Media Grp.*,
2014 U.S. Dist. LEXIS 137491 (S.D.N.Y. Sept. 29, 2014) ...............................10

*United States Media Corp. v. Edde Entm't, Inc.*,
1996 U.S. Dist. LEXIS 13389 (S.D.N.Y. Sep. 10, 1996) ...................................10

*United States v. Al-Farekh*,
956 F.3d 99 (2d Cir. 2020) .............................................................................15

*Warren v. John Wiley & Sons, Inc.*,
952 F. Supp. 2d 610 (S.D.N.Y. 2013) ...............................................................2

**Statutes & Rules**

17 U.S.C. § 104A(h)(4) ...........................................................................................15

17 U.S.C. § 106 ..........................................................................................................7

17 U.S.C. § 115(a)(1)...........................................................................................5, 16

17 U.S.C. §§ 203(a)(4) &(b)(4) ..............................................................................15

17 U.S.C. § 304(a)(3)(A) .........................................................................................15

17 U.S.C. §§ 304(c)(4) & (c)(6)(D)........................................................................15

17 U.S.C. § 1101(a) ...................................................................16

17 U.S.C. § 1311 .......................................................................15

Fed. R. App. P. 35(a)(1)..............................................................2

Fed. R. App. P. 35(a)(2)..............................................................2

Fed. R. App. P. 35(b)(1) .............................................................1

**Other Authorities**

Goldstein on Copyright § 8.0 (2022) ....................................8, 11

Goldstein on Copyright § 8.1.1.1(2022) ...................................11

4 McCarthy on Trademarks and Unfair Competition § 25:24 (5th ed.)..................12

3 Nimmer on Copyright § 8E.03[A][3] (2022).........................16

3 Nimmer on Copyright § 12.04[A][1] (2022) ..........................11

## <u>INTRODUCTION AND RULE 35(B) STATEMENT</u>

In its October 6, 2022 opinion ("Opinion"), the panel held that a company's chief executive and sole shareholder can immunize himself from direct copyright infringement liability by instructing an employee to exploit copyrighted works. This holding is of "exceptional importance" Fed. R. App. P. 35(b)(1), in that it conflicts with the plain language of Section 106 of the Copyright Act, which, as confirmed by the Supreme Court, gives copyright owners the exclusive right "to authorize" copying of their works to the same extent as performing the physical act of copying. By refusing to hold William Sagan personally liable for specifically authorizing the acts of copying by his wholly owned and controlled companies, the panel Opinion effectively read the words "to authorize" out of the statute. The Opinion also conflicts with decisions of other Circuits, and with decisions of district courts in this Circuit, which held corporate officers directly liable for instructing their employees to infringe.

The panel's Opinion would leave copyright owners without a remedy when the owner and chief executive of a business delegates the physical acts of infringement to an employee, while stripping his corporate entity of any assets to satisfy a judgment. The employee could avoid liability by arguing he had no choice

in the matter,[1] while, under the panel's holding, the executive could simply point his finger at the employee. The result is that copyright owners would be left without recourse for infringement of their works, where, as here, the company itself is effectively judgment proof.

If the panel does not reverse its Opinion, *en banc* review is necessary both to "maintain uniformity of the court's decisions," Fed. R. App. P. 35(a)(1), which is of paramount importance in the area of copyright law, *see Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 749 (1989) (noting "Congress' paramount goal in revising the 1976 [Copyright] Act of enhancing predictability and certainty of copyright ownership"), and because this case presents an issue of "exceptional importance," Fed. R. App. P. 35(a)(2); *see Silvers v. Sony Pictures Entm't. Inc.*, 402 F.3d 881, 890 (9th Cir. 1989) (granting *en banc* review and stating "the creation of a circuit split would be particularly troublesome in the realm of copyright").

In a second holding of exceptional importance, the panel disregarded the language of Section 115 of the Copyright Act, which permits, under limited circumstances, copying and distributing sound recordings containing copyrighted musical works without having to negotiate for a license. Prospective licensees who

---

[1] *See Warren v. John Wiley & Sons, Inc.*, 952 F. Supp. 2d 610, 619 (S.D.N.Y. 2013) ("An employee who commits an act of infringement will not be personally liable if that act was required as part of his employment")

wish to exploit recordings that were "fixed by another" must show that those recordings were lawfully fixed with the consent of the performer, and, for recordings made before 1972, that the recordings were made with the consent of the owners of the underlying musical works.

Though compulsory license provisions must be strictly construed, the panel inappropriately expanded Section 115 by interpreting "fixed by another" to mean "fixed by another *but not a predecessor*." Thus, even though the concert recordings Defendants exploited were found by the District Court to have been recorded illegally without the consent of the performing artists or the owners of the musical works, the panel gave Defendants a free pass to exploit Plaintiffs' copyrights under a compulsory license for pennies on the dollar.

Even if, *arguendo*, the panel's interpretation of Section 115 was correct, Defendants still would not qualify for compulsory licenses. Defendants have not submitted any admissible evidence as to who actually made the recordings, and therefore cannot show that the recordings were created by their purported predecessors. Defendants would therefore not qualify for Section 115 licenses even under the panel's expansive interpretation.

## STATEMENT OF THE CASE

This is a copyright infringement action against two companies and their sole owner, president and CEO, William Sagan. Sagan purchased bootleg concert tapes

3

containing secret recordings allegedly made by various concert promoters and venue operators, without the consent of either the performers or the owners of the copyrights in the musical works performed at the concerts.

Sagan then caused his companies to exploit the concert recordings online. He hired his brother-in-law, Matthew Lundberg, and directed Lundberg to digitize the tapes and make them commercially available on Defendants' website. Lundberg carried out Sagan's instructions, resulting in tens of thousands of concert recordings being put up for sale in audio and audiovisual format.

Defendants refused to obtain licenses from the owners of the copyrights in the musical works embodied in the concert recordings, or from the performing artists whose performances are captured in the recordings. After repeatedly demanding that Defendants stop infringing their musical works, Plaintiffs filed suit in May 2015, based on Defendants' infringement of 197 works. Defendants claimed they were entitled to compulsory licenses under the narrow circumstances provided in Section 115 of the Copyright Act.

In March 2018, the District Court granted summary judgment to Plaintiffs on liability as to all of the works at issue. (SAppx1-54.) It held that the works Defendants exploited in audiovisual format were not eligible for Section 115 licenses. It also held that Defendants could not meet the "substantive" requirements of Section 115—namely, that the recordings were (i) fixed lawfully with the consent

of the performers, and (ii) reproduced with the consent of the owners of the copyrights in the recordings, or, for pre-1972 recordings, with the consent of those who made the recordings with permission from the owners of the musical works.

The District Court held Sagan liable for direct infringement, because he "made plans to start digitizing tape recordings with an eye towards making them available on a public website" and he actually exercised his "final decision-making authority" over his companies when he personally "instructed [Lundberg] as to which concerts to make available for download or not." (SAppx51.)

Defendants admitted in the District Court that they would need to satisfy the substantive requirements of Section 115, conceding that "the recordings must have been 'fixed lawfully.'" (SA329.)[2] Defendants took the opposite position in their appeal to this Court. They argued that they are *not* required to satisfy Section 115's substantive requirements, which apply when the recordings being exploited were "fixed by another." 17 U.S.C. § 115(a)(1).[3] According to Defendants, even though

---

[2] Defendants made that same argument to the Ninth Circuit in a successful effort to de-certify a class action infringement lawsuit. *See Kihn v. Bill Graham Archives LLC*, No. 20-17397 (9th Cir. Apr. 19, 2021), Dkt. Entry 12 at 35-38 ("[Q]uestions of 'lawful fixation' would *still* apply to thousands upon thousands of separate audio-only recordings, which compromise the majority of Defendants' collection."); *Id.*, 2022 U.S. App. LEXIS 9, at *9 (9th Cir. Jan. 3, 2022). Defendants' argument to this Court conflicts with their argument to the Ninth Circuit, on which they prevailed.

[3] Congress revised Section 115 after the District Court's ruling, but simply moved the substantive requirements to Section 115(a)(1)(B).

the recordings were made decades ago by unidentified third-parties, they were not "fixed by another," because Sagan allegedly bought them from the people who made them.

The panel reversed the District Court's ruling that Sagan was personally liable. It held that "direct liability attaches only to 'the person who actually presses the button.'" (Opinion 29.) It also held that the recordings in Defendants' collection were not "fixed by another" and therefore Section 115's substantive requirements did not apply, because Defendants claim to have acquired the recordings from the people who made them. (*Id.* at 18-22.)

## **ARGUMENT**

### I. **The Panel Erred in Holding That a Corporate Officer Can Immunize Himself From Liability by Directing a Subordinate to Exploit Copyrighted Works.**

Neither the panel nor Defendants cited a single case in which a court has refused to impose direct liability on a corporate officer and sole owner who specifically directed a subordinate to commit physical acts of copying. The panel Opinion conflicts with the plain language of the Copyright Act, and with decisions of the Supreme Court, this Circuit, and others.

#### A. **The Panel's Opinion Conflicts With the Plain Language of the Copyright Act and Supreme Court Precedent.**

The Supreme Court has explained that the language of the Copyright Act sets forth the basis for claims of direct copyright infringement. *See Sony Corp. of Am. v.*

*Universal City Studios, Inc.*, 464 U.S. 417, 433 (1984) ("[A]nyone who trespasses into [the copyright owner's] exclusive domain by using or *authorizing* the use of the copyrighted work in one of the five ways set forth in the statute, 'is an infringer of the copyright.'") (quoting 17 U.S.C. § 501(a)) (emphasis added). Section 501 of the Copyright Act, quoted in *Sony*, references Section 106, which grants copyright owners "the exclusive rights to do and *to authorize*" certain activities, including reproducing and distributing their works. 17 U.S.C. § 106 (emphasis added). A direct infringer is therefore "not merely one who uses a work without authorization by the copyright owner, but also one who *authorizes* the use of a copyrighted work without actual authority from the copyright owner." *Sony*, 464 U.S. at 435 n.17 (emphasis added).

Sagan indisputably authorized—indeed, he *instructed*—his brother-in-law-turned-employee Lundberg to digitize and distribute the concert tapes Sagan acquired. Therefore, under the plain language of the Copyright Act and consistent with *Sony*, Sagan is liable for direct infringement.

By confining direct infringement only to the person who "presses the button"—*i.e.*, the person who violates the right "to do" the things enumerated in

Section 106—the panel improperly read the phrase "to authorize" out of Section 106.[4]

## B. The Panel's Opinion Conflicts with Law in This Circuit and Leading Commentators.

As the panel noted, direct infringement requires only "'volitional conduct' that 'causes' the copying or distribution." (Opinion 29) (quoting *Zappa v. Rykodisc, Inc.*, 819 F. Supp. 2d 307, 315 (S.D.N.Y. 2011)). "In the context of direct copyright infringement, volition 'is *choosing* to engage in an act that causes infringement.'" *BWP Media USA, Inc. v. Polyvore, Inc.*, 922 F.3d 42, 52 (2d Cir. 2019) (Walker, J., concurring) (quoting 3 Patry on Copyright § 9:5.50).

Sagan indisputably chose to engage in an act that caused the infringement. He instructed his subordinate—who was duty-bound to follow Sagan's instructions—to digitize concert recordings containing Plaintiffs' musical works and make them available online. (Opinion 30.) Sagan is therefore liable for direct infringement.

---

[4] Secondary liability theories are no substitute for properly pled direct infringement claims. Secondary liability theories apply primarily to companies who create technology products that facilitate infringement by their customers, *see MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005), not to individuals who personally direct their subordinates to reproduce and distribute copyrighted works. Requiring plaintiffs to plead secondary liability in that scenario would create unnecessary burdens during discovery and trial, and thereby deter meritorious claims. *See* Goldstein on Copyright § 8.0 (2022) ("Copyright owners that can show direct infringement in these cases will usually be better off doing so because … direct liability does not require proof of the additional elements that must be shown in secondary liability cases.").

The panel erred in relying on *Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121, 131 (2d Cir. 2008) for the proposition that only the "person who actually presses the button" engages in volitional conduct. (Opinion 29.) The issue in *Cartoon Network* was whether a cable company infringed by operating a system that automatically created a copy of a television program whenever a customer directed the system to record the program. *Cartoon Network*, 536 F.3d at 130. The court held that the person who "supplies the necessary element of volition" is "the person who actually presses the button to make the recording" and "not the person who manufactures, maintains, or … owns the machine." *Id.* at 131.

The *Cartoon Network* court did *not* hold that the *only* way to engage in volitional conduct is to "press[] the button" that commences the physical act of copying, and it made clear that its holding applied "only … on the facts of this case," which involved an operator of an automated computer system that enabled infringement by its customers. *Id.* at 133. The *Cartoon Network* case did not involve a corporate owner and CEO who was intimately engaged in his company's operations and personally instructed his employee to copy and distribute copyrighted works.

*Cartoon Network* actually *supports* direct liability against Sagan. There, the court found that cable customers directly infringed by instructing a machine, which had no discretion to refuse, to record television programs. Here, Sagan directly

infringed by instructing Lundberg, who similarly had no discretion to refuse, to digitize and distribute recordings of Plaintiffs' musical works.

District courts in this Circuit have found direct infringement where, as here, an officer directs an employee to copy and distribute copyrighted works. In *UMG Recordings, Inc. v. Escape Media Grp.*, 2014 U.S. Dist. LEXIS 137491, at *60-61 (S.D.N.Y. Sept. 29, 2014), the court held that "Defendants engaged in the required volitional conduct necessary to support a finding of direct infringement. More specifically, defendants *instructed their employees to repeatedly upload substantial volumes of popular copyrighted music files* ...." *Id.* (emphasis added). Similarly, in *United States Media Corp. v. Edde Entm't, Inc.*, 1996 U.S. Dist. LEXIS 13389, at *17 (S.D.N.Y. Sep. 10, 1996), the court found a corporate executive "liable as a direct infringer" because he "personally oversaw the purchase of the [infringing] films ...." *Id.*

Courts in this Circuit have also held corporate officers jointly and severally liable when they cause their companies to infringe, without the need to resort to secondary liability. *See Capitol Records LLC v. ReDigi Inc.*, 2014 U.S. Dist. LEXIS 122711, at *4, 7-8 (S.D.N.Y. Sept. 2, 2014) (Sullivan, J.) (stating corporate officers may be jointly and severally liable for corporation's direct infringement "undertaken at the behest of or with the approval of" the officers, and rejecting argument that "Plaintiff must separately plead each theory of liability as to the [officers]"); *Lottie*

10

*Joplin Thomas Tr. v. Crown Publrs., Inc.*, 456 F. Supp. 531, 537 (S.D.N.Y. 1977), *aff'd*, 592 F.2d 651 (2d Cir. 1978) (stating "a corporate officer … who causes a corporate defendant to infringe … is jointly and severally liable for the infringement," and imposing liability on officer who "negotiated with the pianist and arranged for him to produce the [infringing] master tape").

Leading commentators agree that a defendant may be directly liable even if he did not engage in the physical act of copying, so long as he directed it. *See* 3 Nimmer on Copyright § 12.04[A][1] ("Those who participate in the copyright infringement are often held liable, even if they have not 'personally duplicated the designs' at issue."); Goldstein on Copyright § 8.0 (2022) ("Theories of secondary liability will also sometimes overlap liability for direct infringement itself, particularly in the workplace where the principle of *respondeat superior* may implicate a corporate officer or overseer directly in the infringing acts."); *Id.* at § 8.1.1.1 (where "defendant selected the offending materials for inclusion in the direct infringer's motion picture, … defendant's involvement with the direct infringement was so intimate that he could properly have been characterized as a direct infringer").

The panel's Opinion is also in tension with this Circuit's precedent in the analogous area of trademark law, where corporate officers who specifically direct employees to commit infringing acts are held personally liable. *See Burberry Ltd. v. Euro Moda, Inc.*, 2009 U.S. Dist. LEXIS 53250, at *49 (S.D.N.Y. June 10, 2009)

11

("[I]t is well established in this Circuit that … a corporate officer may be held personally liable for trademark infringement … if the officer is a moving, active conscious force behind [the defendant corporation's] infringement."); 4 McCarthy on Trademarks and Unfair Competition § 25:24 (5th ed.) ("To be personally liable, corporate officers or directors must do more than merely control corporate affairs: they must personally take part in infringing activities *or specifically direct employees to do so*.") (emphasis added); *cf. Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp.*, 25 F.3d 119, 124 (2d Cir. 1994) ("analogous context of trademark infringement" used to derive rules for copyright claims).

### C.    The Panel's Opinion Conflicts with Decisions of Other Circuits.

In *Society of the Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 35-37 (1st Cir. 2012), a monastery sued an archbishop for direct copyright infringement based on materials that had been posted online.  The archbishop argued that "he may not be held liable for direct copyright infringement because he 'is not the person who posted the disputed Works on the website'" and claimed it was "Father Peter" who had done so.  *Id.* at 54.  The First Circuit rejected that argument, because the archbishop "knew Father Peter generally was uploading [the copyrighted works] to the Website and [the archbishop] expressly authorized [Father Peter] to do so."  *Id.* at 56.  "For these reasons, the Archbishop's attempt to shift the

blame onto Father Peter – because the latter personally performed acts of unauthorized copying – fails." *Id.* at 57.

The First Circuit explained that "personal involvement in the alleged infringement" is not required to establish direct infringement. *Id.* It recognized that *Sony* "clearly defined an infringer as … anyone who trespasses into [the copyright owner's] exclusive domain by using <u>or authorizing</u> the use of the copyrighted work in one of the statute's listed exclusive rights,'" *id.* (quoting *Sony*, 464 U.S. at 433) (emphasis in *Gregory*), and that "an infringer is 'not merely one who uses a work without authorization by the copyright owner, <u>but also one who authorizes the use of the copyrighted work without actual authority from the copyright owner</u>.'" *Gregory*, 689 F.3d at 57 (quoting *Sony*, 464 U.S. at 435 n.17) (emphasis in *Gregory*).

The Third Circuit has similarly held corporate officers liable for direct infringement when they cause their companies to engage in physical acts of infringement. In *Star Pac. Corp. v. Star Atl. Corp.*, 574 F. App'x 225, 229-31 (3d Cir. 2014), the court found that an officer who was "clearly substantially embroiled in [a company's] management and operations" that caused the infringement had engaged in volitional conduct, and was therefore liable for direct infringement.

## II. The Panel Improperly Enlarged the Scope of the Copyright Act's Compulsory Licensing Provision.

Section 115 of the Copyright Act is a limited exception to copyright owners' exclusive rights to negotiate terms for the use of their works or to withhold

permission altogether. Courts therefore "narrowly construe" compulsory licensing provisions such as Section 115. *A&M Records v. Napster, Inc.*, 239 F.3d 1004, 1028 (9th Cir. 2001); *Fame Publ'g Co. v. Ala. Custom Tape, Inc.*, 507 F.2d 667, 670 (5th Cir. 1975) ("compulsory license provision … must be construed narrowly").

Notwithstanding the Copyright Act's plain language requiring prospective licensees to satisfy Section 115's substantive requirements when they seek to reproduce musical works contained in recordings "fixed by another," the panel held that those requirements do not apply when the recording was fixed by the applicant's predecessor. In so holding, the panel improperly expanded the limited circumstances under which one may exploit a musical work without the copyright owner's consent by paying the statutory rate (*i.e.*, pennies or fractions of pennies) rather than negotiating a fair-market license.

The panel overlooked fundamental principles of statutory construction, which required it to apply the plain meaning of the word "another." *See Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1737 (2020) ("When the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest. Only the written word is the law.").

Defendants concede that they did not record any of the concerts at issue. Consequently, under the plain language of the statute, Sagan's concert tapes *were* "fixed by another," which triggers the substantive requirements of Section 115. The

panel effectively changed the language of the statute from "fixed by another" to "fixed by another *but not a predecessor*," and dramatically expanded the compulsory licensing statute.

If Congress intended individuals who purchase recordings from others to be exempt from Section 115's substantive requirements, it would have said so. The Copyright Act uses the term "successor" numerous times,[5] indicating that Congress knew how to exempt successors-in-interest from Section 115's substantive requirements if it wanted to. *See United States v. Al-Farekh*, 956 F.3d 99, 107 (2d Cir. 2020) (use of language in one section of statute but not another presumed intentional).[6]

The panel also incorrectly focused on just one aspect of Congressional intent in passing the statute—deterring record piracy. (Opinion 20-22.) Congress' other goal was to prevent parties from obtaining a compulsory license to exploit musical works embodied in illegal recordings that were made without the performers' consent—*i.e.*, bootlegs. That is why Section 115 requires not only that the applicant have the consent of the owner of the recording, but also that the recording was

---

[5] *See* 17 U.S.C. §§ 104A(h)(4), 203(a)(4), 203(b)(4), 304(a)(3)(A), 304(c)(4), 304(c)(6)(D), 1311.

[6] In another context, the panel reasoned that, if Congress intended a result that contradicted the plain language of the Copyright Act, "'it would have artfully worded the definition' to reflect that intent." (Opinion 16) (quoting *Huddleston v. United States*, 415 U.S. 814, 822 (1974)). That reasoning applies equally here.

lawfully fixed, which requires consent from the performers. *See* 17 U.S.C. § 1101(a) (bootlegging unlawful); 3 Nimmer on Copyright § 8E.03[A][3] (2022) ("[F]ixation of [performers'] work, without permission from each performer, violates the statute."). Thus, implicit in the language of Section 115 is the principle that the recording must be lawful in order to obtain a compulsory license.

The panel invoked policy reasons for not construing the word "another" according to its plain meaning, as doing so would, according to the panel, "impair the transferability of these sorts of works because every trade would thereby impose new burdens and diminish value." (Opinion 20). That purported policy goal cannot override the plain language of the statute, and, in any event, is not a serious concern. Purchasers can easily ask for copies of consents showing that the recordings were lawfully fixed, or rely on representations and warranties to that effect. Furthermore, sound public policy would not reward bootleggers by making it easier for them to peddle their illegal wares.

The panel's conclusion was also premised on the misapprehension that Defendants are, in fact, the successors of the people who taped the concerts. But there was no evidence in the record showing who recorded the concerts at issue, even though it was Defendants' burden to prove each element of their license defense. *See Sohm v. Scholastic Inc.,* 959 F.3d 39, 48 (2d Cir. 2020). Thus, even assuming the panel was correct in deciding that the successor of the person who

16

made the recordings is exempt from Section 115's substantive requirements, Defendants would still be subject to those requirements.

The Opinion permits Defendants to effectively launder illegal bootleg recordings through Section 115's compulsory license provisions, thereby avoiding liability for copyright infringement. Allowing Defendants to do so is contrary to the text and purposes of the statute.[7]

## **CONCLUSION**

Panel rehearing or *en banc* review is necessary to address two issues of exceptional importance to the copyright community, and to correct a misreading of critical provisions of the Copyright Act.

Dated: New York, New York
      October 20, 2022

                  LOEB & LOEB LLP

---

[7] Upon rehearing on the issue of whether Defendants violated the substantive provisions of Section 115, the Court should reinstate the District Court's attorneys' fee award. (Opinion 42-43.)

By:*/s/ Barry I. Slotnick*
    Barry I. Slotnick
    Christian D. Carbone
    Tal E. Dickstein
    Sarah Schacter
    345 Park Avenue
    New York, NY 10154
    Telephone: 212.407.4000

    *Attorneys for Plaintiffs-Appellees/Cross-Appellants*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 32(a)(5) of the Federal Rules of Appellate Procedure, the

foregoing brief is in 14-Point Times New Roman proportional font and contains

3,896 words and thus is in compliance with the type-volume limitation set forth in

Local Rule 35(b)(2).


Dated: New York, New York
      October 20, 2022

                        LOEB & LOEB LLP

                      By:*/s/ Barry I. Slotnick*
                          Barry I. Slotnick
                          Christian D. Carbone
                          Tal E. Dickstein
                          Sarah Schacter
                          345 Park Avenue
                          New York, NY 10154
                          Telephone: 212.407.4000

                        *Attorneys for Plaintiffs-Appellees/Cross-Appellants*

22845858

19

20-3816
<u>ABKCO Music, Inc. v. Sagan</u>

1          UNITED STATES COURT OF APPEALS
2            FOR THE SECOND CIRCUIT
3                   _____
4
5                 August Term, 2021
6
7  (Argued: March 14, 2022         Decided:    October 6, 2022)
8
9       Docket Nos. 20-3816(L), 20-4020(CON), 20-4099(XAP)
10                   _____
11
12   ABKCO MUSIC, INC., COLGEMS-EMI MUSIC INC., EMI ALGEE MUSIC CORP., EMI
13     APRIL MUSIC INC., EMI BLACKWOOD MUSIC INC., EMI CONSORTIUM MUSIC
14   PUBLISHING, INC., DBA EMI FULL KEEL MUSIC, EMI CONSORTIUM SONGS, INC.,
15   DBA EMI LONGITUDE MUSIC, EMI FEIST CATALOG INC., EMI ROBBINS CATALOG
16    INC., EMI UNART CATALOG, INC., JOBETE MUSIC CO., INC., SCREENGEMS-EMI
17   MUSIC INC., STONE AGATE MUSIC, STONE DIAMOND MUSIC CORP., IMAGEM MUSIC
18  LLC, PEER INTERNATIONAL CORP., PSO LTD., PEERMUSIC LTD., PEERMUSIC III, LTD.,
19  SONGS OF PEER, LTD., SPIRIT CATALOG HOLDINGS S.A.R.L, SPIRIT TWO MUSIC, INC.,
20     WARNER-TAMERLANE PUBLISHING CORP., WB MUSIC CORP.,

21                         <u>Plaintiffs-Counter-Defendants-Appellees-Cross-</u>
22                                <u>Appellants</u>,

23                                  <u>v.</u>
24
25     WILLIAM SAGAN, NORTON LLC, BILL GRAHAM ARCHIVES, LLC,
26   DBA WOLFGANG'S VAULT, DBA CONCERT VAULT, DBA MUSIC VAULT, DBA
27                   DAYTROTTER,

28                        <u>Defendants-Counterclaimants-Appellants-Cross-</u>
29                               <u>Appellees</u>.

_____

Before: JACOBS, WESLEY, and MENASHI, <u>Circuit Judges</u>.

A collection of music publishers alleged infringement of their copyrights in 197 musical works when a series of live concert recordings was made available by the defendants for download and streaming on their websites. Plaintiffs sought damages and a permanent injunction pursuant to the Copyright Act. The United States District Court for the Southern District of New York (Ramos, <u>J.</u>) held on summary judgment that defendants had no valid licenses and therefore infringed each of the musical works, and that the principal was personally liable. The district court denied plaintiffs' request for a permanent injunction. Two years later, after a nine-day damages trial, the jury awarded plaintiffs a minimal $189,500 in statutory damages. The district court denied plaintiffs' motion for a new trial but awarded them roughly $2.4 million in attorneys' fees.

Defendants appeal from the district court's summary judgment order and the order granting fees and costs. Plaintiffs cross-appeal from the district court's denial of a permanent injunction, several evidentiary rulings, and the denial of a new trial.

1    We AFFIRM in part, VACATE in part, and REVERSE in part, the grant of

2    summary judgment, and AFFIRM the denial of a permanent injunction; REJECT

3    the challenges to the evidentiary rulings; AFFIRM the denial of plaintiffs' motion

4    for a new trial; VACATE the award of attorneys' fees; and REMAND for further

5    proceedings consistent with this opinion.

6    _____

7                                          MICHAEL S. ELKIN (Erin R. Ranahan, on
8                                          the brief), Winston & Strawn LLP, New
9                                          York, NY, for Defendants-
10                                         Counterclaimants-Appellants-Cross-
11                                         Appellees.
12
13                                         BARRY I. SLOTNICK (Christian D.
14                                         Carbone, Tal E. Dickstein, Sarah Schacter,
15                                         and Priy Sinha, on the brief), Loeb & Loeb
16                                         LLP, New York, NY, for Plaintiffs-Counter-
17                                         Defendants-Appellees-Cross-Appellants.
18
19
20   DENNIS JACOBS, Circuit Judge:
21
22    In 2002, William Sagan acquired a trove of live concert recordings that

23   included performances by The Rolling Stones, The Who, the Grateful Dead, and

24   many others.  At the time, the sellers cautioned that Sagan "may be buying the

25   world['s] greatest private collection [of recordings] that no one will ever hear."

3

1    App'x at 453.  But in 2006, Sagan made those and other recordings available to

2    the world through digital download and streaming services offered for a fee

3    through various websites.  Sagan did this through his companies Norton LLC

4    and the Bill Graham Archives, LLC (together with Sagan, "defendants").

5        In 2015, a collection of music publishers (together, the "Publishers")

6    brought this suit under the Copyright Act, alleging that defendants infringed the

7    Publishers' copyrights in 197 musical works that were performed in the live

8    concert recordings.  The Publishers sought about $30 million in damages and a

9    permanent injunction.  On March 30, 2018, the United States District Court for

10   the Southern District of New York (Ramos, J.) held on summary judgment that

11   defendants had no valid licenses and therefore infringed each of the musical

12   works and that Sagan was personally liable.  The district court denied the

13   Publishers' request for a permanent injunction.  Two years later, after a nine-day

14   damages trial, the jury awarded the Publishers $189,500, which was near the

15   minimum statutory damages.  The Publishers argued that the minimal award

16   was a rushed and ill-considered result of the encroaching pandemic and moved

17   for a new trial.  The district court denied the motion but awarded them roughly

18   $2.4 million in attorneys' fees.

4

1    On appeal, defendants challenge the district court's summary judgment

2    rulings and the order granting fees and costs.  The Publishers cross-appeal the

3    district court's denial of a permanent injunction, several evidentiary rulings, and

4    its denial of the new trial.

5

6                              **BACKGROUND**

7                                  **I**

8    Congress has created two types of copyrights in a musical recording.  One

9    is for the underlying "musical work," which encompasses the notes and lyrics of

10   a song.  <u>See</u> 17 U.S.C. § 102(a)(2).  The other is for the "sound recording," which

11   covers the rights to a recording of a particular performance by a particular artist.

12   <u>See</u> <u>id.</u> § 102(a)(7).  This case concerns the first type of copyright.  (The second

13   type was at issue in a prior litigation.)

14   A person seeking to make and distribute phonorecords–that is, material

15   objects in which sounds are fixed–of a previously published musical work can do

1    so by obtaining a compulsory license.  See id. § 115(a)(1).[1]  One need only

2    provide notice to the owner of the copyright in the musical work (*before*

3    distribution) and pay government-prescribed royalties.  See id. § 115(b), (c).

4    Alternatively, a prospective licensee can go directly to the copyright owner or its

5    agent and secure a "negotiated license."  Id. § 115(b)(2), (c)(3)(B).

6        If one seeks to duplicate and sell a sound recording that was "fixed by

7    another," id. § 115(a)(1), rather than make one's own sound recording, there are

8    two additional eligibility requirements for a compulsory license: (i) the sound

9    recording must have been "fixed lawfully," and (ii) the duplication must have

10   been authorized by the copyright owner of the sound recording or, "if the sound

11   recording was fixed before February 15, 1972," the sound must have been fixed

12   "pursuant to an express license from the owner of the copyright in the musical

13   work or pursuant to a valid compulsory license for use of such a work in a sound

14   recording."  Id.  We refer to these as Section 115's "substantive requirements."

---

[1] Section 115 of the Copyright Act was amended in 2018 under the Musical Works Modernization Act and governs conduct engaged in after October 11, 2018.  See Act of Oct. 11, 2018, Pub. L. 115-264, 132 Stat. 3676.  The conduct in this case occurred before that date, so all citations in this opinion to 17 U.S.C. § 115 are to the pre-2018 version of the statute.

1                                        **II**

2          William Sagan is the president, CEO, and sole shareholder of Norton LLC

3   ("Norton").  In 2002, Norton purchased the archives of the late concert promoter

4   Bill Graham by acquiring Bill Graham Archives, LLC ("Archives"), which

5   housed a collection of audio and audiovisual recordings.  The purchase

6   agreement that conveyed the Archives provided that Sagan was acquiring "all

7   Intellectual Property rights . . . to the extent that either Seller or any of its

8   Affiliates possesses such rights."  Supp. App'x at 1334.  A disclaimer recites that

9   the seller made "*no representations* regarding whether the Assets or their past or

10  future use or exploitation infringed or infringes on the Intellectual Property

11  rights of any person."  Id. at 1335 (emphasis added).  The seller also told Sagan

12  that he would need to get record company and artist approval to exploit the

13  recordings.

14         In the ensuing years, defendants continued to acquire recordings of live

15  concerts through other sources.  As with the initial purchase from the Archives,

16  these acquisitions came with limited assurances (or none) as to the nature of the

17  intellectual property rights being conveyed, especially as pertaining to artist

18  consent.  Defendants were undeterred.  Beginning in 2006, these recordings,

7

1    many of them deemed historic, were made available to the public for download

2    and on-demand streaming through defendants' websites.

3          About a year after the recordings launched on their websites, defendants

4    sought to obtain licenses to use the musical works by applying for a licensing

5    account with the Harry Fox Agency ("HFA") –a third-party licensing agent that

6    receives Section 115 notices and grants negotiated licenses on behalf of music

7    publishers.[2]  For the next three years, defendants worked directly with HFA,

8    obtaining licenses for the musical works, and paying the required royalties.  In

9    2010, defendants hired RightsFlow Inc. to secure the licenses and distribute

10   royalties on their behalf.  In 2013, defendants hired MediaNet, Inc. to assume

11   these duties.  RightsFlow and MediaNet would either obtain negotiated licenses

12   (directly from the music publisher or from HFA) or compulsory licenses (by

---

[2] Many music publishers employ HFA "as their agent to receive notice of the intention to obtain a compulsory license, and to collect and distribute royalties. Acting on behalf of their clients, HFA waives the statutory notice requirements, negotiates royalty rates at or below the statutory level, and substitutes a quarterly accounting and payment schedule for the monthly schedule prescribed by Section 115." Rodgers and Hammerstein Org. v. UMG Recordings, Inc., No. 00-cv-9322, 2001 WL 1135811, at *2 (S.D.N.Y. Sept. 26, 2001) (Martin, J.).

8

1    issuing a Section 115 notice).  At the same time, challenges arose and accrued, as

2    follows.

3           In 2006, soon after defendants made the recordings available on their

4    websites, several record labels and a group of musicians sued for infringement of

5    their copyrights in the sound recordings–copyrights separate from musical

6    works.  In 2009, after that case settled, defendants entered "Joint Exploitation

7    Agreements" with three major record labels–UMG Recordings Inc., Warner

8    Music, Inc., and Sony Music Entertainment–which generally authorized

9    defendants to exploit through sale and distribution certain sound recordings

10   featuring the record labels' artists, so long as separate licenses were obtained for

11   the musical works.  These claims are therefore not at issue in this suit.

12          In August 2013 (and again in August 2014), plaintiff ABKCO Music, Inc.

13   demanded that defendants cease and desist exploiting an audiovisual recording

14   of a 1981 Rolling Stones concert: "ABKCO has never issued synchronization

15   licenses for the Video" and without such a grant "ABKCO's copyrights in those

16   Compositions have been infringed and continue to be knowingly and willfully

17   infringed."  Supp. App'x at 1891 ¶ 64.  Around the same time, defendants

9

1    received several similar demands from songwriters and publishers of songs

2    performed in the audiovisual recordings featured on their websites.

3

4                                              **III**

5          On May 27, 2015, the Publishers filed this action alleging that defendants

6    infringed their copyrights in 197 musical works by making audio and

7    audiovisual recordings of those works available for download and streaming

8    from their websites without a license to do so.  In total, the Publishers claimed

9    that defendants had illegally exploited more than 1,175 recordings in audio or

10   audiovisual format.  The Publishers sought statutory damages of up to $150,000

11   for each work infringed and a permanent injunction against the infringing

12   conduct.  Defendants, in turn, sought a declaration that their use of the

13   recordings did not infringe the Publishers' rights and that they may exploit the

14   audiovisual works without obtaining synchronization licenses, which allows a

15   licensee "to synchronize music with visual images in a video, motion picture,

1   etc." <u>Bridgeport Music, Inc. v. Still N The Water Pub.</u>, 327 F.3d 472, 481 n.8 (6th

2   Cir. 2003).

3       In 2017, following discovery, the district court held on summary judgment

4   that defendants had no valid licenses authorizing the reproduction and

5   distribution of the musical works, had no implied license or estoppel defenses,

6   and had therefore infringed all 197 of the musical works.  <u>See</u> <u>ABKCO Music, Inc.</u>

7   <u>v. Sagan</u>, No. 15-cv-4025, 2018 WL 1746564, at *17-20 (S.D.N.Y. Apr. 9, 2018)

8   (Ramos, <u>J.</u>).  The district court further held that the infringement of 167 of the

9   works had been willful (there were disputed issues of fact as to the remaining 30

10  works) and that Sagan was personally liable for direct infringement.  <u>See</u> <u>id.</u> at

11  *21-22.  However, the district court denied a permanent injunction on the

12  grounds that cash could compensate for any future infringement and that the

13  public has an interest in access to this collection of "iconic" recordings.  <u>Id.</u> at *23.

14  (Whether defendants needed to obtain synchronization licenses to exploit the

15  audiovisual recordings was never decided because no party sought summary

16  judgment on that claim.)

17      The district court later denied defendants' motion for reconsideration,

18  which challenged "nearly every aspect of the [Summary Judgment] Opinion."

11

1   ABKCO Music, Inc. v. Sagan, No. 15-cv-4025, 2019 WL 1382074, at *1 (S.D.N.Y.

2   Mar. 26, 2019) (Ramos, J.).

3          Trial began on March 2, 2020.  At issue was (i) whether defendants

4   willfully infringed the 30 works for which disputed issues of fact precluded

5   summary judgment, and (ii) the damages for infringement of all 197 musical

6   works.  The Copyright Act allows the jury to award anywhere between $750 and

7   $150,000 if the infringement is "willful" and between $750 and $30,000 per work

8   if not willful.  17 U.S.C. § 504(c).  After nine days of trial, and less than an hour of

9   deliberations, the jury found that the infringement with respect to the 30 works

10  was non-willful and awarded the statutory minimum of $750 per work.  For the

11  remaining 167 works that the district court had found to be willfully infringed,

12  the jury awarded $1,000 per work.  In total, the jury awarded the Publishers

13  $189,500 of the $30 million that was sought in statutory damages.

14         The Publishers moved for attorneys' fees and costs under Section 505 of

15  the Copyright Act and separately moved for a new trial, arguing that the jury

16  was "unable to deliberate as the COVID-19 pandemic was worsening in New

17  York City."  ABKCO Music, Inc. v. Sagan, No. 15-cv-4025, 2021 WL 1101107, at *1

18  (S.D.N.Y. Marc. 23, 2021) (Ramos, J.).  On November 5, 2020, the district court

12

1    denied the motion for a new trial but awarded the Publishers approximately $2.4

2    million in attorneys' fees.

3

4                              **DISCUSSION**

5          On this cross-appeal, we consider: (I) defendants' challenge to the order

6    granting the Publishers' motion for summary judgment and the order denying

7    defendants' motion for reconsideration; (II) the Publishers' appeal of the denial

8    of a permanent injunction; (III) the Publishers' challenge to several evidentiary

9    rulings and to the denial of a new trial; and (IV) defendants' appeal of the grant

10   of attorneys' fees.

11

1                                                    **I**

2          The summary judgment rulings contested by defendants on appeal are

3    that (A) defendants had no valid license authorizing the reproduction and

4    distribution of the musical works in either audio or audiovisual format,

5    (B) defendants had neither an implied license nor had they any basis for

6    estoppel, and (C) Sagan was liable for direct infringement.  We review these

7    rulings de novo.  See Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith, 11

8    F.4th 26, 36 (2d Cir. 2021), cert. granted, 142 S. Ct. 1412 (2022).

9

10                                                   **A**

11         The ruling that defendants infringed the Publishers' copyrights in the

12   musical works was based on three holdings that overlap: (1)  Section 115

13   compulsory licenses do not cover the use of musical works in audiovisual

14   recordings; (2) defendants failed to satisfy Section 115's substantive requirements

15   for "duplicating a sound recording fixed by another"; and (3) any license that

16   defendants filed *after* distribution of the phonorecords is invalid as a matter of

17   law.  We address each holding in turn.

18

                                                    14

1                                          **1**

2        Of the 197 musical works, "at least" 146 were reproduced and distributed

3    in audiovisual recordings.  <u>ABKCO</u>, No. 15-cv-4025, 2018 WL 1746564, at *7.

4    Those actions, defendants argue, fall within the scope of Section 115 compulsory

5    licenses.

6        Section 115 allows one to "obtain a compulsory license to make and

7    distribute *phonorecords*" of a published musical work.  17 U.S.C. § 115(a)(1)

8    (emphasis added).  Whether Section 115 licenses cover exploitation of

9    audiovisual recordings thus hinges on whether those types of recordings fall

10   within the Copyright Act's definition of "phonorecords":

11                [M]aterial objects in which sounds, ***other than those***
12                ***accompanying a motion picture or other audiovisual***
13                ***work***, are fixed . . ., and from which the sounds can be
14                perceived, reproduced, or otherwise communicated,
15                either directly or with the aid of a machine or device.  The
16                term "phonorecords" includes the material object in
17                which the sounds are first fixed.
18
19   <u>Id.</u> § 101 (emphasis added).  The district court held that this definition excludes

20   all audiovisual recordings, including recordings of live concerts, and that all of

21   defendants' audiovisual recordings were therefore not covered by any Section

22   115 license.  We agree.

                                            15

1    In the first sentence of the phonorecords definition, the exclusionary

2    phrase (bolded above) most naturally applies to any recording that includes both

3    sounds *and* images.  Defendants contend that one can only "accompany"

4    something that is otherwise separate and would thus limit the meaning of the

5    exclusion to such things as a soundtrack, in which the sound is layered over a

6    motion picture, but not to a recording of a live performance, in which the sound

7    and image are fixed simultaneously.  But, given the common and natural

8    meaning of the word, sound can "accompany" an image simultaneously as well

9    as by later addition.  Had Congress intended to exclude from the phonorecords

10   definition only soundtracks and other layered sounds, "it would have artfully

11   worded the definition" to reflect that intent.[3]  Huddleston v. United States, 415

12   U.S. 814, 822 (1974).

13   Defendants contend that their reading of the exclusion is confirmed in the

14   second sentence of the definition because, if "[t]he term 'phonorecords' includes

---

[3] Defendants' reading would also result in different licensing schemes applying to musical works used in motion pictures depending on whether the song was performed on stage (in front of the camera) or in a studio (to be dubbed). Copyright law is complicated, but it is not arbitrary.

16

1    the material object in which the sounds are first fixed," then an object is a

2    phonorecord *even if* images are "first fixed" with the sounds.  As the district court

3    correctly recognized, however, "the use of the definite article 'the' to reference

4    the concepts 'material objects' and 'sounds' can only be read to refer to these

5    terms as *previously* defined in the first sentence, that is to say, as expressly

6    excluding audiovisual works."  ABKCO, No. 15-cv-4025, 2018 WL 1746564, at

7    *11.  The second sentence cannot be read to describe a larger set of sounds than

8    the sentence preceding it does.

9          True, our reading results in some redundancy.  That is, it is unclear what

10   the second sentence of the definition adds given that the first sentence already

11   covers all material objects on which the sounds are fixed–regardless of whether

12   they are fixed first, second, or any time thereafter.  But "[r]edundancy is not a

13   silver bullet."  Rimini Street, Inc. v. Oracle USA, Inc., 139 S. Ct. 873, 881 (2019).

14   The definition of "copies," which appears elsewhere in the Act, has the same

15   structure, similar phrasing, and an analogous second sentence that is likewise

17

1    redundant without changing the evident meaning of the first sentence.[4]  The

2    second sentence, which appears in the definition of "copies" as well as

3    "phonorecords," does not alter our understanding of the first.

4        Guided by the plain language of the exclusionary phrase, we conclude that

5    audiovisual recordings are not covered by Section 115 compulsory licenses.

6    Defendants therefore infringed each musical work included in an audiovisual

7    recording.

8

9                                              **2**

10       The 51 remaining musical works are in audio-only recordings.  The district

11   court concluded that defendants' exploitation of these recordings was unlicensed

---

[4] That definition reads as follows:

> "Copies" are material objects, other than phonorecords, in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device.  The term "copies" includes the material object, other than a phonorecord, in which the work is first fixed.

17 U.S.C. § 101.

18

1    because defendants failed to satisfy Section 115's substantive requirements,

2    which apply when a person seeks to "duplicat[e] a sound recording fixed by

3    another."  17 U.S.C. § 115(a)(1).  Those requisites (with qualification) are that

4    (i) the sound recording was "fixed lawfully" and that (ii) the making of the

5    phonorecords was authorized by the copyright holder in the sound recording.

6    See id.  On appeal, defendants argue that they were not subject to those

7    requirements because the sound recordings they sought to duplicate were fixed

8    by their predecessors and, thus, not "*by another*."[5]  We agree.  While the use of

9    the term "another" is imprecise, defendants' interpretation is supported by logic

10   and legislative history.

11        When defendants acquired the relevant recordings, they bought any rights

12   that the sellers held in those recordings.  The purchase agreement that conveyed

13   the Archives, for instance, provided that the seller was acquiring "all Intellectual

---

[5] While defendants raised this argument for the first time at the summary judgment hearing, we do not consider it waived because the district court chose to address it on reconsideration.  See United States v. Young, 998 F.3d 43, 52 n.2 (2d Cir. 2021) ("[W]e do not consider arguments waived when, although not raised below, they were nevertheless passed on by the district court." (internal quotation marks omitted)).

1    Property rights . . . to the extent that either Seller or any of its Affiliates possesses

2    such rights." Supp. App'x at 1334. It is undisputed that the seller would not be

3    subject to the substantive requirements of Section 115. To find that defendants

4    (as purchasers) would be saddled with these additional requirements would

5    impair the transferability of these sorts of works because every trade would

6    thereby impose new burdens and diminish value. Nothing in the text requires

7    that result.

8        Legislative history militates in the same direction. Under the Copyright

9    Act of 1909, once the copyright owner of a musical composition authorized the

10    work's mechanical reproduction, any other person could make "similar use" of

11    the work on payment to the copyright owner of a two-cent royalty "on each such

12    part manufactured." 17 U.S.C. § 1(e) (1909). The licensee was not expressly

13    required to make its own original sound recording of the musical work or to

14    obtain a license from the lawful owner of the duplicated sound recording.

15        The 1971 amendments to the Copyright Act for the first time granted

16    copyright protection in "sound recordings"–separate from the musical work–to

17    protect against a recording being duplicated without authorization, i.e., record

18    piracy. In the litigation that ensued, music publishers claimed that one who

1  duplicates a sound recording made by somebody else is ineligible for a

2  compulsory license.[6]  These suits made their way to various circuit courts, all of

3  which agreed that compulsory licenses for "similar use" do not allow a person to

4  participate in "piracy under the flag of compulsory licensing."  Duchess Music

5  Corp. v. Stern, 458 F.2d 1305, 1311 (9th Cir. 1972); see also Edward B. Marks

6  Music Corp. v. Colorado Magnetics, Inc., 497 F.2d 285 (10th Cir. 1974); Jondora

7  Music Pub. Co. v. Melody Recordings, Inc., 506 F.2d 392 (3d Cir. 1974); Fame

8  Pub. Co., Inc. v. Alabama Custom Tape, Inc., 507 F.2d 667 (5th Cir. 1975).

9        Later, the 1976 amendments made it possible for a person seeking to

10  duplicate a sound recording "to obtain a compulsory license for the use of

11  copyrighted music under section 115."  H.R. Rep. No. 94-1476, at 108.  But, to

12  prevent piracy, eligibility for a compulsory license was conditioned on "*the owner*

13  *of the sound recording* . . . authoriz[ing] its duplication."  Id. (emphasis added).

14  Since piracy concerns are not a consideration when (as here) the owner of the

---

[6] The Third Circuit theorized that "[o]ne reason for these recent cases may be the increased remedies provided to the composers by [the 1971 Amendment]." Jondora Music Pub. Co. v. Melody Recordings, Inc., 506 F.2d 392, 395 n.8 (3d Cir. 1974).

1    sound recording has transferred its rights to a successor, there is no reason to

2    assume the application of the substantive requirements.

3        We hold that defendants' recordings were not "fixed by another" for the

4    purposes of Section 115, and therefore vacate the district court's summary

5    judgment ruling to the extent it found defendants to have infringed any of the

6    musical works due to a failure to satisfy that section's substantive requirements.[7]

7                                    **3**

8        The final basis for the district court's infringement finding was defendants'

9    failure to provide timely notice before distributing a phonorecord *and* before

10   obtaining a voluntary HFA license.  The Publishers argue that defendants failed

11   to serve timely notice for at least one recording associated with each musical

---

[7] Both the parties and the district court assumed that if the recordings were "fixed by another," then defendants' recordings would not have been "lawfully fixed" without the artists' consent.  The basis for that assumption is questionable: the two statutes on which the district court relied–the federal and New York anti-bootlegging acts–were enacted many years after the recordings at issue were fixed.  See Pub. L. No. 103-465, 108 Stat. 4809 (1994) (codified at 17 U.S.C. § 1101); 1990 N.Y. Sess. Law Serv. 460 (McKinney).  Unless another law applied at the time the recordings were fixed, then it does not appear to have been unlawful for the concert promoters to record the concerts without the performing artists' consent.

1   work and that this failure provides an independent basis for affirming the grant

2   of summary judgment.  We disagree.

3          The district court found infringement due to untimely notice only as to the

4   musical works included in the recordings exploited in 2006 because defendants

5   had sent no notices at that time and did not begin obtaining HFA licenses until

6   the following year.  See ABKCO, No. 15-cv-4025, 2018 WL 1746564, at *16.  As to

7   all other recordings, however, the district court found that "there is a disputed

8   question of fact as to whether and which [notices] were actually submitted after

9   the first download or streaming of a phonorecord and in the absence of an HFA

10  license."  Id.  So far as we can tell, that disputed fact was not resolved.

11         We therefore remand to the district court for further factfinding on this

12  issue.  In so doing, we acknowledge that the factual dispute may be affected by a

13  threshold legal question that arises from Section 115's command that "failure to

14  serve or file the notice of intention . . . forecloses the possibility of a compulsory

15  license."  17 U.S.C. § 115(b)(2).  Specifically, the question is whether one is

16  permanently barred from obtaining a valid compulsory license for a musical

17  work that one had exploited before sending notice and in the absence of a

23

1   negotiated license.[8]  Section 115(b)(4)(A) might alternatively be read to prevent

2   only retroactive issuance of a compulsory license that would otherwise absolve

3   the licensee from suffering the consequence of infringement; in that case, a

4   prospective license could still be acquired, so long as the compulsory licensing

5   requirements are fulfilled.  But this issue has not been briefed, so we merely raise

6   it for further consideration in the district court.

7                              *      *      *

8          To summarize, we agree with the district court's holding that the

9   audiovisual recordings do not fall within the scope of Section 115 compulsory

10  mechanical licenses, disagree with the district court's holding that defendants

11  infringed the remaining musical works by failing to comply with the substantive

12  requirements of Section 115, and reject the Publishers' argument that defendants'

13  failure to serve timely notice provides an independent basis for affirming each

---

[8] Defendants' inability to obtain a compulsory license would not affect any
negotiated license they might secure.  See Rodgers & Hammerstein, 2001 WL
1135811, at *5 ("Nothing in Section 115 suggests that Congress intended to limit
the ability of either copyright holders or prospective licensees to enter into
private agreements that would contain different terms and conditions of the
license.").

1   finding of infringement.  We therefore affirm in part and vacate in part the

2   district court's summary judgment order.

3          On remand, the district court should reevaluate its infringement findings

4   for all audio-only recordings.  We leave it to the district court to decide whether a

5   new jury trial is needed to resolve any factual disputes.

6

7                                           **B**

8          Defendants argue that even if they failed to obtain any compulsory or

9   negotiated licenses for the audiovisual recordings, the affirmative defenses of

10  implied license and equitable estoppel preclude findings of infringement.  We

11  disagree.

12

13                                           **1**

14         We have not yet ruled "on the precise circumstances under which an

15  implied non-exclusive license will be found."  <u>Psihoyos v. Pearson Educ., Inc.</u>,

16  855 F. Supp. 2d 103, 120 (S.D.N.Y. 2012) (Oetken, <u>J.</u>) (internal quotation marks

17  omitted).  Some courts use a narrow test, finding an implied license only where

18  one party "created a work at [the other's] request and handed it over, intending

                                           25

1    that [the other] copy and distribute it."[9] Effects Assocs., Inc. v. Cohen, 908 F.2d

2    555, 558 (9th Cir. 1990).  Others have applied a more permissive test by which

3    consent "may be inferred based on silence where the copyright holder knows of

4    the use and encourages it."  Field v. Google Inc., 412 F. Supp. 2d 1106, 1116 (D.

5    Nev. 2006).  We have no occasion to decide which test to adopt, since both

6    require a "meeting of the minds between the parties to permit the particular

7    usage at issue," Psihoyos, 855 F. Supp. 2d at 124 (internal quotation marks

8    omitted), and there has been none here.

9         Defendants argue that, since they made royalty payments, the Publishers

10   knew how the musical works were being used; and that acceptance of payment

---

[9] The district court cited SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharms., Inc., 211 F.3d 21 (2d Cir. 2000) for the proposition that we have "endorsed" the "narrow" test for finding an implied license.  ABKCO, No. 15-cv-4025, 2018 WL 1746564, at *18.  But SmithKline did not adopt this test; it merely explained that *other courts* have applied the narrow test for deciding whether an implied license existed.  211 F.3d at 25.

1    signified the consent required for a meeting of minds.  But this reasoning ignores

2    the mechanics of compulsory licensing.

3        The Publishers grant thousands of compulsory licenses annually.  Not by

4    choice; it is (as the name says) compulsory.  Payment notifies the Publishers that

5    a compulsory license has issued, but it does not communicate how the license

6    will be used.  The reasonable assumption is that use will be in accord with the

7    requirements of Section 115, which, at the least, means that the musical works

8    will not be used in any audiovisual recordings.  The same assumption applies to

9    any negotiated license in this case. The HFA licenses "state that Defendants seek

10   licenses for 'phonorecords' as 'authorized pursuant to 17 U.S.C. § 115," ABKCO,

11   No. 15-cv-4025, 2018 WL 1746564, at *20, which conveys the clear impression that

12   the musical works would be used in sound recordings only.

13       Defendants further argue that ABKCO's cease-and-desist letters show that

14   the Publishers knew that the musical works were being used in audiovisual

15   recordings.  But those letters show only that the Publishers knew about a single

16   Rolling Stones recording, not any of the rest (of which there were over a

17   thousand).  And, at the risk of being obvious, the demand that defendants *stop*

1 exploiting that single recording cannot be construed as a meeting of the minds

2 about anything.

3

4                                              **2**

5          Nor can defendants establish a defense by equitable estoppel.  That

6 affirmative defense "is properly invoked where the enforcement of rights of one

7 party would work an injustice upon the other party due to the latter's justifiable

8 reliance upon the former's words or conduct."  Veltri v. Building Serv. 32B-J

9 Pension Fund, 393 F.3d 318, 326 (2d Cir. 2004) (internal quotation marks

10 omitted).  To prevail on an estoppel defense in the copyright context, a defendant

11 must show that:

12          (1) plaintiff had knowledge of the defendant's infringing
13          conduct; (2) plaintiff either (a) intended that defendant
14          rely on plaintiff's acts or omissions suggesting
15          authorization, or (b) acted or failed to act in such a
16          manner that defendant had a right to believe it was
17          intended to rely on plaintiff's conduct; (3) defendant was
18          ignorant of the true facts; and (4) defendant relied on
19          plaintiff's conduct to its detriment.
20
21 SimplexGrinnell LP v. Integrated Sys. & Power, Inc., 642 F. Supp. 2d 167, 194

22 (S.D.N.Y. 2009) (Lynch, J.) (citation omitted) (alterations adopted).

1    But as the district court concluded, there is no showing that the Publishers

2    knew about the infringing conduct.  See ABKCO, No. 15-cv-4025, 2018 WL

3    1746564, at *20.  True, ABKCO knew that defendants were exploiting a recording

4    of The Rolling Stones, which is why ABKCO demanded that defendants stop

5    exploiting it.  But, even as to that single recording, defendants are unable to

6    show that the cease-and-desist letters "suggest authorization" or anything of the

7    sort.

8

9                                                      **C**

10   Defendants next challenge the district court's holding that Sagan was liable

11   for direct infringement.  Direct liability requires "volitional conduct" that

12   "causes" the copying or distribution.  Zappa v. Rykodisc, Inc., 819 F. Supp. 2d

13   307, 315 (S.D.N.Y. 2011) (Pauley, J.) (citation omitted).  That is, direct liability

14   attaches only to "the person who actually presses the button."  Cartoon Network

15   LP v. CSC Holdings, Inc., 536 F.3d 121, 131 (2d Cir. 2008).  In UMG Recording,

16   Inc. v. Escape Media Group, for example, two executives were directly liable

17   because they "personally uploaded copyrighted sound recordings to [their

29

1  website]." No. 11-cv-8407, 2014 WL 5089743, at *26 (S.D.N.Y. Sept. 29, 2014)

2  (Griesa, J.).

3      Even if a copyright is not infringed by a corporate officer's own hand, a

4  corporate officer with an obvious and direct financial interest, and a power of

5  supervision to effect an infringement, may be vicariously liable.  See EMI

6  Christian Music Grp. v. MP3tunes, LLC, 844 F.3d 79, 99 (2d Cir. 2016).  But the

7  Publishers pled only direct liability.  The district court recognized as much and

8  acknowledged that summary judgment would have to be premised "on that

9  basis alone."  ABKCO, No. 15-cv-4025, 2018 WL 1746564, at *22 n.33.

10     However, the district court went on to recite the standard for vicarious

11  liability instead, and to apply that standard to conduct that (with one arguable

12  exception) could not give rise to direct liability.  See id. at *22.  As to the

13  exception: Sagan's Chief Technology Officer stated in his deposition that "it was

14  Sagan who instructed him as to 'which concerts to make available for download

15  or not,' . . . and made plans 'to start digitizing tape recordings with an eye

16  towards making them available on a public website.'"  Id. (citations omitted).

17  But that passage involves only instructions and plans; there is no evidence that

1    Sagan is the one who "actually presse[d] the button."  <u>Cartoon Network</u>, 536 F.3d

2    at 131.

3        We therefore reverse the district court's order granting judgment against

4    Sagan.

5

6

1                                    **II**

2        The Publishers challenge the district court's refusal to issue a permanent

3     injunction.[10]  We review this decision for abuse of discretion.  See 16 Casa Duse,

4                  LLC v. Merkin, 791 F.3d 247, 254 (2d Cir. 2015).

5           Under the Copyright Act, a court may "grant temporary and final

6     injunctions on such terms as it may deem reasonable to prevent or restrain

7     infringement of a copyright."  17 U.S.C. § 502(a).  The test for determining when

8     to grant such equitable relief requires the plaintiff to demonstrate: "(1) that it has

9     suffered an irreparable injury; (2) that remedies available at law, such as

10    monetary damages, are inadequate to compensate for that injury; (3) that,

11    considering the balance of hardships between the plaintiff and defendant, a

12    remedy in equity is warranted; and (4) that the public interest would not be

13    disserved by a permanent injunction."  eBay Inc. v. MercExchange, L.L.C., 547

14    U.S. 388, 391 (2006).

---

[10] Because we have vacated the district court's order with regards to infringement on the audio-only recordings, the permanent injunction issue is relevant only with respect to the audiovisual recordings.

1        The district court found that the first two factors weigh against an

2    injunction since the Publishers can be made whole with cash.  We agree.  The

3    Publishers argue that their damages are impossible to quantify because

4    defendants' infringing conduct "threatens [their] relationships with . . . existing

5    licensees, and undermines their negotiating leverage with prospective licensees."

6    Plaintiffs-Appellees Br. at 69-70.  But they provide no factual (or theoretical)

7    support that would allow us to credit that claim.  True, "[h]arm can be

8    irreparable" where, "absent an injunction, the defendant is likely to continue

9    infringing the copyright."  <u>Broad. Music, Inc. v. Pamdh Enters., Inc.</u>, No. 13-cv-

10   2255, 2014 WL 2781846, at *4 (S.D.N.Y. June 19, 2014) (Wood, <u>J.</u>).  But that factor

11   is not decisive when (as here) the record gives no indication that defendants will

12   continue their infringing conduct.

13       The third factor tilts in the same direction.  Defendants invested tens of

14   millions of dollars to acquire a library of live concert recordings and have

15   devoted two decades to building a business around those recordings.  The

16   Publishers claim an offsetting hardship if they had "to commence litigation for

17   each future violation," whereas it would be no cognizable hardship if defendants

18   were compelled "to comply with their legal duties."  <u>Broad. Music, Inc. v. Prana</u>

33

1    Hosp., Inc., 158 F. Supp. 3d 184, 196 (S.D.N.Y. 2016) (Engelmayer, J.).  But the

2    Publishers have the resources to commence future litigation if needed, and if

3    they do so successfully, they might collect fees and costs under Section 505 of the

4    Copyright Act.

5         The final factor also favors defendants because the public has an interest in

6    accessing "iconic" recordings of historical importance.  ABKCO, No. 15-cv-4025,

7    2018 WL 1746564, at *23.  The Publishers rely on a case in which we explained

8    that the public has an interest in "protecting copyright owners' marketable rights

9    to their work and the economic incentive to continue creating."  WPIX, Inc. v. ivi,

10   Inc., 691 F.3d 275, 287 (2d Cir. 2012).  But WPIX affirmed an injunction against

11   "streaming [the] plaintiffs' copyrighted television programming over the internet

12   live and without their consent."  Id. at 277.  We concluded that a preliminary

13   injunction would not disserve the public interest because "[p]laintiffs' desire to

14   create original television programming surely would be dampened if their

15   creative works could be copied and streamed over the Internet," and because

16   "the public will still be able to access plaintiffs' programs through means other

17   than [the defendant's] Internet service."  Id. at 288.

34

1    This case is distinguishable in every way that matters.  The concert

2    recordings at issue were made primarily from the 1960s to the early 2000s; so no

3    ongoing stream of new content is at stake.  Even if it were, the Publishers fail to

4    explain how the denial of a permanent injunction would curb creativity.  See

5    Salinger v. Colting, 607 F.3d 68, 82 (2d Cir. 2010) ("The object of copyright law is

6    to promote the store of knowledge available to the public.").  Surely it would

7    have no impact on concert performances themselves, or the desire to preserve

8    them.

9

10                                         **III**

11   After a nine-day damages trial, the jury awarded the Publishers the near

12   minimum of their statutory entitlement–about $30 million less than what they

13   had sought.  The Publishers now want a retrial on the ground that the district

14   court abused its discretion with respect to a series of evidentiary rulings, and in

15   its denial of the Publishers' motion for a new trial.  We address these arguments

16   in turn.

17

35

1                                              **A**

2          Three evidentiary rulings are contested.

3          First: The district court admitted into evidence payments that defendants

4    made to non-parties and for works on which the Publishers did not sue.  The

5    district court concluded that the payments were relevant to the "conduct and

6    attitude of the parties" and the "willfulness" or state of mind of defendants, and

7    it issued a limiting instruction to that effect.  App'x at 757.  On appeal, the

8    Publishers contend that this evidence was irrelevant and that any probative

9    value was outweighed by the danger of misleading the jury as to the sum

10   defendants paid for the musical works at issue.  But the Publishers waived this

11   argument when their counsel stated that he was "fine" with such evidence being

12   admitted so long as a limiting instruction was given, as it was.  Id. at 766.[11]

---

[11] The Publishers also argue that defendants' list of checks–a list created
specifically for the litigation–should have been excluded "under the Best
Evidence Rule," and because "there was a dispute as to which checks had
actually been cashed."  Plaintiffs-Appellees' Reply Br. at 7.  The Publishers first
raised this argument on appeal in their reply brief, and thereby waived it.  See JP
Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V., 412 F.3d 418, 428
(2d Cir. 2005) ("[A]rguments not made in an appellant's opening brief are
waived even if the appellant pursued those arguments in the district court or
raised them in a reply brief.").

1     Second: The district court admitted into evidence the Joint Exploitation

2     Agreements that defendants entered with Sony, Warner, and UMG.  The

3     Publishers' motion <u>in limine</u> to exclude the agreements from evidence was

4     denied "subject to reopening as events unfold during the course of the trial."  <u>Id.</u>

5     at 755.  On appeal, the Publishers argue that the district court abused its

6     discretion because admitting these agreements conflicted with several of its other

7     rulings.

8          This argument too was not preserved.  An evidentiary issue is preserved <u>in</u>

9     <u>limine</u> only if it was (among other things) "ruled upon by the court without

10    equivocation."  <u>United States v. McDermott</u>, 245 F.3d 133, 140 n.3 (2d Cir. 2001).

11    The <u>in limine</u> ruling left the door ajar for objections at trial, and the Publishers

12    did not object when these agreements were introduced at trial.  The Publishers

13    thus waived the argument they now advance on appeal.  <u>See</u> <u>Barlow v. Liberty</u>

14    <u>Maritime Corp.</u>, 746 F.3d 518, 529 (2d Cir. 2014) ("[Plaintiff] raised this objection

15    <u>in limine</u>, but failed to raise it at trial, and specifically withdrew his objection in

16    his post-trail briefing.  We therefore need not consider it.").

17         Third: The Publishers sought to question Sagan about a June 2015 article

18    published by defendants' licensing agent, MediaNet, which stated that, to exploit

1   music in audiovisual format, "[s]ynchronization licenses for the musical

2   composition in each track used must also be obtained from the appropriate

3   music publisher(s)." Supp. App'x at 2107. The district court precluded this

4   hearsay statement after concluding that it was not made within "the scope of

5   [MediaNet's] agency with respect to defendants." Id. at 661.

6       The Publishers contest this ruling by pointing to the testimony of Sagan's

7   Chief Technology Officer that MediaNet provided "[a]dvice with respect to what

8   licenses were required." Id. at 657. But this testimony was vague and did not

9   necessarily relate to synchronization licenses. Moreover, the full record shows

10  that MediaNet's agency role was largely limited to calculating what defendants

11  owed and making the requisite royalty payments. The district court did not

12  abuse its discretion in excluding this evidence.

13

14                                        **B**

15      A motion for a new trial may be granted "for any reason for which a new

16  trial has heretofore been granted in an action at law in federal court." Fed. R.

17  Civ. P. 59(a)(1)(A). Such a motion ordinarily should be denied "unless the trial

18  court is convinced that the jury has reached a seriously erroneous result or that

38

1    the verdict is a miscarriage of justice."  <u>Atkins v. New York City</u>, 143 F.3d 100,

2    102 (2d Cir. 1998) (citation omitted).  The Publishers contend a new trial should

3    have been granted because the pandemic resulted in a rushed and ill-considered

4    jury verdict.  We disagree.

5         When trial began on March 2, 2020, news of the pandemic was spreading.

6    On March 10, the district court told counsel that "we may be surrounded by the

7    National Guard tomorrow morning,  . . . .  I want to get this done as soon as

8    possible, okay?"  App'x at 1889.  The next day, the district court told counsel that

9    "[t]he world is falling apart around us, and I would like to get this done . . . it

10   would be very, very helpful to get this done as soon as possible."  Supp. App'x at

11   791.

12        On March 12, 2020, New York's mayor declared a state of emergency.

13   That same day, Juror Five asked to speak in open court.  The juror stated that the

14   jury intended to do their job and "do[] it fairly," but that:

15             We have been coming here for two weeks, all of us in this
16             room.  We have been exposing ourselves.  Whether we
17             know it or not, it's happening.  And, quite frankly, this
18             matter doesn't seem all that important compared to lives
19             at stake, such as my mom who has lupus.  She has a very
20             compromised immune system. . . .  We are here to decide
21             damages and money.  And, quite frankly, money, to me,

1               is not worth the life of my mother or any of the lives of

2               the jurors in there who also there are several who are

3               older, and that's my concern.

4

5  App'x at 797-98.  The district court ruled <u>sua sponte</u> that the juror's comments

6  did not warrant his exclusion.  Neither party objected.

7       Prior to deliberation later that day, the district court assured the jury:

8  "Now that the case is in your hands, you can stay as long as you wish.  I'm

9  happy to stay with the usual schedule of 9:30 to 2:30, but if you wish to stay

10  longer, I'll leave that entirely up to you."  <u>Id.</u> at 935.  The jury reached a verdict in

11  less than an hour and without reviewing any trial exhibits.  It awarded the

12  Publishers $189,500 in statutory damages, and made findings as to willful

13  infringement with respect to 30 recordings.

14       The Publishers' motion for a new damages trial argued that "the trial was

15  fundamentally unfair because the jury was allegedly unable to deliberate as the

16  COVID-19 pandemic was worsening in New York City."  <u>ABKCO Music, Inc. v.</u>

17  <u>Sagan</u>, 500 F. Supp. 3d 199, 205 (S.D.N.Y. 2020) (Ramos, <u>J.</u>), <u>judgment entered</u>,

40

No. 15-cv-4025, 2021 WL 761852 (S.D.N.Y. Feb. 26, 2021).  The Publishers claim

an abuse of discretion for three reasons.

First: A new trial was ordered in the supposedly analogous case of Lucas

v. American Manufacturing Co., 630 F.2d 291 (5th Cir. 1980), in which the jury

returned a verdict within 45 minutes after three days of trial, and shortly before a

hurricane made landfall near the courthouse.  Id. at 293.  But Lucas was

materially different.  There, the judge asked the jurors to render a verdict in

fifteen minutes, see id., whereas the judge in this case told the jury that it could

"stay as long as [it] wish[ed]."  Supp. App'x at 935.  And while Lucas held that

there had been no evidentiary basis for the jury's award, which was less than half

the amount to which the defendant stipulated prior to trial, 630 F.2d at 293, the

jury in this case awarded damages within the permissible statutory range.

Second: The Publishers cite Juror Five's concerns.  But those concerns

revealed only an uneasiness to proceed in the face of the pandemic, not an

unwillingness to engage in fair and thorough deliberations.  Juror Five made this

plain: "I'm not trying to get a hung jury.  I want to do my job.  I want to do my

duty.  So does everyone in this room, and we plan on doing it fairly."  ABKCO,

500 F. Supp. 3d at 208.

41

1    Third: The Publishers argue that the effect of the pandemic on the trial is

2    evidenced by the low damages award relative to the Publishers' expectations.  As

3    the district court explained, however, the Publishers failed to "persuasively draw

4    any connection between the potential impact of the COVID-19 pandemic and the

5    specific damages awarded," or explain why it would have been easier for a

6    rushed jury to award damages on the lower side of the scale, as opposed to in the

7    middle or on the higher end.  Id. at 210.

8

9                                              **IV**

10   The district court awarded the Publishers roughly $2.4 million in

11   attorneys' fees primarily on the ground that defendants acted unreasonably

12   when they claimed (without evidence) that artists had consented to the recording

13   and exploitation of their concert performances and, relatedly, because

14   defendants' infringement was willful as to a large portion of the recordings.  See

15   ABKCO, 500 F. Supp. at 213-15.  The premise of that award is that (according to

16   the parties and the district court) the substantive requirements of Section 115

17   incorporate the requirement for performer consent.  The award therefore

42

1  conflicts (at least in part) with our holding that defendants were not subject to

2  Section 115's substantive requirements.

3      We therefore vacate the district court's grant of attorneys' fees and remand

4  for reconsideration in light of this opinion.

5

6                              **CONCLUSION**

7      To summarize:

8          (1) We AFFIRM the rulings in the summary judgment order to the
9              extent they: (a) held that defendants failed to obtain a license for
10             any of the audiovisual recordings, and therefore infringed the
11             audiovisual works; (b) concluded that defendants had no valid
12             affirmative defense; and (c) declined the Publishers' request for a
13             permanent injunction.
14
15         (2) We VACATE the ruling in the summary judgment order that
16             defendants infringed the musical works used in the audio-only
17             recordings by failing to comply with Section 115's substantive
18             requirements.
19
20         (3) We REVERSE the ruling on summary judgment that Sagan was
21             liable for direct infringement.
22
23         (4) We REJECT the challenges to evidentiary rulings.
24
25         (5) We AFFIRM the order denying the motion for a new trial.
26
27         (6) We VACATE the award of attorneys' fees.
28

1    (7) We REMAND the case for further proceedings consistent with
2     this opinion.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

20-3816
<u>ABKCO Music, Inc. v. Sagan</u>

1      UNITED STATES COURT OF APPEALS
2         FOR THE SECOND CIRCUIT
3         _____
4
5            August Term, 2021
6
7  (Argued: March 14, 2022          Decided:      October 6, 2022)
8
9      Docket Nos. 20-3816(L), 20-4020(CON), 20-4099(XAP)
10            _____
11
12  ABKCO MUSIC, INC., COLGEMS-EMI MUSIC INC., EMI ALGEE MUSIC CORP., EMI
13      APRIL MUSIC INC., EMI BLACKWOOD MUSIC INC., EMI CONSORTIUM MUSIC
14    PUBLISHING, INC., DBA EMI FULL KEEL MUSIC, EMI CONSORTIUM SONGS, INC.,
15    DBA EMI LONGITUDE MUSIC, EMI FEIST CATALOG INC., EMI ROBBINS CATALOG
16     INC., EMI UNART CATALOG, INC., JOBETE MUSIC CO., INC., SCREENGEMS-EMI
17   MUSIC INC., STONE AGATE MUSIC, STONE DIAMOND MUSIC CORP., IMAGEM MUSIC
18   LLC, PEER INTERNATIONAL CORP., PSO LTD., PEERMUSIC LTD., PEERMUSIC III, LTD.,
19  SONGS OF PEER, LTD., SPIRIT CATALOG HOLDINGS S.A.R.L, SPIRIT TWO MUSIC, INC.,
20       WARNER-TAMERLANE PUBLISHING CORP., WB MUSIC CORP.,

21                        <u>Plaintiffs-Counter-Defendants-Appellees-Cross-</u>
22                              <u>Appellants</u>,

23                              <u>v.</u>

24
25        WILLIAM SAGAN, NORTON LLC, BILL GRAHAM ARCHIVES, LLC,
26     DBA WOLFGANG'S VAULT, DBA CONCERT VAULT, DBA MUSIC VAULT, DBA
27                    DAYTROTTER,

28                        <u>Defendants-Counterclaimants-Appellants-Cross-</u>
29                              <u>Appellees</u>.

_____

Before: JACOBS, WESLEY, and MENASHI, <u>Circuit Judges</u>.

      A collection of music publishers alleged infringement of their copyrights in 197 musical works when a series of live concert recordings was made available by the defendants for download and streaming on their websites.  Plaintiffs sought damages and a permanent injunction pursuant to the Copyright Act.  The United States District Court for the Southern District of New York (Ramos, <u>J.</u>) held on summary judgment that defendants had no valid licenses and therefore infringed each of the musical works, and that the principal was personally liable.  The district court denied plaintiffs' request for a permanent injunction.  Two years later, after a nine-day damages trial, the jury awarded plaintiffs a minimal $189,500 in statutory damages.  The district court denied plaintiffs' motion for a new trial but awarded them roughly $2.4 million in attorneys' fees.

      Defendants appeal from the district court's summary judgment order and the order granting fees and costs.  Plaintiffs cross-appeal from the district court's denial of a permanent injunction, several evidentiary rulings, and the denial of a new trial.

1    We AFFIRM in part, VACATE in part, and REVERSE in part, the grant of

2   summary judgment, and AFFIRM the denial of a permanent injunction; REJECT

3   the challenges to the evidentiary rulings; AFFIRM the denial of plaintiffs' motion

4   for a new trial; VACATE the award of attorneys' fees; and REMAND for further

5   proceedings consistent with this opinion.

6                                    _____

7                                   MICHAEL S. ELKIN (Erin R. Ranahan, on
8                                   the brief), Winston & Strawn LLP, New
9                                   York, NY, for Defendants-
10                                  Counterclaimants-Appellants-Cross-
11                                  Appellees.
12
13                                  BARRY I. SLOTNICK (Christian D.
14                                  Carbone, Tal E. Dickstein, Sarah Schacter,
15                                  and Priy Sinha, on the brief), Loeb & Loeb
16                                  LLP, New York, NY, for Plaintiffs-Counter-
17                                  Defendants-Appellees-Cross-Appellants.
18
19
20   DENNIS JACOBS, Circuit Judge:
21
22   In 2002, William Sagan acquired a trove of live concert recordings that

23   included performances by The Rolling Stones, The Who, the Grateful Dead, and

24   many others. At the time, the sellers cautioned that Sagan "may be buying the

25   world['s] greatest private collection [of recordings] that no one will ever hear."

3

1    App'x at 453.  But in 2006, Sagan made those and other recordings available to

2    the world through digital download and streaming services offered for a fee

3    through various websites.  Sagan did this through his companies Norton LLC

4    and the Bill Graham Archives, LLC (together with Sagan, "defendants").

5         In 2015, a collection of music publishers (together, the "Publishers")

6    brought this suit under the Copyright Act, alleging that defendants infringed the

7    Publishers' copyrights in 197 musical works that were performed in the live

8    concert recordings.  The Publishers sought about $30 million in damages and a

9    permanent injunction.  On March 30, 2018, the United States District Court for

10   the Southern District of New York (Ramos, <u>J.</u>) held on summary judgment that

11   defendants had no valid licenses and therefore infringed each of the musical

12   works and that Sagan was personally liable.  The district court denied the

13   Publishers' request for a permanent injunction.  Two years later, after a nine-day

14   damages trial, the jury awarded the Publishers $189,500, which was near the

15   minimum statutory damages.  The Publishers argued that the minimal award

16   was a rushed and ill-considered result of the encroaching pandemic and moved

17   for a new trial.  The district court denied the motion but awarded them roughly

18   $2.4 million in attorneys' fees.

4

1    On appeal, defendants challenge the district court's summary judgment

2    rulings and the order granting fees and costs.  The Publishers cross-appeal the

3    district court's denial of a permanent injunction, several evidentiary rulings, and

4    its denial of the new trial.

5

6                                    **BACKGROUND**

7                                          **I**

8    Congress has created two types of copyrights in a musical recording.  One

9    is for the underlying "musical work," which encompasses the notes and lyrics of

10   a song.  <u>See</u> 17 U.S.C. § 102(a)(2).  The other is for the "sound recording," which

11   covers the rights to a recording of a particular performance by a particular artist.

12   <u>See</u> <u>id.</u> § 102(a)(7).  This case concerns the first type of copyright.  (The second

13   type was at issue in a prior litigation.)

14   A person seeking to make and distribute phonorecords–that is, material

15   objects in which sounds are fixed–of a previously published musical work can do

1    so by obtaining a compulsory license.  See id. § 115(a)(1).[1]  One need only

2    provide notice to the owner of the copyright in the musical work (*before*

3    distribution) and pay government-prescribed royalties.  See id. § 115(b), (c).

4    Alternatively, a prospective licensee can go directly to the copyright owner or its

5    agent and secure a "negotiated license."  Id. § 115(b)(2), (c)(3)(B).

6         If one seeks to duplicate and sell a sound recording that was "fixed by

7    another," id. § 115(a)(1), rather than make one's own sound recording, there are

8    two additional eligibility requirements for a compulsory license: (i) the sound

9    recording must have been "fixed lawfully," and (ii) the duplication must have

10   been authorized by the copyright owner of the sound recording or, "if the sound

11   recording was fixed before February 15, 1972," the sound must have been fixed

12   "pursuant to an express license from the owner of the copyright in the musical

13   work or pursuant to a valid compulsory license for use of such a work in a sound

14   recording."  Id.  We refer to these as Section 115's "substantive requirements."

---

[1] Section 115 of the Copyright Act was amended in 2018 under the Musical Works Modernization Act and governs conduct engaged in after October 11, 2018.  See Act of Oct. 11, 2018, Pub. L. 115-264, 132 Stat. 3676.  The conduct in this case occurred before that date, so all citations in this opinion to 17 U.S.C. § 115 are to the pre-2018 version of the statute.

1                                **II**

2        William Sagan is the president, CEO, and sole shareholder of Norton LLC

3   ("Norton").  In 2002, Norton purchased the archives of the late concert promoter

4   Bill Graham by acquiring Bill Graham Archives, LLC ("Archives"), which

5   housed a collection of audio and audiovisual recordings.  The purchase

6   agreement that conveyed the Archives provided that Sagan was acquiring "all

7   Intellectual Property rights . . . to the extent that either Seller or any of its

8   Affiliates possesses such rights."  Supp. App'x at 1334.  A disclaimer recites that

9   the seller made "*no representations* regarding whether the Assets or their past or

10  future use or exploitation infringed or infringes on the Intellectual Property

11  rights of any person."  Id. at 1335 (emphasis added).  The seller also told Sagan

12  that he would need to get record company and artist approval to exploit the

13  recordings.

14       In the ensuing years, defendants continued to acquire recordings of live

15  concerts through other sources.  As with the initial purchase from the Archives,

16  these acquisitions came with limited assurances (or none) as to the nature of the

17  intellectual property rights being conveyed, especially as pertaining to artist

18  consent.  Defendants were undeterred.  Beginning in 2006, these recordings,

1     many of them deemed historic, were made available to the public for download

2     and on-demand streaming through defendants' websites.

3            About a year after the recordings launched on their websites, defendants

4     sought to obtain licenses to use the musical works by applying for a licensing

5     account with the Harry Fox Agency ("HFA") –a third-party licensing agent that

6     receives Section 115 notices and grants negotiated licenses on behalf of music

7     publishers.[2]  For the next three years, defendants worked directly with HFA,

8     obtaining licenses for the musical works, and paying the required royalties.  In

9     2010, defendants hired RightsFlow Inc. to secure the licenses and distribute

10    royalties on their behalf.  In 2013, defendants hired MediaNet, Inc. to assume

11    these duties.  RightsFlow and MediaNet would either obtain negotiated licenses

12    (directly from the music publisher or from HFA) or compulsory licenses (by

---

[2] Many music publishers employ HFA "as their agent to receive notice of the
intention to obtain a compulsory license, and to collect and distribute royalties.
Acting on behalf of their clients, HFA waives the statutory notice requirements,
negotiates royalty rates at or below the statutory level, and substitutes a
quarterly accounting and payment schedule for the monthly schedule prescribed
by Section 115."  Rodgers and Hammerstein Org. v. UMG Recordings, Inc., No.
00-cv-9322, 2001 WL 1135811, at *2 (S.D.N.Y. Sept. 26, 2001) (Martin, J.).

1    issuing a Section 115 notice).  At the same time, challenges arose and accrued, as

2    follows.

3           In 2006, soon after defendants made the recordings available on their

4    websites, several record labels and a group of musicians sued for infringement of

5    their copyrights in the sound recordings–copyrights separate from musical

6    works.  In 2009, after that case settled, defendants entered "Joint Exploitation

7    Agreements" with three major record labels–UMG Recordings Inc., Warner

8    Music, Inc., and Sony Music Entertainment–which generally authorized

9    defendants to exploit through sale and distribution certain sound recordings

10   featuring the record labels' artists, so long as separate licenses were obtained for

11   the musical works.  These claims are therefore not at issue in this suit.

12          In August 2013 (and again in August 2014), plaintiff ABKCO Music, Inc.

13   demanded that defendants cease and desist exploiting an audiovisual recording

14   of a 1981 Rolling Stones concert: "ABKCO has never issued synchronization

15   licenses for the Video" and without such a grant "ABKCO's copyrights in those

16   Compositions have been infringed and continue to be knowingly and willfully

17   infringed."  Supp. App'x at 1891 ¶ 64.  Around the same time, defendants

9

1    received several similar demands from songwriters and publishers of songs

2    performed in the audiovisual recordings featured on their websites.

3

4                                **III**

5        On May 27, 2015, the Publishers filed this action alleging that defendants

6    infringed their copyrights in 197 musical works by making audio and

7    audiovisual recordings of those works available for download and streaming

8    from their websites without a license to do so.  In total, the Publishers claimed

9    that defendants had illegally exploited more than 1,175 recordings in audio or

10    audiovisual format.  The Publishers sought statutory damages of up to $150,000

11    for each work infringed and a permanent injunction against the infringing

12    conduct.  Defendants, in turn, sought a declaration that their use of the

13    recordings did not infringe the Publishers' rights and that they may exploit the

14    audiovisual works without obtaining synchronization licenses, which allows a

15    licensee "to synchronize music with visual images in a video, motion picture,

1  etc." <u>Bridgeport Music, Inc. v. Still N The Water Pub.</u>, 327 F.3d 472, 481 n.8 (6th

2  Cir. 2003).

3      In 2017, following discovery, the district court held on summary judgment

4  that defendants had no valid licenses authorizing the reproduction and

5  distribution of the musical works, had no implied license or estoppel defenses,

6  and had therefore infringed all 197 of the musical works.  <u>See</u> <u>ABKCO Music, Inc.</u>

7  <u>v. Sagan</u>, No. 15-cv-4025, 2018 WL 1746564, at *17-20 (S.D.N.Y. Apr. 9, 2018)

8  (Ramos, <u>J.</u>).  The district court further held that the infringement of 167 of the

9  works had been willful (there were disputed issues of fact as to the remaining 30

10  works) and that Sagan was personally liable for direct infringement.  <u>See</u> <u>id.</u> at

11  *21-22.  However, the district court denied a permanent injunction on the

12  grounds that cash could compensate for any future infringement and that the

13  public has an interest in access to this collection of "iconic" recordings.  <u>Id.</u> at *23.

14  (Whether defendants needed to obtain synchronization licenses to exploit the

15  audiovisual recordings was never decided because no party sought summary

16  judgment on that claim.)

17      The district court later denied defendants' motion for reconsideration,

18  which challenged "nearly every aspect of the [Summary Judgment] Opinion."

1    <u>ABKCO Music, Inc. v. Sagan</u>, No. 15-cv-4025, 2019 WL 1382074, at *1 (S.D.N.Y.

2    Mar. 26, 2019) (Ramos, <u>J.</u>).

3        Trial began on March 2, 2020.  At issue was (i) whether defendants

4    willfully infringed the 30 works for which disputed issues of fact precluded

5    summary judgment, and (ii) the damages for infringement of all 197 musical

6    works.  The Copyright Act allows the jury to award anywhere between $750 and

7    $150,000 if the infringement is "willful" and between $750 and $30,000 per work

8    if not willful.  17 U.S.C. § 504(c).  After nine days of trial, and less than an hour of

9    deliberations, the jury found that the infringement with respect to the 30 works

10    was non-willful and awarded the statutory minimum of $750 per work.  For the

11    remaining 167 works that the district court had found to be willfully infringed,

12    the jury awarded $1,000 per work.  In total, the jury awarded the Publishers

13    $189,500 of the $30 million that was sought in statutory damages.

14        The Publishers moved for attorneys' fees and costs under Section 505 of

15    the Copyright Act and separately moved for a new trial, arguing that the jury

16    was "unable to deliberate as the COVID-19 pandemic was worsening in New

17    York City."  <u>ABKCO Music, Inc. v. Sagan</u>, No. 15-cv-4025, 2021 WL 1101107, at *1

18    (S.D.N.Y. Marc. 23, 2021) (Ramos, <u>J.</u>).  On November 5, 2020, the district court

1    denied the motion for a new trial but awarded the Publishers approximately $2.4

2    million in attorneys' fees.

3

4                                    **DISCUSSION**

5           On this cross-appeal, we consider: (I) defendants' challenge to the order

6    granting the Publishers' motion for summary judgment and the order denying

7    defendants' motion for reconsideration; (II) the Publishers' appeal of the denial

8    of a permanent injunction; (III) the Publishers' challenge to several evidentiary

9    rulings and to the denial of a new trial; and (IV) defendants' appeal of the grant

10   of attorneys' fees.

11

1          **I**

2          The summary judgment rulings contested by defendants on appeal are

3     that (A) defendants had no valid license authorizing the reproduction and

4     distribution of the musical works in either audio or audiovisual format,

5     (B) defendants had neither an implied license nor had they any basis for

6     estoppel, and (C) Sagan was liable for direct infringement.  We review these

7     rulings <u>de novo</u>.  <u>See</u> <u>Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith</u>, 11

8     F.4th 26, 36 (2d Cir. 2021), <u>cert. granted</u>, 142 S. Ct. 1412 (2022).

9

10          **A**

11          The ruling that defendants infringed the Publishers' copyrights in the

12    musical works was based on three holdings that overlap: (1)  Section 115

13    compulsory licenses do not cover the use of musical works in audiovisual

14    recordings; (2) defendants failed to satisfy Section 115's substantive requirements

15    for "duplicating a sound recording fixed by another"; and (3) any license that

16    defendants filed *after* distribution of the phonorecords is invalid as a matter of

17    law.  We address each holding in turn.

18

14

1                                          **1**

2           Of the 197 musical works, "at least" 146 were reproduced and distributed

3    in audiovisual recordings.  <u>ABKCO</u>, No. 15-cv-4025, 2018 WL 1746564, at *7.

4    Those actions, defendants argue, fall within the scope of Section 115 compulsory

5    licenses.

6           Section 115 allows one to "obtain a compulsory license to make and

7    distribute *phonorecords*" of a published musical work.  17 U.S.C. § 115(a)(1)

8    (emphasis added).  Whether Section 115 licenses cover exploitation of

9    audiovisual recordings thus hinges on whether those types of recordings fall

10   within the Copyright Act's definition of "phonorecords":

11                   [M]aterial objects in which sounds, ***other than those***
12                   ***accompanying a motion picture or other audiovisual***
13                   ***work***, are fixed . . ., and from which the sounds can be
14                   perceived, reproduced, or otherwise communicated,
15                   either directly or with the aid of a machine or device.  The
16                   term "phonorecords" includes the material object in
17                   which the sounds are first fixed.
18
19   <u>Id.</u> § 101 (emphasis added).  The district court held that this definition excludes

20   all audiovisual recordings, including recordings of live concerts, and that all of

21   defendants' audiovisual recordings were therefore not covered by any Section

22   115 license.  We agree.

1    In the first sentence of the phonorecords definition, the exclusionary

2    phrase (bolded above) most naturally applies to any recording that includes both

3    sounds *and* images.  Defendants contend that one can only "accompany"

4    something that is otherwise separate and would thus limit the meaning of the

5    exclusion to such things as a soundtrack, in which the sound is layered over a

6    motion picture, but not to a recording of a live performance, in which the sound

7    and image are fixed simultaneously.  But, given the common and natural

8    meaning of the word, sound can "accompany" an image simultaneously as well

9    as by later addition.  Had Congress intended to exclude from the phonorecords

10   definition only soundtracks and other layered sounds, "it would have artfully

11   worded the definition" to reflect that intent.[3]  <u>Huddleston v. United States</u>, 415

12   U.S. 814, 822 (1974).

13   Defendants contend that their reading of the exclusion is confirmed in the

14   second sentence of the definition because, if "[t]he term 'phonorecords' includes

---

[3] Defendants' reading would also result in different licensing schemes applying to musical works used in motion pictures depending on whether the song was performed on stage (in front of the camera) or in a studio (to be dubbed). Copyright law is complicated, but it is not arbitrary.

16

1 the material object in which the sounds are first fixed," then an object is a

2 phonorecord *even if* images are "first fixed" with the sounds. As the district court

3 correctly recognized, however, "the use of the definite article 'the' to reference

4 the concepts 'material objects' and 'sounds' can only be read to refer to these

5 terms as *previously* defined in the first sentence, that is to say, as expressly

6 excluding audiovisual works." ABKCO, No. 15-cv-4025, 2018 WL 1746564, at

7 *11. The second sentence cannot be read to describe a larger set of sounds than

8 the sentence preceding it does.

9      True, our reading results in some redundancy. That is, it is unclear what

10 the second sentence of the definition adds given that the first sentence already

11 covers all material objects on which the sounds are fixed–regardless of whether

12 they are fixed first, second, or any time thereafter. But "[r]edundancy is not a

13 silver bullet." Rimini Street, Inc. v. Oracle USA, Inc., 139 S. Ct. 873, 881 (2019).

14 The definition of "copies," which appears elsewhere in the Act, has the same

15 structure, similar phrasing, and an analogous second sentence that is likewise

17

1    redundant without changing the evident meaning of the first sentence.[4]  The

2    second sentence, which appears in the definition of "copies" as well as

3    "phonorecords," does not alter our understanding of the first.

4          Guided by the plain language of the exclusionary phrase, we conclude that

5    audiovisual recordings are not covered by Section 115 compulsory licenses.

6    Defendants therefore infringed each musical work included in an audiovisual

7    recording.

8

9                                         **2**

10         The 51 remaining musical works are in audio-only recordings.  The district

11   court concluded that defendants' exploitation of these recordings was unlicensed

---

[4] That definition reads as follows:

> "Copies" are material objects, other than phonorecords, in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device.  The term "copies" includes the material object, other than a phonorecord, in which the work is first fixed.

17 U.S.C. § 101.

18

1   because defendants failed to satisfy Section 115's substantive requirements,

2   which apply when a person seeks to "duplicat[e] a sound recording fixed by

3   another."  17 U.S.C. § 115(a)(1).  Those requisites (with qualification) are that

4   (i) the sound recording was "fixed lawfully" and that (ii) the making of the

5   phonorecords was authorized by the copyright holder in the sound recording.

6   See id.  On appeal, defendants argue that they were not subject to those

7   requirements because the sound recordings they sought to duplicate were fixed

8   by their predecessors and, thus, not "*by another*."[5]  We agree.  While the use of

9   the term "another" is imprecise, defendants' interpretation is supported by logic

10  and legislative history.

11      When defendants acquired the relevant recordings, they bought any rights

12  that the sellers held in those recordings.  The purchase agreement that conveyed

13  the Archives, for instance, provided that the seller was acquiring "all Intellectual

---

[5] While defendants raised this argument for the first time at the summary judgment hearing, we do not consider it waived because the district court chose to address it on reconsideration.  See United States v. Young, 998 F.3d 43, 52 n.2 (2d Cir. 2021) ("[W]e do not consider arguments waived when, although not raised below, they were nevertheless passed on by the district court." (internal quotation marks omitted)).

19

1    Property rights . . . to the extent that either Seller or any of its Affiliates possesses

2    such rights." Supp. App'x at 1334. It is undisputed that the seller would not be

3    subject to the substantive requirements of Section 115. To find that defendants

4    (as purchasers) would be saddled with these additional requirements would

5    impair the transferability of these sorts of works because every trade would

6    thereby impose new burdens and diminish value. Nothing in the text requires

7    that result.

8         Legislative history militates in the same direction. Under the Copyright

9    Act of 1909, once the copyright owner of a musical composition authorized the

10   work's mechanical reproduction, any other person could make "similar use" of

11   the work on payment to the copyright owner of a two-cent royalty "on each such

12   part manufactured." 17 U.S.C. § 1(e) (1909). The licensee was not expressly

13   required to make its own original sound recording of the musical work or to

14   obtain a license from the lawful owner of the duplicated sound recording.

15        The 1971 amendments to the Copyright Act for the first time granted

16   copyright protection in "sound recordings"–separate from the musical work–to

17   protect against a recording being duplicated without authorization, i.e., record

18   piracy. In the litigation that ensued, music publishers claimed that one who

1    duplicates a sound recording made by somebody else is ineligible for a

2    compulsory license.[6]  These suits made their way to various circuit courts, all of

3    which agreed that compulsory licenses for "similar use" do not allow a person to

4    participate in "piracy under the flag of compulsory licensing."  <u>Duchess Music</u>

5    <u>Corp. v. Stern</u>, 458 F.2d 1305, 1311 (9th Cir. 1972); <u>see also</u> <u>Edward B. Marks</u>

6    <u>Music Corp. v. Colorado Magnetics, Inc.</u>, 497 F.2d 285 (10th Cir. 1974); <u>Jondora</u>

7    <u>Music Pub. Co. v. Melody Recordings, Inc.</u>, 506 F.2d 392 (3d Cir. 1974); <u>Fame</u>

8    <u>Pub. Co., Inc. v. Alabama Custom Tape, Inc.</u>, 507 F.2d 667 (5th Cir. 1975).

9          Later, the 1976 amendments made it possible for a person seeking to

10   duplicate a sound recording "to obtain a compulsory license for the use of

11   copyrighted music under section 115."  H.R. Rep. No. 94-1476, at 108.  But, to

12   prevent piracy, eligibility for a compulsory license was conditioned on "*the owner*

13   *of the sound recording . . .* authoriz[ing] its duplication."  <u>Id.</u> (emphasis added).

14   Since piracy concerns are not a consideration when (as here) the owner of the

---

[6] The Third Circuit theorized that "[o]ne reason for these recent cases may be the
increased remedies provided to the composers by [the 1971 Amendment]."
<u>Jondora Music Pub. Co. v. Melody Recordings, Inc.</u>, 506 F.2d 392, 395 n.8 (3d Cir.
1974).

21

1   sound recording has transferred its rights to a successor, there is no reason to

2   assume the application of the substantive requirements.

3        We hold that defendants' recordings were not "fixed by another" for the

4   purposes of Section 115, and therefore vacate the district court's summary

5   judgment ruling to the extent it found defendants to have infringed any of the

6   musical works due to a failure to satisfy that section's substantive requirements.[7]

7                                    **3**

8        The final basis for the district court's infringement finding was defendants'

9   failure to provide timely notice before distributing a phonorecord *and* before

10  obtaining a voluntary HFA license.  The Publishers argue that defendants failed

11  to serve timely notice for at least one recording associated with each musical

---

[7] Both the parties and the district court assumed that if the recordings were "fixed by another," then defendants' recordings would not have been "lawfully fixed" without the artists' consent.  The basis for that assumption is questionable: the two statutes on which the district court relied–the federal and New York anti-bootlegging acts–were enacted many years after the recordings at issue were fixed.  See Pub. L. No. 103-465, 108 Stat. 4809 (1994) (codified at 17 U.S.C. § 1101); 1990 N.Y. Sess. Law Serv. 460 (McKinney).  Unless another law applied at the time the recordings were fixed, then it does not appear to have been unlawful for the concert promoters to record the concerts without the performing artists' consent.

1   work and that this failure provides an independent basis for affirming the grant

2   of summary judgment.  We disagree.

3       The district court found infringement due to untimely notice only as to the

4   musical works included in the recordings exploited in 2006 because defendants

5   had sent no notices at that time and did not begin obtaining HFA licenses until

6   the following year.  See ABKCO, No. 15-cv-4025, 2018 WL 1746564, at *16.  As to

7   all other recordings, however, the district court found that "there is a disputed

8   question of fact as to whether and which [notices] were actually submitted after

9   the first download or streaming of a phonorecord and in the absence of an HFA

10  license."  Id.  So far as we can tell, that disputed fact was not resolved.

11      We therefore remand to the district court for further factfinding on this

12  issue.  In so doing, we acknowledge that the factual dispute may be affected by a

13  threshold legal question that arises from Section 115's command that "failure to

14  serve or file the notice of intention . . . forecloses the possibility of a compulsory

15  license."  17 U.S.C. § 115(b)(2).  Specifically, the question is whether one is

16  permanently barred from obtaining a valid compulsory license for a musical

17  work that one had exploited before sending notice and in the absence of a

23

1    negotiated license.[8]  Section 115(b)(4)(A) might alternatively be read to prevent

2    only retroactive issuance of a compulsory license that would otherwise absolve

3    the licensee from suffering the consequence of infringement; in that case, a

4    prospective license could still be acquired, so long as the compulsory licensing

5    requirements are fulfilled.  But this issue has not been briefed, so we merely raise

6    it for further consideration in the district court.

7                                   *       *       *

8            To summarize, we agree with the district court's holding that the

9    audiovisual recordings do not fall within the scope of Section 115 compulsory

10   mechanical licenses, disagree with the district court's holding that defendants

11   infringed the remaining musical works by failing to comply with the substantive

12   requirements of Section 115, and reject the Publishers' argument that defendants'

13   failure to serve timely notice provides an independent basis for affirming each

---

[8] Defendants' inability to obtain a compulsory license would not affect any
negotiated license they might secure.  See Rodgers & Hammerstein, 2001 WL
1135811, at *5 ("Nothing in Section 115 suggests that Congress intended to limit
the ability of either copyright holders or prospective licensees to enter into
private agreements that would contain different terms and conditions of the
license.").

1   finding of infringement.  We therefore affirm in part and vacate in part the

2   district court's summary judgment order.

3          On remand, the district court should reevaluate its infringement findings

4   for all audio-only recordings.  We leave it to the district court to decide whether a

5   new jury trial is needed to resolve any factual disputes.

6

7                                          **B**

8          Defendants argue that even if they failed to obtain any compulsory or

9   negotiated licenses for the audiovisual recordings, the affirmative defenses of

10  implied license and equitable estoppel preclude findings of infringement.  We

11  disagree.

12

13                                          **1**

14         We have not yet ruled "on the precise circumstances under which an

15  implied non-exclusive license will be found."  <u>Psihoyos v. Pearson Educ., Inc.</u>,

16  855 F. Supp. 2d 103, 120 (S.D.N.Y. 2012) (Oetken, <u>J.</u>) (internal quotation marks

17  omitted).  Some courts use a narrow test, finding an implied license only where

18  one party "created a work at [the other's] request and handed it over, intending

1    that [the other] copy and distribute it."[9] Effects Assocs., Inc. v. Cohen, 908 F.2d

2    555, 558 (9th Cir. 1990).  Others have applied a more permissive test by which

3    consent "may be inferred based on silence where the copyright holder knows of

4    the use and encourages it."  Field v. Google Inc., 412 F. Supp. 2d 1106, 1116 (D.

5    Nev. 2006).  We have no occasion to decide which test to adopt, since both

6    require a "meeting of the minds between the parties to permit the particular

7    usage at issue," Psihoyos, 855 F. Supp. 2d at 124 (internal quotation marks

8    omitted), and there has been none here.

9         Defendants argue that, since they made royalty payments, the Publishers

10   knew how the musical works were being used; and that acceptance of payment

---

[9] The district court cited SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharms., Inc., 211 F.3d 21 (2d Cir. 2000) for the proposition that we have "endorsed" the "narrow" test for finding an implied license.  ABKCO, No. 15-cv-4025, 2018 WL 1746564, at *18.  But SmithKline did not adopt this test; it merely explained that *other courts* have applied the narrow test for deciding whether an implied license existed.  211 F.3d at 25.

1    signified the consent required for a meeting of minds.  But this reasoning ignores

2    the mechanics of compulsory licensing.

3         The Publishers grant thousands of compulsory licenses annually.  Not by

4    choice; it is (as the name says) compulsory.  Payment notifies the Publishers that

5    a compulsory license has issued, but it does not communicate how the license

6    will be used.  The reasonable assumption is that use will be in accord with the

7    requirements of Section 115, which, at the least, means that the musical works

8    will not be used in any audiovisual recordings.  The same assumption applies to

9    any negotiated license in this case. The HFA licenses "state that Defendants seek

10    licenses for 'phonorecords' as 'authorized pursuant to 17 U.S.C. § 115," <u>ABKCO</u>,

11    No. 15-cv-4025, 2018 WL 1746564, at *20, which conveys the clear impression that

12    the musical works would be used in sound recordings only.

13         Defendants further argue that ABKCO's cease-and-desist letters show that

14    the Publishers knew that the musical works were being used in audiovisual

15    recordings.  But those letters show only that the Publishers knew about a single

16    Rolling Stones recording, not any of the rest (of which there were over a

17    thousand).  And, at the risk of being obvious, the demand that defendants *stop*

1    exploiting that single recording cannot be construed as a meeting of the minds

2    about anything.

3

4                                            **2**

5            Nor can defendants establish a defense by equitable estoppel.  That

6    affirmative defense "is properly invoked where the enforcement of rights of one

7    party would work an injustice upon the other party due to the latter's justifiable

8    reliance upon the former's words or conduct."  Veltri v. Building Serv. 32B-J

9    Pension Fund, 393 F.3d 318, 326 (2d Cir. 2004) (internal quotation marks

10   omitted).  To prevail on an estoppel defense in the copyright context, a defendant

11   must show that:

12            (1) plaintiff had knowledge of the defendant's infringing
13            conduct; (2) plaintiff either (a) intended that defendant
14            rely on plaintiff's acts or omissions suggesting
15            authorization, or (b) acted or failed to act in such a
16            manner that defendant had a right to believe it was
17            intended to rely on plaintiff's conduct; (3) defendant was
18            ignorant of the true facts; and (4) defendant relied on
19            plaintiff's conduct to its detriment.
20
21   SimplexGrinnell LP v. Integrated Sys. & Power, Inc., 642 F. Supp. 2d 167, 194

22   (S.D.N.Y. 2009) (Lynch, J.) (citation omitted) (alterations adopted).

1       But as the district court concluded, there is no showing that the Publishers

2   knew about the infringing conduct.  See ABKCO, No. 15-cv-4025, 2018 WL

3   1746564, at *20.  True, ABKCO knew that defendants were exploiting a recording

4   of The Rolling Stones, which is why ABKCO demanded that defendants stop

5   exploiting it.  But, even as to that single recording, defendants are unable to

6   show that the cease-and-desist letters "suggest authorization" or anything of the

7   sort.

8

9                                              **C**

10      Defendants next challenge the district court's holding that Sagan was liable

11  for direct infringement.  Direct liability requires "volitional conduct" that

12  "causes" the copying or distribution.  Zappa v. Rykodisc, Inc., 819 F. Supp. 2d

13  307, 315 (S.D.N.Y. 2011) (Pauley, J.) (citation omitted).  That is, direct liability

14  attaches only to "the person who actually presses the button."  Cartoon Network

15  LP v. CSC Holdings, Inc., 536 F.3d 121, 131 (2d Cir. 2008).  In UMG Recording,

16  Inc. v. Escape Media Group, for example, two executives were directly liable

17  because they "personally uploaded copyrighted sound recordings to [their

29

1    website]." No. 11-cv-8407, 2014 WL 5089743, at *26 (S.D.N.Y. Sept. 29, 2014)

2    (Griesa, J.).

3         Even if a copyright is not infringed by a corporate officer's own hand, a

4    corporate officer with an obvious and direct financial interest, and a power of

5    supervision to effect an infringement, may be vicariously liable.  See EMI

6    Christian Music Grp. v. MP3tunes, LLC, 844 F.3d 79, 99 (2d Cir. 2016).  But the

7    Publishers pled only direct liability.  The district court recognized as much and

8    acknowledged that summary judgment would have to be premised "on that

9    basis alone."  ABKCO, No. 15-cv-4025, 2018 WL 1746564, at *22 n.33.

10        However, the district court went on to recite the standard for vicarious

11   liability instead, and to apply that standard to conduct that (with one arguable

12   exception) could not give rise to direct liability.  See id. at *22.  As to the

13   exception: Sagan's Chief Technology Officer stated in his deposition that "it was

14   Sagan who instructed him as to 'which concerts to make available for download

15   or not,' . . . and made plans 'to start digitizing tape recordings with an eye

16   towards making them available on a public website.'"  Id. (citations omitted).

17   But that passage involves only instructions and plans; there is no evidence that

1    Sagan is the one who "actually presse[d] the button." <u>Cartoon Network</u>, 536 F.3d

2    at 131.

3         We therefore reverse the district court's order granting judgment against

4    Sagan.

5

6

31

**II**

The Publishers challenge the district court's refusal to issue a permanent injunction.[10]  We review this decision for abuse of discretion.  See 16 Casa Duse, LLC v. Merkin, 791 F.3d 247, 254 (2d Cir. 2015).

Under the Copyright Act, a court may "grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright."  17 U.S.C. § 502(a).  The test for determining when to grant such equitable relief requires the plaintiff to demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006).

---

[10] Because we have vacated the district court's order with regards to infringement on the audio-only recordings, the permanent injunction issue is relevant only with respect to the audiovisual recordings.

1        The district court found that the first two factors weigh against an

2   injunction since the Publishers can be made whole with cash.  We agree.  The

3   Publishers argue that their damages are impossible to quantify because

4   defendants' infringing conduct "threatens [their] relationships with . . . existing

5   licensees, and undermines their negotiating leverage with prospective licensees."

6   Plaintiffs-Appellees Br. at 69-70.  But they provide no factual (or theoretical)

7   support that would allow us to credit that claim.  True, "[h]arm can be

8   irreparable" where, "absent an injunction, the defendant is likely to continue

9   infringing the copyright."  Broad. Music, Inc. v. Pamdh Enters., Inc., No. 13-cv-

10  2255, 2014 WL 2781846, at *4 (S.D.N.Y. June 19, 2014) (Wood, J.).  But that factor

11  is not decisive when (as here) the record gives no indication that defendants will

12  continue their infringing conduct.

13       The third factor tilts in the same direction.  Defendants invested tens of

14  millions of dollars to acquire a library of live concert recordings and have

15  devoted two decades to building a business around those recordings.  The

16  Publishers claim an offsetting hardship if they had "to commence litigation for

17  each future violation," whereas it would be no cognizable hardship if defendants

18  were compelled "to comply with their legal duties."  Broad. Music, Inc. v. Prana

33

1   Hosp., Inc., 158 F. Supp. 3d 184, 196 (S.D.N.Y. 2016) (Engelmayer, J.).  But the

2   Publishers have the resources to commence future litigation if needed, and if

3   they do so successfully, they might collect fees and costs under Section 505 of the

4   Copyright Act.

5       The final factor also favors defendants because the public has an interest in

6   accessing "iconic" recordings of historical importance.  ABKCO, No. 15-cv-4025,

7   2018 WL 1746564, at *23.  The Publishers rely on a case in which we explained

8   that the public has an interest in "protecting copyright owners' marketable rights

9   to their work and the economic incentive to continue creating."  WPIX, Inc. v. ivi,

10  Inc., 691 F.3d 275, 287 (2d Cir. 2012).  But WPIX affirmed an injunction against

11  "streaming [the] plaintiffs' copyrighted television programming over the internet

12  live and without their consent."  Id. at 277.  We concluded that a preliminary

13  injunction would not disserve the public interest because "[p]laintiffs' desire to

14  create original television programming surely would be dampened if their

15  creative works could be copied and streamed over the Internet," and because

16  "the public will still be able to access plaintiffs' programs through means other

17  than [the defendant's] Internet service."  Id. at 288.

1    This case is distinguishable in every way that matters.  The concert

2    recordings at issue were made primarily from the 1960s to the early 2000s; so no

3    ongoing stream of new content is at stake.  Even if it were, the Publishers fail to

4    explain how the denial of a permanent injunction would curb creativity.  See

5    Salinger v. Colting, 607 F.3d 68, 82 (2d Cir. 2010) ("The object of copyright law is

6    to promote the store of knowledge available to the public.").  Surely it would

7    have no impact on concert performances themselves, or the desire to preserve

8    them.

9

10                                          **III**

11    After a nine-day damages trial, the jury awarded the Publishers the near

12    minimum of their statutory entitlement–about $30 million less than what they

13    had sought.  The Publishers now want a retrial on the ground that the district

14    court abused its discretion with respect to a series of evidentiary rulings, and in

15    its denial of the Publishers' motion for a new trial.  We address these arguments

16    in turn.

17

1    **A**

2    Three evidentiary rulings are contested.

3    First: The district court admitted into evidence payments that defendants

4    made to non-parties and for works on which the Publishers did not sue.  The

5    district court concluded that the payments were relevant to the "conduct and

6    attitude of the parties" and the "willfulness" or state of mind of defendants, and

7    it issued a limiting instruction to that effect.  App'x at 757.  On appeal, the

8    Publishers contend that this evidence was irrelevant and that any probative

9    value was outweighed by the danger of misleading the jury as to the sum

10   defendants paid for the musical works at issue.  But the Publishers waived this

11   argument when their counsel stated that he was "fine" with such evidence being

12   admitted so long as a limiting instruction was given, as it was.  Id. at 766.[11]

---

[11] The Publishers also argue that defendants' list of checks–a list created
specifically for the litigation–should have been excluded "under the Best
Evidence Rule," and because "there was a dispute as to which checks had
actually been cashed."  Plaintiffs-Appellees' Reply Br. at 7.  The Publishers first
raised this argument on appeal in their reply brief, and thereby waived it.  See JP
Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V., 412 F.3d 418, 428
(2d Cir. 2005) ("[A]rguments not made in an appellant's opening brief are
waived even if the appellant pursued those arguments in the district court or
raised them in a reply brief.").

36

1       Second: The district court admitted into evidence the Joint Exploitation

2    Agreements that defendants entered with Sony, Warner, and UMG.  The

3    Publishers' motion in limine to exclude the agreements from evidence was

4    denied "subject to reopening as events unfold during the course of the trial."  Id.

5    at 755.  On appeal, the Publishers argue that the district court abused its

6    discretion because admitting these agreements conflicted with several of its other

7    rulings.

8       This argument too was not preserved.  An evidentiary issue is preserved in

9    limine only if it was (among other things) "ruled upon by the court without

10   equivocation."  United States v. McDermott, 245 F.3d 133, 140 n.3 (2d Cir. 2001).

11   The in limine ruling left the door ajar for objections at trial, and the Publishers

12   did not object when these agreements were introduced at trial.  The Publishers

13   thus waived the argument they now advance on appeal.  See Barlow v. Liberty

14   Maritime Corp., 746 F.3d 518, 529 (2d Cir. 2014) ("[Plaintiff] raised this objection

15   in limine, but failed to raise it at trial, and specifically withdrew his objection in

16   his post-trail briefing.  We therefore need not consider it.").

17      Third: The Publishers sought to question Sagan about a June 2015 article

18   published by defendants' licensing agent, MediaNet, which stated that, to exploit

37

1    music in audiovisual format, "[s]ynchronization licenses for the musical

2    composition in each track used must also be obtained from the appropriate

3    music publisher(s)." Supp. App'x at 2107. The district court precluded this

4    hearsay statement after concluding that it was not made within "the scope of

5    [MediaNet's] agency with respect to defendants." Id. at 661.

6         The Publishers contest this ruling by pointing to the testimony of Sagan's

7    Chief Technology Officer that MediaNet provided "[a]dvice with respect to what

8    licenses were required." Id. at 657. But this testimony was vague and did not

9    necessarily relate to synchronization licenses. Moreover, the full record shows

10   that MediaNet's agency role was largely limited to calculating what defendants

11   owed and making the requisite royalty payments. The district court did not

12   abuse its discretion in excluding this evidence.

13

14                                  **B**

15        A motion for a new trial may be granted "for any reason for which a new

16   trial has heretofore been granted in an action at law in federal court." Fed. R.

17   Civ. P. 59(a)(1)(A). Such a motion ordinarily should be denied "unless the trial

18   court is convinced that the jury has reached a seriously erroneous result or that

                                     38

1    the verdict is a miscarriage of justice."  <u>Atkins v. New York City</u>, 143 F.3d 100,

2    102 (2d Cir. 1998) (citation omitted).  The Publishers contend a new trial should

3    have been granted because the pandemic resulted in a rushed and ill-considered

4    jury verdict.  We disagree.

5           When trial began on March 2, 2020, news of the pandemic was spreading.

6    On March 10, the district court told counsel that "we may be surrounded by the

7    National Guard tomorrow morning,  . . . .  I want to get this done as soon as

8    possible, okay?"  App'x at 1889.  The next day, the district court told counsel that

9    "[t]he world is falling apart around us, and I would like to get this done . . . it

10   would be very, very helpful to get this done as soon as possible."  Supp. App'x at

11   791.

12          On March 12, 2020, New York's mayor declared a state of emergency.

13   That same day, Juror Five asked to speak in open court.  The juror stated that the

14   jury intended to do their job and "do[] it fairly," but that:

15               We have been coming here for two weeks, all of us in this
16               room.  We have been exposing ourselves.  Whether we
17               know it or not, it's happening.  And, quite frankly, this
18               matter doesn't seem all that important compared to lives
19               at stake, such as my mom who has lupus.  She has a very
20               compromised immune system. . . .  We are here to decide
21               damages and money.  And, quite frankly, money, to me,

39

1          is not worth the life of my mother or any of the lives of
2          the jurors in there who also there are several who are
3          older, and that's my concern.
4
5    App'x at 797-98.  The district court ruled <u>sua sponte</u> that the juror's comments

6    did not warrant his exclusion.  Neither party objected.

7          Prior to deliberation later that day, the district court assured the jury:

8    "Now that the case is in your hands, you can stay as long as you wish.  I'm

9    happy to stay with the usual schedule of 9:30 to 2:30, but if you wish to stay

10   longer, I'll leave that entirely up to you."  <u>Id.</u> at 935.  The jury reached a verdict in

11   less than an hour and without reviewing any trial exhibits.  It awarded the

12   Publishers $189,500 in statutory damages, and made findings as to willful

13   infringement with respect to 30 recordings.

14         The Publishers' motion for a new damages trial argued that "the trial was

15   fundamentally unfair because the jury was allegedly unable to deliberate as the

16   COVID-19 pandemic was worsening in New York City."  <u>ABKCO Music, Inc. v.</u>

17   <u>Sagan</u>, 500 F. Supp. 3d 199, 205 (S.D.N.Y. 2020) (Ramos, <u>J.</u>), <u>judgment entered</u>,

40

1    No. 15-cv-4025, 2021 WL 761852 (S.D.N.Y. Feb. 26, 2021).  The Publishers claim

2    an abuse of discretion for three reasons.

3        First: A new trial was ordered in the supposedly analogous case of Lucas

4    v. American Manufacturing Co., 630 F.2d 291 (5th Cir. 1980), in which the jury

5    returned a verdict within 45 minutes after three days of trial, and shortly before a

6    hurricane made landfall near the courthouse.  Id. at 293.  But Lucas was

7    materially different.  There, the judge asked the jurors to render a verdict in

8    fifteen minutes, see id., whereas the judge in this case told the jury that it could

9    "stay as long as [it] wish[ed]."  Supp. App'x at 935.  And while Lucas held that

10   there had been no evidentiary basis for the jury's award, which was less than half

11   the amount to which the defendant stipulated prior to trial, 630 F.2d at 293, the

12   jury in this case awarded damages within the permissible statutory range.

13       Second: The Publishers cite Juror Five's concerns.  But those concerns

14   revealed only an uneasiness to proceed in the face of the pandemic, not an

15   unwillingness to engage in fair and thorough deliberations.  Juror Five made this

16   plain: "I'm not trying to get a hung jury.  I want to do my job.  I want to do my

17   duty.  So does everyone in this room, and we plan on doing it fairly."  ABKCO,

18   500 F. Supp. 3d at 208.

41

1  Third: The Publishers argue that the effect of the pandemic on the trial is

2  evidenced by the low damages award relative to the Publishers' expectations.  As

3  the district court explained, however, the Publishers failed to "persuasively draw

4  any connection between the potential impact of the COVID-19 pandemic and the

5  specific damages awarded," or explain why it would have been easier for a

6  rushed jury to award damages on the lower side of the scale, as opposed to in the

7  middle or on the higher end.  Id. at 210.

8

9                                         **IV**

10  The district court awarded the Publishers roughly $2.4 million in

11  attorneys' fees primarily on the ground that defendants acted unreasonably

12  when they claimed (without evidence) that artists had consented to the recording

13  and exploitation of their concert performances and, relatedly, because

14  defendants' infringement was willful as to a large portion of the recordings.  See

15  ABKCO, 500 F. Supp. at 213-15.  The premise of that award is that (according to

16  the parties and the district court) the substantive requirements of Section 115

17  incorporate the requirement for performer consent.  The award therefore

42

1   conflicts (at least in part) with our holding that defendants were not subject to

2   Section 115's substantive requirements.

3        We therefore vacate the district court's grant of attorneys' fees and remand

4   for reconsideration in light of this opinion.

5

6                           **CONCLUSION**

7   To summarize:

8        (1) We AFFIRM the rulings in the summary judgment order to the
9            extent they: (a) held that defendants failed to obtain a license for
10           any of the audiovisual recordings, and therefore infringed the
11           audiovisual works; (b) concluded that defendants had no valid
12           affirmative defense; and (c) declined the Publishers' request for a
13           permanent injunction.
14

15       (2) We VACATE the ruling in the summary judgment order that
16           defendants infringed the musical works used in the audio-only
17           recordings by failing to comply with Section 115's substantive
18           requirements.
19

20       (3) We REVERSE the ruling on summary judgment that Sagan was
21           liable for direct infringement.
22

23       (4) We REJECT the challenges to evidentiary rulings.
24

25       (5) We AFFIRM the order denying the motion for a new trial.
26

27       (6) We VACATE the award of attorneys' fees.
28

1   (7) We REMAND the case for further proceedings consistent with
2         this opinion.

A True Copy

Catherine O'Hagan Wolfe, Clerk

United States Court of Appeals, Second Circuit

44