# No. 20- 3816 (L)

## No. 20-4020 (CON)
## No. 20-4099 (XAP)

### United States Court of Appeals for the Second Circuit

ABKCO MUSIC, INC., COLGEMS-EMI MUSIC INC., EMI ALGEE MUSIC CORP., EMI APRIL MUSIC INC., EMI BLACKWOOD MUSIC INC., EMI CONSORTIUM MUSIC PUBLISHING, INC., DBA EMI FULL KEEL MUSIC, EMI CONSORTIUM SONGS, INC., DBA EMI LONGITUDE MUSIC, EMI FEIST CATALOG INC., EMI ROBBINS CATALOG INC., EMI UNART CATALOG, INC., JOBETE MUSIC CO., INC., SCREENGEMS-EMI MUSIC INC., STONE AGATE MUSIC, STONE DIAMOND MUSIC CORP., IMAGEM MUSIC LLC, PEER INTERNATIONAL CORP., PSO LTD., PEERMUSIC LTD., PEERMUSIC III, LTD., SONGS OF PEER, LTD., SPIRIT CATALOG HOLDINGS S.A.R.L., SPIRIT TWO MUSIC, INC., WARNER-TAMERLANE PUBLISHING CORP., WB MUSIC CORP.,
*Plaintiffs-Appellees-Cross-Appellants*

*v.*

WILLIAM SAGAN, NORTON LLC, BILL GRAHAM ARCHIVES, LLC, DBA WOLFGANG'S VAULT,
*Defendants-Appellants-Cross-Appellees.*

*APPEAL FROM THE UNITED STATES DISTRICT COURT*
*FOR THE SOUTHERN DISTRICT OF NEW YORK, NO. 1:15-CV-04025*

#### APPELLANTS-CROSS-APPELLEES' PETITION FOR REHEARING AND REHEARING EN BANC

MICHAEL S. ELKIN
*Winston & Strawn LLP*
*200 Park Avenue*
*New York, NY 10166*
*(212) 294-6729*
*MElkin@winston.com*

ERIN R. RANAHAN
*Winston & Strawn LLP*
*333 South Grand Avenue*
*Los Angeles, CA 90071*
*(213) 615-1835*
*Eranahan@winston.com*

*Counsel for Appellants-Cross-Appellees William Sagan et al.*

# **TABLE OF CONTENTS**

**Page**

RULE 35 STATEMENT ............................................................1

ISSUE PRESENTED ...............................................................3

BACKGROUND ...................................................................3

ARGUMENT .......................................................................4

    I.    Compulsory Licensing Under the U.S. Copyright Act .............................4

    II.    The Panel Misconstrued the Statutory Definition of "Phonorecords".................................................................7

    III.    The Panel Opinion Creates Redundancy Disfavored In Statutory Interpretation ..........................................................10

    IV.    The Additional Concerns Raised by the Panel are Not Sufficiently Compelling To Abandon The Statute's Plain Language.........................15

CONCLUSION ....................................................................18

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS ...............................................................19

CERTIFICATE OF SERVICE ...................................................20

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*ABKCO Music, Inc. v. Sagan*,
  50 F.4th 309 (2d Cir. 2022) ...........................................................................1

*ABKCO Music, Inc. v. Stellar Records, Inc.*,
  96 F.3d 60 (2d. Cir. 1996) ...........................................................................15

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*,
  515 U.S. 687 (1995)......................................................................................10

*BP Am. Prod. Co. v. Burton*,
  549 U.S. 84, 127 S. Ct. 638, 166 L. Ed. 2d 494 (2006) ....................................11

*Comm. to Stop Airport Expansion v. F.A.A.*,
  320 F.3d 285 (2d Cir. 2003) .........................................................................10

*Fame Pub. Co. v. Alabama Custom Tape, Inc.*,
  507 F.2d 667 (5th Cir. 1975) ..........................................................................4

*Filler v. Hanvit Bank*,
  378 F.3d 213 (2d Cir. 2004) .........................................................................10

*Joe Hand Promotions, Inc. v. Maupin*,
  2016 WL 6459631 (E.D.N.Y. Oct. 31, 2016) ...................................................16

*In re Pandora Media, Inc.*,
  6 F. Supp. 3d 317 (S.D.N.Y. 2014) ................................................................16

*Rimini St., Inc. v. Oracle USA, Inc.*,
  139 S. Ct. 873 (2019)...............................................................................12, 13

*United States v. Am. Soc. of Composers, Authors, Publishers*,
  627 F.3d 64 (2d Cir. 2010) ...........................................................................16

*United States v. Nordic Vill. Inc.*,
  503 U.S. 30 (1992)........................................................................................11

**Statutes**

17 U.S.C. § 101 .................................................................6, 7, 9, 10

17 U.S.C. § 102(a) ...................................................................5

17 U.S.C. § 115(a)(1) .............................................................3, 8

132 Stat. 3676, Pub. L. 115-264 (Oct. 11, 2018) ......................3

U.S. Copyright Act § 115 .....................................................*passim*

**Other Authorities**

Fed. R. App. P. 32(a)(5) .........................................................19

Fed. R. App. P. 32(a)(6) .........................................................19

Fed. R. App. P. 32(f) ..............................................................19

Fed. R. App. P. 35(b) ...............................................................1

Fed. R. App. P. 35(b)(2) .........................................................19

H.R. Rep. No. 94-1476 .........................................................6, 7

## RULE 35 STATEMENT

Pursuant to Rules 35(b) and 40 of the Federal Rules of Appellate Procedure, Defendants-Counterclaimants-Appellants-Cross-Appellees Norton LLC, Bill Graham Archives, LLC, and William Sagan ("Defendants") submit this petition for rehearing and rehearing en banc, seeking review of one discrete issue from the Panel Opinion, dated October 6, 2022, that dealt with a multitude of copyright and corporate liability issues from each side on appeal. *See ABKCO Music, Inc. v. Sagan*, 50 F.4th 309 (2d Cir. 2022) (the "Panel Opinion," attached).

While the Panel Opinion reversed, remanded, and affirmed other issues that Defendants do not challenge here, Defendants—owners of copyrights in historic live music recordings—seek *en banc* review of one discrete aspect of the Panel Opinion affirming in part the district court's (Ramos, E.) summary judgment ruling in favor of music publisher Plaintiff-Appellees ("Plaintiffs"). Specifically, Defendants seek en banc review of the Panel determination regarding the meaning of "phonorecords," as defined under the Copyright Act and construed within that Act's compulsory licensing scheme. This statutory interpretation issue of first impression is whether Section 115 compulsory licenses are unavailable to Defendants based on an exclusionary reading of the statute that would foreclose Defendants from making their audiovisual recordings available to the public. Because these recordings were originally first fixed and created on recording devices that simultaneously captured

visual images and audio recordings of the live musical performances in question, they qualify as phonorecords for Section 115 compulsory licenses. The Copyright Act offers a two-sentence definition of "phonorecord," but the Panel Opinion ignored the distinction of the second sentence addressing initial fixation. The Panel also noted that while its reading would render a sentence in the statute at issue entirely redundant, it would nevertheless accept the district court's interpretation on this particular issue.

This petition presents a pure legal question of exceptional importance and first impression with respect to the statutory interpretation of the meaning of the term "phonorecord" under the Copyright Act, and within the context of Section 115. The resolution of this question impacts the treatment and eligibility for compulsory licensing of live music and audiovisual recordings first fixed in a phonorecord that included visual aspects, including the historic live music recordings owned by Defendants in this case. Defendants request that an en banc panel analyze this issue of extraordinary importance as it deals with whether iconic live music recordings—which serve the public interest—will ever see the light of day so that music fans everywhere can access and enjoy them.

## ISSUE PRESENTED

Should the defined term "phonorecords" as used in compulsory licensing statute(s)[1] exclude original recordings where sounds were first fixed and simultaneously captured with images of the live musical act performing, even if that interpretation would render a portion of the statute dealing with initial fixation redundant and meaningless?

## BACKGROUND

Of the 197 musical compositions Plaintiffs put at issue in this copyright case, a significant portion of those were reproduced and distributed in at least one audiovisual recording. Panel Op. at 15 (*citing ABKCO*, No. 15-cv-4025, 2018 WL 1746564, at *7). Section 115 allows one to "obtain a compulsory license to make and distribute *phonorecords*" of a published musical work. 17 U.S.C. § 115(a)(1) (emphasis added). The Panel Opinion affirmed the district court with respect to its finding that this portion of the musical works were not eligible for Section 115 compulsory licensing because they were "audiovisual," in that the sound recordings

---

[1] While the precise statute governing these licenses has recently changed, the use of phonorecords has remained consistent in that statutory scheme as well, and thus the issue persists despite Section 115 being supplanted. Specifically, Section 115 of the Copyright Act was amended in 2018 under the Music Modernization Act, which governs conduct engaged in after October 11, 2018. *See* 132 Stat. 3676, Pub. L. 115-264 (Oct. 11, 2018). The conduct in this case occurred before that date, so all citations in this opinion to 17 U.S.C. § 115 are to the pre-2018 version of the statute.

themselves included live footage from the historic live music events where the songs were performed.  *See* Panel Op. at 15-18.

## ARGUMENT

### I.    Compulsory Licensing Under the U.S. Copyright Act

Copyright law is a careful balance of fostering creativity while honoring ownership of artistic works.  Keeping with this goal, the compulsory licensing provision developed by Congress is designed to "encourage future creative endeavor[s] and to combat monopolization in the music industry."  *Fame Pub. Co. v. Alabama Custom Tape, Inc*., 507 F.2d 667, 670 (5th Cir. 1975); SAppx3.  The right Congress created bypasses the "exclusive right" copyright holders usually enjoy when deciding whether to license their work for others' use.  *Id*.  That is, publishers could no longer unilaterally bar others from exploiting their compositions.  Artists and others who complied with the statute were guaranteed a "mechanical" license to record (and distribute) these musical works.  Of course, performers would still have to pay for this use of another's composition—but Congress created a standard royalty rate, again, to prevent monopolization. *Id.* at 669-670.

Whether Section 115 licenses cover exploitation of audiovisual recordings depends upon whether those types of recordings fall within the Copyright Act's definition of "phonorecords":

[M]aterial objects in which sounds, other than those accompanying a motion picture or other audiovisual work, are fixed . . ., and from which the sounds can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. **The term "phonorecords" includes the material object in which the sounds are first fixed**.

Panel Opinion at 15 (*citing* 17 U.S.C. § 101) (emphasis added).

Defendants' recordings at issue are unambiguously "phonorecords" under the plain language of the Copyright Act's definition. Where, as here, sounds are "first fixed" as part of and inseparably from an audiovisual work, the resulting "material object" is a phonorecord by definition. The statute's second sentence, by expressly including "the material object in which the sounds are first fixed"—i.e., a tape that also records video images—establishes that Defendants' recordings are phonorecords. That is, Defendants' recordings were "first fixed" in a physical format that captured both audio and video.

The Copyright Act concerns works that are fixed "in" a material object—not "by" a material object—and the equipment that performs or enables the fixation is plainly not part of the work itself. *See* 17 U.S.C. § 102(a) (copyright applies only to works "fixed in [a] tangible medium").

Because the sounds of such live performances do not "accompany[]" anything, they do not fall into the "audiovisual works" exception. Where the audio and video components of a concert tape are "first fixed" and inexorably bound together, it cannot be said that the sounds merely "accompany[]" the video. This is not the case, for instance, of sounds being grafted after-the-fact to accompany "motion picture or other audiovisual work"—e.g., a film score or dialogue dubbed in during the editing process. Thus, there is no conflict between the first and second prongs of the phonorecords definition in Section 101.

H.R. Rep. 94-1476 also makes clear that the term "audiovisual work" does not include recordings like those that are at issue here. *See* DB53-54, 62 ("Defendants' Brief"). That report included an illustrative example of what would constitute an "audiovisual work": "the bill equates audiovisual materials such as filmstrips, slide sets, and sets of transparencies with 'motion pictures.'" H.R. Rep. No. 94-1476, 9 (1976).

Similarly, H.R. Rep. 94-1476 makes clear that the audiovisual exception is meant to exclude from compulsory licensing a sound recording that is produced separately from the video portion of a work and then is subsequently added—such as a soundtrack to a motion picture:

The first sentence of section 115(a) (1) would change the basis for

6

compulsory licensing to authorized public distribution of phonorecords (including disks and audio tapes but not the sound tracks or other sound records accompanying a motion picture or other audiovisual work).

H.R. Rep. No. 94-1476, 53 (1976). Thus, both the statute's plain meaning and legislative materials counsel in favor of Defendants' interpretation.

## II.    The Panel Misconstrued the Statutory Definition of "Phonorecords"

The position advocated by the Panel reads the first part of the statutory definition to expressly exclude material objects in which audiovisual works are fixed. But the statute says no such thing; it classifies sounds, not material objects. *See* District Ct. Dkt. 230 (p. 9n.21) (Defendants' Reply in Further Support of Summary Judgment); 17 U.S.C. § 101; H.R. Rep. No. 94-1476, 53 (1976).

The interpretation by the Panel is also wrong from a policy standpoint: while the definitional exclusion, in conjunction with Section 115, properly protects filmmakers by excluding motion pictures from compulsory licensing regimes, there is no rational policy basis for a reading whose sole effect is to permit Plaintiffs to make an end run around Congress's carefully calibrated compulsory licensing framework and let them collect windfall profits by exercising veto power over the dissemination of culturally important works that happened to have been first fixed on videotape. The decision below effectively bars countless recordings from Section 115(a)(1) licensing.

7

The Panel and the district court erred as a matter of law in determining that Defendants' original audiovisual recordings were not "phonorecords," thereby invalidating all Section 115 licenses for audiovisual recordings. SAppx27-28. Phonorecords include objects *such as studio equipment.* *See* Dkt. 258 at 16; DB61. Professional recording studios do not hold a monopoly on the ability to fix an original sound recording conveying some artistic contribution—a sound machine, a multi-level recording device, at a live concert at the Bill Graham[2] shows or in the studio at a King Biscuit recording qualifies too, as there is nothing based in fact or law that would render these recording devices inferior to a record label's studio. These recordings produced original sound recordings, for which Defendants are now the registered owners with the United States Copyright Office. Appx283.

Congressional intent in regulating sections excluding certain works from the compulsory license regime was intended to cover video which synced a separate, unrelated composition, referring expressly to "motion pictures" as an example. The audiovisual recordings at issue in this case, on the other hand, conveyed original ownership to the producer and sound engineer for their contributions, and resulted in recordings that should be squarely protected by Section 115 notwithstanding the contemporaneous inclusion of visual aspects of the phonorecords.

---

[2] The legendary promoter Bill Graham produced a number of the concerts at issue, while other "King Biscuit" sessions were engineered and mixed by David Hewitt from mobile recording trucks. *See* DB8-9. 54-55.

The King Biscuit archive, which composes the largest percentage of Defendants' iconic recordings, was broadcast to millions of listeners over hundreds of radio stations in the 70s, 80s and 90s, and the bands were compensated for these live performance recordings[3], and the live video elements were thus inherent in the original recording. (It is no coincidence, then, that Plaintiffs' witnesses at trial focused on the licensing market for separately synced media such as television and film, as opposed to concert footage. *See, e.g.*, Appx1365-1366; 1429).

Defendants' interpretation, that their recordings constitute phonorecords because they constitute the material objects upon which the sounds were *first* fixed, honors the distinction between Section 101's clauses. When an item is first fixed is significant in copyright law because that is when the work is created. *See* 17 U.S. Code § 101 ("A work is 'created' when it is fixed in a copy or phonorecord for the first time….") Defendants' reading gives meaning to the sentence about phonorecords so that the lawful owner of sound recordings may exercise its rights to exploit the original works consistent with the balancing act fostering creativity and availability of artistic works—even if the phonorecords contain audiovisual images.

---

[3] Both the Panel and lower court have noted the historic nature of these recordings, and their importance to the public. *See* SAppx54 ("Defendants provide recordings of iconic songs and entertainers in a platform that makes them accessible to the general public"); Panel Op. at 34.

Nevertheless, the Panel agreed with the district court that this definition excludes all audiovisual recordings, including recordings of live concerts, and that all of Defendants' audiovisual recordings were therefore not covered by any Section 115 license. *See* Panel Op. at 18.

## III. The Panel Opinion Creates Redundancy Disfavored In Statutory Interpretation

In affirming the district court on this issue, the Panel's reading focuses entirely on the statute's first sentence and renders the second sentence redundant. After all, "material objects in which sounds … are fixed" plainly includes the material objects in which sounds are first fixed. § 101.

It is well settled law that classic notions of statutory interpretation counsel against redundancy and statutory surplusage. *See, e.g., Comm. to Stop Airport Expansion v. F.A.A.*, 320 F.3d 285, 288 (2d Cir. 2003) ("We disfavor an interpretation of a statute that renders statutory language superfluous."); *Filler v. Hanvit Bank*, 378 F.3d 213, 220 (2d Cir. 2004) ("If we were to accept the Banks' argument, we would render the reference to political subdivisions in these provisions redundant, a result that is to be avoided in statutory construction.") Here, the *Filler* court cites in turn to *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 698, (1995) (applying canon of interpretation disfavoring readings of statutes that render statutory language surplusage).

Redundancy is thus heavily disfavored in interpreting statutory text. In contrast, it is a basic tenant of statutory interpretation to make "every word" mean something. *See also United States v. Nordic Vill. Inc.*, 503 U.S. 30, 36 (1992) ("[R]espondent's interpretation violates the settled rule that a statute must, if possible, be construed in such fashion that every word has some operative effect."); *BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 85, 127 S. Ct. 638, 640, 166 L. Ed. 2d 494 (2006) (Considering ""the canon against reading a statute in a way that makes part of it redundant.")

The Panel's interpretation admittedly deemed an entire sentence of this statute to be entirely meaningless and redundant. The Panel's Order acknowledged that its interpretation results in "some redundancy." Specifically, the Panel conceded:

> True, our reading results in some redundancy. That is, it is unclear what the second sentence of the definition adds given that the first sentence already covers all material objects on which the sounds are fixed– regardless of whether they are fixed first, second, or any time thereafter. Panel Op. at 17.

To justify the redundancy, the Panel Opinion relies only on *Rimini St., Inc. v. Oracle USA, Inc*., 139 S. Ct. 873, 881 (2019) in noting that redundancy is not always determinative, citing to that case with the quote, "[r]edundancy is not a silver bullet." *Id*. But in *Rimini*, the Supreme Court was addressing redundancies in the context of

11

the meaning of "full costs" available under the Copyright Act. The Court in *Rimini* noted that even if the defendant is correct that the term "full" with respect to costs under the Copyright Act has become unnecessary or redundant since the 1976 amendment, the "significance" of that "statutory surplusage or redundancy" was "overstate[d]" given that "some "redundancy is 'hardly unusual' in statutes addressing costs." *Id.* (citing *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385, (2013)). In that context, the court in *Rimini* explicitly noted: "[w]e have recognized that some "redundancy is 'hardly unusual' in statutes addressing costs." *Id.* at 881. Additionally and importantly, the *Rimini* court found that the opposing "interpretation would create its own redundancy problem ***by rendering the second sentence of § 505 largely redundant***." *Id.* (emphasis added).

The Supreme Court went on in *Rimini* to note that if "one possible interpretation of a statute would cause some redundancy and another interpretation would avoid redundancy, that difference in the two interpretations can supply a clue as to the better interpretation of a statute." *Id.* Thus, *Rimini* dealt with an entirely different statutory scheme, and should not be read as a shoulder-shrugging in favor of surplusage. In *Rimini*, both competing interpretations would have created redundancies—whereas here, Defendants' interpretation would not.

12

Furthermore, the Panel looked to other definitions of words in the Copyright Act—albeit not at issue in this case or within the compulsory licensing structure—to conclude there seemed to be redundancy there, too:

> The definition of "copies," which appears elsewhere in the Act, has the same structure, similar phrasing, and an analogous second sentence that is likewise redundant without changing the evident meaning of the first sentence.

Panel Op. at 17-18. Notably, "copies" happens to be a definition that explicitly *excludes* phonorecords under the Copyright Act, and thus the interpretation of phonorecords should bear no relevance to that term:

> "Copies--Are material objects, **other than phonorecords**, in which a work is fixed by any method now known or later developed, and from which a work can be perceived, reproduced or otherwise communicated, either directly or with the aid of a machine or device. The term "copies" includes the material object, **other than a phonorecord**, in which the work is first fixed."

Panel Op. at 18 (citing 17 U.S.C. § 101) (emphasis added). The Panel stated that the "second sentence, which appears in the definition of 'copies' as well as 'phonorecords,' does not alter our understanding of the first." *Id.*

This reasoning is flawed. The second sentence does not appear in both definitions in the Copyright Act, but is instead the inverse—as the definition of

"copies" explicitly excludes a phonorecord from the material object definition, and the phonorecords definition explicitly includes the material object from the definition:

| "Phonorecords" Under the Copyright Act | "Copies" Under the Copyright Act |
|---|---|
| The term "phonorecords" includes the material object in which the sounds are first fixed. | The term "copies" includes the material object, other than a phonorecord, in which the work is first fixed. |

Nevertheless, the Panel used the congruency in the sentence structure, despite the inverse meaning, to conclude that the redundancy should be disregarded:

Guided by the plain language of the exclusionary phrase, we conclude that audiovisual recordings are not covered by Section 115 compulsory licenses. Defendants therefore infringed each musical work included in an audiovisual recording.

Panel Op. at 15.

A rehearing or en banc panel should consider whether the redundancy is in fact necessary here, or whether it can be read in the manner Defendants are advocating, which leaves no redundancy.

14

**IV.   The Additional Concerns Raised by the Panel are Not Sufficiently Compelling to Abandon the Statute's Plain Language**

In affirming the district court's analysis,[4] the Panel noted that "Defendants' reading would also result in different licensing schemes applying to musical works used in motion pictures depending on whether the song was performed on stage (in front of the camera) or in a studio (to be dubbed)."  Panel Op. at 16.  With perhaps some degree of irony, the Panel added: "Copyright law is complicated, but it is not arbitrary."  *Id.*

However, the concern raised by the Panel of "different licensing schemes applying to musical works" depending on their contents and mode of creation is actually quite commonplace throughout copyright law.  For instance, there are different licensing schemes if the same work is streamed on a radio, or streamed on the Internet; there are different licensing schemes for a work that is performed "publicly" by being played outside a home, for instance at a bar or a hair salon, then there are if it is played at a home, no matter how many people are at either location.[5]

---

[4] As background: the district court relied on inapplicable authority to support its holding that Defendants' recordings are not phonorecords as a matter of law.  *See* SAppx27-28.  For instance, the district court relied heavily on the Second Circuit's decision in *ABKCO Music, Inc. v. Stellar Records, Inc.,* 96 F.3d 60, 65 (2d. Cir. 1996).  However, *Stellar Records* involved songs that had been linked to certain karaoke videos—a crucial detail that the district court failed to consider.  These videos, then, were *not* inherently linked at first fixation, and are therefore distinguishable from Defendants' live recordings at issue here.

[5] Relatedly, there is an entirely separate body of law—right of publicity—that would deal with promotion of the audio or audiovisual rights as it relates to celebrities.

*See, e.g., In re Pandora Media, Inc.*, 6 F. Supp. 3d 317, 320 (S.D.N.Y. 2014); *Joe Hand Promotions, Inc. v. Maupin*, 2016 WL 6459631, at *2 (E.D.N.Y. Oct. 31, 2016); *United States v. Am. Soc. of Composers, Authors, Publishers*, 627 F.3d 64, 69 (2d Cir. 2010).

Indeed, Defendants themselves have also obtained the requisite licenses for public performance, which grant the right to perform the work in, or transmit the work to, the public, by paying the required amounts to performing rights organizations ("PROs"), who in turn pay songwriters and publishers. Appx288; Appx316-378; Panel Op. at 8. Defendants have contracts with and makes payments to the three leading PROs: the American Society of Composers, Authors and Publishers ("ASCAP"); Broadcast Music, Inc. ("BMI"); and the Society of European Stage Authors and Composers ("SESAC"). *Id.* Prior to 2010, WV remitted royalties for all on-demand streaming under the licenses it had, and still has, with the three major PROs (ASCAP, BMI, and SESAC) in accordance with law and industry practice. *See* PB25.

Likewise, this hypothetical posed by the Panel's Order has a reasonable answer. If the musical performance uses a layover or musical background, this would create yet another example of synchronization, and thus would trigger

synchronization licensing and would not fall under the dilemma presented by this situation.[6]

But if the recording is capturing the sound recording first-hand, meaning it is being performed by the stage performers, there is nothing to "synchronize" through a synchronization license. That is, there is a meaningful difference between an intrinsically connected work where the sounds are first fixed, such as phonorecords here; and the works in which sounds and images are dubbed together or synchronized after-the-fact. In a situation where the sound was dubbed together in a studio, the promise of that work being shared and used artistically so that the original sound recording contained within it is also shared in context. Excluding certain original sound recording works from compulsory licensing altogether simply because they were fixed with accompanying video is neither supported by the plainest statutory interpretation nor the purposes behind the statute, and Defendants respectfully request a rehearing and en banc review to decide this issue.

---

[6] Although neither the district court nor the Panel reached the question of synchronization licensing. *See* Panel Op. at 11; SAppx28.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' petition for panel rehearing and rehearing en banc.

OCTOBER 20, 2022

*s/Michael S. Elkin*
Michael S. Elkin

**CERTIFICATE OF COMPLIANCE**
**WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS,**
**AND TYPE-STYLE REQUIREMENTS**

I hereby certify that

1.      This document complies with the type-volume limit of Fed. R. App. P. 35(b)(2) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 3,760 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

OCTOBER 20, 2022

*s/Michael S. Elkin*
Michael S. Elkin

**CERTIFICATE OF SERVICE**

I hereby certify that on October 20, 2022, an electronic copy of the foregoing brief was filed and served on counsel of record via this Court's CM/ECF system, which will send a notice of filing to all registered users.

*s/Michael S. Elkin*
Michael S. Elkin

# OPINION

20-3816
ABKCO Music, Inc. v. Sagan

1      UNITED STATES COURT OF APPEALS
2          FOR THE SECOND CIRCUIT
3      _____
4
5          August Term, 2021
6
7   (Argued: March 14, 2022          Decided:      October 6, 2022)
8
9      Docket Nos. 20-3816(L), 20-4020(CON), 20-4099(XAP)
10      _____
11
12   ABKCO MUSIC, INC., COLGEMS-EMI MUSIC INC., EMI ALGEE MUSIC CORP., EMI
13      APRIL MUSIC INC., EMI BLACKWOOD MUSIC INC., EMI CONSORTIUM MUSIC
14   PUBLISHING, INC., DBA EMI FULL KEEL MUSIC, EMI CONSORTIUM SONGS, INC.,
15   DBA EMI LONGITUDE MUSIC, EMI FEIST CATALOG INC., EMI ROBBINS CATALOG
16      INC., EMI UNART CATALOG, INC., JOBETE MUSIC CO., INC., SCREENGEMS-EMI
17   MUSIC INC., STONE AGATE MUSIC, STONE DIAMOND MUSIC CORP., IMAGEM MUSIC
18   LLC, PEER INTERNATIONAL CORP., PSO LTD., PEERMUSIC LTD., PEERMUSIC III, LTD.,
19   SONGS OF PEER, LTD., SPIRIT CATALOG HOLDINGS S.A.R.L, SPIRIT TWO MUSIC, INC.,
20      WARNER-TAMERLANE PUBLISHING CORP., WB MUSIC CORP.,

21                  Plaintiffs-Counter-Defendants-Appellees-Cross-
22                  Appellants,

23      v.

24
25      WILLIAM SAGAN, NORTON LLC, BILL GRAHAM ARCHIVES, LLC,
26   DBA WOLFGANG'S VAULT, DBA CONCERT VAULT, DBA MUSIC VAULT, DBA
27          DAYTROTTER,

28                  Defendants-Counterclaimants-Appellants-Cross-
29                  Appellees.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Oct 06 2022

CERTIFIED COPY ISSUED ON 10/06/2022

1
2    _____
3
4    Before: JACOBS, WESLEY, and MENASHI, <u>Circuit Judges</u>.
5
6         A collection of music publishers alleged infringement of their copyrights in

7    197 musical works when a series of live concert recordings was made available

8    by the defendants for download and streaming on their websites.  Plaintiffs

9    sought damages and a permanent injunction pursuant to the Copyright Act.  The

10   United States District Court for the Southern District of New York (Ramos, <u>J.</u>)

11   held on summary judgment that defendants had no valid licenses and therefore

12   infringed each of the musical works, and that the principal was personally liable.

13   The district court denied plaintiffs' request for a permanent injunction.  Two

14   years later, after a nine-day damages trial, the jury awarded plaintiffs a minimal

15   $189,500 in statutory damages.  The district court denied plaintiffs' motion for a

16   new trial but awarded them roughly $2.4 million in attorneys' fees.

17         Defendants appeal from the district court's summary judgment order and

18   the order granting fees and costs.  Plaintiffs cross-appeal from the district court's

19   denial of a permanent injunction, several evidentiary rulings, and the denial of a

20   new trial.

1    We AFFIRM in part, VACATE in part, and REVERSE in part, the grant of

2    summary judgment, and AFFIRM the denial of a permanent injunction; REJECT

3    the challenges to the evidentiary rulings; AFFIRM the denial of plaintiffs' motion

4    for a new trial; VACATE the award of attorneys' fees; and REMAND for further

5    proceedings consistent with this opinion.

6    _____

7                                    MICHAEL S. ELKIN (Erin R. Ranahan, on
8                                    the brief), Winston & Strawn LLP, New
9                                    York, NY, for Defendants-
10                                   Counterclaimants-Appellants-Cross-
11                                   Appellees.
12
13                                   BARRY I. SLOTNICK (Christian D.
14                                   Carbone, Tal E. Dickstein, Sarah Schacter,
15                                   and Priy Sinha, on the brief), Loeb & Loeb
16                                   LLP, New York, NY, for Plaintiffs-Counter-
17                                   Defendants-Appellees-Cross-Appellants.
18
19
20   DENNIS JACOBS, Circuit Judge:
21
22   In 2002, William Sagan acquired a trove of live concert recordings that

23   included performances by The Rolling Stones, The Who, the Grateful Dead, and

24   many others.  At the time, the sellers cautioned that Sagan "may be buying the

25   world['s] greatest private collection [of recordings] that no one will ever hear."

3

1    App'x at 453.  But in 2006, Sagan made those and other recordings available to

2    the world through digital download and streaming services offered for a fee

3    through various websites.  Sagan did this through his companies Norton LLC

4    and the Bill Graham Archives, LLC (together with Sagan, "defendants").

5           In 2015, a collection of music publishers (together, the "Publishers")

6    brought this suit under the Copyright Act, alleging that defendants infringed the

7    Publishers' copyrights in 197 musical works that were performed in the live

8    concert recordings.  The Publishers sought about $30 million in damages and a

9    permanent injunction.  On March 30, 2018, the United States District Court for

10   the Southern District of New York (Ramos, J.) held on summary judgment that

11   defendants had no valid licenses and therefore infringed each of the musical

12   works and that Sagan was personally liable.  The district court denied the

13   Publishers' request for a permanent injunction.  Two years later, after a nine-day

14   damages trial, the jury awarded the Publishers $189,500, which was near the

15   minimum statutory damages.  The Publishers argued that the minimal award

16   was a rushed and ill-considered result of the encroaching pandemic and moved

17   for a new trial.  The district court denied the motion but awarded them roughly

18   $2.4 million in attorneys' fees.

4

1    On appeal, defendants challenge the district court's summary judgment

2    rulings and the order granting fees and costs.  The Publishers cross-appeal the

3    district court's denial of a permanent injunction, several evidentiary rulings, and

4    its denial of the new trial.

5

6                          **BACKGROUND**

7                               **I**

8    Congress has created two types of copyrights in a musical recording.  One

9    is for the underlying "musical work," which encompasses the notes and lyrics of

10   a song.  See 17 U.S.C. § 102(a)(2).  The other is for the "sound recording," which

11   covers the rights to a recording of a particular performance by a particular artist.

12   See id. § 102(a)(7).  This case concerns the first type of copyright.  (The second

13   type was at issue in a prior litigation.)

14   A person seeking to make and distribute phonorecords–that is, material

15   objects in which sounds are fixed–of a previously published musical work can do

1  so by obtaining a compulsory license.  See id. § 115(a)(1).[1]  One need only

2  provide notice to the owner of the copyright in the musical work (*before*

3  distribution) and pay government-prescribed royalties.  See id. § 115(b), (c).

4  Alternatively, a prospective licensee can go directly to the copyright owner or its

5  agent and secure a "negotiated license."  Id. § 115(b)(2), (c)(3)(B).

6      If one seeks to duplicate and sell a sound recording that was "fixed by

7  another," id. § 115(a)(1), rather than make one's own sound recording, there are

8  two additional eligibility requirements for a compulsory license: (i) the sound

9  recording must have been "fixed lawfully," and (ii) the duplication must have

10  been authorized by the copyright owner of the sound recording or, "if the sound

11  recording was fixed before February 15, 1972," the sound must have been fixed

12  "pursuant to an express license from the owner of the copyright in the musical

13  work or pursuant to a valid compulsory license for use of such a work in a sound

14  recording."  Id.  We refer to these as Section 115's "substantive requirements."

---

[1] Section 115 of the Copyright Act was amended in 2018 under the Musical Works Modernization Act and governs conduct engaged in after October 11, 2018.  See Act of Oct. 11, 2018, Pub. L. 115-264, 132 Stat. 3676.  The conduct in this case occurred before that date, so all citations in this opinion to 17 U.S.C. § 115 are to the pre-2018 version of the statute.

1                                    **II**

2           William Sagan is the president, CEO, and sole shareholder of Norton LLC

3     ("Norton").  In 2002, Norton purchased the archives of the late concert promoter

4     Bill Graham by acquiring Bill Graham Archives, LLC ("Archives"), which

5     housed a collection of audio and audiovisual recordings.  The purchase

6     agreement that conveyed the Archives provided that Sagan was acquiring "all

7     Intellectual Property rights . . . to the extent that either Seller or any of its

8     Affiliates possesses such rights."  Supp. App'x at 1334.  A disclaimer recites that

9     the seller made "*no representations* regarding whether the Assets or their past or

10    future use or exploitation infringed or infringes on the Intellectual Property

11    rights of any person."  Id. at 1335 (emphasis added).  The seller also told Sagan

12    that he would need to get record company and artist approval to exploit the

13    recordings.

14          In the ensuing years, defendants continued to acquire recordings of live

15    concerts through other sources.  As with the initial purchase from the Archives,

16    these acquisitions came with limited assurances (or none) as to the nature of the

17    intellectual property rights being conveyed, especially as pertaining to artist

18    consent.  Defendants were undeterred.  Beginning in 2006, these recordings,

1    many of them deemed historic, were made available to the public for download

2    and on-demand streaming through defendants' websites.

3            About a year after the recordings launched on their websites, defendants

4    sought to obtain licenses to use the musical works by applying for a licensing

5    account with the Harry Fox Agency ("HFA") –a third-party licensing agent that

6    receives Section 115 notices and grants negotiated licenses on behalf of music

7    publishers.[2]  For the next three years, defendants worked directly with HFA,

8    obtaining licenses for the musical works, and paying the required royalties.  In

9    2010, defendants hired RightsFlow Inc. to secure the licenses and distribute

10   royalties on their behalf.  In 2013, defendants hired MediaNet, Inc. to assume

11   these duties.  RightsFlow and MediaNet would either obtain negotiated licenses

12   (directly from the music publisher or from HFA) or compulsory licenses (by

---

[2] Many music publishers employ HFA "as their agent to receive notice of the
intention to obtain a compulsory license, and to collect and distribute royalties.
Acting on behalf of their clients, HFA waives the statutory notice requirements,
negotiates royalty rates at or below the statutory level, and substitutes a
quarterly accounting and payment schedule for the monthly schedule prescribed
by Section 115."  Rodgers and Hammerstein Org. v. UMG Recordings, Inc., No.
00-cv-9322, 2001 WL 1135811, at *2 (S.D.N.Y. Sept. 26, 2001) (Martin, J.).

1    issuing a Section 115 notice).  At the same time, challenges arose and accrued, as

2    follows.

3         In 2006, soon after defendants made the recordings available on their

4    websites, several record labels and a group of musicians sued for infringement of

5    their copyrights in the sound recordings–copyrights separate from musical

6    works.  In 2009, after that case settled, defendants entered "Joint Exploitation

7    Agreements" with three major record labels–UMG Recordings Inc., Warner

8    Music, Inc., and Sony Music Entertainment–which generally authorized

9    defendants to exploit through sale and distribution certain sound recordings

10   featuring the record labels' artists, so long as separate licenses were obtained for

11   the musical works.  These claims are therefore not at issue in this suit.

12        In August 2013 (and again in August 2014), plaintiff ABKCO Music, Inc.

13   demanded that defendants cease and desist exploiting an audiovisual recording

14   of a 1981 Rolling Stones concert: "ABKCO has never issued synchronization

15   licenses for the Video" and without such a grant "ABKCO's copyrights in those

16   Compositions have been infringed and continue to be knowingly and willfully

17   infringed."  Supp. App'x at 1891 ¶ 64.  Around the same time, defendants

1    received several similar demands from songwriters and publishers of songs

2    performed in the audiovisual recordings featured on their websites.

3

4                                              **III**

5           On May 27, 2015, the Publishers filed this action alleging that defendants

6    infringed their copyrights in 197 musical works by making audio and

7    audiovisual recordings of those works available for download and streaming

8    from their websites without a license to do so.  In total, the Publishers claimed

9    that defendants had illegally exploited more than 1,175 recordings in audio or

10   audiovisual format.  The Publishers sought statutory damages of up to $150,000

11   for each work infringed and a permanent injunction against the infringing

12   conduct.  Defendants, in turn, sought a declaration that their use of the

13   recordings did not infringe the Publishers' rights and that they may exploit the

14   audiovisual works without obtaining synchronization licenses, which allows a

15   licensee "to synchronize music with visual images in a video, motion picture,

1   etc." <u>Bridgeport Music, Inc. v. Still N The Water Pub.</u>, 327 F.3d 472, 481 n.8 (6th

2   Cir. 2003).

3          In 2017, following discovery, the district court held on summary judgment

4   that defendants had no valid licenses authorizing the reproduction and

5   distribution of the musical works, had no implied license or estoppel defenses,

6   and had therefore infringed all 197 of the musical works.  <u>See</u> <u>ABKCO Music, Inc.</u>

7   <u>v. Sagan</u>, No. 15-cv-4025, 2018 WL 1746564, at *17-20 (S.D.N.Y. Apr. 9, 2018)

8   (Ramos, <u>J.</u>).  The district court further held that the infringement of 167 of the

9   works had been willful (there were disputed issues of fact as to the remaining 30

10  works) and that Sagan was personally liable for direct infringement.  <u>See</u> <u>id.</u> at

11  *21-22.  However, the district court denied a permanent injunction on the

12  grounds that cash could compensate for any future infringement and that the

13  public has an interest in access to this collection of "iconic" recordings.  <u>Id.</u> at *23.

14  (Whether defendants needed to obtain synchronization licenses to exploit the

15  audiovisual recordings was never decided because no party sought summary

16  judgment on that claim.)

17         The district court later denied defendants' motion for reconsideration,

18  which challenged "nearly every aspect of the [Summary Judgment] Opinion."

11

1     <u>ABKCO Music, Inc. v. Sagan</u>, No. 15-cv-4025, 2019 WL 1382074, at *1 (S.D.N.Y.

2     Mar. 26, 2019) (Ramos, <u>L</u>.).

3           Trial began on March 2, 2020.  At issue was (i) whether defendants

4     willfully infringed the 30 works for which disputed issues of fact precluded

5     summary judgment, and (ii) the damages for infringement of all 197 musical

6     works.  The Copyright Act allows the jury to award anywhere between $750 and

7     $150,000 if the infringement is "willful" and between $750 and $30,000 per work

8     if not willful.  17 U.S.C. § 504(c).  After nine days of trial, and less than an hour of

9     deliberations, the jury found that the infringement with respect to the 30 works

10     was non-willful and awarded the statutory minimum of $750 per work.  For the

11     remaining 167 works that the district court had found to be willfully infringed,

12     the jury awarded $1,000 per work.  In total, the jury awarded the Publishers

13     $189,500 of the $30 million that was sought in statutory damages.

14           The Publishers moved for attorneys' fees and costs under Section 505 of

15     the Copyright Act and separately moved for a new trial, arguing that the jury

16     was "unable to deliberate as the COVID-19 pandemic was worsening in New

17     York City."  <u>ABKCO Music, Inc. v. Sagan</u>, No. 15-cv-4025, 2021 WL 1101107, at *1

18     (S.D.N.Y. Marc. 23, 2021) (Ramos, <u>L</u>.).  On November 5, 2020, the district court

1    denied the motion for a new trial but awarded the Publishers approximately $2.4

2    million in attorneys' fees.

3

4                              **DISCUSSION**

5          On this cross-appeal, we consider: (I) defendants' challenge to the order

6    granting the Publishers' motion for summary judgment and the order denying

7    defendants' motion for reconsideration; (II) the Publishers' appeal of the denial

8    of a permanent injunction; (III) the Publishers' challenge to several evidentiary

9    rulings and to the denial of a new trial; and (IV) defendants' appeal of the grant

10   of attorneys' fees.

11

1           **I**

2           The summary judgment rulings contested by defendants on appeal are

3     that (A) defendants had no valid license authorizing the reproduction and

4     distribution of the musical works in either audio or audiovisual format,

5     (B) defendants had neither an implied license nor had they any basis for

6     estoppel, and (C) Sagan was liable for direct infringement.  We review these

7     rulings <u>de novo</u>.  <u>See</u> <u>Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith</u>, 11

8     F.4th 26, 36 (2d Cir. 2021), <u>cert. granted</u>, 142 S. Ct. 1412 (2022).

9

10          **A**

11          The ruling that defendants infringed the Publishers' copyrights in the

12    musical works was based on three holdings that overlap: (1)  Section 115

13    compulsory licenses do not cover the use of musical works in audiovisual

14    recordings; (2) defendants failed to satisfy Section 115's substantive requirements

15    for "duplicating a sound recording fixed by another"; and (3) any license that

16    defendants filed *after* distribution of the phonorecords is invalid as a matter of

17    law.  We address each holding in turn.

18

**1**

1                Of the 197 musical works, "at least" 146 were reproduced and distributed

2    in audiovisual recordings.  <u>ABKCO</u>, No. 15-cv-4025, 2018 WL 1746564, at *7.

3    Those actions, defendants argue, fall within the scope of Section 115 compulsory

4    licenses.

5                Section 115 allows one to "obtain a compulsory license to make and

6    distribute *phonorecords*" of a published musical work.  17 U.S.C. § 115(a)(1)

7    (emphasis added).  Whether Section 115 licenses cover exploitation of

8    audiovisual recordings thus hinges on whether those types of recordings fall

9    within the Copyright Act's definition of "phonorecords":

> [M]aterial objects in which sounds, ***other than those***
> ***accompanying a motion picture or other audiovisual***
> ***work***, are fixed . . ., and from which the sounds can be
> perceived, reproduced, or otherwise communicated,
> either directly or with the aid of a machine or device.  The
> term "phonorecords" includes the material object in
> which the sounds are first fixed.

<u>Id.</u> § 101 (emphasis added).  The district court held that this definition excludes

all audiovisual recordings, including recordings of live concerts, and that all of

defendants' audiovisual recordings were therefore not covered by any Section

115 license.  We agree.

15

1   In the first sentence of the phonorecords definition, the exclusionary

2 phrase (bolded above) most naturally applies to any recording that includes both

3 sounds *and* images.  Defendants contend that one can only "accompany"

4 something that is otherwise separate and would thus limit the meaning of the

5 exclusion to such things as a soundtrack, in which the sound is layered over a

6 motion picture, but not to a recording of a live performance, in which the sound

7 and image are fixed simultaneously.  But, given the common and natural

8 meaning of the word, sound can "accompany" an image simultaneously as well

9 as by later addition.  Had Congress intended to exclude from the phonorecords

10 definition only soundtracks and other layered sounds, "it would have artfully

11 worded the definition" to reflect that intent.[3] <u>Huddleston v. United States</u>, 415

12 U.S. 814, 822 (1974).

13   Defendants contend that their reading of the exclusion is confirmed in the

14 second sentence of the definition because, if "[t]he term 'phonorecords' includes

---

[3] Defendants' reading would also result in different licensing schemes applying to musical works used in motion pictures depending on whether the song was performed on stage (in front of the camera) or in a studio (to be dubbed). Copyright law is complicated, but it is not arbitrary.

1  the material object in which the sounds are first fixed," then an object is a

2  phonorecord *even if* images are "first fixed" with the sounds.  As the district court

3  correctly recognized, however, "the use of the definite article 'the' to reference

4  the concepts 'material objects' and 'sounds' can only be read to refer to these

5  terms as *previously* defined in the first sentence, that is to say, as expressly

6  excluding audiovisual works."  <u>ABKCO</u>, No. 15-cv-4025, 2018 WL 1746564, at

7  *11.  The second sentence cannot be read to describe a larger set of sounds than

8  the sentence preceding it does.

9        True, our reading results in some redundancy.  That is, it is unclear what

10  the second sentence of the definition adds given that the first sentence already

11  covers all material objects on which the sounds are fixed–regardless of whether

12  they are fixed first, second, or any time thereafter.  But "[r]edundancy is not a

13  silver bullet."  <u>Rimini Street, Inc. v. Oracle USA, Inc.</u>, 139 S. Ct. 873, 881 (2019).

14  The definition of "copies," which appears elsewhere in the Act, has the same

15  structure, similar phrasing, and an analogous second sentence that is likewise

17

1    redundant without changing the evident meaning of the first sentence.[4]  The

2    second sentence, which appears in the definition of "copies" as well as

3    "phonorecords," does not alter our understanding of the first.

4          Guided by the plain language of the exclusionary phrase, we conclude that

5    audiovisual recordings are not covered by Section 115 compulsory licenses.

6    Defendants therefore infringed each musical work included in an audiovisual

7    recording.

8

9                                          **2**

10         The 51 remaining musical works are in audio-only recordings.  The district

11   court concluded that defendants' exploitation of these recordings was unlicensed

---

[4] That definition reads as follows:

> "Copies" are material objects, other than phonorecords,
> in which a work is fixed by any method now known or
> later developed, and from which the work can be
> perceived, reproduced, or otherwise communicated,
> either directly or with the aid of a machine or device.  The
> term "copies" includes the material object, other than a
> phonorecord, in which the work is first fixed.

17 U.S.C. § 101.

1    because defendants failed to satisfy Section 115's substantive requirements,

2    which apply when a person seeks to "duplicat[e] a sound recording fixed by

3    another."  17 U.S.C. § 115(a)(1).  Those requisites (with qualification) are that

4    (i) the sound recording was "fixed lawfully" and that (ii) the making of the

5    phonorecords was authorized by the copyright holder in the sound recording.

6    See id.  On appeal, defendants argue that they were not subject to those

7    requirements because the sound recordings they sought to duplicate were fixed

8    by their predecessors and, thus, not "*by another*."[5]  We agree.  While the use of

9    the term "another" is imprecise, defendants' interpretation is supported by logic

10    and legislative history.

11        When defendants acquired the relevant recordings, they bought any rights

12    that the sellers held in those recordings.  The purchase agreement that conveyed

13    the Archives, for instance, provided that the seller was acquiring "all Intellectual

---

[5] While defendants raised this argument for the first time at the summary judgment hearing, we do not consider it waived because the district court chose to address it on reconsideration.  See United States v. Young, 998 F.3d 43, 52 n.2 (2d Cir. 2021) ("[W]e do not consider arguments waived when, although not raised below, they were nevertheless passed on by the district court." (internal quotation marks omitted)).

1   Property rights . . . to the extent that either Seller or any of its Affiliates possesses

2   such rights." Supp. App'x at 1334. It is undisputed that the seller would not be

3   subject to the substantive requirements of Section 115. To find that defendants

4   (as purchasers) would be saddled with these additional requirements would

5   impair the transferability of these sorts of works because every trade would

6   thereby impose new burdens and diminish value. Nothing in the text requires

7   that result.

8         Legislative history militates in the same direction. Under the Copyright

9   Act of 1909, once the copyright owner of a musical composition authorized the

10  work's mechanical reproduction, any other person could make "similar use" of

11  the work on payment to the copyright owner of a two-cent royalty "on each such

12  part manufactured." 17 U.S.C. § 1(e) (1909). The licensee was not expressly

13  required to make its own original sound recording of the musical work or to

14  obtain a license from the lawful owner of the duplicated sound recording.

15        The 1971 amendments to the Copyright Act for the first time granted

16  copyright protection in "sound recordings"–separate from the musical work–to

17  protect against a recording being duplicated without authorization, i.e., record

18  piracy. In the litigation that ensued, music publishers claimed that one who

1   duplicates a sound recording made by somebody else is ineligible for a

2   compulsory license.[6]  These suits made their way to various circuit courts, all of

3   which agreed that compulsory licenses for "similar use" do not allow a person to

4   participate in "piracy under the flag of compulsory licensing."  Duchess Music

5   Corp. v. Stern, 458 F.2d 1305, 1311 (9th Cir. 1972); see also Edward B. Marks

6   Music Corp. v. Colorado Magnetics, Inc., 497 F.2d 285 (10th Cir. 1974); Jondora

7   Music Pub. Co. v. Melody Recordings, Inc., 506 F.2d 392 (3d Cir. 1974); Fame

8   Pub. Co., Inc. v. Alabama Custom Tape, Inc., 507 F.2d 667 (5th Cir. 1975).

9         Later, the 1976 amendments made it possible for a person seeking to

10   duplicate a sound recording "to obtain a compulsory license for the use of

11   copyrighted music under section 115."  H.R. Rep. No. 94-1476, at 108.  But, to

12   prevent piracy, eligibility for a compulsory license was conditioned on "*the owner*

13   *of the sound recording* . . . authoriz[ing] its duplication."  Id. (emphasis added).

14   Since piracy concerns are not a consideration when (as here) the owner of the

---

[6] The Third Circuit theorized that "[o]ne reason for these recent cases may be the increased remedies provided to the composers by [the 1971 Amendment]." Jondora Music Pub. Co. v. Melody Recordings, Inc., 506 F.2d 392, 395 n.8 (3d Cir. 1974).

1    sound recording has transferred its rights to a successor, there is no reason to

2    assume the application of the substantive requirements.

3         We hold that defendants' recordings were not "fixed by another" for the

4    purposes of Section 115, and therefore vacate the district court's summary

5    judgment ruling to the extent it found defendants to have infringed any of the

6    musical works due to a failure to satisfy that section's substantive requirements.[7]

7                                         **3**

8         The final basis for the district court's infringement finding was defendants'

9    failure to provide timely notice before distributing a phonorecord *and* before

10   obtaining a voluntary HFA license.  The Publishers argue that defendants failed

11   to serve timely notice for at least one recording associated with each musical

---

[7] Both the parties and the district court assumed that if the recordings were "fixed by another," then defendants' recordings would not have been "lawfully fixed" without the artists' consent.  The basis for that assumption is questionable: the two statutes on which the district court relied–the federal and New York anti-bootlegging acts–were enacted many years after the recordings at issue were fixed.  See Pub. L. No. 103-465, 108 Stat. 4809 (1994) (codified at 17 U.S.C. § 1101); 1990 N.Y. Sess. Law Serv. 460 (McKinney).  Unless another law applied at the time the recordings were fixed, then it does not appear to have been unlawful for the concert promoters to record the concerts without the performing artists' consent.

1  work and that this failure provides an independent basis for affirming the grant

2  of summary judgment.  We disagree.

3       The district court found infringement due to untimely notice only as to the

4  musical works included in the recordings exploited in 2006 because defendants

5  had sent no notices at that time and did not begin obtaining HFA licenses until

6  the following year.  See ABKCO, No. 15-cv-4025, 2018 WL 1746564, at *16.  As to

7  all other recordings, however, the district court found that "there is a disputed

8  question of fact as to whether and which [notices] were actually submitted after

9  the first download or streaming of a phonorecord and in the absence of an HFA

10 license."  Id.  So far as we can tell, that disputed fact was not resolved.

11      We therefore remand to the district court for further factfinding on this

12 issue.  In so doing, we acknowledge that the factual dispute may be affected by a

13 threshold legal question that arises from Section 115's command that "failure to

14 serve or file the notice of intention . . . forecloses the possibility of a compulsory

15 license."  17 U.S.C. § 115(b)(2).  Specifically, the question is whether one is

16 permanently barred from obtaining a valid compulsory license for a musical

17 work that one had exploited before sending notice and in the absence of a

23

1     negotiated license.[8] Section 115(b)(4)(A) might alternatively be read to prevent

2     only retroactive issuance of a compulsory license that would otherwise absolve

3     the licensee from suffering the consequence of infringement; in that case, a

4     prospective license could still be acquired, so long as the compulsory licensing

5     requirements are fulfilled.  But this issue has not been briefed, so we merely raise

6     it for further consideration in the district court.

7                         *     *     *

8          To summarize, we agree with the district court's holding that the

9     audiovisual recordings do not fall within the scope of Section 115 compulsory

10     mechanical licenses, disagree with the district court's holding that defendants

11     infringed the remaining musical works by failing to comply with the substantive

12     requirements of Section 115, and reject the Publishers' argument that defendants'

13     failure to serve timely notice provides an independent basis for affirming each

---

[8] Defendants' inability to obtain a compulsory license would not affect any negotiated license they might secure.  See Rodgers & Hammerstein, 2001 WL 1135811, at *5 ("Nothing in Section 115 suggests that Congress intended to limit the ability of either copyright holders or prospective licensees to enter into private agreements that would contain different terms and conditions of the license.").

1 finding of infringement.  We therefore affirm in part and vacate in part the

2 district court's summary judgment order.

3      On remand, the district court should reevaluate its infringement findings

4 for all audio-only recordings.  We leave it to the district court to decide whether a

5 new jury trial is needed to resolve any factual disputes.

6

7 **B**

8      Defendants argue that even if they failed to obtain any compulsory or

9 negotiated licenses for the audiovisual recordings, the affirmative defenses of

10 implied license and equitable estoppel preclude findings of infringement.  We

11 disagree.

12

13 **1**

14      We have not yet ruled "on the precise circumstances under which an

15 implied non-exclusive license will be found."  <u>Psihoyos v. Pearson Educ., Inc.,</u>

16 855 F. Supp. 2d 103, 120 (S.D.N.Y. 2012) (Oetken, <u>J.</u>) (internal quotation marks

17 omitted).  Some courts use a narrow test, finding an implied license only where

18 one party "created a work at [the other's] request and handed it over, intending

25

1   that [the other] copy and distribute it."[9]  Effects Assocs., Inc. v. Cohen, 908 F.2d

2   555, 558 (9th Cir. 1990).  Others have applied a more permissive test by which

3   consent "may be inferred based on silence where the copyright holder knows of

4   the use and encourages it."  Field v. Google Inc., 412 F. Supp. 2d 1106, 1116 (D.

5   Nev. 2006).  We have no occasion to decide which test to adopt, since both

6   require a "meeting of the minds between the parties to permit the particular

7   usage at issue," Psihoyos, 855 F. Supp. 2d at 124 (internal quotation marks

8   omitted), and there has been none here.

9       Defendants argue that, since they made royalty payments, the Publishers

10  knew how the musical works were being used; and that acceptance of payment

---

[9] The district court cited SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharms., Inc., 211 F.3d 21 (2d Cir. 2000) for the proposition that we have "endorsed" the "narrow" test for finding an implied license.  ABKCO, No. 15-cv-4025, 2018 WL 1746564, at *18.  But SmithKline did not adopt this test; it merely explained that *other courts* have applied the narrow test for deciding whether an implied license existed.  211 F.3d at 25.

1  signified the consent required for a meeting of minds.  But this reasoning ignores

2  the mechanics of compulsory licensing.

3       The Publishers grant thousands of compulsory licenses annually.  Not by

4  choice; it is (as the name says) compulsory.  Payment notifies the Publishers that

5  a compulsory license has issued, but it does not communicate how the license

6  will be used.  The reasonable assumption is that use will be in accord with the

7  requirements of Section 115, which, at the least, means that the musical works

8  will not be used in any audiovisual recordings.  The same assumption applies to

9  any negotiated license in this case. The HFA licenses "state that Defendants seek

10  licenses for 'phonorecords' as 'authorized pursuant to 17 U.S.C. § 115," <u>ABKCO</u>,

11  No. 15-cv-4025, 2018 WL 1746564, at *20, which conveys the clear impression that

12  the musical works would be used in sound recordings only.

13       Defendants further argue that ABKCO's cease-and-desist letters show that

14  the Publishers knew that the musical works were being used in audiovisual

15  recordings.  But those letters show only that the Publishers knew about a single

16  Rolling Stones recording, not any of the rest (of which there were over a

17  thousand).  And, at the risk of being obvious, the demand that defendants *stop*

1    exploiting that single recording cannot be construed as a meeting of the minds

2    about anything.

3

4                                           **2**

5           Nor can defendants establish a defense by equitable estoppel.  That

6    affirmative defense "is properly invoked where the enforcement of rights of one

7    party would work an injustice upon the other party due to the latter's justifiable

8    reliance upon the former's words or conduct."  <u>Veltri v. Building Serv. 32B-J</u>

9    <u>Pension Fund</u>, 393 F.3d 318, 326 (2d Cir. 2004) (internal quotation marks

10   omitted).  To prevail on an estoppel defense in the copyright context, a defendant

11   must show that:

12          (1) plaintiff had knowledge of the defendant's infringing
13          conduct; (2) plaintiff either (a) intended that defendant
14          rely on plaintiff's acts or omissions suggesting
15          authorization, or (b) acted or failed to act in such a
16          manner that defendant had a right to believe it was
17          intended to rely on plaintiff's conduct; (3) defendant was
18          ignorant of the true facts; and (4) defendant relied on
19          plaintiff's conduct to its detriment.
20
21   <u>SimplexGrinnell LP v. Integrated Sys. & Power, Inc.</u>, 642 F. Supp. 2d 167, 194

22   (S.D.N.Y. 2009) (Lynch, <u>J.</u>) (citation omitted) (alterations adopted).

1    But as the district court concluded, there is no showing that the Publishers

2    knew about the infringing conduct.  See ABKCO, No. 15-cv-4025, 2018 WL

3    1746564, at *20.  True, ABKCO knew that defendants were exploiting a recording

4    of The Rolling Stones, which is why ABKCO demanded that defendants stop

5    exploiting it.  But, even as to that single recording, defendants are unable to

6    show that the cease-and-desist letters "suggest authorization" or anything of the

7    sort.

8

9                                    C

10   Defendants next challenge the district court's holding that Sagan was liable

11   for direct infringement.  Direct liability requires "volitional conduct" that

12   "causes" the copying or distribution.  Zappa v. Rykodisc, Inc., 819 F. Supp. 2d

13   307, 315 (S.D.N.Y. 2011) (Pauley, J.) (citation omitted).  That is, direct liability

14   attaches only to "the person who actually presses the button."  Cartoon Network

15   LP v. CSC Holdings, Inc., 536 F.3d 121, 131 (2d Cir. 2008).  In UMG Recording,

16   Inc. v. Escape Media Group, for example, two executives were directly liable

17   because they "personally uploaded copyrighted sound recordings to [their

1    website].” No. 11-cv-8407, 2014 WL 5089743, at *26 (S.D.N.Y. Sept. 29, 2014)

2    (Griesa, <u>J</u>.).

3          Even if a copyright is not infringed by a corporate officer’s own hand, a

4    corporate officer with an obvious and direct financial interest, and a power of

5    supervision to effect an infringement, may be vicariously liable.  <u>See</u> <u>EMI</u>

6    <u>Christian Music Grp. v. MP3tunes, LLC</u>, 844 F.3d 79, 99 (2d Cir. 2016).  But the

7    Publishers pled only direct liability.  The district court recognized as much and

8    acknowledged that summary judgment would have to be premised “on that

9    basis alone.”  <u>ABKCO</u>, No. 15-cv-4025, 2018 WL 1746564, at *22 n.33.

10         However, the district court went on to recite the standard for vicarious

11    liability instead, and to apply that standard to conduct that (with one arguable

12    exception) could not give rise to direct liability.  <u>See</u> <u>id.</u> at *22.  As to the

13    exception: Sagan’s Chief Technology Officer stated in his deposition that “it was

14    Sagan who instructed him as to ‘which concerts to make available for download

15    or not,’ . . . and made plans ‘to start digitizing tape recordings with an eye

16    towards making them available on a public website.’”  <u>Id.</u> (citations omitted).

17    But that passage involves only instructions and plans; there is no evidence that

1    Sagan is the one who "actually presse[d] the button." <u>Cartoon Network</u>, 536 F.3d

2    at 131.

3        We therefore reverse the district court's order granting judgment against

4    Sagan.

5

6

1                                              **II**

2         The Publishers challenge the district court's refusal to issue a permanent

3    injunction.[10]  We review this decision for abuse of discretion.  See 16 Casa Duse,

4                         LLC v. Merkin, 791 F.3d 247, 254 (2d Cir. 2015).

5         Under the Copyright Act, a court may "grant temporary and final

6    injunctions on such terms as it may deem reasonable to prevent or restrain

7    infringement of a copyright."  17 U.S.C. § 502(a).  The test for determining when

8    to grant such equitable relief requires the plaintiff to demonstrate: "(1) that it has

9    suffered an irreparable injury; (2) that remedies available at law, such as

10   monetary damages, are inadequate to compensate for that injury; (3) that,

11   considering the balance of hardships between the plaintiff and defendant, a

12   remedy in equity is warranted; and (4) that the public interest would not be

13   disserved by a permanent injunction."  eBay Inc. v. MercExchange, L.L.C., 547

14   U.S. 388, 391 (2006).

---

[10] Because we have vacated the district court's order with regards to infringement
on the audio-only recordings, the permanent injunction issue is relevant only
with respect to the audiovisual recordings.

1        The district court found that the first two factors weigh against an

2    injunction since the Publishers can be made whole with cash.  We agree.  The

3    Publishers argue that their damages are impossible to quantify because

4    defendants' infringing conduct "threatens [their] relationships with . . . existing

5    licensees, and undermines their negotiating leverage with prospective licensees."

6    Plaintiffs-Appellees Br. at 69-70.  But they provide no factual (or theoretical)

7    support that would allow us to credit that claim.  True, "[h]arm can be

8    irreparable" where, "absent an injunction, the defendant is likely to continue

9    infringing the copyright."  Broad. Music, Inc. v. Pamdh Enters., Inc., No. 13-cv-

10   2255, 2014 WL 2781846, at *4 (S.D.N.Y. June 19, 2014) (Wood, J.).  But that factor

11   is not decisive when (as here) the record gives no indication that defendants will

12   continue their infringing conduct.

13       The third factor tilts in the same direction.  Defendants invested tens of

14   millions of dollars to acquire a library of live concert recordings and have

15   devoted two decades to building a business around those recordings.  The

16   Publishers claim an offsetting hardship if they had "to commence litigation for

17   each future violation," whereas it would be no cognizable hardship if defendants

18   were compelled "to comply with their legal duties."  Broad. Music, Inc. v. Prana

33

1    Hosp., Inc., 158 F. Supp. 3d 184, 196 (S.D.N.Y. 2016) (Engelmayer, J.).  But the

2    Publishers have the resources to commence future litigation if needed, and if

3    they do so successfully, they might collect fees and costs under Section 505 of the

4    Copyright Act.

5          The final factor also favors defendants because the public has an interest in

6    accessing "iconic" recordings of historical importance.  ABKCO, No. 15-cv-4025,

7    2018 WL 1746564, at *23.  The Publishers rely on a case in which we explained

8    that the public has an interest in "protecting copyright owners' marketable rights

9    to their work and the economic incentive to continue creating."  WPIX, Inc. v. ivi,

10   Inc., 691 F.3d 275, 287 (2d Cir. 2012).  But WPIX affirmed an injunction against

11   "streaming [the] plaintiffs' copyrighted television programming over the internet

12   live and without their consent."  Id. at 277.  We concluded that a preliminary

13   injunction would not disserve the public interest because "[p]laintiffs' desire to

14   create original television programming surely would be dampened if their

15   creative works could be copied and streamed over the Internet," and because

16   "the public will still be able to access plaintiffs' programs through means other

17   than [the defendant's] Internet service."  Id. at 288.

1      This case is distinguishable in every way that matters.  The concert

2      recordings at issue were made primarily from the 1960s to the early 2000s; so no

3      ongoing stream of new content is at stake.  Even if it were, the Publishers fail to

4      explain how the denial of a permanent injunction would curb creativity.  See

5      Salinger v. Colting, 607 F.3d 68, 82 (2d Cir. 2010) ("The object of copyright law is

6      to promote the store of knowledge available to the public.").  Surely it would

7      have no impact on concert performances themselves, or the desire to preserve

8      them.

9

10                                          **III**

11     After a nine-day damages trial, the jury awarded the Publishers the near

12     minimum of their statutory entitlement–about $30 million less than what they

13     had sought.  The Publishers now want a retrial on the ground that the district

14     court abused its discretion with respect to a series of evidentiary rulings, and in

15     its denial of the Publishers' motion for a new trial.  We address these arguments

16     in turn.

17

1                                        **A**

2          Three evidentiary rulings are contested.

3          First: The district court admitted into evidence payments that defendants

4   made to non-parties and for works on which the Publishers did not sue.  The

5   district court concluded that the payments were relevant to the "conduct and

6   attitude of the parties" and the "willfulness" or state of mind of defendants, and

7   it issued a limiting instruction to that effect.  App'x at 757.  On appeal, the

8   Publishers contend that this evidence was irrelevant and that any probative

9   value was outweighed by the danger of misleading the jury as to the sum

10  defendants paid for the musical works at issue.  But the Publishers waived this

11  argument when their counsel stated that he was "fine" with such evidence being

12  admitted so long as a limiting instruction was given, as it was.  Id. at 766.[11]

---

[11] The Publishers also argue that defendants' list of checks–a list created
specifically for the litigation–should have been excluded "under the Best
Evidence Rule," and because "there was a dispute as to which checks had
actually been cashed."  Plaintiffs-Appellees' Reply Br. at 7.  The Publishers first
raised this argument on appeal in their reply brief, and thereby waived it.  See JP
Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V., 412 F.3d 418, 428
(2d Cir. 2005) ("[A]rguments not made in an appellant's opening brief are
waived even if the appellant pursued those arguments in the district court or
raised them in a reply brief.").

1   Second: The district court admitted into evidence the Joint Exploitation

2 Agreements that defendants entered with Sony, Warner, and UMG.  The

3 Publishers' motion <u>in limine</u> to exclude the agreements from evidence was

4 denied "subject to reopening as events unfold during the course of the trial."  <u>Id.</u>

5 at 755.  On appeal, the Publishers argue that the district court abused its

6 discretion because admitting these agreements conflicted with several of its other

7 rulings.

8   This argument too was not preserved.  An evidentiary issue is preserved <u>in</u>

9 <u>limine</u> only if it was (among other things) "ruled upon by the court without

10 equivocation."  <u>United States v. McDermott</u>, 245 F.3d 133, 140 n.3 (2d Cir. 2001).

11 The <u>in limine</u> ruling left the door ajar for objections at trial, and the Publishers

12 did not object when these agreements were introduced at trial.  The Publishers

13 thus waived the argument they now advance on appeal.  <u>See</u> <u>Barlow v. Liberty</u>

14 <u>Maritime Corp.</u>, 746 F.3d 518, 529 (2d Cir. 2014) ("[Plaintiff] raised this objection

15 <u>in limine</u>, but failed to raise it at trial, and specifically withdrew his objection in

16 his post-trail briefing.  We therefore need not consider it.").

17   Third: The Publishers sought to question Sagan about a June 2015 article

18 published by defendants' licensing agent, MediaNet, which stated that, to exploit

1   music in audiovisual format, "[s]ynchronization licenses for the musical

2   composition in each track used must also be obtained from the appropriate

3   music publisher(s)." Supp. App'x at 2107. The district court precluded this

4   hearsay statement after concluding that it was not made within "the scope of

5   [MediaNet's] agency with respect to defendants." Id. at 661.

6       The Publishers contest this ruling by pointing to the testimony of Sagan's

7   Chief Technology Officer that MediaNet provided "[a]dvice with respect to what

8   licenses were required." Id. at 657. But this testimony was vague and did not

9   necessarily relate to synchronization licenses. Moreover, the full record shows

10  that MediaNet's agency role was largely limited to calculating what defendants

11  owed and making the requisite royalty payments. The district court did not

12  abuse its discretion in excluding this evidence.

13

14                                  **B**

15      A motion for a new trial may be granted "for any reason for which a new

16  trial has heretofore been granted in an action at law in federal court." Fed. R.

17  Civ. P. 59(a)(1)(A). Such a motion ordinarily should be denied "unless the trial

18  court is convinced that the jury has reached a seriously erroneous result or that

1    the verdict is a miscarriage of justice." <u>Atkins v. New York City</u>, 143 F.3d 100,

2    102 (2d Cir. 1998) (citation omitted).  The Publishers contend a new trial should

3    have been granted because the pandemic resulted in a rushed and ill-considered

4    jury verdict.  We disagree.

5          When trial began on March 2, 2020, news of the pandemic was spreading.

6    On March 10, the district court told counsel that "we may be surrounded by the

7    National Guard tomorrow morning,  . . . .  I want to get this done as soon as

8    possible, okay?"  App'x at 1889.  The next day, the district court told counsel that

9    "[t]he world is falling apart around us, and I would like to get this done . . . it

10   would be very, very helpful to get this done as soon as possible."  Supp. App'x at

11   791.

12         On March 12, 2020, New York's mayor declared a state of emergency.

13   That same day, Juror Five asked to speak in open court.  The juror stated that the

14   jury intended to do their job and "do[] it fairly," but that:

15                 We have been coming here for two weeks, all of us in this
16                 room.  We have been exposing ourselves.  Whether we
17                 know it or not, it's happening.  And, quite frankly, this
18                 matter doesn't seem all that important compared to lives
19                 at stake, such as my mom who has lupus.  She has a very
20                 compromised immune system. . . .  We are here to decide
21                 damages and money.  And, quite frankly, money, to me,

1                        is not worth the life of my mother or any of the lives of

2                        the jurors in there who also there are several who are

3                        older, and that's my concern.

4

5  App'x at 797-98.  The district court ruled <u>sua sponte</u> that the juror's comments

6  did not warrant his exclusion.  Neither party objected.

7        Prior to deliberation later that day, the district court assured the jury:

8  "Now that the case is in your hands, you can stay as long as you wish.  I'm

9  happy to stay with the usual schedule of 9:30 to 2:30, but if you wish to stay

10  longer, I'll leave that entirely up to you."  <u>Id.</u> at 935.  The jury reached a verdict in

11  less than an hour and without reviewing any trial exhibits.  It awarded the

12  Publishers $189,500 in statutory damages, and made findings as to willful

13  infringement with respect to 30 recordings.

14        The Publishers' motion for a new damages trial argued that "the trial was

15  fundamentally unfair because the jury was allegedly unable to deliberate as the

16  COVID-19 pandemic was worsening in New York City."  <u>ABKCO Music, Inc. v.</u>

17  <u>Sagan</u>, 500 F. Supp. 3d 199, 205 (S.D.N.Y. 2020) (Ramos, <u>J.</u>), <u>judgment entered</u>,

1    No. 15-cv-4025, 2021 WL 761852 (S.D.N.Y. Feb. 26, 2021).  The Publishers claim

2    an abuse of discretion for three reasons.

3          First: A new trial was ordered in the supposedly analogous case of Lucas

4    v. American Manufacturing Co., 630 F.2d 291 (5th Cir. 1980), in which the jury

5    returned a verdict within 45 minutes after three days of trial, and shortly before a

6    hurricane made landfall near the courthouse.  Id. at 293.  But Lucas was

7    materially different.  There, the judge asked the jurors to render a verdict in

8    fifteen minutes, see id., whereas the judge in this case told the jury that it could

9    "stay as long as [it] wish[ed]."  Supp. App'x at 935.  And while Lucas held that

10   there had been no evidentiary basis for the jury's award, which was less than half

11   the amount to which the defendant stipulated prior to trial, 630 F.2d at 293, the

12   jury in this case awarded damages within the permissible statutory range.

13         Second: The Publishers cite Juror Five's concerns.  But those concerns

14   revealed only an uneasiness to proceed in the face of the pandemic, not an

15   unwillingness to engage in fair and thorough deliberations.  Juror Five made this

16   plain: "I'm not trying to get a hung jury.  I want to do my job.  I want to do my

17   duty.  So does everyone in this room, and we plan on doing it fairly."  ABKCO,

18   500 F. Supp. 3d at 208.

41

1       Third: The Publishers argue that the effect of the pandemic on the trial is

2   evidenced by the low damages award relative to the Publishers' expectations.  As

3   the district court explained, however, the Publishers failed to "persuasively draw

4   any connection between the potential impact of the COVID-19 pandemic and the

5   specific damages awarded," or explain why it would have been easier for a

6   rushed jury to award damages on the lower side of the scale, as opposed to in the

7   middle or on the higher end.  Id. at 210.

8

9                                              **IV**

10      The district court awarded the Publishers roughly $2.4 million in

11  attorneys' fees primarily on the ground that defendants acted unreasonably

12  when they claimed (without evidence) that artists had consented to the recording

13  and exploitation of their concert performances and, relatedly, because

14  defendants' infringement was willful as to a large portion of the recordings.  See

15  ABKCO, 500 F. Supp. at 213-15.  The premise of that award is that (according to

16  the parties and the district court) the substantive requirements of Section 115

17  incorporate the requirement for performer consent.  The award therefore

1    conflicts (at least in part) with our holding that defendants were not subject to

2    Section 115's substantive requirements.

3           We therefore vacate the district court's grant of attorneys' fees and remand

4    for reconsideration in light of this opinion.

5

6                                      **CONCLUSION**

7           To summarize:

8           (1) We AFFIRM the rulings in the summary judgment order to the
9                extent they: (a) held that defendants failed to obtain a license for
10               any of the audiovisual recordings, and therefore infringed the
11               audiovisual works; (b) concluded that defendants had no valid
12               affirmative defense; and (c) declined the Publishers' request for a
13               permanent injunction.
14
15          (2) We VACATE the ruling in the summary judgment order that
16               defendants infringed the musical works used in the audio-only
17               recordings by failing to comply with Section 115's substantive
18               requirements.
19
20          (3) We REVERSE the ruling on summary judgment that Sagan was
21               liable for direct infringement.
22
23          (4) We REJECT the challenges to evidentiary rulings.
24
25          (5) We AFFIRM the order denying the motion for a new trial.
26
27          (6) We VACATE the award of attorneys' fees.
28

1                   (7) We REMAND the case for further proceedings consistent with

2                        this opinion.

A True Copy

Catherine O'Hagan Wolfe, Clerk

United States Court of Appeals, Second Circuit

44